# DEPARTMENT OF THE TREASURY

## Internal Revenue Service

### 26 CFR Part 54

### [TD–9840]

### RIN 1545–BN92

# DEPARTMENT OF LABOR

## Employee Benefits Security Administration

### 29 CFR Part 2590

### RIN 1210–AB83

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

### 45 CFR Part 147

### [CMS–9940–F2]

### RIN 0938–AT54

## Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** These rules finalize, with changes based on public comments, interim final rules concerning religious exemptions and accommodations regarding coverage of certain preventive services issued in the **Federal Register** on October 13, 2017. These rules expand exemptions to protect religious beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act. These rules do not alter the discretion of the Health Resources and Services Administration, a component of the U.S. Department of Health and Human Services, to maintain the guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules also leave in place an ''accommodation'' process as an optional process for certain exempt entities that wish to use it voluntarily. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy.

**DATES:** *Effective date:* These regulations are effective on January 14, 2019.

**FOR FURTHER INFORMATION CONTACT:** Jeff Wu, at (301) 492–4305 or *marketreform@cms.hhs.gov* for the Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS); Amber Rivers or Matthew Litton, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; William Fischer, Internal Revenue Service, Department of the Treasury, at (202) 317–5500.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline, 1–866–444–EBSA (3272) or visit the Department of Labor's website (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's website (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary and Background
  A. Executive Summary
  1. Purpose
  2. Summary of the Major Provisions
  a. Expanded Religious Exemptions to the Contraceptive Coverage Requirement
  b. Optional Accommodation
  3. Summary of Costs, Savings and Benefits of the Major Provisions
  B. Background
II. Overview, Analysis, and Response to Public Comments
  A. The Departments' Authority To Mandate Coverage and Provide Religious Exemptions
  B. Availability and Scope of Religious Exemptions
  C. The First Amendment and the Religious Freedom Restoration Act
  1. Discretion To Provide Religious Exemptions
  2. Requiring Entities To Choose Between Compliance With the Contraceptive Mandate or the Accommodation Violated RFRA in Many Instances
  a. Substantial Burden
  b. Compelling Interest
  c. Burdens on Third Parties
  d. Interim Final Rulemaking
  E. Health Effects of Contraception and Pregnancy
  G. Health and Equality Effects of Contraceptive Coverage Mandates
III. Description of the Text of the Regulations and Response to Additional Public Comments
  A. Restatement of Statutory Requirements of PHS Act Section 2713(a) and (a)(4) (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv))
  B. Prefatory Language of Religious Exemptions (45 CFR 147.132(a)(1))
  C. Scope of Religious Exemptions and Requirements for Exempt Entities (45 CFR 147.132)
  D. Plan Sponsors in General (45 CFR 147.132(a)(1)(i) prefatory text)
  E. Houses of Worship and Integrated Auxiliaries (45 CFR 147.132(a)(1)(i)(A))
  F. Nonprofit Organizations (45 CFR 147.132(a)(1)(i)(B))
  G. Closely Held For-Profit Entities (45 CFR 147.132(a)(1)(i)(C))
  H. For-Profit Entities That Are Not Closely Held (45 CFR 147.132(a)(1)(i)(D))
  I. Other Non-Governmental Employers (45 CFR 147.132(a)(1)(i)(E))
  J. Plans Established or Maintained by Objecting Nonprofit Entities (45 CFR 147.132(a)(1)(ii))
  K. Institutions of Higher Education (45 CFR 147.132(a)(1)(iii))
  L. Health Insurance Issuers (45 CFR 147.132(a)(1)(iv))
  M. Description of the Religious Objection (45 CFR 147.132(a)(2))
  N. Individuals (45 CFR 147.132(b))
  O. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)
  P. Definition of Contraceptives for the Purpose of These Final Rules
  Q. Severability
  R. Other Public Comments
  1. Items Approved as Contraceptives But Used To Treat Existing Conditions
  2. Comments Concerning Regulatory Impact
  3. Interaction With State Laws
IV. Economic Impact and Paperwork Burden
  A. Executive Orders 12866 and 13563—Department of HHS and Department of Labor
  1. Need for Regulatory Action
  2. Anticipated Effects
  a. Removal of Burdens on Religious Exercise
  b. Notices When Revoking Accommodated Status
  c. Impacts on Third Party Administrators and Issuers
  d. Impacts on Persons Covered by Newly Exempt Plans
  i. Unknown Factors Concerning Impact on Persons in Newly Exempt Plans
  ii. Public Comments Concerning Estimates in Religious IFC
  iii. Possible Sources of Information for Estimating Impact
  iv. Estimates Based on Litigating Entities That May Use Expanded Exemptions
  v. Estimates of Accommodated Entities That May Use Expanded Exemptions
  vi. Combined Estimates of Litigating and Accommodated Entities
  vii. Alternate Estimates Based on Consideration of Pre-ACA Plans
  viii. Final Estimates of Persons Affected by Expanded Exemptions
  B. Special Analyses—Department of the Treasury
  C. Regulatory Flexibility Act
  D. Paperwork Reduction Act—Department of Health and Human Services
  1. Wage Data
  2. ICRs Regarding Self-Certification or Notices to HHS (§ 147.131(c)(3))

3. ICRs Regarding Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(e))
4. ICRs Regarding Notice of Revocation of Accommodation (§ 147.131(c)(4))
5. Submission of PRA-Related Comments
E. Paperwork Reduction Act—Department of Labor
F. Regulatory Reform Executive Orders 13765, 13771 and 13777
G. Unfunded Mandates Reform Act
H. Federalism
V. Statutory Authority

# I. Executive Summary and Background

## A. Executive Summary

### 1. Purpose

The primary purpose of this rule is to finalize, with changes in response to public comments, the interim final regulations with requests for comments (IFCs) published in the **Federal Register** on October 13, 2017 (82 FR 47792), "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" (the Religious IFC). The rules are necessary to expand the protections for the sincerely held religious objections of certain entities and individuals. The rules, thus, minimize the burdens imposed on their exercise of religious beliefs, with regard to the discretionary requirement that health plans cover certain contraceptive services with no cost-sharing, a requirement that was created by HHS through guidance promulgated by the Health Resources and Services Administration (HRSA) (hereinafter "Guidelines"), pursuant to authority granted by the ACA in section 2713(a)(4) of the Public Health Service Act. In addition, the rules maintain a previously created accommodation process that permits entities with certain religious objections voluntarily to continue to object while the persons covered in their plans receive contraceptive coverage or payments arranged by their health insurance issuers or third party administrators. The rules do not remove the contraceptive coverage requirement generally from HRSA's Guidelines. The changes being finalized to these rules will ensure that proper respect is afforded to sincerely held religious objections in rules governing this area of health insurance and coverage, with minimal impact on HRSA's decision to otherwise require contraceptive coverage.

### 2. Summary of the Major Provisions

#### a. Expanded Religious Exemptions to the Contraceptive Coverage Requirement

These rules finalize exemptions provided in the Religious IFC for the group health plans and health insurance coverage of various entities and individuals with sincerely held religious beliefs opposed to coverage of some or all contraceptive or sterilization methods encompassed by HRSA's Guidelines. The rules finalize exemptions to the same types of organizatons and individuals for which exemptions were provided in the Religious IFC: Non-governmental plan sponsors including a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order; a nonprofit organization; for-profit entities; an institution of higher education in arranging student health insurance coverage; and, in certain circumstances, issuers and individuals. The rules also finalize the regulatory restatement in the Religious IFC of language from section 2713(a) and (a)(4) of the Public Health Service Act.

In response to public comments, various changes are made to clarify the intended scope of the language in the Religious IFC. The prefatory language to the exemptions is clarified to ensure exemptions apply to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections. The Departments add language to clarify that, where an exemption encompasses a plan or coverage established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other non-governmental organization or association, the exemption applies to each employer, organization, or plan sponsor that adopts the plan. Language is also added to clarify that the exemptions apply to non-governmental entities, including as the exemptions apply to institutions of higher education. The Departments revise the exemption applicable to health insurance issuers to make clear that the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement. The Departments also restructure the

provision describing the religious objection for entities. That provision specifies that the entity objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for either: coverage or payments for some or all contraceptive services; or, a plan, issuer, or third party administrator that provides or arranges such coverage or payments.

The Departments also clarify language in the exemption applicable to plans of objecting individuals. The final rule specifies that the individual exemption ensures that the HRSA Guidelines do not prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs. The exemption adds that, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

#### b. Optional Accommodation

These rules also finalize provisions from the Religious IFC that maintain the accommodation process as an optional process for entities that qualify for the exemption. Under that process, entities can choose to use the accommodation process so that contraceptive coverage to which they object is omitted from their plan, but their issuer or third party administrator, as applicable, will arrange for the persons covered by their plan to receive contraceptive coverage or payments.

In response to public comments, these final rules make technical changes to the accommodation regulations maintained in parallel by HHS, the Department of Labor, and the Department of the Treasury. The Departments modify the regulations governing when an entity, that was using or will use the accommodation, can revoke the accommodation and operate under the exemption. The modifications set forth a transitional

rule as to when entities currently using the accommodation may revoke it and use the exemption by giving 60-days notice pursuant to Public Health Service Act section 2715(d)(4) and 45 CFR 147.200(b), 26 CFR 54.9815–2715(b), and 29 CFR 2590.715–2715(b). The modifications also express a general rule that, in plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an organization eligible for the accommodation may revoke its use of the accommodation process effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

The Departments also modify the Religious IFC by adding a provision that existed in rules prior to the Religious IFC, namely, that if an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable contraceptive coverage requirement from HRSA's Guidelines if the issuer complies with the obligations under this section applicable to such issuer. Likewise, the rule adds pre-existing "reliance" language deeming an issuer serving an accommodated organization compliant with the contraceptive coverage requirement if the issuer relies reasonably and in good faith on a representation by an organization as to its eligibility for the accommodation and the issuer otherwise complies with the accommodation regulation, and likewise deeming a group health plan compliant with the contraceptive coverage requirement if it complies with the accommodation regulation.

3. Summary of Costs, Savings and Benefits of the Major Provisions

| Provision | Savings and benefits | Costs |
|---|---|---|
| Restatement of statutory language from section 2713(a) and (a)(4) of the Public Health Service Act. | The purpose of this provision is to ensure that the regulatory language that restates section 2713(a) and (a)(4) of the Public Health Service Act mirrors the language of the statute. We estimate no economic savings or benefit from finalizing this part of the rule, but consider it a deregulatory action to minimize the regulatory impact beyond the scope set forth in the statute. | We estimate no costs from finalizing this part of the rule. |
| Expanded religious exemptions. | Expanding religious exemptions to the contraceptive coverage requirement will relieve burdens that some entities and individuals experience from being forced to choose between, on the one hand, complying with their religious beliefs and facing penalties from failing to comply with the contraceptive coverage requirement, and on the other hand, providing (or, for individuals, obtaining) contraceptive coverage or using the accommodation in violation of their sincerely held religious beliefs. | We estimate there will be transfer costs where women previously receiving contraceptive coverage from employers will no longer receive that coverage where the employers use the expanded exemptions. Even after the public comment period, we have very limited data on what the scale of those transfer costs will be. We estimate that in no event will they be more than $68.9 million.<br>We estimate that, where entities using the accommodation revoke it to use the exemption, the cost to industry of sending notices of revocation to their policy holders will be $112,163. |
| Optional accommodation regulations. | Maintaining the accommodation as an optional process will ensure that contraceptive coverage is made available to many women covered by plans of employers that object to contraceptive coverage but not to their issuers or third party administrators arranging for such coverage to be provided to their plan participants. | We estimate that, by expanding the types of organizations that may use the accommodation, some entities not currently using it will opt into it. When doing so they will incur costs of $677 to send a self-certification or notice to their issuer or third party administrator, or to HHS, to commence operation of the accommodation.<br>We estimate that entities that newly make use of the accommodation as the result of these rules, or their issuers or third party administrators, will incur costs of $311,304 in providing their policy holders with notices indicating that contraceptive coverage or payments are available to them under the accommodation process. |

## B. Background

Over many decades, Congress has protected conscientious objections, including those based on religious beliefs, in the context of health care and human services including health coverage, even as it has sought to promote and expand access to health services.[1] In 2010, Congress enacted the individuals and entities that object to abortion); Consolidated Appropriations Act of 2018, Div. H, Sec. 507(d) (Departments of Labor, HHS, and Education, and Related Agencies Appropriations Act), Public Law 115–141, 132 Stat. 348, 764 (Mar. 23, 2018) (protecting any "health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion for any reason); id. at Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act) (protecting individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions"); id. at Div. E, Sec. 808 (regarding any requirement for "the provision of contraceptive coverage by health insurance plans" in the District of Columbia, "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions."); id. at Div. I, (Department of State, Foreign Operations, and Related Programs Appropriations Act) (protecting applicants for family planning funds based on their "religious or conscientious commitment to offer only natural family planning"); 42 U.S.C. 290bb–36 (prohibiting the statutory section from being construed to require suicide-related treatment services for youth where the parents or legal guardians object based on "religious beliefs or moral objections"); 42 U.S.C. 290kk–1 (protecting the religious character of organizations participating in certain programs and the religious freedom of beneficiaries of the programs); 42 U.S.C. 300x–65 (protecting the religious character of organizations

---

[1] See, for example, 42 U.S.C. 300a–7 (protecting individuals and health care entities from being required to provide or assist sterilizations, abortions, or other lawful health services if it would violate their "religious beliefs or moral convictions"); 42 U.S.C. 238n (protecting

Patient Protection and Affordable Care Act (PPACA) (Pub. L. 111–148) (March 23, 2010). Congress enacted the Health Care and Education Reconciliation Act of 2010 (HCERA) (Pub. L. 111–152) on March 30, 2010, which, among other things, amended the PPACA. As amended by HCERA, the PPACA is known as the Affordable Care Act (ACA).

The ACA reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The ACA adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code), in order to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

In section 2713(a)(4) of the PHS Act (hereinafter "section 2713(a)(4)"), Congress provided administrative

discretion to require that certain group health plans and health insurance issuers cover certain women's preventive services, in addition to other preventive services required to be covered in section 2713. Congress granted that discretion to the Health Resources and Services Administration (HRSA), a component of the U.S. Department of Health and Human Services (HHS). Specifically, section 2713(a)(4) allows HRSA discretion to specify coverage requirements, "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by" HRSA's Guidelines.

Since 2011, HRSA has exercised that discretion to require coverage for, among other things, certain contraceptive services.[2] In the same time period, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, "the Departments")[3] have promulgated regulations to guide HRSA in exercising its discretion to allow exemptions to those requirements, including issuing and finalizing three interim final regulations prior to 2017.[4] In those

regulations, the Departments defined the scope of permissible exemptions and accommodations for certain religious objectors where the Guidelines require coverage of contraceptive services, changed the scope of those exemptions and accommodations, and solicited public comments on a number of occasions. Many individuals and entities brought legal challenges to the contraceptive coverage requirement and regulations (hereinafter, the "contraceptive Mandate," or the "Mandate") as being inconsistent with various legal protections, including the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1 ("RFRA"). Several of those cases went to the Supreme Court. *See, for example, Burwell* v. *Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751 (2014); *Zubik* v. *Burwell,* 136 S. Ct. 1557 (2016).

The Departments most recently solicited public comments on these issues again in two interim final regulations with requests for comments (IFCs) published in the **Federal Register** on October 13, 2017: the regulations (82 FR 47792) that are being finalized with changes here, and regulations (82 FR 47838) concerning moral objections (the Moral IFC), which are being finalized with changes in companion final rules published elsewhere in today's **Federal Register**.

In the preamble to the Religious IFC, the Departments explained several reasons why it was appropriate to reevaluate the religious exemptions and accommodations for the contraceptive Mandate and to take into account the religious beliefs of certain employers concerning that Mandate. The Departments also sought public comment on those modifications. The Departments considered, among other things, Congress's history of providing protections for religious beliefs regarding certain health services (including contraception, sterilization, and items or services believed to involve abortion); the text, context, and intent of section 2713(a)(4) and the ACA; protection of the free exercise of religion in the First Amendment and, by Congress, in RFRA; Executive Order 13798, "Promoting Free Speech and Religious Liberty" (May 4, 2017); previously submitted public comments;

and the religious freedom of individuals involved in the use of government funds to provide substance abuse services); 42 U.S.C. 604a (protecting the religious character of organizations and the religious freedom of beneficiaries involved in the use of government assistance to needy families); 42 U.S.C. 1395w–22(j)(3)(B) (protecting against forced counseling or referrals in Medicare+Choice (now Medicare Advantage) managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396a(w)(3) (ensuring particular Federal laws does not infringe on "conscience" as protected in state law concerning advance directives); 42 U.S.C. 1396u–2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 5106i (prohibiting certain Federal statutes from being construed to require that a parent or legal guardian provide a child any medical service or treatment against the religious beliefs of the parent or legal guardian); 42 U.S.C. 2996f(b) (protecting objection to abortion funding in legal services assistance grants based on "religious beliefs or moral convictions"); 42 U.S.C. 14406 (protecting organizations and health providers from being required to inform or counsel persons pertaining to assisted suicide); 42 U.S.C. 18023 (blocking any requirement that issuers or exchanges must cover abortion); 42 U.S.C. 18113 (protecting health plans or health providers from being required to provide an item or service that helps cause assisted suicide); see also 8 U.S.C. 1182(g) (protecting vaccination objections by "aliens" due to "religious beliefs or moral convictions"); 18 U.S.C. 3597 (protecting objectors to participation in Federal executions based on "moral or religious convictions"); 20 U.S.C. 1688 (prohibiting sex discrimination law to be used to require abstinence in abortion for any reason); 22 U.S.C. 7631(d) (protecting entities from being required to use HIV/ AIDS funds contrary to their "religious or moral objection").

[2] The references in this document to "contraception," "contraceptive," "contraceptive coverage," or "contraceptive services" generally include all contraceptives, sterilization, and related patient education and counseling, required by the Women's Preventive Services Guidelines, unless otherwise indicated. The Guidelines issued in 2011 referred to "Contraceptive Methods and Counseling" as "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." *https://www.hrsa.gov/ womens-guidelines/index.html.* The Guidelines as amended in December 2016 refer, under the header "Contraception," to: "the full range of female-controlled U.S. Food and Drug Administration-approved contraceptive methods, effective family planning practices, and sterilization procedures," "contraceptive counseling, initiation of contraceptive use, and follow-up care (for example, management, and evaluation as well as changes to or removal or discontinuation of the contraceptive method)," and "instruction in fertility awareness-based methods, including the lactation amenorrhea method." *https://www.hrsa.gov/womens-guidelines-2016/index.html.*

[3] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.

[4] Interim final regulations on July 19, 2010, at 75 FR 41726 (July 2010 interim final regulations); interim final regulations amending the July 2010 interim final regulations on August 3, 2011, at 76 FR 46621; final regulations on February 15, 2012, at 77 FR 8725 (2012 final regulations); an advance notice of proposed rulemaking (ANPRM) on March 21, 2012, at 77 FR 16501; proposed regulations on February 6, 2013, at 78 FR 8456; final regulations on July 2, 2013, at 78 FR 39870 (July 2013 final regulations); interim final regulations on August 27, 2014, at 79 FR 51092 (August 2014 interim final regulations); proposed regulations on August 27, 2014, at 79 FR 51118 (August 2014 proposed regulations); final regulations on July 14, 2015, at

80 FR 41318 (July 2015 final regulations); and a request for information on July 26, 2016, at 81 FR 47741 (RFI), which was addressed in an FAQ document issued on January 9, 2017, available at: *https://www.dol.gov/sites/default/files/ebsa/about-our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf.*

and the extensive litigation over the contraceptive Mandate.

After consideration of the comments and feedback received from stakeholders, the Departments are finalizing the Religious IFC, with changes based on comments as indicated herein.[5]

## II. Overview, Analysis, and Response to Public Comments

We provided a 60-day public comment period for the Religious IFC, which closed on December 5, 2017. The Departments received over 56,000 public comment submissions, which are posted at *www.regulations.gov*.[6] Below, the Departments provide an overview of the general comments on the final regulations, and address the issues raised by commenters.

These rules expand exemptions to protect religious beliefs for certain entities and individuals with religious objections to contraception whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the ACA. These rules do not alter the discretion of HRSA, a component of HHS, to maintain the Guidelines requiring contraceptive coverage where no regulatorily recognized objection exists. These rules finalize the accommodation process, which was previously established in response to objections of religious organizations that were not protected by the original exemption, as an optional process for any exempt entities. These rules do not alter multiple other federal programs that provide free or subsidized contraceptives or related education and counseling for women at risk of unintended pregnancy.[7]

### A. The Departments' Authority To Mandate Coverage and Provide Religious Exemptions

The Departments received conflicting comments on their legal authority to provide the expanded exemptions and accommodation for religious beliefs. Some commenters agreed that the Departments are legally authorized to provide the expanded exemptions and accommodation, noting that there was no requirement of contraceptive coverage in the ACA and no prohibition on providing religious exemptions in Guidelines issued under section 2713(a)(4). Other commenters, however, asserted that the Departments have no legal authority to provide any exemptions to the contraceptive Mandate, contending, based on statements in the ACA's legislative history, that the ACA requires contraceptive coverage. Still other commenters contended that the Departments are legally authorized to provide the exemptions that existed prior to the Religious IFC, but not to expand them.

Some commenters who argued that section 2713(a)(4) does not allow for exemptions said that the previous exemptions for houses of worship and integrated auxiliaries, and the previous accommodation process, were set forth in the ACA itself, and therefore were acceptable while the expanded exemptions in the Religious IFC were not. This is incorrect. The ACA does not prescribe (or prohibit) the previous exemptions for house of worship and the accommodation processes that the Departments issued through regulations.[8] The Departments, therefore, find it appropriate to use the regulatory process to issue these expanded exemptions and accommodation, to better address concerns about religious exercise.

The Departments conclude that legal authority exists to provide the expanded exemptions and accommodation for religious beliefs set forth in these final rules. These rules concern section 2713 of the PHS Act, as also incorporated into ERISA and the Code. Congress has granted the Departments legal authority,

collectively, to administer these statutes.[9]

Where it applies, section 2713(a)(4) requires coverage without cost sharing for "such additional" women's preventive care and screenings "as provided for" and "supported by" Guidelines developed by HHS through HRSA. When Congress enacted this provision, those Guidelines did not exist. And nothing in the statute mandated that the Guidelines had to include contraception, let alone for all types of employers with covered plans. Instead, section 2713(a)(4) provided a positive grant of authority for HSRA to develop those Guidelines, thus delegating authority to HHS, as the administering agency of HRSA, and to all three agencies, as the administering agencies of the statutes by which the Guidelines are enforced, to shape that development. *See* 26 U.S.C. 9834; 29 U.S.C. 1191(c), 42 U.S.C. 300gg–92. That is especially true for HHS, as HRSA is a component of HHS that was unilaterally created by the agency and thus is subject to the agency's general supervision, *see* 47 FR 38,409 (August 31, 1982). Thus, nothing prevented HRSA from creating an exemption from otherwise-applicable Guidelines or prevented HHS and the other agencies from directing that HRSA create such an exemption.

Congress did not specify the extent to which HRSA must "provide for" and "support" the application of Guidelines that it chooses to adopt. HRSA's authority to support "comprehensive guidelines" involves determining both the types of coverage and scope of that coverage. Section 2714(a)(4) requires coverage for preventive services only "as provided for in comprehensive guidelines supported by [HRSA]." That is, services are required to be included in coverage only to the extent that the Guidelines supported by HRSA provide for them. Through use of the word "as" in the phrase "as provided for," it requires that HRSA support how those services apply—that is, the manner in which the support will happen, such as in the phrase "as you like it."[10] When Congress means to require certain activities to occur in a certain manner, instead of simply authorizing the agency to decide the manner in which they will occur, Congress knows how to do so. *See, e.g.,* 42 U.S.C. 1395x ("The Secretary shall establish procedures to make beneficiaries and providers aware

---

[5] The Department of the Treasury and the Internal Revenue Service (IRS) published proposed and temporary regulations as part of the joint rulemaking of the Religious IFC. The Departments of Labor and HHS published their respective rules as interim final rules with request for comments and are finalizing their interim final rules. The Department of the Treasury and IRS are finalizing their proposed regulations.

[6] *See Regulations.gov* at *https://www.regulations.gov/searchResults?rpp=25&so=DESC&sb=postedDate&po=0&cmd=12%7C05%7C17-12%7C05%7C17&dktid=CMS-2014-0115* and *https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=7525&dct=PS&D=IRS-2017-0016.* Some of those submissions included form letters or attachments that, while not separately tabulated at *regulations.gov,* together included comments from, or were signed by, hundreds of thousands of separate persons. The Departments reviewed all of the public comments and attachments.

[7] *See, for example,* Family Planning grants in 42 U.S.C. 300 *et seq.;* the Teenage Pregnancy Prevention Program, Public Law 112–74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c–8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; Maternal

and Child Health Block Grants, 42 U.S.C. 703; 42 U.S.C. 247b–12; Title XIX of the Social Security Act, 42 U.S.C. 1396, *et seq.;* the Indian Health Service, 25 U.S.C. 13, 42 U.S.C. 2001(a), and 25 U.S.C. 1601, *et seq.;* Health center grants, 42 U.S.C. 254b(e), (g), (h), and (i); the NIH Clinical Center, 42 U.S.C. 248; and the Personal Responsibility Education Program, 42 U.S.C. 713.

[8] The ACA also does not require that contraceptives be covered under the preventive services provisions.

[9] 26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg–92.

[10] See As (usage 2), *Oxford English Dictionary Online* (Feb. 2018) ("[u]sed to indicate by comparison the way something happens or is done").

of the requirement that a beneficiary complete a health risk assessment *prior to or at the same time as* receiving personalized prevention plan services.") (emphasis added). Thus, the inclusion of "as" in section 300gg–13(a)(3), and its absence in similar neighboring provisions, shows that HRSA has been granted discretion in supporting how the preventive coverage mandate applies—it does not refer to the timing of the promulgation of the Guidelines.

Nor is it simply a textual aberration that the word "as" is missing from the other three provisions in PHS Act section 2713(a). Rather, this difference mirrors other distinctions within that section that demonstrate that Congress intended HRSA to have the discretion the Agencies invoke. For example, sections (a)(1) and (a)(3) require "evidence-based" or "evidence-informed" coverage, while section (a)(4) does not. This difference suggests that the Agencies have the leeway to incorporate policy-based concerns into their decision-making. This reading of section 2713(a)(4) also prevents the statute from being interpreted in a cramped way that allows no flexibility or tailoring, and that would force the Departments to choose between ignoring religious objections in violation of RFRA or else eliminating the contraceptive coverage requirement from the Guidelines altogether. The Departments instead interpret section 2713(a)(4) as authorizing HRSA's Guidelines to set forth both the kinds of items and services that will be covered, and the scope of entities to which the contraceptive coverage requirement in those Guidelines will apply.

The religious objections at issue here, and in regulations providing exemptions from the inception of the Mandate in 2011, are considerations that, consistent with the statutory provision, permissibly inform what HHS, through HRSA, decides to provide for and support in the Guidelines. Since the first rulemaking on this subject in 2011, the Departments have consistently interpreted the broad discretion granted to HRSA in section 2713(a)(4) as including the power to reconcile the ACA's preventive-services requirement with sincerely held views of conscience on the sensitive subject of contraceptive coverage—namely, by exempting churches and their integrated auxiliaries from the contraceptive Mandate. (*See* 76 FR at 46623.) As the Departments explained at that time, the HRSA Guidelines "exist solely to bind non-grandfathered group health plans and health insurance issuers with respect to the extent of their coverage of certain preventive services for women," and "it

is appropriate that HRSA . . . takes into account the effect on the religious beliefs of [employers] if coverage of contraceptive services were required in [their] group health plans." *Id.* Consistent with that longstanding view, Congress's grant of discretion in section 2713(a)(4), and the lack of a specific statutory mandate that contraceptives must be covered or that they be covered without any exemptions or exceptions, supports the conclusion that the Departments are legally authorized to exempt certain entities or plans from a contraceptive Mandate if HRSA decides to otherwise include contraceptives in its Guidelines.

The conclusions on which these final rules are based are consistent with the Departments' interpretation of section 2713 of the PHS Act since 2010, when the ACA was enacted, and since the Departments started to issue interim final regulations implementing that section. The Departments have consistently interpreted section 2713(a)(4)'s grant of authority to include broad discretion regarding the extent to which HRSA will provide for, and support, the coverage of additional women's preventive care and screenings, including the decision to exempt certain entities and plans, and not to provide for or support the application of the Guidelines with respect to those entities or plans. The Departments defined the scope of the exemption to the contraceptive Mandate when HRSA issued its Guidelines for contraceptive coverage in 2011, and then amended and expanded the exemption and added an accommodation process in multiple rulemakings thereafter. The accommodation process requires the provision of coverage or payments for contraceptives to participants in an eligible organization's health plan by the organization's insurer or third party administrator. However, the accommodation process itself, in some cases, failed to require contraceptive coverage for many women, because—as the Departments acknowledged at the time—the enforcement mechanism for that process, section 3(16) of ERISA, does not provide a means to impose an obligation to provide contraceptive coverage on the third party administrators of self-insured church plans. *See* 80 FR 41323. Non-exempt employers participate in many church plans. Therefore, in both the previous exemption, and in the previous accommodation's application to self-insured church plans, the Departments have been choosing not to require contraceptive coverage for certain kinds

of employers since the Guidelines were adopted. During prior rulemakings, the Departments also disagreed with commenters who contended the Departments had no authority to create exemptions under section 2713 of the PHS Act, or as incorporated into ERISA and the Code, and who contended instead that we must enforce the Guidelines on the broadest spectrum of group health plans as possible. *See, e.g.,* 2012 final regulations at 77 FR 8726.

The Departments' interpretation of section 2713(a)(4) is confirmed by the ACA's statutory structure. Congress did not intend to require coverage of preventive services for every type of plan that is subject to the ACA. *See, e.g.,* 76 FR 46623. On the contrary, Congress carved out an exemption from PHS Act section 2713 (and from several other provisions) for grandfathered plans. In contrast, grandfathered plans do have to comply with many of the other provisions in Title I of the ACA—provisions referred to by the previous Administration as providing "particularly significant protections." (75 FR 34540). Those provisions include (from the PHS Act) section 2704, which prohibits preexisting condition exclusions or other discrimination based on health status in group health coverage; section 2708, which prohibits excessive waiting periods (as of January 1, 2014); section 2711, which relates to lifetime and annual dollar limits; section 2712, which generally prohibits rescission of health coverage; section 2714, which extends dependent child coverage until the child turns 26; and section 2718, which imposes a minimum medical loss ratio on health insurance issuers in the individual and group health insurance markets, and requires them to provide rebates to policyholders if that medical loss ratio is not met. (75 FR 34538, 34540, 34542). Consequently, of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans not subject to section 2713.[11] Some commenters assert the exemptions for grandfathered plans are temporary, or were intended to be temporary, but as the Supreme Court observed, "there is no legal requirement that grandfathered plans ever be phased out." *Hobby Lobby,* 134 S. Ct. at 2764 n.10.

Some commenters argue that Executive Order 13535's reference to

---

[11] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2017 Annual Survey," Henry J Kaiser Family Foundation (Sept. 2017). *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.*

implementing the ACA consistent with certain conscience laws does not justify creating exemptions to contraceptive coverage in the Guidelines, because those laws do not specifically require exemptions to the Mandate in the Guidelines. The Departments, however, believe these final regulations are consistent with Executive Order 13535. Issued upon the signing of the ACA, Executive Order 13535 specified that ''longstanding Federal laws to protect conscience . . . remain intact,'' including laws that protect holders of religious beliefs from certain requirements in health care contexts. While the Executive Order 13535 does not require the expanded exemptions in these rules, the expanded exemptions are, as explained below, consistent with longstanding federal laws that protect religious beliefs, and are consistent with the Executive Order's intent that the ACA would be implemented in accordance with the conscience protections set forth in those laws.

The extent to which RFRA provides authority for these final rules is discussed below in section II.C., The First Amendment and the Religious Freedom Restoration Act.

## B. Availability and Scope of Religious Exemptions

Some commenters supported the expanded exemptions and accommodation in the Religious IFC, and the entities and individuals to which they applied. They asserted the expanded exemptions and accommodation are appropriate exercises of discretion and are consistent with religious exemptions Congress has provided in many similar contexts. Some further commented that the expanded exemptions are necessary under the First Amendment or RFRA. Similarly, commenters stated that the accommodation was an inadequate means to resolve religious objections, and that the expanded exemptions are needed. They objected to the accommodation process because it was another method to require compliance with the Mandate. They contended its self-certification or notice involved triggering the very contraceptive coverage that organizations objected to, and that such coverage flowed in connection with the objecting organizations' health plans. The commenters contended that the seamlessness cited by the Departments between contraceptive coverage and an accommodated plan gives rise to the religious objections that organizations would not have with an expanded exemption.

Several other commenters asserted that the exemptions in the Religious IFC are too narrow and called for there to be no mandate of contraceptive coverage. Some of them contended that HRSA should not include contraceptives in their women's preventive services Guidelines because fertility and pregnancy are generally healthy conditions, not diseases that are appropriately the target of preventive health services. They also contended that contraceptives can pose medical risks for women and that studies do not show that contraceptive programs reduce abortion rates or rates of unintended pregnancies. Some commenters contended that, to the extent the Guidelines require coverage of certain drugs and devices that may prevent implantation of an embryo after fertilization, they require coverage of items that are abortifacient and, therefore, violate federal conscience protections such as the Weldon Amendment, *see* section 507(d) of Public Law 115–141.

Other commenters contended that the expanded exemptions are too broad. In general, these commenters supported the inclusion of contraceptives in the Guidelines, contending they are a necessary preventive service for women. Some said that the Departments should not exempt various kinds of entities such as businesses, health insurance issuers, or other plan sponsors that are not nonprofit entities. Other commenters contended the exemptions and accommodation should not be expanded, but should remain the same as they were in the July 2015 final regulations (80 FR 41318). Some commenters said the Departments should not expand the exemptions, but simply expand or adjust the accommodation process to resolve religious objections to the Mandate and accommodation. Some commenters contended that even the previous regulations allowing an exemption and accommodation were too broad, and said that no exemptions to the Mandate should exist, in order that contraceptive coverage would be provided to as many women as possible.

After consideration of the comments, the Departments are finalizing the provisions of the Religious IFC without contracting the scope of the exemptions and accommodation set forth in the Religious IFC. Since HRSA issued its Guidelines in 2011, the Departments have recognized that religious exemptions from the contraceptive Mandate are appropriate. The details of the scope of such exemptions are discussed in further detail below. In general, the Departments conclude it is

appropriate to maintain the exemptions created by the Religious IFC to avoid instances where the Mandate is applied in a way that violates the religious beliefs of certain plan sponsors, issuers, or individuals. The Departments do not believe the previous exemptions are adequate, because some religious objections by plan sponsors and individuals were favored with exemptions, some were not subjected to contraceptive coverage if they fell under the indirect exemption for certain self-insured church plans, and others had to choose between the Mandate and the accommodation even though they objected to both. The Departments wish to avoid inconsistency in respecting religious objections in connection with the provision of contraceptive coverage. The lack of a congressional mandate that contraceptives be covered, much less that they be covered without religious exemptions, has also informed the Departments' decision to expand the exemptions. And Congress's decision not to apply PHS Act section 2713 to grandfathered plans has likewise informed the Departments' decision whether exemptions to the contraceptive Mandate are appropriate.

Congress has also established a background rule against substantially burdening sincere religious beliefs except where consistent with the stringent requirements of the Religious Freedom Restoration Act. And Congress has consistently provided additional, specific exemptions for religious beliefs in statutes addressing federal requirements in the context of health care and specifically concerning issues such as abortion, sterilization, and contraception. Therefore, the Departments consider it appropriate, to the extent we impose a contraceptive coverage Mandate by the exercise of agency discretion, that we also include exemptions for the protection of religious beliefs in certain cases. The expanded exemptions finalized in these rules are generally consistent with the scope of exemptions that Congress has established in similar contexts. They are also consistent with the intent of Executive Order 13535 (March 24, 2010), which was issued upon the signing of the ACA and declared that, ''[u]nder the Act, longstanding federal laws to protect conscience (such as the Church Amendment, 42 U.S.C. 300a–7, and the Weldon Amendment, section 508(d)(1) of Public Law 111–8) remain intact'' and that ''[n]umerous executive agencies have a role in ensuring that these restrictions are enforced, including the HHS.''

Some commenters argued that Congress's failure to explicitly include

religious exemptions in PHS Act section 2713 itself is indicative of an intent that such exemptions not be included, but the Departments disagree. As noted above, Congress also failed to require contraceptive coverage in PHS Act section 2713. And the commenters' argument would negate not just these expanded exemptions, but the previous exemptions for houses of worship and integrated auxiliaries, and the indirect exemption for self-insured church plans that use the accommodation. Where Congress left so many matters concerning section 2713(a)(4) to agency discretion, the Departments consider it appropriate to implement these expanded exemptions in light of Congress's long history of respecting religious beliefs in the context of certain federal health care requirements.

If there is to be a federal contraceptive mandate that fails to include some—or, in the views of some commenters, any—religious exemptions, the Departments do not believe it is appropriate for us to impose such a regime through discretionary administrative measures. Instead, such a serious imposition on religious liberty should be created, if at all, by Congress, in response to citizens exercising their rights of political participation. Congress did not prohibit religious exemptions under this Mandate. It did not even require contraceptive coverage under the ACA. It left the ACA subject to RFRA, and it specified that additional women's preventive services will only be required coverage as provided for in Guidelines supported by HRSA. Moreover, Congress legislated in the context of the political consensus on conscientious exemptions for health care that has long been in place. Since *Roe* v. *Wade* in 1973, Congress and the states have consistently offered religious exemptions for health care providers and others concerning issues such as sterilization and abortion, which implicate deep disagreements on scientific, ethical, and religious (and moral) concerns. Indeed over the last 44 years, Congress has repeatedly expanded religious exemptions in similar cases, including to contraceptive coverage. Congress did not purport to deviate from that approach in the ACA. Thus, we conclude it is appropriate to specify in these final rules, that, if the Guidelines continue to maintain a contraceptive coverage requirement, the expanded exemptions will apply to those Guidelines and their enforcement.

Some commenters contended that, even though Executive Order 13535 refers to the Church Amendments, the intention of those statutes is narrow, should not be construed to extend to entities, and should not be construed to prohibit procedures. But those comments mistake the Departments' position. The Departments are not construing the Church Amendments to require these exemptions, nor do the exemptions prohibit any procedures. Instead, through longstanding federal conscience statutes, Congress has established consistent principles concerning respect for religious beliefs in the context of certain Federal health care requirements. Under those principles, and absent any contrary requirement of law, the Departments are offering exemptions for sincerely held religious beliefs to the extent the Guidelines otherwise include contraceptive coverage.[12] These exemptions do not prohibit any services, nor do they authorize employers to prohibit employees from obtaining any services. The Religious IFC and these final rules simply refrain from imposing the federal Mandate that employers and health insurance issuers cover contraceptives in their health plans where compliance with the Mandate would violate their sincerely held religious beliefs. And though not necessary to the Departments' decision here, the Departments note that the Church Amendments explicitly protect entities and that several subsequent federal conscience statutes have protected against federal mandates in health coverage.

The Departments note that their decision is also consistent with state practice. A significant majority of states either impose no contraceptive coverage requirement or offer broader exemptions than the exemption contained in the July 2015 final regulations.[13] Although the practice of states is not a limit on the discretion delegated to HRSA by the ACA, nor is it a statement about what the federal government may do consistent with RFRA or other limitations or protections embodied in federal law, such state practices can inform the Departments' view that it is appropriate to protect religious liberty as an exercise of agency discretion.

The Departments decline to adopt the suggestion of some commenters to use these final rules to revoke the contraceptive Mandate altogether, such as by declaring that HHS through HRSA shall not include contraceptives in the list of women's preventive services in Guidelines issued under section 2713(a)(4). Although previous regulations were used to authorize religious exemptions and accommodations to the imposition of the Guidelines' coverage of contraception, the issuance of the Guidelines themselves in 2011 describing what items constitute recommended women's preventive services, and the update to those recommendations in December 2016, did not occur through the regulations that preceded the 2017 Religious IFC and these final rules. The Guidelines' specification of which women's preventive services were recommended were issued, not by regulation, but directly by HRSA, after consultation with external organizations that operated under cooperative agreements with HRSA to consider the issue, solicit public comment, and provide recommendations. The Departments decline to accept the invitation of some commenters to use these rules to specify whether HRSA includes contraceptives in the Guidelines at all. Instead the Departments conclude it is appropriate for these rules to continue to focus on restating the statutory language of PHS Act section 2713 in regulatory form, and delineating what exemptions and accommodations apply if HRSA lists contraceptives in its Guidelines. Some commenters said that if contraceptives are not removed from the Guidelines entirely, some entities or individuals with religious objections might not qualify for the exemptions or accommodation. As discussed below, however, the exemptions in the Religious IFC and these final rules cover a broad range of entities and individuals. The Departments are not aware of specific groups or individuals whose religious beliefs would still be substantially burdened by the Mandate after the issuance of these final rules.

Some commenters asserted that HRSA should remove contraceptives from the Guidelines because the Guidelines have not been subject to the notice and comment process under the Administrative Procedure Act. Some commenters also contended that the Guidelines should be amended to omit items that may prevent (or possibly dislodge) the implantation of a human embryo after fertilization, in order to ensure consistency with conscience provisions that prohibit requiring plans to pay for or cover abortions.

---

[12] The Departments note that the Church Amendments are the subject of another, ongoing rulemaking process. *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 FR 3880 (NPRM Jan. 26, 2018). Since the Departments are not construing the Amendments to require the religious exemptions, we defer issues regarding the scope, interpretation, and protections of the Amendments to HHS in that rulemaking.

[13] *See* Guttmacher Institute, ''Insurance Coverage of Contraceptives'', The Guttmacher Institute (June 11, 2018), *https://www.guttmacher.org/state-policy/ explore/insurance-coverage-contraceptives.*

Whether and to what extent the Guidelines continue to list contraceptives, or items considered to prevent implantation of an embryo, for entities not subject to exemptions and an accommodation, and what process is used to include those items in the Guidelines, is outside the scope of these final rules. These rules focus on what religious exemptions and accommodations shall apply if Guidelines issued under section 2713(a)(4) include contraceptives or items considered to be abortifacients.

Members of the public that support or oppose the inclusion of some or all contraceptives in the Guidelines, or wish to comment concerning the content of, and the process for developing and updating, the Guidelines, are welcome to communicate their views to HRSA, at *wellwomancare@hrsa.gov.*

The Departments conclude that it would be inadequate to merely attempt to amend or expand the accommodation process instead of expanding the exemption. In the past, the Departments had stated in our regulations and court briefs that the previous accommodation process required contraceptive coverage or payments in a way that is "seamless" with the coverage provided by the objecting employer. As a result, in significant respects, that previous accommodation process did not actually accommodate the objections of many entities, as many entities with religious objections have argued. The Departments have attempted to identify an accommodation process that would eliminate the religious objections of all plaintiffs, including seeking public comment through a Request For Information, 81 FR 47741 (July 26, 2016), but we stated in January 2017 that we were unable to develop such an approach at that time.[14] The Departments continue to believe that, because of the nature of the accommodation process, merely amending that accommodation process without expanding the exemptions would not adequately address religious objections to compliance with the Mandate. Instead, we conclude that the

most appropriate approach to resolve these concerns is to expand the exemptions as set forth in the Religious IFC and these final rules, while maintaining the accommodation as an option for providing contraceptive coverage, without forcing entities to choose between compliance with either the Mandate or the accommodation and their religious beliefs.

Comments considering the appropriateness of exempting certain specific kinds of entities or individuals are discussed in more detail below.

### C. The First Amendment and the Religious Freedom Restoration Act

Some commenters said that the Supreme Court ruled that the exemptions to the contraceptive Mandate, which the Departments previously provided to houses of worship and integrated auxiliaries, were required by the First Amendment. From this, commenters concluded that the exemptions for houses of worship and integrated auxiliaries are legally authorized, but exemptions beyond those are not. But in *Hobby Lobby* and *Zubik,* the Supreme Court did not decide whether the exemptions previously provided to houses of worship and integrated auxiliaries were required by the First Amendment, and the Court did not say the Departments must apply the contraceptive Mandate to other organizations unless RFRA prohibits the Departments from doing so. Moreover, the previous church exemption, which applied automatically to all churches whether or not they had even asserted a religious objection to contraception, 45 CFR 147.141(a), is not tailored to any plausible free-exercise concerns. The Departments decline to adopt the view that RFRA does not apply to other religious organizations, and there is no logical explanation for how RFRA could require the church exemption but not this expanded religious exemption, given that the accommodation is no less an available alternative for the former than the latter.

Commenters disagreed about the scope of RFRA's protection in this context. Some commenters said that the expanded exemptions and accommodation are consistent with RFRA. Some also said that they are required by RFRA, as the Mandate imposes substantial burdens on religious exercise and fails to satisfy the compelling-interest and least-restrictive-means tests imposed by RFRA. Other commenters, however, contended that the expanded exemptions and accommodation are neither required by, nor consistent with, RFRA. In this vein, some argued that the Departments have

a compelling interest to deny religious exemptions, that there is no less restrictive means to achieve its goals, or that the Mandate or its accommodation process do not impose a substantial burden on religious exercise.

For the reasons discussed below, the Departments believe that agencies charged with administering a statute that imposes a substantial burden on the exercise of religion under RFRA have discretion in determining whether the appropriate response is to provide an exemption from the burdensome requirement, or to merely attempt to create an accommodation that would mitigate the burden. Here, after further consideration of these issues and review of the public comments, the Departments have determined that a broader exemption, rather than a mere accommodation, is the appropriate response.

In addition, with respect to religious employers, the Departments conclude that, without finalizing the expanded exemptions, and therefore requiring certain religiously objecting entities to choose between the Mandate, the accommodation, or penalties for noncompliance—or requiring objecting individuals to choose between purchasing insurance with coverage to which they object or going without insurance—the Departments would violate their rights under RFRA.

### 1. Discretion To Provide Religious Exemptions

In the Religious IFC, we explained that even if RFRA does not compel the Departments to provide the religious exemptions set forth in the IFC, the Departments believe the exemptions are the most appropriate administrative response to the religious objections that have been raised.

The Departments received conflicting comments on this issue. Some commenters agreed that the Departments have administrative discretion to address the religious objections even if the Mandate and accommodation did not violate RFRA. Other commenters expressed the view that RFRA does not provide such discretion, but only allows exemptions when RFRA requires exemptions. They contended that RFRA does not require exemptions for entities covered by the expanded exemptions of the Religious IFC, but that subjecting those entities to the accommodation satisfies RFRA, and therefore RFRA provides the Departments with no additional authority to exempt those entities. Those commenters further contended that because, in their view, section 2713(a)(4) does not authorize the

---

[14] *See* Departments of Labor, Health and Human Services, and the Treasury, "FAQs About Affordable Care Act Implementation Part 36," (Jan. 9, 2017), *https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf* ("the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage").

expanded exemptions, no statutory authority exists for the Departments to finalize the expanded exemptions.

As discussed above, the Departments disagree with the suggestions of commenters that section 2713(a)(4) does not authorize the Departments to adopt the expanded exemptions. Nevertheless, the Departments note that the expanded exemptions for religious objectors also rest on an additional, independent ground: The Departments have determined that, in light of RFRA, an expanded exemption rather than the existing accommodation is the most appropriate administrative response to the substantial burden identified by the Supreme Court in *Hobby Lobby*. Indeed, with respect to at least some objecting entities, an expanded exemption, as opposed to the existing accommodation, is required by RFRA. The Departments disagree with commenters who contend RFRA does not give the Departments discretion to offer these expanded exemptions.

The Departments' determination about their authority under RFRA rests in part on the Departments' reassessment of the interests served by the application of the Mandate in this specific context. Although the Departments previously took the position that the application of the Mandate to objecting employers was narrowly tailored to serve a compelling governmental interest, as discussed below the Departments have now concluded, after reassessing the relevant interests and for the reasons stated below, that it does not. Particularly under those circumstances, the Departments believe that agencies charged with administering a statute that imposes a substantial burden on the exercise of religion under RFRA have discretion in determining whether the appropriate response is to provide an exemption from the burdensome requirement or instead to attempt to create an accommodation that would mitigate the burden. And here, the Departments have determined that a broader exemption rather than the existing accommodation is the appropriate response. That determination is informed by the Departments' reassessment of the relevant interests, as well as by their desire to bring to a close the more than five years of litigation over RFRA challenges to the Mandate.

Although RFRA prohibits the government from substantially burdening a person's religious exercise where doing so is not the least restrictive means of furthering a compelling interest—as is the case with the contraceptive Mandate, pursuant to

*Hobby Lobby*—neither RFRA nor the ACA *prescribes* the remedy by which the government must eliminate that burden, where any means of doing so will require departing from the ACA to some extent (on the view of some commenters, with which the Departments disagree, that section 2713(a)(4) does not itself authorize the Departments to recognize exceptions). The prior administration *chose* to do so through the complex accommodation it created, but nothing in RFRA or the ACA compelled that novel choice or prohibits the current administration from employing the more straightforward choice of an exemption—much like the existing and unchallenged exemption for churches. After all, on the theory that section 2713(a)(4) allows for no exemptions, the accommodation also departed from section 2713(a)(4) in the sense that employers were not themselves offering contraceptive coverage, and the ACA did not require the Departments to choose that departure rather than the expanded exemptions as the exclusive method to satisfy their obligations under RFRA to eliminate the substantial burden imposed by the Mandate. The agencies' choice to adopt an exemption in addition to the accommodation is particularly reasonable given the existing legal uncertainty as to whether the accommodation itself violates RFRA. *See* 82 FR at 47798; *see also Ricci* v. *DeStefano,* 557 U.S. 586, 585 (2009) (holding that an employer need only have a strong basis to believe that an employment practice violates Title VII's disparate impact ban in order to take certain types of remedial action that would otherwise violate Title VII's disparate-treatment ban). Indeed, if the Departments had simply adopted an expanded exemption from the outset— as they did for churches—no one could reasonably have argued that doing so was improper because they should have invented the accommodation instead. Neither RFRA nor the ACA compels a different result now based merely on path dependence.

Although the foregoing analysis is independently sufficient, additional support for this view is provided by the Departments' conclusion, as explained more fully below, that an expanded exemption is required by RFRA for at least some objectors. In the Religious IFC, the Departments reaffirmed their conclusion that there is not a way to satisfy all religious objections by amending the accommodation, (82 FR at 47800), a conclusion that was confirmed by some commenters (and the continued

litigation over the accommodation).[15] Some commenters agreed the religious objections could not be satisfied by amending the accommodation without expanding the exemptions, because if the accommodation requires an objecting entity's issuer or third party administrator to provide or arrange contraceptive coverage for persons covered by the plan because they are covered by the plan, this implicates the objection of entities to the coverage being provided through their own plan, issuer, or third party administrator. Other commenters contended the accommodation could be modified to satisfy RFRA concerns without extending exemptions to objecting entities, but they did not propose a method of modifying the accommodation that would, in the view of the Departments, actually address the religious objections to the accommodation.

In the Departments' view, after considering all the comments and the preceding years of contention over this issue, it is appropriate to finalize the expanded exemptions rather than merely attempt to change the accommodation to satisfy religious objections. This is because if the accommodation still delivers contraceptive coverage through use of the objecting employer's plan, issuer, or third party administrator, it does not address the religious objections. If the accommodation could deliver contraceptive coverage independent and separate from the objecting employer's plan, issuer, and third party administrator, it could possibly address the religious objections, but there are two problems with such an approach. First, it would effectively be an exemption, not the accommodation as it has existed, so it would not be a reason not to offer the expanded exemptions finalized in these rules. Second, although (as explained above) the Departments have authority to provide exemptions to the Mandate, the Departments are not aware of the authority, or of a practical mechanism, for using section 2713(a)(4) to require contraceptive coverage be provided

---

[15] *See* RFI, 81 FR 47741 (July 26, 2016); Departments of Labor, Health and Human Services, and the Treasury, "FAQs, About Affordable Care Act Implementation Part 36," (Jan. 9, 2017), *https:// www.dol.gov/sites/default/files/ebsa/about-ebsa/ our-activities/resource-center/faqs/aca-part-36.pdf* and *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf* ("the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage").

specifically to persons covered by an objecting employer, other than by using the employer's plan, issuer, or third party administrator, which would likely violate some entities' religious objections. The Departments are aware of ways in which certain persons covered by an objecting employer might obtain contraceptive coverage through other governmental programs or requirements, instead of through objecting employers' plans, issuers, or third party administrators, and we mention those elsewhere in this rule. But those approaches do not involve the accommodation, they involve the expanded exemptions, plus the access to contraceptives through separate means.

## 2. Requiring Entities To Choose Between Compliance With the Contraceptive Mandate or the Accommodation Violated RFRA in Many Instances

Before the Religious IFC, the Departments had previously contended that the Mandate did not impose a substantial burden on entities and individuals under RFRA; that it was supported by a compelling government interest; and that it was, in combination with the accommodation, the least restrictive means of advancing that interest. With respect to the coverage Mandate itself, apart from the accommodation, and as applied to entities with sincerely held religious objections, that argument was rejected in *Hobby Lobby,* which held that the Mandate imposes a substantial burden and was not the least restrictive means of achieving any compelling governmental interest. *See* 134 S. Ct. at 2775–79. In the Religious IFC, the Departments revisited its earlier conclusions and reached a different view, concluding that requiring compliance through the Mandate or accommodation constituted a substantial burden on the religious exercise of many entities or individuals with religious objections, did not serve a compelling interest, and was not the least restrictive means of serving a compelling interest, so that requiring such compliance led to the violation of RFRA in many instances. (82 FR at 47806).

In general, commenters disagreed about this issue. Some commenters agreed with the Departments, and with some courts, that requiring entities to choose between the contraceptive Mandate and its accommodation violated their rights under RFRA, because it imposed a substantial burden on their religious exercise, did not advance a compelling government

interest, and was not the least restrictive means of achieving such an interest. Other commenters contended that requiring compliance either with the Mandate or the accommodation did not violate RFRA, agreeing with some courts that have concluded the accommodation does not substantially burden the religious exercise of organizations since, in their view, it does not require organizations to facilitate contraceptive coverage except by submitting a self-certification form or notice, and requiring compliance was the least restrictive means of advancing the compelling interest of providing contraceptive access to women covered by objecting entities' plans.

The Departments have examined further, including in light of public comments, the issue of whether requiring compliance with the combination of the contraceptive Mandate and the accommodation process imposes a substantial burden on entities that object to both, and is the least restrictive means of advancing a compelling government interest. The Departments now reaffirm the conclusion set forth in the Religious IFC, that requiring certain religiously objecting entities or individuals to choose between the Mandate, the accommodation, or incurring penalties for noncompliance imposes a substantial burden on religious exercise under RFRA.

### a. Substantial Burden

The Departments concur with the description of substantial burdens expressed recently by the Department of Justice:

A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.

Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion.[16]

The Mandate and accommodation under the previous regulation forced

certain non-exempt religious entities to choose between complying with the Mandate, complying with the accommodation, or facing significant penalties. Various entities sincerely contended, in litigation or in public comments, that complying with either the Mandate or the accommodation was inconsistent with their religious observance or practice. The Departments have concluded that withholding an exemption from those entities imposed a substantial burden on their exercise of religion, either by compelling an act inconsistent with that observance or practice, or by substantially pressuring the adherents to modify such observance or practice. To this extent, the Departments believe that the Court's analysis in *Hobby Lobby* extends, for the purposes of analyzing substantial burden, to the burdens that an entity faces when it opposes, on the basis of its religious beliefs, complying with the Mandate or participating in the accommodation process, and is subject to penalties or disadvantages that would have applied in this context if it chose neither. *See also Sharpe Holdings,* 801 F.3d at 942. Likewise, reconsideration of these issues has also led the Departments to conclude that the Mandate imposes a substantial burden on the religious beliefs of an individual employee who opposes coverage of some (or all) contraceptives in his or her plan on the basis of his or her religious beliefs, and would be able to obtain a plan that omits contraception from a willing employer or issuer (as applicable), but cannot obtain one solely because the Mandate requires that employer or issuer to provide a plan that covers all FDA-approved contraceptives. The Departments disagree with commenters that contend the accommodation did not impose a substantial burden on religiously objecting entities, and agree with other commenters and some courts and judges that concluded the accommodation can be seen as imposing a substantial burden on religious exercise in many instances.

### b. Compelling Interest

Although the Departments previously took the position that the application of the Mandate to certain objecting employers was necessary to serve a compelling governmental interest, the Departments have concluded, after reassessing the relevant interests and, in light of the public comments received, that it does not. This is based on several independent reasons.

First, as discussed above, the structure of section 2713(a)(4) and the ACA evince a desire by Congress to

---

[16] *See* Federal Law Protections for Religious Liberty, 82 FR 49668, 49669 (Oct. 26, 2017).

grant a great amount of discretion on the issue of whether, and to what extent, to require contraceptive coverage in health plans pursuant to section 2713(a)(4). This informs the Departments' assessment of whether the interest in mandating the coverage constitutes a compelling interest, as doing so imposes a substantial burden on religious exercise. As the Department of Justice has explained, "[t]he strict scrutiny standard applicable to RFRA is exceptionally demanding," and "[o]nly those interests of the highest order can outweigh legitimate claims to the free exercise of religion, and such interests must be evaluated not in broad generalities but as applied to the particular adherent." [17]

Second, since the day the contraceptive Mandate came into effect in 2011, the Mandate has not applied in many circumstances. To begin, the ACA does not apply the Mandate, or any part of the preventive services coverage requirements, to grandfathered plans. To continue, the Departments under the last Administration provided exemptions to the Mandate and expanded those exemptions through multiple rulemaking processes. Those rulemaking processes included an accommodation that effectively left employees of many non-exempt religious nonprofit entities without contraceptive coverage, in particular with respect to self-insured church plans exempt from ERISA. Under the previous accommodation, once a self-insured church plan filed a self-certification or notice, the accommodation relieved it of any further obligation with respect to contraceptive services coverage. Having done so, the accommodation process would generally have transferred the obligation to provide or arrange for contraceptive coverage to a self-insured plan's third party administrator (TPA). But the Departments recognized that they lack authority to compel church plan TPAs to provide contraceptive coverage or levy fines against those TPAs for failing to provide it. This is because church plans are exempt from ERISA pursuant to section 4(b)(2) of ERISA. Section 2761(a) of the PHS Act provides that States may enforce the provisions of title XXVII of the PHS Act as they pertain to health insurance issuers, but does not apply to church plans that do not provide coverage through a policy issued by a health insurance issuer. The combined result of PHS Act section 2713's authority to remove contraceptive coverage obligations from self-insured church

plans, and HHS's and DOL's lack of authority under the PHS Act or ERISA to require TPAs of those plans to provide such coverage, led to significant disparity in the requirement to provide contraceptive coverage among nonprofit organizations with religious objections to the coverage.

Third party administrators for some, but not all, religious nonprofit organizations were subject to enforcement for failure to provide contraceptive coverage under the accommodation, depending on whether they administer a self-insured church plan. Notably, many of those nonprofit organizations were not houses of worship or integrated auxiliaries. Under section 3(33)(C) of ERISA, organizations whose employees participate in self-insured church plans need not be churches so long as they are controlled by or "share[ ] common religious bonds and convictions with" a church or convention or association of churches. The effect is that many similar religious organizations were being treated differently with respect to their employees receiving contraceptive coverage based solely on whether organization employees participate in a church plan.

This arrangement encompassed potentially hundreds of religious non-profit organizations that were not covered by the exemption for houses of worship and integrated auxiliaries. For example, the Departments were sued by two large self-insured church plans— Guidestone and Christian Brothers.[18] Guidestone is a plan organized by the Southern Baptist convention that covers 38,000 employers, some of which are exempt as churches or integrated auxiliaries, and some of which are not. Christian Brothers is a plan that covers Catholic churches and integrated auxiliaries and has said in litigation that it covers about 500 additional entities that are not exempt as churches. In several other lawsuits challenging the Mandate, the previous Administration took the position that some plans established and maintained by houses of worship but that included entities that were not integrated auxiliaries, were church plans under section 3(33) of ERISA and, thus, the Government "has no authority to require the plaintiffs' TPAs to provide contraceptive coverage at this time." *Roman Catholic Archdiocese of N.Y.* v. *Sebelius,* 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013).

Third, the Departments now believe the administrative record on which the Mandate rested was—and remains— insufficient to meet the high threshold to establish a compelling governmental interest in ensuring that women covered by plans of objecting organizations receive cost-free contraceptive coverage through those plans. The Mandate is not narrowly tailored to advance the government's interests and appears both overinclusive and underinclusive. It includes some entities where a contraceptive coverage requirement seems unlikely to be effective, such as religious organizations of certain faiths, which, according to commenters, primarily hire persons who agree with their religious views or make their dedication to their religious views known to potential employees who are expected to respect those views. The Mandate also does not apply to a significant number of entities encompassing many employees and for-profit businesses, such as grandfathered plans. And it does not appear to target the population defined, at the time the Guidelines were developed, as being the most at-risk of unintended pregnancy, that is, "women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority." [19] Rather than focusing on this group, the Mandate is a broad-sweeping requirement across employer-provided coverage and the individual and group health insurance markets.

The Department received conflicting comments on this issue. Some commenters agreed that the government does not have a compelling interest in applying the Mandate to objecting religious employers. They noted that the expanded exemptions will impact only a small fraction of women otherwise affected by the Mandate and argued that refusing to provide those exemptions would fail to satisfy the compelling interest test. Other commenters, however, argued that the government has a broader interest in the Mandate because all women should be considered at-risk of unintended pregnancy. But the Institute of Medicine (IOM), in discussing whether contraceptive coverage is needed, provided a very specific definition of the population of women most at-risk of unintended pregnancy.[20] The Departments believe it is appropriate to consider the government's interest in

---

[17] *Id.* at 49670.

[18] The Departments take no view on the status of particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.

[19] Institute of Medicine, "Clinical Preventive Services for Women: Closing the Gaps" at 102 (2011).

[20] Id.

the contraceptive coverage requirement using the definition that formed the basis of that requirement and the justifications the Departments have offered for it since 2011. The Mandate, by its own terms, applies not just to women most at-risk of unintended pregnancy as identified by the IOM, but applies to any non-grandfathered "group health plan and a health insurance issuer offering group or individual health insurance coverage." PHS Act section 2713(a). Similarly, the exemptions and accommodation in previous rules, and the expanded exemptions in these rules, do not apply only to coverage for women most at-risk of unintended pregnancy, but to plans where a qualifying objection exists based on sincerely held religious beliefs without regard to the types of women covered in those plans. Seen in this light, the Departments believe there is a serious question whether the administrative record supports the conclusion that the Mandate, as applied to religious objectors encompassed by the expanded exemptions, is narrowly tailored to achieve the interests previously identified by the government. Whether and to what extent it is certain that an interest in health is advanced by refraining from providing expanded religious exemptions is discussed in more detail below in section II.F., Health Effects of Contraception and Pregnancy.

Fourth, the availability of contraceptive coverage from other possible sources—including some objecting entities that are willing to provide some (but not all) contraceptives, or from other governmental programs for low-income women—detracts from the government's interest to refuse to expand exemptions to the Mandate. The Guttmacher Institute recently published a study that concluded, "[b]etween 2008 and 2014, there were no significant changes in the overall proportion of women who used a contraceptive method both among all women and among women at risk of unintended pregnancy," and "there was no significant increase in the use of methods that would have been covered under the ACA (most or moderately effective methods) during the most recent time period (2012–2014) excepting small increases in implant use." [21] In discussing why they did not see such an effect from the Mandate, the authors suggested that "[p]rior to the

implementation of the ACA, many women were able to access contraceptive methods at low or no cost through publicly funded family planning centers and Medicaid; existence of these safety net programs may have dampened any impact that the ACA could have had on contraceptive use. In addition, cost is not the only barrier to accessing a full range of method options," and "[t]he fact that income is not associated with use of most other methods [besides male sterilization and withdrawal] obtained through health care settings may reflect broader access to affordable and/or free contraception made possible through programs such as Title X."

Fifth, the Departments previously created the accommodation, in part, as a way to provide for payments of contraceptives and sterilization in a way that is "seamless" with the coverage that eligible employers provide to their plan participants and their beneficiaries. (80 FR 41318). As noted above, some commenters contended that seamlessness between contraceptive coverage and employer sponsored insurance is important and is a compelling governmental interest, while other commenters disagreed. Neither Congress, nor the Departments in other contexts, have concluded that seamlessness, as such, is a compelling interest in the federal government's delivery of contraceptive coverage. For example, the preventive services Mandate itself does not require contraceptive coverage and does not apply to grandfathered plans, thereby failing to guarantee seamless contraceptive coverage. The exemption for houses of worship and integrated auxiliaries, and the application of the accommodation to certain self-insured church plans, also represents a failure to achieve seamless contraceptive coverage. HHS's Title X program provides contraceptive coverage in a way that is not necessarily seamless with beneficiaries' employer sponsored insurance plans. After reviewing the public comments and reconsidering this issue, the Departments no longer believe that if a woman working for an objecting religious employer receives contraceptive access in ways that are not seamless to her employer sponsored insurance, a compelling government interest has nevertheless been undermined. Therefore the Departments conclude that guaranteeing seamlessness between contraceptive access and employer sponsored insurance does not constitute a compelling interest that overrides

employers' religious objections to the contraceptive Mandate.

Some commenters contended that obtaining contraceptive coverage from other sources could be more difficult or more expensive for women than obtaining it from their group health plan or health insurance plan. The Departments do not believe that such differences rise to the level of a compelling interest or make it inappropriate for us to issue the expanded exemptions set forth in these final rules. Instead, after considering this issue, the Departments conclude that the religious liberty interests that would be infringed if we do not offer the expanded exemptions are not overridden by the impact on those who will no longer obtain contraceptives through their employer sponsored coverage as a result. This is discussed in more detail in following section, II.D., Burdens on Third Parties.

## D. Burdens on Third Parties

The Departments received a number of comments on the question of burdens that these rules might impose on third parties. Some commenters asserted that the expanded exemptions and accommodation do not impose an impermissible or unjustified burden on third parties, including on women who might not otherwise receive contraceptive coverage with no cost-sharing. These included commenters agreeing with the Departments' explanations in the Religious IFC, stating that unintended pregnancies were decreasing before the Mandate was implemented, and asserting that any benefit that third parties might receive in getting contraceptive coverage does not justify forcing religious persons to provide such products in violation of their beliefs. Other commenters disagreed, asserting that the expanded exemptions unacceptably burden women who might lose contraceptive coverage as a result. They contended the exemptions may remove contraceptive coverage, causing women to have higher contraceptive costs, fewer contraceptive options, less ability to use contraceptives more consistently, more unintended pregnancies,[22] births spaced more closely, and workplace, economic, or societal inequality. Still other commenters took the view that other laws or protections, such as those found in the First or Fifth Amendments, prohibit the expanded exemptions, which those commenters view as

---

[21] M.L. Kavanaugh et al., Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, 97 *Contraception* 14, 14–21 (2018), available at *http://www.contraceptionjournal.org/article/S0010-7824(17)30478-X/pdf.*

[22] Some commenters attempted to quantify the costs of unintended pregnancy, but failed to persuasively estimate the population of women that this exemption may affect.

prioritizing religious liberty of exempted entities over the religious liberty, conscience, or choices of women who would not receive contraceptive coverage where an exemption is used.

The Departments note that the exemptions in the Religious IFC and these final rules, like the exemptions created by the previous Administration, do not impermissibly burden third parties. Initially, the Departments observe that these final rules do not create a governmental burden; rather, they relieve a governmental burden. The ACA did not impose a contraceptive coverage requirement. HHS exercised discretion granted to HRSA by the Congress to include contraceptives in the Guidelines issued under section 2713(a)(4). That decision is what created and imposed a governmental burden. These rules simply relieve part of that governmental burden. If some third parties do not receive contraceptive coverage from private parties who the government chose not to coerce, that result exists in the absence of governmental action—it is not a result the government has imposed. Calling that result a governmental burden rests on an incorrect presumption: that the government has an obligation to force private parties to benefit those third parties and that the third parties have a right to those benefits. But Congress did not create a right to receive contraceptive coverage from other private citizens through PHS Act section 2713, other portions of the ACA, or any other statutes it has enacted. Although some commenters also contended such a right might exist under treaties the Senate has ratified or the Constitution, the Departments are not aware of any source demonstrating that the Constitution or a treaty ratified by the Senate creates a right to receive contraceptive coverage from other private citizens.

The fact that the government at one time exercised its administrative discretion to require private parties to provide coverage to benefit other private parties, does not prevent the government from relieving some or all of the burden of its Mandate. Otherwise, any governmental coverage requirement would be a one-way ratchet. In the Religious IFC and these rules, the government has simply restored a zone of freedom where it once existed. There is no statutory or constitutional obstacle to the government doing so, and the doctrine of third-party burdens should not be interpreted to impose such an obstacle. Such an interpretation would be especially problematic given the millions of women, in a variety of contexts, whom the Mandate does not

ultimately benefit, notwithstanding any expanded exemptions—including through grandfathering of plans, the previous religious exemptions, and the failure of the accommodation to require delivery of contraceptive coverage in various self-insured church plan contexts.

In addition, the Government is under no constitutional obligation to fund contraception. *Cf. Harris* v. *McRae,* 448 U.S. 297 (1980) (holding that, although the Supreme Court has recognized a constitutional right to abortion, there is no constitutional obligation for government to pay for abortions). Even more so may the Government refrain from requiring private citizens, in violation of their religious beliefs, to cover contraception for other citizens. *Cf. Rust* v. *Sullivan,* 500 U.S. 173, 192–93 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."). The constitutional rights of liberty and privacy do not require the government to force private parties to provide contraception to other citizens and do not prohibit the government from protecting religious objections to such governmental mandates, especially where, as here, the mandate is not an explicit statutory requirement.[23] The Departments do not believe that the Constitution prohibits offering the expanded exemptions in these final rules.

As the Department of Justice has observed, the fact that exemptions may relieve a religious adherent from conferring a benefit on a third party "does not categorically render an exemption unavailable," and RFRA still applies.[24] The Departments conclusion on this matter is consistent with the Supreme Court's observation that RFRA may require exemptions even from laws requiring claimants "to confer benefits on third parties." *See Hobby Lobby,* 134 S. Ct. at 2781 n.37. Here, no law contains such a requirement, but the Mandate is derived from an administrative exercise of discretion that Congress charged HRSA and the Departments with exercising. Burdens that may affect third parties as a result of revisiting the exercise of agency discretion, but they cannot be dispositive. "Otherwise, for example, the

Government could decide that all supermarkets must sell alcohol for the convenience of customers (and thereby exclude Muslims with religious objections from owning supermarkets), or it could decide that all restaurants must remain open on Saturdays to give employees an opportunity to earn tips (and thereby exclude Jews with religious objections from owning restaurants)." *Id.*

When government relieves burdens on religious exercise, it does not violate the Establishment Clause; rather, "it follows the best of our traditions." *Zorach* v. *Clauson,* 343 U.S. 306, 314 (1952). The Supreme Court's cases "leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Board of Educ. of Kiryas Joel Village Sch. Dist.* v. *Grumet,* 512 U.S. 687, 705 (1994). Rather, the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *Amos,* 483 U.S. 327, 334 (1987) (quoting *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* 480 U.S. 136, 144–45 (1987)). "[T]here is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter* v. *Wilkinson,* 544 U.S. 709, 713 (2005) (internal quotation omitted). Thus, the Supreme Court has upheld a broad range of accommodations against Establishment Clause challenges, including the exemption of religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion, *see Amos,* 483 U.S. at 335–39; a state property tax exemption for religious organizations, *see Walz* v. *Tax Comm'n of City of New York,* 397 U.S. 664, 672–80 (1970); and a state program releasing public school children during the school day to receive religious instruction at religious centers, *see Zorach,* 343 U.S. at 315.

Before 2012 (when HRSA's Guidelines went into effect), there was no federal women's preventive services coverage mandate imposed nationally on health insurance and group health plans. The ACA did not require contraceptives to be included in HRSA's Guidelines, and it did not require any preventive services required under PHS

---

[23] *See, for example, Planned Parenthood Ariz., Inc.* v. *Am. Ass'n of Pro-Life Obstetricians & Gynecologists,* 257 P.3d 181, 196 (Ariz. Ct. App. 2011) ("[A] woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either.").

[24] See Federal Law Protections for Religious Liberty, 82 FR at 49670.

Act section 2713 to be covered by grandfathered plans. Many States do not impose contraceptive coverage mandates, or they offer religious exemptions to the requirements of such coverage mandates—exemptions that have not been invalidated by federal or State courts. The Departments, in previous regulations, exempted houses of worship and integrated auxiliaries from the Mandate. The Departments then issued a temporary enforcement safe harbor allowing religious nonprofit groups to not provide contraceptive coverage under the Mandate for almost two additional years. The Departments further expanded the houses of worship and integrated auxiliaries exemption through definitional changes. And the Departments created an accommodation process under which many women in self-insured church plans may not ultimately receive contraceptive coverage. In addition, many organizations have not been subject to the Mandate in practice because of injunctions they received through litigation, protecting them from federal imposition of the Mandate, including under several recently entered permanent injunctions that will apply regardless of the issuance of these final rules.

Commenters offered various assessments of the impact these rules might have on state or local governments. Some commenters said that the expanded exemptions will not burden state or local governments, or that such burdens should not prevent the Departments from offering those exemptions. Others said that if the Departments provide expanded exemptions, states or local jurisdictions may face higher costs in providing birth control to women through government programs. The Departments consider it appropriate to offer expanded exemptions, notwithstanding the objection of some state or local governments. The ACA did not require a contraceptive Mandate, and its discretionary creation by means of HRSA's Guidelines does not translate to a benefit that the federal government owes to states or local governments. We are not aware of instances where the various situations recited in the previous paragraph, in which the federal government has not imposed contraceptive coverage (other than through the Religious and Moral IFCs), have been determined to cause a cognizable injury to state or local governments. Some states that were opposed to the IFCs submitted comments objecting to the potential impacts on their programs resulting

from the expanded exemptions, but they did not adequately demonstrate that such impacts would occur, and they did not explain whether, or to what extent, they were impacted by the other kinds of instances mentioned above in which no federal mandate of contraceptive coverage has applied to certain plans. The Departments find no legal prohibition on finalizing these rules based on the speculative suggestion of an impact on state or local governments, and we disagree with the suggestion that once we have exercised our discretion to deny exemptions—no matter how recently or incompletely—we cannot change course if some state and local governments believe they are receiving indirect benefits from the previous decision.

In addition, these expanded exemptions apply only to a small fraction of entities to which the Mandate would otherwise apply—those with qualifying religious objections. Public comments did not provide reliable data on how many entities would use these expanded religious exemptions, in which states women in such plans would reside, how many of those women would qualify for or use state and local government subsidies of contraceptives as a result, or in which states such women, if they are low income, would go without contraceptives and potentially experience unintended pregnancies that state Medicaid programs would have to cover. As mentioned above, at least one study, published by the Guttmacher Institute, concluded the Mandate has caused no clear increase in contraceptive use; one explanation proposed by the authors of the study is that women eligible for family planning from safety net programs were already receiving free or subsidized contraceptive access through them, notwithstanding the Mandate's effects on the overall market. Some commenters who opposed the expanded exemptions admitted that this information is unclear at this stage; other commenters that estimated considerably more individuals and entities would seek an exemption also admitted the difficulty of quantifying estimates.

In the discussion below concerning estimated economic impacts of these rules, the Departments explain there is not reliable data available to accurately estimate the number of women who may lose contraceptive coverage under these rules, and the Departments set forth various reasons why it is difficult to know how many entities will use these exemptions or how many women will be impacted by those decisions.

Solely for the purposes of determining whether the rules have a significant economic impact under Executive Order 12,866, and in order to estimate the broadest possible impact so as to determine the applicability of the procedures set forth in that Executive Order, the Departments propose that the rules will affect no more than 126,400 women of childbearing age who use contraceptives covered by the Guidelines, and conclude the economic impact falls well below $100 million. As explained below, that estimate assumes that a certain percentage of employers which did not cover contraceptives before the ACA will use these exemptions based on sincerely held religious beliefs. The Departments do not actually know that such entities will do so, however, or that they operate based on sincerely held religious beliefs against contraceptive coverage. The Departments also explain that other exemptions unaffected by these rules may encompass many or most women potentially affected by the expanded exemptions. In other words, the houses of worship and integrated auxiliaries exemption, the accommodation's failure to require contraceptive coverage in certain self-insured church plans, the non-applicability of PHS Act section 2713 to grandfathered plans, and the permanent injunctive relief many religious litigants have received against section 2713(a)(4), may encompass a large percentage of women potentially affected by religious objections, and therefore many women in those plans may not be impacted by these rules at all. In addition, even if 126,400 women might be affected by these rules, that number constitutes less than 0.1% of all women in the United States.[25] This suggests that if these rules have any impact on state or local governments, it will be statistically de minimus. The Departments conclude that there is insufficient evidence of a potential negative impact of these rules on state and local governments to override the appropriateness of deciding to finalize these rules.

Some commenters contended that the expanded exemptions would constitute unlawful sex discrimination, such as under section 1557 of the Affordable Care Act, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, or the Fifth Amendment. Some commenters suggested the expanded exemptions

---

[25] U.S. Census Bureau, "Quick Facts: Population Estimates, July 1, 2017" (estimating 325,719,178 persons in the U.S., 50.8% of which are female), available at *https://www.census.gov/quickfacts/fact/table/US/PST045217.*

would discriminate on bases such as race, disability, or LGBT status, or that they would disproportionately burden certain persons in such categories.

But these final rules do not discriminate or draw any distinctions on the basis of sex, pregnancy, race, disability, socio-economic class, LGBT status, or otherwise, nor do they discriminate on any unlawful grounds. The expanded exemptions in these rules do not authorize entities to comply with the Mandate for one person, but not for another person, based on that person's status as a member of a protected class. Instead they allow entities that have sincerely held religious objections to providing some or all contraceptives included in the Mandate to not be forced to provide coverage of those items to anyone.

These commenters' contentions about discrimination are unpersuasive for still additional reasons. First, Title VII is applicable to discrimination committed by employers, and these rules have been issued in the government's capacity as a regulator of group health plans and group and individual health insurance, not an employer. *See also In Re Union Pac. R.R. Emp't Practices Litig.,* 479 F.3d 936, 940–42 & n.1 (8th Cir. 2007) (holding that Title VII "does not require coverage of contraception because contraception is not a gender-specific term like potential pregnancy, but rather applies to both men and women"). Second, these rules create no disparate impact. The women's preventive services mandate under section 2713(a)(4), and the contraceptive Mandate promulgated under such preventive services mandate, already inures to the specific benefit of women—men are denied any benefit from that section. Both before and after these final rules, section 2713(a)(4) and the Guidelines issued under that section treat women's preventive services in general, and female contraceptives specifically, more favorably than they treat male preventive services or male contraceptives.

It is simply not the case that the government's implementation of section 2713(a)(4) is discriminatory against women because exemptions are expanded to encompass religious objections. The previous regulations, as discussed elsewhere herein, do not require contraceptive coverage in a host of plans, including grandfathered plans, plans of houses of worship, and— through inability to enforce the accommodation on certain third party administrators—plans of many religious non-profits in self-insured church plans. Below, the Departments estimate that few women of childbearing age in the country will be affected by these expanded exemptions.[26] In this context, the Departments do not believe that an adjustment to discretionary Guidelines for women's preventive services concerning contraceptives constitutes unlawful sex discrimination. Otherwise, anytime the government exercises its discretion to provide a benefit that is specific to women (or specific to men), it would constitute sex discrimination for the government to reconsider that benefit. Under that theory, *Hobby Lobby* itself, and RFRA (on which *Hobby Lobby's* holding was based), which provided a religious exemption to this Mandate for many businesses, would be deemed discriminatory against women because the underlying women's preventive services requirement is a benefit for women, not for men. Such conclusions are not consistent with legal doctrines concerning sex discrimination.

It is not clear that these expanded exemptions will significantly burden women most at risk of unintended pregnancies. Some commenters observed that contraceptives are often readily accessible at relatively low cost. Other commenters disagreed. Some objected to the suggestion in the Religious IFC that many forms of contraceptives are available for around $50 per month and other forms, though they bear a higher one-time cost, cost a similar amount over the duration of use. But some of those commenters cited sources maintaining that birth control pills can cost up to $600 per year (that is, $50 per month), and said that IUDs, which can last three to six years or more,[27] can cost $1,100 (that is, less than $50 per month over the duration of use). Some commenters said that, for lower income women, contraceptives can be available at free or low cost through government programs (federal programs offering such services include, for example, Medicaid, Title X, community health center grants, and Temporary Assistance for Needy Families (TANF)). Other commenters contended that many women in employer-sponsored coverage might not qualify for those programs, although that sometimes occurs because their incomes are above certain thresholds or because the programs were not intended to absorb privately insured individuals. Some commenters observed that contraceptives may be available through other sources, such as a plan of another family member and that the expanded exemptions will not likely encompass a very large segment of the population otherwise benefitting from the Mandate. Other commenters disagreed, pointing out that some government programs that provide family planning have income and eligibility thresholds, so that women earning certain amounts above those levels would need to pay full cost for contraceptives if they were no longer covered in their health plans.

The Departments do not believe that these general considerations make it inappropriate to issue the expanded exemptions set forth in these rules. In addition, the Departments note that the HHS Office of Population Affairs, within the Office of the Assistant Secretary for Health, has recently issued a proposed regulation to amend the regulations governing its Title X family planning program. The proposed regulation would amend the definition of "low income family"—individuals eligible for free or low cost contraceptive services—to include women who are unable to obtain certain family planning services under their employer-sponsored health coverage due to their employers' religious beliefs or moral convictions (see 83 FR 25502). If that regulation is finalized as proposed, it could further reduce any potential effect of these final rules on women's access to contraceptives. That proposal also demonstrates that the government has other means available to it for increasing women's access to contraception. Some of those means are less restrictive of religious exercise than imposition of the contraceptive Mandate on employers with sincerely held religious objections to providing such coverage.

Some commenters stated that the expanded exemptions would violate section 1554 of the ACA. That section says the Secretary of HHS "shall not promulgate any regulation" that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," "interferes with communications regarding a full range of treatment options between the patient and the provider," "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," "violates the principles of informed consent and the ethical standards of health care professionals," or "limits the

---

[26] Below, the Departments estimate that no more than 126,400 women of childbearing age will be affected by the expanded exemptions. As noted above, this is less than 0.1% of the over 165 million women in the United States. The Departments previously estimated that, at most 120,000 women of childbearing age would be affected by the expanded exemptions. *See* Religious IFC, 82 FR 47,823–84.

[27] *See, for example,* Planned Parenthood, "IUD," *https://www.plannedparenthood.org/learn/birth-control/iud.*

availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. 18114. Such commenters urged, for example, that the Religious IFC created unreasonable barriers to the ability of individuals to obtain appropriate medical care, particularly in areas they said may have a disproportionately high number of entities likely to take advantage of the exemption.

The Departments disagree with these comments about section 1554. The Departments issued previous exemptions and accommodations that allowed various plans to not provide contraceptive coverage on the basis of religious objections. The Departments, which administer both ACA section 1554 and PHS Act section 2713, did not conclude that the exemptions or accommodations in those regulations violated section 1554. Moreover, the decision not to impose a governmental mandate is not the "creation" of a "barrier," especially when that mandate requires private citizens to provide services to other private citizens. Nor, in any event, are the exemptions from the Mandate unreasonable. Section 1554 of the ACA does not require the Departments to require coverage of, or to keep in place a requirement to cover, certain services, including contraceptives, that was issued pursuant to HHS's exercise of discretion under section 2713(a)(4). Nor does section 1554 prohibit the Departments from providing exemptions for burdens on religious exercise, or, as is the case here, from refraining to impose the Mandate in cases where religious exercise would be burdened by it. In light of RFRA and the First Amendment, providing religious exemptions is a reasonable administrative response in the context of this federally mandated burden, especially since the burden itself is a subregulatory creation that does not apply in various contexts. Religious exemptions from federal mandates in sensitive health contexts have existed in federal laws for decades, and President Obama referenced them when he issued Executive Order 13535 (March 24, 2010), declaring that, under the ACA, "longstanding Federal laws to protect conscience (such as the Church Amendment, 42 U.S.C. 300a–7, and the Weldon Amendment, section 508(d)(1) of Pub. L. 111–8) remain intact," and that "[n]umerous executive agencies have a role in ensuring that these restrictions are enforced, including the HHS." While the text of Executive Order 13535 does not require the expanded exemptions issued in these rules, the expanded exemptions are, as explained

below, consistent with longstanding federal laws to protect religious beliefs.

In short, the Departments do not believe sections 1554 or 1557 of the ACA, other nondiscrimination statutes, or any constitutional doctrines, create an affirmative obligation to create, maintain, or impose a Mandate that forces covered entities to provide coverage of preventive contraceptive services in health plans. The ACA's grant of authority to HRSA to provide for, and support, the Guidelines is not transformed by any of the laws cited by commenters into a requirement that, once those Guidelines exist, they can never be reconsidered or amended because doing so would only affect women's coverage or would allegedly impact particular populations disparately.

Members of the public have widely divergent views on whether expanding the exemptions is good public policy. Some commenters said the exemptions would burden workers, families, and the economic and social stability of the country, and interfere with the physician-patient relationship. Other commenters disagreed, favoring the public policy behind expanding the exemptions and arguing that the exemptions would not interfere with the physician-patient relationship. For all the reasons explained at length in this preamble, the Departments have determined that these rules are good policy. Because of the importance of the religious liberty values being accommodated, the limited impact of these rules, and uncertainty about the impact of the Mandate overall according to some studies, the Departments do not believe these rules will have any of the drastic negative consequences on third parties or society that some opponents of these rules have suggested.

### E. Interim Final Rulemaking

The Departments received several comments about their decision to issue the Religious IFC as interim final rules with requests for comments, instead of as a notice of proposed rulemaking. Several commenters asserted that the Departments had the authority to issue the Religious IFC in that way, agreeing that the Departments had explicit statutory authority to do so, good cause under the Administrative Procedure Act (APA), or both. Other commenters held the opposite view, contending that there was neither statutory authority to issue the rules on an interim final basis, nor good cause under the APA to make the rules immediately effective.

The Departments continue to believe legal authority existed to issue the Religious IFC as interim final rules.

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include sections 2701 through 2728 of the PHS Act and the incorporation of those sections into section 715 of ERISA and section 9815 of the Code. The Religious and Moral IFCs fall under those statutory authorizations for the use of interim final rulemaking. Prior to the Religious IFC, the Departments issued three interim final rules implementing this section of the PHS Act because of the needs of covered entities for immediate guidance and the weighty matters implicated by the HRSA Guidelines, including issuance of new or revised exemptions or accommodations. (75 FR 41726; 76 FR 46621; 79 FR 51092). The Departments also had good cause to issue the Religious IFC as interim final rules, for the reasons discussed therein.

In any event, the objections of some commenters to the issuance of the Religious IFC as interim final rules with request for comments does not prevent the issuance of these final rules. These final rules are being issued after receiving and thoroughly considering public comments as requested in the Religious IFC. These final rules therefore comply with the APA's notice and comment requirements.

### F. Health Effects of Contraception and Pregnancy

The Departments received numerous comments on the health effects of contraception and pregnancy. As noted above, some commenters supported the expanded exemptions, and others urged that contraceptives be removed from the Guidelines entirely, based on the view that pregnancy and the unborn children resulting from conception are not diseases or unhealthy conditions that are properly the subject of preventive care coverage. Such commenters further contended that hormonal contraceptives may present health risks to women. For example, they contended that studies show certain contraceptives cause or are associated with an increased risk of depression,[28] venous thromboembolic

---

[28] Commenters cited Charlotte Wessel Skovlund et al., "Association of Hormonal Contraception with Depression," 73 JAMA Psychiatry 1154, 1154 (published online Sept. 28, 2016) ("Use of hormonal contraception, especially among adolescents, was associated with subsequent use of antidepressants and a first diagnosis of depression,

disease,[29] fatal pulmonary embolism,[30] thrombotic stroke and myocardial infarction (particularly among women who smoke, are hypertensive, or are older),[31] hypertension,[32] HIV–1 acquisition and transmission,[33] and

suggesting depression as a potential adverse effect of hormonal contraceptive use.'').

[29] Commenters cited the Practice Committee of the American Society for Reproductive Medicine, ''Hormonal Contraception: Recent Advances and Controversies,'' 82 *Fertility and Sterility* S20, S26 (2004); V.A. Van Hylckama et al., ''The Venous Thrombotic Risk of Oral Contraceptives, Effects of Estrogen Dose and Progestogen Type: Results of the MEGA Case-Control Study,'' 339 *Brit. Med. J.* 339b2921 (2009); Y. Vinogradova et al., ''Use of Combined Oral Contraceptives and Risk of Venous Thromboembolism: Nested Case-Control Studies Using the QResearch and CPRD Databases,'' 350 *Brit. Med. J.* 350h2135 (2015) (''Current exposure to any combined oral contraceptive was associated with an increased risk of venous thromboembolism . . . , compared with no exposure in the previous year.''); Ø. Lidegaard et al., ''Hormonal contraception and risk of venous thromboembolism: national follow-up study,'' 339 *Brit. Med. J.* b2890 (2009); M. de Bastos et al., ''Combined oral contraceptives: venous thrombosis,'' Cochrane Database Syst. Rev. (no. 3, 2014). CD010813. doi: 10.1002/14651858.CD010813.pub2, available at *https://www.ncbi.nlm.nih.gov/pubmed?term=24590565*; L.J Havrilesky et al., ''Oral Contraceptive User for the Primary Prevention of Ovarian Cancer,'' Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusetp.html*; and Robert A. Hatcher et al., *Contraceptive Technology* 405–07 (Ardent Media 18th rev. ed. 2004).

[30] Commenters cited N.R. Poulter, ''Risk of Fatal Pulmonary Embolism with Oral Contraceptives,'' 355 *Lancet* 2088 (2000).

[31] Commenters cited Ø. Lidegaard et al., ''Thrombotic Stroke and Myocardial Infarction with Hormonal Contraception,'' 366 *N. Eng. J. Med.* 2257, 2257 (2012) (risks ''increased by a factor of 0.9 to 1.7 with oral contraceptives that included ethinyl estradiol at a dose of 20 μg and by a factor of 1.3 to 2.3 with those that included ethinyl estradiol at a dose of 30 to 40 μg''); Practice Committee of the American Society for Reproductive Medicine, ''Hormonal Contraception''; M. Vessey et al., ''Mortality in Relation to Oral Contraceptive Use and Cigarette Smoking,'' 362 *Lancet* 185, 185–91 (2003); WHO Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, ''Acute Myocardial Infarction and Combined Oral Contraceptives: Results of an International Multicentre Case-Control Study,'' 349 *Lancet* 1202, 1202–09(1997); K.M. Curtis et al., Combined Oral Contraceptive Use Among Women With Hypertension: A Systematic Review, 73 Contraception 73179, 179–88 (2006); L.A. Gillum et al., ''Ischemic stroke risk with oral contraceptives: A meta analysis,'' 284 *JAMA* 72, 72–78 (2000), available at *https://www.ncbi.nlm.nih.gov/pubmed/10872016*; and Robert A. Hatcher et al., *Contraceptive Technology* 404–05, 445 (Ardent Media 18th rev. ed. 2004).

[32] Commenters cited Robert A. Hatcher et al., *Contraceptive Technology* 407, 445 (Ardent Media 18th rev. ed. 2004).

[33] Commenters cited Renee Heffron et al., ''Use of Hormonal Contraceptives and Risk of HIV–1 Transmission: A Prospective Cohort Study,'' 12 *Lancet Infectious Diseases 19, 24* (2012) (''Use of hormonal contraceptives was associated with a two-times increase in the risk of HIV–1 acquisition by women and HIV–1 transmission from women to men.''); and ''Hormonal Contraception Doubles HIV Risk, Study Suggests,'' *Science Daily* (Oct. 4, 2011),

breast, cervical, and liver cancers.[34] Some commenters also observed that fertility awareness based methods of birth spacing are free of similar health risks since they do not involve ingestion of chemicals. Some commenters contended that contraceptive access does not reduce unintended pregnancies or abortions.

Other commenters disagreed, citing a variety of studies they contend show health benefits caused by, or associated with, contraceptive use or the prevention of unintended pregnancy. Commenters cited, for example, the 2011 IOM Report's discussions of the negative effects associated with unintended pregnancies, as well as other studies. Such commenters contended that, by reducing unintended pregnancy, contraceptives reduce the risk of unaddressed health complications, low birth weight, preterm birth, infant mortality, and maternal mortality.[35] Commenters also said studies show contraceptives are associated with a reduced risk of conditions such as ovarian cancer, colorectal cancer, and endometrial cancer,[36] and that contraceptives treat such conditions as endometriosis, polycystic ovarian syndrome, migraines, pre-menstrual pain, menstrual regulation, and pelvic inflammatory

*https://www.sciencedaily.com/releases/2011/10/111003191253.htm*.

[34] Commenters cited ''Oral Contraceptives and Cancer Risk'' (Mar. 21, 2018), National Cancer Institute (reviewed Feb. 22, 2018), *https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/oral-contraceptives-fact-sheet*; L.J Havrilesky et al., ''Oral Contraceptive User for the Primary Prevention of Ovarian Cancer,'' Agency for Healthcare Research and Quality, Report No. 13–E002–EF (June 2013), available at *https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusetp.html*; S.N. Bhupathiraju et al., ''Exogenous hormone use: Oral contraceptives, postmenopausal hormone therapy, and health outcomes in the Nurses' Health Study,'' 106 *Am. J. Pub. Health* 1631, 1631–37 (2016); The World Health Organization Department of Reproductive Health and Research, ''The Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment'', World Health Organization (Sept. 2005), *http://www.who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf*; and the American Cancer Society, ''Known and Probably Human Carcinogens,'' American Cancer Society (rev. Nov. 3, 2016), *https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html*.

[35] Citing, *e.g.*, Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23, and John Hopkins Bloomberg Public Health School of Health, Contraception Use Averts 272,000 Maternal Deaths Worldwide, *https://www.jhsph.edu/news/news-releases/2012/ahmed-contraception.html*.

[36] Citing, *e.g.*, Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. International Journal of Endocrinology and Metabolism, 11 (1), 41–47.

disease.[37] Some commenters said that pregnancy presents various health risks, such as blood clots, bleeding, anemia, high blood pressure, gestational diabetes, and death. Some commenters also contended that increased access to contraception reduces abortions.

Some commenters said that, in the Religious IFC, the Departments made incorrect statements concerning scientific studies. For example, some commenters argued there is no proven increased risk of breast cancer or other risks among contraceptive users. They criticized the Religious IFC for citing studies, including one previewed in the 2011 IOM Report itself (Agency for Healthcare Research and Quality Report No.: 13–E002–EF (June 2013) (cited above)), discussing an association between contraceptive use and increased risks of breast and cervical cancer, and concluding there are no net cancer-reducing benefits of contraceptive use. As described in the Religious IFC, 82 FR at 47804, the 2013 Agency for Healthcare Research and Quality study, and others, reach conclusions with which these commenters appear to disagree. The Departments consider it appropriate to take into account both of those studies, as well as the studies cited by commenters who disagree with those conclusions.

Some commenters further criticized the Departments for saying two studies cited by the 2011 IOM Report, which asserted an associative relationship between contraceptive use and decreases in unintended pregnancy, did not on their face establish a causal relationship between a broad coverage mandate and decreases in unintended pregnancy. In this respect, as noted in the Religious IFC,[38] the purpose for the Departments' reference to such studies was to highlight the difference between a causal relationship and an associative one, as well as the difference between saying contraceptive use has a certain effect and saying a contraceptive coverage mandate (or, more specifically, the part of that mandate affected by certain exemptions) will necessarily have (or negate, respectively) such an effect.

Commenters disagreed about the effects of some FDA-approved contraceptives on embryos. Some

[37] Citing, *e.g.*, id., and American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). Committee Opinion Number 615: Access to Contraception. As discussed below, to the extent that contraceptives are prescribed to treat existing health conditions, and not for preventive purposes, the Mandate would not be applicable.

[38] 82 FR at 47803–04.

commenters agreed with the quotation, in the Religious IFC, of FDA materials [39] that indicate that some items it has approved as contraceptives may prevent the implantation of an embryo after fertilization. Some of those commenters cited additional scientific sources to argue that certain approved contraceptives may prevent implantation, and that, in some cases, some contraceptive items may even dislodge an embryo shortly after implantation. Other commenters disagreed with the sources cited in the Religious IFC and cited additional studies on that issue. Some commenters further criticized the Departments for asserting in the Religious IFC that some persons believe those possible effects are "abortifacient."

The objection on this issue appears to be partially one of semantics. People disagree about whether to define "conception" or "pregnancy" to occur at fertilization, when the sperm and ovum unite, or days later at implantation, when that embryo has undergone further cellular development, travelled down the fallopian tube, and implanted in the uterine wall. This question is independent of the question of what mechanisms of action FDA-approved or cleared contraceptives may have. It is also a separate question from whether members of the public assert, or believe, that it is appropriate to consider the items "abortifacient"—that is, a kind of abortion, or a medical product that causes an abortion—because they believe abortion means to cause the demise of a post-fertilization embryo inside the mother's body. Commenters referenced scientific studies and sources on both sides of the issue of whether certain contraceptives prevent implantation. Commenters and litigants have positively stated that some of them view certain contraceptives as abortifacients, for this reason. *See also Hobby Lobby*, 134 U.S. at 2765 ("The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients.").

The Departments do not take a position on the scientific, religious, or moral debates on this issue by recognizing that some people have

sincere religious objections to providing contraception coverage on this basis. The Supreme Court has already recognized that such a view can form the basis of a sincerely held religious belief under RFRA.[40] Even though there is a plausible scientific argument against the view that certain contraceptives have mechanisms of action that may prevent implantation, there is also a plausible scientific argument in favor of it—as demonstrated, for example, by FDA's statement that some contraceptives may prevent implantation and by some scientific studies cited by commenters. The Departments believe in this context we have a sufficient rationale to offer expanded religious exemptions with respect to this Mandate.

The Departments also received comments about their discussion of the uncertain effects of the expanded exemptions on teen sexual activity. In this respect, the Departments stated, "With respect to teens, the Santelli and Melnikas study cited by IOM 2011 observes that, between 1960 and 1990, as contraceptive use increased, teen sexual activity outside of marriage likewise increased (although the study does not assert a causal relationship). Another study, which proposed an economic model for the decision to engage in sexual activity, stated that '[p]rograms that increase access to contraception are found to decrease teen pregnancies in the short run but increase teen pregnancies in the long run.' " [41] Some commenters agreed with

this discussion, while other commenters disagreed. Commenters who supported the expanded exemptions cited these and similar sources suggesting that denying expanded exemptions to the Mandate is not a narrowly tailored way to advance the Government's interests in reducing teen pregnancy, and suggesting there are means of doing so that are less restrictive of religious exercise.[42] Some commenters opposing the expanded exemptions stated that school-based health centers provide access to contraceptives, thus increasing use of contraceptives by sexually active students. They also cited studies concluding that certain decreases in teen pregnancy are attributable to increased contraceptive use.[43]

Many commenters opposing the Religious IFC misunderstood the Departments' discussion of this issue. Teens are a significant part, though not the entirety, of women the IOM identified as being most at risk of unintended pregnancy. The Departments do not take a position on the empirical question of whether contraception has caused certain reductions in teen pregnancy. Rather, we note that studies suggesting various causes of teen pregnancy and unintended pregnancy in general support the Departments' conclusion that it is difficult to establish causation between granting religious exemptions to the contraceptive Mandate and either an increase in teen pregnancies in particular, or unintended pregnancies in general. For example, a 2015 study investigating the decline in teen pregnancy since 1991 attributed it to multiple factors (including but not limited to reduced sexual activity, falling welfare benefit levels, and expansion of family planning services in Medicaid, with the latter accounting for less than 13 percent of the decline), and concluded "that none of the relatively easy, policy-based explanations for the recent decline in teen childbearing in the United States hold up very well to careful empirical scrutiny." [44] One

---

[39] FDA's guide "Birth Control: Medicines To Help You," specifies that various approved contraceptives, including Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization and "may also work . . . by preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization. Available at *https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm*.

[40] "Although many of the required, FDA-approved methods of contraception work by preventing the fertilization of an egg, four of those methods (those specifically at issue in these cases) may have the effect of preventing an already fertilized egg from developing any further by inhibiting its attachment to the uterus. See Brief for HHS in No. 13–354, pp. 9–10, n. 4; FDA, Birth Control: Medicines to Help You." *Hobby Lobby*, 134 S. Ct. at 2762–63. "The Hahns have accordingly excluded from the group-health-insurance plan they offer to their employees certain contraceptive methods that they consider to be abortifacients. . . . Like the Hahns, the Greens believe that life begins at conception and that it would violate their religion to facilitate access to contraceptive drugs or devices that operate after that point." *Id.* at 2765–66.

[41] Citing J.S. Santelli & A.J. Melnikas, "Teen fertility in transition: recent and historic trends in the United States," 31 *Ann. Rev. Pub. Health* 371, 375–76 (2010), and Peter Arcidiacono et al., *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* (2005), available at *http://public.econ.duke.edu/~psarcidi/addicted13.pdf*. *See also* K. Buckles & D. Hungerman, "The Incidental Fertility Effects of School Condom Distribution Programs," *Nat'l Bureau of Econ. Research* Working Paper No. 22322 (June 2016), available at *http://www.nber.org/papers/w22322* ("access to condoms in schools increases teen fertility by about 10 percent" and increased sexually transmitted infections).

[42] *See* Helen Alvaré, "No Compelling Interest: The 'Birth Control' Mandate and Religious Freedom," 58 *Vill. L. Rev.* 379, 400–02 (2013) (discussing the Santelli & Melnikas study and the Arcidiacono study cited above, and other research that considers the extent to which reduction in teen pregnancy is attributable to sexual risk avoidance rather than to contraception access).

[43] *See, for example,* Lindberg L., Santelli J., "Understanding the Decline in Adolescent Fertility in the United States, 2007–2012," 59 *J. Adolescent Health* 577–83 (Nov. 2016), *https://doi.org/10.1016/j.jadohealth.2016.06.024; see also* Comment of The Colorado Health Foundation, submission ID CMS–2014–0115–19635, *www.regulations.gov* (discussing teen pregnancy data from Colorado).

[44] Kearney MS and Levine PB, "Investigating recent trends in the U.S. birth rate," 41 *J. Health*

study found that during the teen pregnancy decline between 2007–2012, teen sexual activity was also decreasing.[45] One study concluded that falling unemployment rates in the 1990s accounted for 85% of the decrease in rates of first births among 18–19 year-old African Americans.[46] Another study found that the representation of African-American teachers was associated with a significant reduction in the African-American teen pregnancy rate.[47] One study concluded that an ''increase in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy.'' [48] Similarly, one study from England found that, where funding for teen pregnancy prevention was reduced, there was no evidence that the reduction led to an increase in teen pregnancies.[49] Some commenters also cited studies, which are not limited to the issue of teen pregnancy, that have found many women who have abortions report that they were using contraceptives when they became pregnant.[50]

*Econ.* 15–29 (2015), available at *https:// www.sciencedirect.com/science/article/abs/pii/ S0167629615000041.*

[45] *See, for example,* K. Ethier et al., ''Sexual Intercourse Among High School Students—29 States and United States Overall, 2005–2015,'' 66 *CDC Morb. Mortal. Wkly Report* 1393, 1393–97 (Jan. 5, 2018), available at *http://dx.doi.org/10.15585/ mmwr.mm6651S2a1* (''Nationwide, the proportion of high school students who had ever had sexual intercourse decreased significantly overall. . . .'').

[46] Colen CG, Geronimus AT, and Phipps MG, ''Getting a piece of the pie? The economic boom of the 1990s and declining teen birth rates in the United States,'' 63 *Social Science & Med.* 1531–45 (Sept. 2006), available at *https:// www.sciencedirect.com/science/article/pii/ S027795360600205X.*

[47] Atkins DN and Wilkins VM, ''Going Beyond Reading, Writing, and Arithmetic: The Effects of Teacher Representation on Teen Pregnancy Rates,'' 23 *J. Pub. Admin. Research & Theory* 771–90 (Oct. 1, 2013), available at *https://academic.oup.com/ jpart/article-abstract/23/4/771/963674.*

[48] E. Collins & B. Herchbein, ''The Impact of Subsidized Birth Control for College Women: Evidence from the Deficit Reduction Act,'' *U. Mich. Pop. Studies Ctr.* Report 11–737 (May 2011), available at *https://www.psc.isr.umich.edu/pubs/ pdf/rr11-737.pdf* (''[I]ncrease in the price of the Pill on college campuses . . . did not increase the rates of unintended pregnancy or sexually transmitted infections for most women'').

[49] *See* D. Paton & L. Wright, ''The effect of spending cuts on teen pregnancy,'' 54 *J. Health Econ.* 135, 135–46 (2017), available at *https:// www.sciencedirect.com/science/article/abs/pii/ S0167629617304551* (''Contrary to predictions made at the time of the cuts, panel data estimates provide no evidence that areas which reduced expenditure the most have experienced relative increases in teenage pregnancy rates. Rather, expenditure cuts are associated with small reductions in teen pregnancy rates'').

[50] Commenters cited, for example, Guttmacher Institute, ''Fact Sheet: Induced Abortion in the United States'' (Jan. 2018) (''Fifty-one percent of abortion patients in 2014 were using a contraceptive method in the month they became pregnant''), available at *https://*

As the Departments stated in the Religious IFC, we do not take a position on the variety of empirical questions discussed above. Likewise, these rules do not address the substantive question of whether HRSA should include contraceptives in the women's preventive services Guidelines issued under section 2713(a)(4). Rather, reexamination of the record and review of the public comments has reinforced the Departments' conclusion that significantly more uncertainty and ambiguity exists on these issues than the Departments previously acknowledged when we declined to extend the exemption to certain objecting organizations and individuals. The uncertainty surrounding these weighty and important issues makes it appropriate to maintain the expanded exemptions and accommodation if and for as long as HRSA continues to include contraceptives in the Guidelines. The federal government has a long history, particularly in certain sensitive and multi-faceted health issues, of providing religious exemptions from governmental mandates. These final rules are consistent with that history and with the discretion Congress vested in the Departments for implementing the ACA.

*G. Health and Equality Effects of Contraceptive Coverage Mandates*

The Departments also received comments about the health and equality effects of the Mandate more broadly. Some commenters contended that the contraceptive Mandate promotes the health and equality of women, especially low income women and promotes female participation and equality in the workforce. Other commenters contended that there was insufficient evidence that the expanded exemptions would harm those interests. Some of those commenters further questioned whether there was evidence that broad health coverage mandates of contraception lead to increased contraceptive use, reductions in unintended pregnancies, or reductions in negative effects said to be associated with unintended pregnancies. In particular, some commenters discussed the study quoted above, published and revised by the Guttmacher Institute in October 2017, concluding that through 2014 there were no significant changes in the overall proportion of women who used a contraceptive method both among all women and among women at risk of unintended pregnancy, that there was no significant shift from less

*www.guttmacher.org/sites/default/files/factsheet/ fb_induced_abortion.pdf.*

effective to more effective methods, and that it was ''unclear'' whether this Mandate impacted contraceptive use because there was no significant increase in the use of contraceptive methods the Mandate covered.[51] These commenters also noted that, in the 29 States where contraceptive coverage mandates have been imposed statewide,[52] those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall.[53] Other commenters, however, disputed the significance of these state statistics, noting that of the 29 states with contraceptive coverage mandates, only four states have laws that match the federal requirements in scope. Some also observed that, even in states with state contraceptive coverage mandates, self-insured group health plans might escape those requirements, and some states do not mandate the contraceptives to be covered at no out-of-pocket cost to the beneficiary.

The Departments have considered these experiences as relevant to the effect the expanded exemptions in these rules might have on the Mandate more broadly. The state mandates apply to a very large number of plans and plan participants, notwithstanding ERISA preemption, and public commenters did not point to studies showing those state mandates reduced unintended pregnancies. The federal contraceptive Mandate, likewise, applies to a broad, but not entirely comprehensive, number of employers. For example, to the extent that houses of worship and integrated auxiliaries may have self-insured to avoid state health insurance contraceptive coverage mandates or for other reasons, those groups are, and have been, exempt from the federal Mandate prior to the Religious IFC. The exemptions as set forth in the Religious IFC and in these final rules leave the contraceptive Mandate in place for nearly all entities and plans to which the Mandate has applied. The Departments are not aware of data showing that these expanded exemptions would negate any reduction in unintended pregnancies that might

[51] Kavanagh, 97 *Contraception* at 14–21.

[52] *See* Guttmacher Institute, ''Insurance Coverage of Contraceptives'' (June 11, 2018); Kaiser Family Foundation, ''State Requirements for Insurance Coverage of Contraceptives,'' Henry J Kaiser Family Foundation (Jan. 1, 2018), *https://www.kff.org/ other/state-indicator/state-requirements-for- insurance-coverage-of-contraceptives/?current Timeframe=0&sortModel=%7B%22colId%22: %22Location%22,%22sort%22:%22asc%22%7D.*

[53] *See* Michael J. New, ''Analyzing the Impact of State Level Contraception Mandates on Public Health Outcomes,'' 13 *Ave Maria L. Rev.* 345 (2015), available at *http://avemarialaw-law-review. avemarialaw.edu/Content/articles/ vXIII.i2.new.final.0809.pdf.*

result from a broad contraceptive coverage mandate.

Some commenters expressed concern that providing exemptions to the Mandate that private parties provide contraception may lead to exemptions regarding other medications or services, like vaccines. The exemptions provided in these rules, however, do not apply beyond the contraceptive coverage requirement implemented through section 2713(a)(4). Specifically, PHS Act section 2713(a)(2) requires coverage of ''immunizations,'' and these exemptions do not encompass that requirement. The fact that the Departments have exempted houses of worship and integrated auxiliaries from the contraceptive Mandate since 2011 did not lead to those entities receiving exemptions under section 2713(a)(2) concerning vaccines. In addition, hundreds of entities have sued the Departments over the implementation of section 2713(a)(4), leading to two decisions of the U.S. Supreme Court, but no similar wave of lawsuits has challenged section 2713(a)(2). The expanded exemptions in these final rules are consistent with a long history of statutes protecting religious beliefs from certain health care mandates concerning issues such as sterilization, abortion and birth control.

Some commenters took issue with the conclusion set forth in the Religious IFC, which is similar to that asserted in the 2017 Guttmacher study, that ''[t]he role that the contraceptive coverage guarantee played in impacting use of contraception at the national level remains unclear, as there was no significant increase in the use of methods that would have been covered under the ACA.'' They observed that more women have coverage of contraceptives and contraception counseling under the ACA and that more contraceptives are provided without co-pays than before. Still other commenters argued that the Mandate, or other expansions of contraceptive coverage, have led women to increase their use of contraception in general, or to change from less effective, less expensive contraceptive methods to more effective, more expensive contraceptive methods. Some commenters lamented that exemptions would include exemption from the requirement to cover contraception counseling. Some commenters pointed to studies cited in the 2011 IOM Report recommending contraception be included in the Guidelines and argued that certain women will go without certain health care, or contraception specifically, because of cost. They contended that a smaller percentage of women delay or forego health care overall under the ACA [54] and that, according to studies, coverage of contraceptives without cost-sharing has increased use of contraceptives in certain circumstances. Some commenters also argued that studies show that decreases in unintended pregnancies are due to broader access of contraceptives. Finally, some commenters argued that birth control access generally has led to social and economic equality for women.

The Departments have reviewed the comments, including studies submitted by commenters either supporting or opposing these expanded exemptions. Based on our review, it is not clear that merely expanding exemptions as done in these rules will have a significant effect on contraceptive use and health, or workplace equality, for the vast majority of women benefitting from the Mandate. There is conflicting evidence regarding whether the Mandate alone, as distinct from birth control access more generally, has caused increased contraceptive use, reduced unintended pregnancies, or eliminated workplace disparities, where all other women's preventive services were covered without cost sharing. Without taking a definitive position on those evidentiary issues, however, we conclude that the Religious IFC and these final rules— which merely withdraw the Mandate's requirement from what appears to be a small group of newly exempt entities and plans—are not likely to have negative effects on the health or equality of women nationwide. We also conclude that the expanded exemptions are an appropriate policy choice left to the agencies under the relevant statutes, and, thus, are an appropriate exercise of the Departments' discretion.

Moreover, we conclude that the best way to balance the various policy interests at stake in the Religious IFC and these final rules is to provide the expanded exemptions set forth herein, even if certain effects may occur among the populations actually affected by the employment of these exemptions. These rules will provide tangible protections for religious liberty, and impose fewer governmental burdens on various entities and individuals, some of whom have contended for several years that denying them an exemption from the contraceptive Mandate imposes a substantial burden on their religious exercise. The Departments view the provision of those protections to preserve religious exercise in this health care context as an appropriate policy option, notwithstanding the widely divergent effects that public commenters have predicted based on different studies they cited. Providing the protections for religious exercise set forth in the Religious IFC and these final rules is not inconsistent with the ACA, and brings this Mandate into better alignment with various other federal conscience protections in health care, some of which have been in place for decades.

## III. Description of the Text of the Regulations and Response to Additional Public Comments

Here, the Departments describe the regulatory text set forth prior to the Religious IFC, the regulations from that IFC, public comments in response to the specific regulatory text set forth in the IFC, the Departments' response to those comments, and, in consideration of those comments, the regulatory text as finalized in this final rule. As noted above, various members of the public provided comments that were supportive, or critical, of the Religious IFC overall, or of significant policies pertaining to those regulations. To the extent those comments apply to the following regulatory text, the Departments have responded to them above. This section of the preamble responds to comments that pertain more specifically to particular regulatory text.

### A. Restatement of Statutory Requirements of PHS Act Section 2713(a) and (a)(4) (26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv))

The previous regulations restated the statutory requirements of section 2713(a) of the PHS Act, at 26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv). The Religious IFC modified these restatements to more closely align them with the text of PHS Act section 2713(a) and (a)(4).

Previous versions of these rules had varied from the statutory language. PHS Act section 2713(a) and (a)(4) require group health plans and health insurance issuers offering coverage to provide coverage without cost sharing for ''such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines'' supported by HRSA. In comparison, the previous version of regulatory restatements of this language (as drawn from 45 CFR 147.130(a)(1)

---

[54] Citing, for example, Adelle Simmons et al., ''The Affordable Care Act: Promoting Better Health for Women,'' Table 1, Assistant Secretary for Planning and Evaluation (June 14, 2016), *https://aspe.hhs.gov/system/files/pdf/205066/ACAWomenHealthIssueBrief.pdf*.

and (a)(1)(iv)) stated the coverage must include "evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by" HRSA. The Religious IFC amended this language to state, parallel to the language in section 2713(a)(4), that the coverage must include "such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by" HRSA.

These rules adopt as final, without change, the provisions in the Religious IFC amending 26 CFR 54.9815–2713(a)(1) and (a)(1)(iv), 29 CFR 2590.715–2713(a)(1) and (a)(1)(iv), and 45 CFR 147.130(a)(1) and (a)(1)(iv). In this way, the regulatory text better conforms to the statutory language. In paragraph (a)(1) of the final regulations, instead of saying "must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements . . . with respect to those items and services:", the regulation now tracks the statutory language by saying "must provide coverage for and must not impose any cost-sharing requirements . . . for—". By eliminating the language "coverage for all of the following items and services," and "with respect to those items and services," the Departments do not intend that coverage for specified items and services will not be required, but we simply intend to simplify the text of the regulation to track the statute and avoid duplicative language.

By specifying that paragraph (a)(1)(iv) concerning the women's preventive services Guidelines encompasses "such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to §§ 147.131 and 147.132," the regulatory text also better tracks the statutory language that the Guidelines are for "such additional" preventive services as HRSA may "provide[ ] for" and "support[ ]." This text also eliminates language, not found in the statute, that the Guidelines are "evidence-informed" and "binding." Congress did not include the word "binding" in PHS Act section 2713, and did include the words "evidence-based" or "evidence-informed" in section 2713(a)(1) and (a)(3), but omitted such terms from section 2713(a)(4). In this way, the regulatory text better comports with the scope of the statutory text. This text of paragraph (a)(1)(iv) also

acknowledges that the Departments have decided Guidelines issued under section 2713(a)(4) will not be provided for or supported to the extent they exceed the exemptions and accommodation set forth in 45 CFR 147.131 and 147.132. Previous versions of the regulation placed that limit in 45 CFR 147.130(a)(1), but did not reiterate it in § 147.130(a)(1)(iv). To clearly set forth the applicability of the exemptions and accommodation, the Departments adopt as final the Religious IFC language, which included the language "subject to §§ 147.131 and 147.132" in both § 147.130(a)(1) and § 147.130(a)(1)(iv). Because these final rules adopt as final the Religious IFC language which includes the exemptions and accommodation in both §§ 147.131 and 147.132, and not just in § 147.131 as under the previous rules, the Departments correspondingly included references to both sections in this part.

Some commenters supported restoring the statutory language from PHS Act section 2713(a) and (a)(4) in the regulatory restatements of that language. Other commenters opposed doing so, asserting that Guidelines issued pursuant to section 2713(a)(4) must be "evidence-informed" and "binding." The Departments disagree with the position that, even though Congress omitted those terms from section 2713(a)(4), their regulatory restatement of the statutory requirement should include those terms. Instead, the Departments conclude that it is more appropriate for the regulatory restatements of section 2713(a)(4) to track the statutory language in this regard, namely, "as provided for in comprehensive guidelines supported by [HRSA] for purposes of" that paragraph.

## B. Prefatory Language of Religious Exemptions (45 CFR 147.132(a)(1))

These final rules adopt as final, with changes based on comments as set forth below, the regulatory provision in the Religious IFC that moved the religious exemption from 45 CFR 147.131(a) to 45 CFR 147.132.

In the previous regulations, the exemption stated, at § 147.131(a), that HRSA's Guidelines "may establish an exemption" for the health plan or coverage of a "religious employer," defined as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code." The Religious IFC moved the exemption to a new § 147.132, in which paragraph (a) discussed objecting entities, paragraph (b) discussed objecting individuals,

paragraph (c) set forth a definition, and paragraph (d) discussed severability. The prefatory language to § 147.132(a)(1) stated that HRSA's Guidelines "must not provide for or support the requirement of coverage or payments for contraceptive services" for the health plan or coverage of an "objecting organization," and thus that HRSA "will exempt" such an organization from the contraceptive coverage requirments of the Guidelines. The remainder of paragraph (a)(1), which is discussed in greater detail below, describes what entities are included as objecting organizations.

This language not only specifies that certain entities are "exempt," but also explains that the Guidelines shall not support or provide for an imposition of the contraceptive coverage requirement to such exempt entities. This is an acknowledgement that section 2713(a)(4) requires women's preventive services coverage only "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." To the extent the HRSA Guidelines do not provide for, or support, the application of such coverage to certain entities or plans, the Affordable Care Act does not require the coverage. Those entities or plans are "exempt" by not being subject to the requirements in the first instance. Therefore, in describing the entities or plans as "exempt," and in referring to the "exemption" encompassing those entities or plans, the Departments also affirm the non-applicability of the Guidelines to them.

The Departments wish to make clear that the expanded exemption set forth in § 147.132(a) applies to several distinct entities involved in the provision of coverage to the objecting employer's employees. This explanation is consistent with how prior regulations have worked by means of similar language. When sections § 147.132(a)(1) and (a)(1)(i) specify that "[a] group health plan," "health insurance coverage provided in connection with a group health plan," and "health insurance coverage offered or arranged by an objecting organization" are exempt "to the extent" of the objections "as specified in paragraph (a)(2)," that language exempts the group health plans of the sponsors that object, and their health insurance issuers in providing the coverage in those plans (whether or not the issuers have their own objections). Consequently, with respect to Guidelines issued under § 147.130(a)(1)(iv) (and as referenced by the parallel provisions in 26 CFR 54.9815–2713(a)(1)(iv) and 29 CFR 2590.715–2713(a)(1)(iv)), the plan

sponsor, issuer, and plan covered in the exemption of § 147.132(a)(1) and (a)(1)(i) would face no penalty as a result of omitting certain contraceptive coverage from the benefits of the plan participants and beneficiaries. However, while the objection of a plan sponsor (or entity that arranges coverage under the plan, as applicable) removes penalties from that plan's issuer, it only does so for that plan—it does not affect the issuer's coverage for other group health plans where the plan sponsor has no qualifying objection. More information on the effects of the objection of a health insurance issuer in § 147.132(a)(1)(iii) is included below.

The exemptions in § 147.132(a)(1) apply ''to the extent'' of the objecting entities' sincerely held religious convictions. Thus, entities that hold a requisite objection to covering some, but not all, contraceptive items would be exempt with respect to the items to which they object, but not with respect to the items to which they do not object. Some commenters said it was unclear whether the plans of entities or individuals that religiously object to some but not all contraceptives would be exempt from being required to cover just the contraceptive methods as to which there is an objection, or whether the objection to some contraceptives leads to an exemption from that plan being required to cover all contraceptives. The Departments intend that a requisite religious objection against some but not all contraceptives would lead to an exemption only to the extent of that objection: That is, the exemption would encompass only the items to which the relevant entity or individual objects, and would not encompass contraceptive methods to which the objection does not apply. To make this clearer, in these final rules, the Departments finalize the prefatory language of § 147.132(a) with the following change, so that the final rules state that an exemption shall be included, and the Guidelines must not provide for contraceptive coverage, ''to the extent of the objections specified below.''

The Departments have made corresponding changes to language throughout the regulatory text, to describe the exemptions as applying ''to the extent'' of the objection(s).

### C. Scope of Religious Exemptions and Requirements for Exempt Entities (45 CFR 147.132)

In 45 CFR 147.132(a)(1)(i) through (iii) and (b), the Religious IFC expands the exemption to plans of additional entities and individuals not encompassed by the exemption set forth in the regulations

prior to the Religious IFC. Specific entities to which the expanded exemptions apply are discussed below.

The exemptions contained in previous regulations, at § 147.131(a), did not require exempt entities to submit any particular self-certification or notice, either to the government or to their issuer or third party administrator, in order to obtain or qualify for the exemption. Similarly, under the expanded exemptions in § 147.132, the Religious IFC did not require exempt entities to comply with a self-certification process. We finalize that approach in this respect without change. Although exempt entities do not need to file notices or certifications of their exemption, and these final rules do not impose any new notice requirements on them, existing ERISA rules governing group health plans require that, with respect to plans subject to ERISA, a plan document must include a comprehensive summary of the benefits covered by the plan and a statement of the conditions for eligibility to receive benefits. Under ERISA, the plan document identifies what benefits are provided to participants and beneficiaries under the plan; if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document. Moreover, if there is a reduction in a covered service or benefit, the plan has to disclose that change to plan participants.[55] Thus, where an exemption applies and all (or a subset of) contraceptive services are omitted from a plan's coverage, otherwise applicable ERISA disclosure documents must reflect the omission of coverage in ERISA plans. These existing disclosure requirements serve to help provide notice to participants and beneficiaries of what ERISA plans do and do not cover.

Some commenters supported the expanded exemption's approach which maintained the policy of the previous exemption in not requiring exempt entities to comply with a self-certification process. They suggested that self-certification forms for an exemption are not necessary, could add burdens to exempt entities beyond those imposed by the previous exemption, and could give rise to religious objections to the self-certification process itself. Commenters also stated that requiring an exemption form for

exempt entities could cause additional operational burdens for plans that have existing processes in place to handle exemptions. Other commenters, however, favored including a self-certification process for exempt entities. They suggested that entities might abuse the availability of an exemption or use exempt status insincerely if no self-certification process exists, and that the Mandate might be difficult to enforce without a self-certification process. Some commenters asked that the government publish a list of entities that claim the exemption.

The Departments believe it is appropriate to not require exempt entities to submit a self-certification or notice. The previous exemption did not require a self-certification or notice, and the Departments did not collect a list of all entities that used the exemption. The Departments believe the approach under the previous exemption is appropriate for the expanded exemption. Adding a self-certification or notice to the exemption process would impose an additional paperwork burden on exempt entities that the previous regulations did not impose, and would also involve additional public costs if those certifications or notices were to be reviewed or kept on file by the government.

The Departments are not aware of instances where the lack of a self-certification under the previous exemption led to abuses or to an inability to engage in enforcement. The Mandate is enforceable through various mechanisms in the PHS Act, the Code, and ERISA. Entities that insincerely or otherwise improperly operate as if they are exempt would do so at the risk of enforcement under such mechanisms. The Departments are not aware of sufficient reasons to believe those measures and mechanisms would fail to deter entities from improperly operating as if they are exempt. Moreover, as noted above, ERISA and other plan disclosure requirements governing group health plans require provision of a comprehensive summary of the benefits covered by the plan and disclosure of any reductions in covered services or benefits, so beneficiaries in plans that reduce or eliminate contraceptive benefits as a result of the exemption will know whether their health plan claims an exemption and will be able to raise appropriate challenges to such claims. As a consequence, the Departments believe it is an appropriate balance of various concerns expressed by commenters for these rules to continue to not require notices or self-certifications for using the exemption.

---

[55] See, for example, 29 U.S.C. 1022, 1024(b), 29 CFR 2520.102–2, 102–3, & 104b–3(d), and 29 CFR 2590.715–2715. *See also* 45 CFR 147.200 (requiring disclosure of the ''exceptions, reductions, and limitations of the coverage,'' including group health plans and group and individual issuers).

Some commenters asked the Departments to add language indicating that an exemption cannot be invoked in the middle of a plan year, nor should it be used to the extent inconsistent with laws that apply to, or state approval of, fully insured plans. None of the previous iterations of the exemption regulations included such provisions, and the Departments do not consider them necessary in these rules. The expanded exemptions in these rules only purport to exempt plans and entities from the application of the federal contraceptive coverage requirement of the Guidelines issued under section 2713(a)(4). They do not purport to exempt entities or plans from state laws concerning contraceptive coverage, or laws governing whether an entity can make a change (of whatever kind) during a plan year. The rules governing the accommodation likewise do not purport to obviate the need to follow otherwise applicable rules about making changes during a plan year. (Below, these rules discuss in more detail the accommodation and when an entity seeking to revoke it would be able to do so or to notify plan participants of the revocation.)

Commenters also asked that clauses be added to the regulatory text holding issuers harmless where exemptions are invoked by plan sponsors. As discussed above, the exemption rules already specify that, where an exemption applies to a group health plan, it encompasses both the group health plan and health insurance coverage provided in connection with the group health plan, and therefore encompasses any impact on the issuer of the contraceptive coverage requirement with respect to that plan. In addition, as discussed below, the Departments are including, in these final rules, language from the previous regulations protecting issuers that act in reliance on certain representations made in the accommodation process. To the extent that commenters seek language offering additional protections for other incidents that might occur in connection with the invocation of an exemption, the previous exemption regulations did not include such provisions, and the Departments do not consider them necessary in these final rules. As noted above, the expanded exemptions in these final rules simply remove or narrow the contraceptive Mandate contained in and derived from the Guidelines for certain plans. The previous regulations included a reliance clause in the accommodation provisions, but did not specify further details regarding the relationship between exempt entities and their issuers or third party administrators.

Regarding the Religious IFC's expansion of the exemption to other kinds of entities and individuals in general, commenters disagreed about the likely effects of the exemptions on the health coverage market. Some commenters said that expanding the exemptions would not cause complications in the market, while others said that it could, due to such causes as a lack of uniformity among plans or permitting multiple risk pools. The Departments note that the extent to which plans cover contraception under the prior regulations is already far from uniform. Congress did not require all entities to comply with section 2713 of the PHS Act (under which the Mandate was promulgated)—most notably by exempting grandfathered plans. Moreover, under the previous regulations, issuers were already able to offer plans that omit contraceptives—or offer only some contraceptives—to houses of worship and integrated auxiliaries; some commenters and litigants said that issuers were doing so. These cases where plans did not need to comply with the Mandate, and the Departments' previous accommodation process allowing coverage not to be provided in certain self-insured church plans, together show that the importance of a uniform health coverage system is not significantly harmed by allowing plans to omit contraception in some contexts.[56]

Concerning the prospect raised by commenters of different risk pools between men and women, PHS Act section 2713(a) itself provides for some preventive services coverage that applies to both men and women, and some that would apply only to women. With respect to the latter, it does not specify what, if anything, HRSA's Guidelines for women's preventives services would cover, or if contraceptive coverage would be required. These rules do not require issuers to offer products that satisfy religiously objecting entities or individuals; they simply make it legal to do so. The Mandate has been imposed only relatively recently, and the contours of its application to religious entities has been in continual flux, due to various rulemakings and court orders. Overall, concerns raised by some public commenters have not led the Departments to consider it likely that offering these expanded exemptions will cause any injury to the uniformity or operability of the health coverage market.

## D. Plan Sponsors in General (45 CFR 147.132(a)(1)(i) Prefatory Text)

With respect to employers and others that sponsor group health plans, in § 147.132(a)(1)(i), the Religious IFC provided exemptions for non-governmental plan sponsors that object to coverage of all, or a subset, of contraceptives or sterilization and related patient education and counseling based on sincerely held religious beliefs. The Departments finalize the prefatory text of § 147.132(a)(1)(i) without change.

The expanded exemptions covered any kind of non-governmental employer plan sponsor with the requisite objections, stating the exemption encompassed ''[a] group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (a)(2) of this section.'' For the sake of clarity, the expanded exemptions also stated that ''[s]uch non-governmental plan sponsors include, but are not limited to, the following entities,'' followed by an illustrative, non-exhaustive list of non-governmental organizations whose objections qualify the plans they sponsor for an exemption. Each type of such entities, and comments specifically concerning them, are discussed below.

The plans of governmental employers are not covered by the plan sponsor exemption in § 147.132(a)(1)(i). Some commenters suggested that the expanded religious exemptions should include government entities. Others disagreed. The Departments are not aware of reasons why it would be appropriate or necessary to offer a religious exemption to governmental employer plan sponsors with respect to the contraceptive Mandate. We are unaware of government entities that would attempt to assert a religious exemption to the Mandate, and it is not clear to us that a governmental entity could do so. Accordingly, we conclude that it is appropriate for us to not further expand the religious exemption to include governmental entities in the religious plan-sponsor exemption.

Nevertheless, as discussed below, governmental employers are permitted to respect an individual's objection under § 147.132(b) and, thus, to provide

---

[56] *See also Real Alternatives* v. *Sec'y, Dep't of Health & Human Servs.,* 867 F.3d 338, 389 (3d Cir. 2017) (Jordan, J., concurring in part and dissenting in part) (''Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government's interest in a sustainable and functioning market. . . . Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the ACA) would be unworkable, it has not satisfied strict scrutiny.'' (citation and internal quotation marks omitted)).

health coverage without the objected-to contraceptive coverage to such individual. Where that exemption is operative, the Guidelines may not be construed to prevent a willing governmental plan sponsor of a group health plan from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.

By the general extension of the exemption to the plans of plan sponsors in § 147.132(a)(1)(i), these final rules also exempt group health plans sponsored by an entity other than an employer (for example, a union, or a sponsor of a multiemployer plan) that objects based on sincerely held religious beliefs to coverage of contraceptives or sterilization. Some commenters objected to extending the exemption to such entities, arguing that they could not have the same kind of religious objection that a single employer might have. Other commenters supported the protection of any plan sponsor with the requisite religious objection. The Departments conclude that it is appropriate, where the plan sponsor of a union, multiemployer, or similar plan adopts a religious objection using the same procedures that such a plan sponsor might use to make other decisions, that the expanded exemptions should respect that decision by providing an exemption from the Mandate.

*E. Houses of Worship and Integrated Auxiliaries (45 CFR 147.132(a)(1)(i)(A))*

As noted above, the exemption in the previous regulations, found at § 147.131(a), included only "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." Section 6033(a)(3)(A)(i) or (iii) of the Code encompasses "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order."

The Religious IFC expanded the exemption to include, in § 147.132(a)(1)(i)(A), plans sponsored by "[a] church, an integrated auxiliary of a church, a convention or association of churches, or a religious order." Most commenters did not oppose the exemptions continuing to include these entities, although some contended that the Departments have no authority to exempt any entity or plan from the Mandate, an objection to which the

Departments respond above. Notably, this exemption exempts "a religious order," and not merely "the exclusively religious activities of any religious order." In addition, section 6033(a)(3)(A)(i) specifies that it covers churches, not merely "the exclusively religious activities" of a church. Some religious people might express their beliefs through a church, others might do so through a religious order, and still others might do so through religious bodies that take a different form, structure, or nomenclature based on a different cultural or historical tradition. *Cf. Hosanna-Tabor Evangelical Lutheran Church and School* v. *E.E.O.C.,* 565 U.S. 171, 198 (2012) (Alito and Kagan, JJ., concurring) ("The term 'minister' is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews, Muslims, Hindus, or Buddhists."). For the purposes of respecting the exercise of religious beliefs, which the expanded exemptions in these rules concern, the Departments find it appropriate that this part of the exemption encompasses religious orders and churches similarly, without limiting the scope of the protection to the exclusively religious activities of either kind of entity. Based on all these considerations, the Departments finalize § 147.132(a)(1)(i)(A) without change.

Moreover, the Departments also finalize the regulatory text to exempt plans "established or maintained by" a house of worship or integrated auxiliary on a plan, not employer, basis. Under previous regulations, the Departments stated that "the availability of the exemption or accommodation [was to] be determined on *an employer by employer basis,* which the Departments . . . believe[d] best balance[d] the interests of religious employers and eligible organizations and those of employees and their dependents." (78 FR 39886 (emphasis added)). Therefore, under the prior exemption, if an employer participated in a house of worship's plan—perhaps because it was affiliated with a house of worship—but was not an integrated auxiliary or a house of worship itself, that employer was not covered by the exemption, even though it was, in the ordinary meaning of the text of the prior regulation, participating in a "plan established or maintained by a [house of worship]." Upon further consideration, in the Religious IFC, the Departments changed their view on this issue and expanded the exemption for houses of worship and integrated auxiliaries. Under these rules, the Departments intend that,

when this regulation text exempts a plan "established or maintained by" a house of worship or integrated auxiliary, such exemption will no longer "be determined on an employer by employer basis," but will be determined on a plan basis—that is, by whether the plan is a "plan established or maintained by" a house of worship or integrated auxiliary. This interpretation better conforms to the text of the regulation setting forth the exemption—in both the prior regulation and in the text set forth in these final rules. It also offers appropriate respect to houses of worship and their integrated auxiliaries not only in their internal employment practices, but in their choice of organizational form and/or in their activity of establishing or maintaining health plans for employees of associated employers that do not meet the requirement of being integrated auxiliaries. Under this interpretation, houses of worship would not be faced with the potential of having to include, in the plans that they have established and maintained, coverage for services to which they have a religious objection for employees of an affiliated employer participating in the plans.

The Departments do not believe there is a sufficient factual basis to exclude from this part of the exemption entities that are so closely associated with a house of worship or integrated auxiliary that they are permitted to participate in its health plan but are not themselves integrated auxiliaries. Additionally, this interpretation is not inconsistent with the operation of the accommodation under the prior regulation where with respect to self-insured church plans, hundreds of nonprofit religious entities participating in those plans were provided a mechanism by which their plan participants would not receive contraceptive coverage through the plan or third party administrator.[57]

Therefore, the Departments believe it is most appropriate to use a plan basis, not an employer by employer basis, to determine the scope of an exemption for a group health plan established or maintained by a house of worship or integrated auxiliary.

*F. Nonprofit Organizations (45 CFR 147.132(a)(1)(i)(B))*

The exemption under previous regulations did not encompass nonprofit religious organizations beyond one that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Code. The Religious IFC expanded the exemption to include plans sponsored by any other

---

[57] See supra at II.A.3.

''nonprofit organization,''
§ 147.132(a)(1)(i)(B), if it has the
requisite religious objection under
§ 147.132(a)(2) (see § 147.132(a)(1)(i)
introductory text). The Religious IFC
also specified in § 147.132(a)(1)(i)(A), as
under the prior exemption, that the
exemption covers ''a group health plan
established or maintained by . . . [a]
church, the integrated auxiliary of a
church, a convention or association of
churches, or a religious order.''
(Hereinafter ''houses of worship and
integrated auxiliaries.'') These rules
finalize, without change, the text of
§ 147.132(a)(1)(i)(A) and (B).

The Departments received comments
in support of, and in opposition to, this
expansion. Some commenters supported
the expansion of the exemptions beyond
houses of worship and integrated
auxiliaries to other nonprofit
organizations with religious objections
(referred to herein as ''religious
nonprofit'' organizations, groups or
employers). They said that religious
belief and exercise in American law has
not been limited to worship, that
religious people engage in service and
social engagement as part of their
religious exercise, and, therefore, that
the Departments should respect the
religiosity of nonprofit groups even
when they are not houses of worship
and integrated auxiliaries. Some public
commenters and litigants have indicated
that various religious nonprofit groups
possess deep religious commitments
even if they are not houses of worship
or their integrated auxiliaries. Other
commenters did not support the
expansion of exemptions to nonprofit
organizations. Some of them described
churches as having a special status that
should not be extended to religious
nonprofit groups. Some others
contended that women at nonprofit
religious organizations may support or
wish to use contraceptives and that if
the exemptions are expanded, it would
deprive all or most of the employees of
various religious nonprofit
organizations of contraceptive coverage.

After evaluating the comments, the
Departments continue to believe that an
expanded exemption is the appropriate
administrative response to the
substantial burdens on sincere religious
beliefs imposed by the contraceptive
Mandate, as well as to the litigation
objecting to the same. We agree with the
comments that religious exercise in this
country has long been understood to
encompass actions outside of houses of
worship and their integrated auxiliaries.
The Departments' previous assertion
that the exemptions were intended to
respect a certain sphere of church
autonomy (80 FR 41325) is not, in itself,

grounds to refuse to extend the
exemptions to other nonprofit entities
with religious objections. Respect for
churches does not preclude respect for
other religious entities. Among religious
nonprofit organizations, the
Departments no longer adhere to our
previous assertion that ''[h]ouses of
worship and their integrated auxiliaries
that object to contraceptive coverage on
religious grounds are more likely than
other employers to employ people of the
same faith who share the same
objection.'' (78 FR 39874.) It is not clear
to the Departments that the percentage
of women who work at churches that
oppose contraception, but who support
contraception, is lower than the
percentage of woman who work at
nonprofit religious organizations that
oppose contraception on religious
grounds, but who support
contraception. In addition, public
comments and litigation reflect that
many nonprofit religious organizations
publicly describe their religiosity.
Government records and those groups'
websites also often reflect those groups'
religious character. If a person who
desires contraceptive coverage works at
a nonprofit religious organization, the
Departments believe it is sufficiently
likely that the person would know, or
would know to ask, whether the
organization offers such coverage. The
Departments are not aware of federal
laws that would require a nonprofit
religious organization that opposes
contraceptive coverage to hire a person
who the organization knows disagrees
with the organization's view on
contraceptive coverage. Instead,
nonprofit organizations generally have
access to a First Amendment right of
expressive association and religious free
exercise to choose to hire persons (or, in
the case of students, to admit them)
based on whether they share, or at least
will be respectful of, their beliefs.[58]

In addition, it is not at all clear to the
Departments that expanding the
exemptions would, as some commenters
asserted, remove contraceptive coverage
from employees of many large religious
nonprofit organizations. Many large
religious nonprofit employers, including
but not limited to some Catholic
hospitals, notified the Department
under the last Administration that they
had opted into the accommodation and
expressed no objections to doing so. We
also received public comments from
organizations of similar nonprofit

employers indicating that the
accommodation satisfied their religious
objections. These final rules leave the
accommodation in place as an optional
process. Thus, it is not clear to the
Departments that all or most such
large nonprofit employers will choose to
use the expanded exemption instead of
the accommodation. If they continue to
use the accommodation, their insurers
or third party administrators would
continue to be required to provide
contraceptive coverage to the plan
sponsors' employees through such
accommodation.

Given the sincerely held religious
beliefs of many nonprofit religious
organizations, some commenters also
contended that continuing to impose the
contraceptive Mandate on certain
nonprofit religious objectors might also
undermine the Government's broader
interests in ensuring health coverage by
causing some entities to stop providing
health coverage entirely.[59] Although the
Departments do not know the extent to
which that effect would result from not
extending exemptions, we wish to avoid
that potential obstacle to the general
expansion of health coverage.

*G. Closely Held For-Profit Entities (45
CFR 147.132(a)(1)(i)(C))*

The previous regulations did not
exempt plans sponsored by closely held
for-profit entities; however, the
Religious IFC included in its list of
exempt plan sponsors, at
§ 147.132(a)(1)(i)(C), ''[a] closely held
for-profit entity.'' These rules finalize
§ 147.132(a)(1)(i)(C) without change.

Some commenters supported
including these entities in the
exemption, saying owners of such
entities exercise their religious beliefs
through their businesses and should not
be burdened by a federal governmental
contraceptive Mandate. Other
commenters opposed extending the
exemption to closely held for-profit
entities, saying the entities cannot
exercise religion or should not have
their religious opposition to
contraceptive coverage protected by the
exemption. Some said the entities
should not be able to impose their
beliefs about contraceptive coverage on
their employees, and that doing so
constitutes discrimination.

As set forth in the Religious IFC, the
Departments believe it is appropriate to
expand the exemptions to include
closely held for-profit employers in

---

[58] Notably, ''the First Amendment simply does
not require that every member of a group agree on
every issue in order for the group's policy to be
'expressive association.' '' *Boy Scouts of America* v.
*Dale,* 530 U.S. 640, 655 (2000).

[59] See, *e.g.,* Manya Brachear Pashman, ''Wheaton
College ends coverage amid fight against birth
control mandate,'' Chicago Tribune, July 29, 2015;
Laura Bassett, ''Franciscan University Drops Entire
Student Health Insurance Plan Over Birth Control
Mandate,'' HuffPost, May 15, 2012.

order to protect the religious exercise of those entities and their owners. The ACA did not apply the preventive services mandate to the many grandfathered health plans among closely held as well as publicly traded for-profit entities, encompassing tens of millions of women. As explained below, we are not aware of evidence showing that the expanded exemptions finalized here will impact such a large number of women. And, in the Departments' view, the decision by Congress to not apply the preventive services mandate to grandfathered plans did not constitute improper discrimination or an imposition of beliefs. We also do not believe RFRA or the large number of other statutory exemptions Congress has provided for religious beliefs (including those exercised for profit) in certain health contexts such as sterilization, contraception, or abortion have been improper.

Including closely held for-profit entities in the exemption is also consistent with the Supreme Court's ruling in *Hobby Lobby*, which declared that a corporate entity is capable of possessing and pursuing non-pecuniary goals (in *Hobby Lobby*, the pursuit of religious beliefs), regardless of whether the entity operates as a nonprofit organization, and rejected the previous Administration's argument to the contrary. 134 S. Ct. at 2768–75. Some reports and industry experts have indicated that few for-profit entities beyond those that had originally challenged the Mandate have sought relief from it after *Hobby Lobby*.[60]

*H. For-Profit Entities That Are Not Closely Held (45 CFR 147.132(a)(1)(i)(D))*

The previous regulations did not exempt for-profit entities that are not closely held. However, the Religious IFC included in its list of exempt plan sponsors, at § 147.132(a)(1)(i)(D), "[a] for-profit entity that is not closely held." These rules finalize § 147.132(a)(1)(i)(D) without change.

Under § 147.132(a)(1)(i)(D), the rules extend the exemption to the plans of for-profit entities that are not closely held. Some commenters supported including such entities, including publicly traded businesses, in the scope of the exemption. Some of them said that publicly traded entities have historically taken various positions on important public concerns beyond merely (and exclusively) seeking the

company's own profits, and that nothing in principle would preclude them from using the same mechanisms of corporate decision-making to exercise religious views against contraceptive coverage. They also said that other protections for religious beliefs in federal health care conscience statutes do not preclude the application of such protections to certain entities on the basis that they are not closely held, and federal law defines "persons," protected under RFRA, to include corporations at 1 U.S.C. 1. Other commenters opposed including publicly traded companies in the expanded exemptions. Some of these commenters stated that such companies could not exercise religious beliefs, and opposed the effects on women if they could. These commenters also objected that including such employers, along with closely held businesses, would extend the exemptions to all or virtually all employers.

The Departments conclude it is appropriate to include entities that are not closely held within the expanded exemptions for entities with religious objection. RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion . . . ." unless it demonstrates that the application of the burden to the person" is the least restrictive means to achieve a compelling governmental interest. 42 U.S.C. 2000bb–1(a) & (b). As commenters noted, the definition of "person" applicable in RFRA is found at 1 U.S.C. 1, which defines "person" as including "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." Accordingly, the Departments' decision to extend the religious exemption to publicly traded for-profit corporations is supported by the text of RFRA. The mechanisms for determining whether a company has adopted and holds certain principles or views, such as sincerely held religious beliefs, is a matter of well-established State law with respect to corporate decision-making,[61] and the Departments expect that application of such laws would cabin the scope of this exemption.

As to the impact of so extending the religious exemption, the Departments are not aware of any publicly traded entities that have publicly objected to providing contraceptive coverage on the basis of religious belief. As noted above, before the ACA, a substantial majority of

employers covered contraceptives. Some commenters opposed to including publicly traded entities in these exemptions noted that there did not appear to be any known religiously motivated objections to the Mandate from publicly traded for-profit corporations. These comments support our estimates that including publicly traded entities in the exemptions will have little, if any effect, on contraceptive coverage for women. We likewise agree with the Supreme Court's statement in *Hobby Lobby* that it is unlikely that many publicly traded companies will adopt religious objections to offering women contraceptive coverage. *See* 134 S. Ct. at 2774. Some commenters contended that, because many closely held for-profit businesses expressed religious objections to the Mandate, or took advantage of the accommodation, it is likely that many publicly traded businesses will do so. The Departments agree it is possible that publicly traded businesses may use the expanded exemption. But while scores of closely held for-profit businesses filed suit against the Mandate, no publicly traded entities did so, even though they were not authorized to seek the accommodation. Based on these data points, we believe the impact of the extension of the exemption to publicly traded for-profit organizations will not be significant. Below, based on limited data, but on years of receiving public comments and defending litigation brought by organizations challenging the Mandate on the basis of their religious objections, our best estimate of the anticipated effects of these rules is that no publicly traded employers will invoke the religious exemption.

In the Departments' view, such estimate does not lead to the conclusion that the religious exemption should not be extended to publicly traded corporations. The Departments are generally aware that, in a country as large as the U.S., comprised of a supermajority of religious persons,[62] some publicly traded entities might claim a religious character for their company, or the majority of shares (or voting shares) of some publicly traded companies might be controlled by a small group of religiously devout persons so as to set forth such a religious character.[63] Thus we consider

[60] *See* Jennifer Haberkorn, "Two years later, few Hobby Lobby copycats emerge," *Politico* (Oct. 11, 2016), *http://www.politico.com/story/2016/10/obamacare-birth-control-mandate-employers-229627.*

[61] Although the Departments do not prescribe any form or notification, they would expect that such principles or views would have been adopted and documented in accordance with the laws of the jurisdiction under which the organization is incorporated or organized.

[62] For example, in 2017, 74 percent of Americans said that religion is fairly important or very important in their lives, and 87 percent of Americans said they believe in God. Gallup, "Religion," available at *https://news.gallup.com/poll/1690/religion.aspx.*

[63] *See, for example,* Kapitall, "4 Publicly Traded Religious Companies if You're Looking to Invest in

it possible that a publicly traded company might have religious objections to contraceptive coverage. Moreover, as noted, there are many closely held for-profit corporations that do have religious objections to covering some or all contraceptives. The Departments do not want to preclude such a closely held corporation from having to decide between relinquishing the exemption or financing future growth by sales of stock, which would be the effect of denying it the exemption if it changes its status and became a publicly traded entity. The Departments also find it relevant that other federal conscience statutes, such as those applying to hospitals or insurance companies, do not exclude publicly traded businesses from protection.[64] As a result, the Departments continue to consider it appropriate not to exclude such entities from these expanded exemptions.

### I. Other Non-Governmental Employers (45 CFR 147.132(a)(1)(i)(E))

As noted above, the exemption in the previous regulations, found at § 147.131(a), included only churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order. The Religious IFC included, in its list of exempt plan sponsors at § 147.132(a)(1)(i)(E), "[a]ny other non-governmental employer." These rules finalize § 147.132(a)(1)(i)(E) without change.

Some commenters objected to extending the exemption to other nongovernmental employers, asserting that it is not clear such employers should be protected, nor that they can assert religious objections. The Departments, however, agree with other commenters that supported that provision of the Religious IFC. The Departments believe it is appropriate that any nongovernmental employer asserting the requisite religious objections should be protected from the Mandate in the same way as other plan sponsors. Such other employers could include, for example, association health plans.[65] The reasons discussed above for providing the exemption to various specific kinds of employers, and for their ability to assert sincerely held religious beliefs using ordinary mechanisms of corporate decision-making, generally apply to other nongovernmental employers as well, if they have sincerely held religious beliefs opposed to contraceptive coverage and otherwise meet the requirements of these rules. We agree with commenters who contend there is not a sufficient basis to exclude other nongovernmental employers from the exemption.

### J. Plans Established or Maintained by Objecting Nonprofit Entities (45 CFR 147.132(a)(1)(ii))

Based on the expressed intent in the Religious IFC, as discussed above, to expand the exemption to encompass plans established or maintained by nonprofit organizations with religious objections, and on public comments received concerning those exemptions, these rules finalize new language in § 147.132(a)(1)(ii) to better clarify the scope and application of the exemptions.

The preamble to the Religious IFC contained several discussions about the Departments' intent to exempt plans established or maintained by certain religious organizations that have the requisite objection to contraceptive coverage, including instances in which the plans encompass multiple employers. For example, as noted above, the Departments intended that the exemption for houses of worship and integrated auxiliaries be interpreted to apply on a plan basis, instead of on an employer-by-employer basis. In addition, the Departments discussed at length the fact that, under the prior regulations, where an entity was enrolled in a self-insured church plan exempt from ERISA under ERISA section 3(33) and the accommodation in the previous regulations was used, that accommodation process provided no mechanism to impose, or enforce, the accommodation requirement of contraceptive coverage against a third party administrator of such a plan. As a result, the prior accommodation served, in effect, as an exemption from requirements of contraceptive coverage for all organizations and employers covered under a self-insured church plan.

In response to these discussions in the Religious IFC, some commenters, including some church plans, supported the apparent intent to exempt such plans on a plan basis, but suggested that additional clarification is needed in the text of the rule to effect this intent. They observed that some plans are established or maintained by religious nonprofit entities that might not be houses of worship or integrated auxiliaries, and that some employers that adopt or participate in such plans may not be the "plan sponsors." They recommended, therefore, that the final rules specify that the exemption applies on a plan basis when plans are established or maintained by houses of worship, integrated auxiliaries, or religious nonprofits, so as to shield employers that adopt such plans from penalties for noncompliance with the Mandate.

The text of the prefatory language of § 147.132(a)(1), as set forth in the Religious IFC, declared that the Guidelines would not apply "with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization." We intended this language to exempt a plan and/or coverage where the entity that established or maintained a plan was an objecting organization, and not just to look at the views or status of individual employers (or other entities) participating in such plan. The Departments agree with commenters who stated that additional clarity is needed and appropriate in these final rules, in order to ensure that such plans are exempt on a plan basis, and that employers joining or adopting those plans are exempt by virtue of the plan itself being exempt. Doing so will make the application of the expanded exemption clearer, and protect employers (and other entities) participating in such plans from penalties for noncompliance with the Mandate. Clearer language will better realize the intent to exempt plans and coverage "established or maintained by an objecting organization," and make the operation of that exemption simpler by specifying that the exemption applies based on the objection of the entity that established or maintains the plan. Such language would also resolve the anomaly that, under the previous rules, only self-insured church plans (not insured church plans) under ERISA section 3(33) were, in effect, exempt—but only indirectly through the Departments' inability to impose, or enforce, the accommodation process against the third party administrators of such plans, instead of being specifically exempt in the rules.

We believe entities participating in plans established or maintained by an objecting organization usually share the views of those organizations. Multiple lawsuits were filed against the Departments by churches that established or maintained plans, or the church plans themselves, and they generally declared that the entities or individuals participating in their plans

---

Faith'' (Feb. 7, 2014), *http://www.nasdaq.com/ article/4-publicly-traded-religious-companies-if- youre-looking-to-invest-in-faith-cm324665.*

[64] *See, for example,* 42 U.S.C. 300a–7, 42 U.S.C. 238n, Consolidated Appropriations Act of 2018, Div. H, Sec. 507(d), Public Law 115–141, and *id.* at Div. E, Sec. 808.

[65] See 29 CFR 2510.3–5.

are usually required to share their religious affiliation or beliefs. In addition, because, as we have stated before, "providing payments for contraceptive services is cost neutral for issuers" (78 FR 39877), we do not believe this clarification would produce any financial incentive for entities that do not have religious objections to contraceptive coverage to enter into plans established or maintained by an organization that does have such objections.

Therefore, the Departments finalize the text of § 147.132(a)(1) of the Religious IFC with the following change: adding a provision that makes explicit this understanding, in a new paragraph at § 147.132(a)(1)(ii). This language now specifies that the exemptions encompassed by § 147.132(a)(1) include: "[a] group health plan, and health insurance coverage provided in connection with a group health plan, where the plan or coverage is established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other organization or association, to the extent the plan sponsor responsible for establishing and/or maintaining the plan objects as specified in paragraph (a)(2) of this section. The exemption in this paragraph applies to each employer, organization, or plan sponsor that adopts the plan[.]"

*K. Institutions of Higher Education (45 CFR 147.132(a)(1)(iii))*

The previous regulations did not exempt student health plans arranged by institutions of higher education, although it did, for purposes of the accommodation, treat plans arranged by institutions of higher education similar to the way in which the regulations treated plans of nonprofit religious employers. *See* 80 FR at 41347. The Religious IFC included in its list of exemptions, at § 147.132(a)(1)(ii), "[a]n institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to 'plan participants and beneficiaries' will be interpreted as references to student enrollees and their covered dependents.'' These rules

finalize this language with a change to clarify their application, as discussed below, and by redesignating the paragraph as § 147.132(a)(1)(iii).

These rules treat the plans of institutions of higher education that arrange student health insurance coverage similarly to the way in which the rules treat the plans of employers. These rules do so by making such student health plans eligible for the expanded exemptions, and by permitting them the option of electing to utilize the accommodation process. Thus, these rules specify, in § 147.132(a)(1)(iii), that the exemption is extended, in the case of institutions of higher education (as defined in 20 U.S.C. 1002) with objections to the Mandate based on sincerely held religious beliefs, to their arrangement of student health insurance coverage in a manner comparable to the applicability of the exemption for group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer.

Some commenters supported including, in the expanded exemptions, institutions of higher education that provide health coverage for students through student health plans but have religious objections to providing certain contraceptive coverage. They said that religious exemptions allow freedom for certain religious institutions of higher education to exist, and this in turn gives students the choice of institutions that hold different views on important issues such as contraceptives and abortifacients. Other commenters opposed including the exemption, asserting that expanding the exemptions would negatively impact female students because institutions of higher education might not cover contraceptives in student health plans, women enrolled in those plans would not receive access to birth control, and an increased number of unintended pregnancies would result among those women.

In the Departments' view, the reasons for extending the exemptions to institutions of higher education are similar to the reasons, discussed above, for extending the exemption to other nonprofit organizations. Only a minority of students in higher education receive health insurance coverage from plans arranged by their colleges or universities.[66] It is necessarily true that

an even smaller number receive such coverage from religious schools, and from religious or other private schools that object to arranging contraceptive coverage. Religious institutions of higher education are private entities with religious missions. Various commenters asserted the importance, to many of those institutions, of being able to adhere to their religious tenets. Indeed, many students who attend such institutions do so because of the institutions' religious tenets. No student is required to attend such an institution. At a minimum, students who attend private colleges and universities have the ability to ask those institutions in advance what religious tenets they follow, including whether the institutions will provide contraceptives in insurance plans they arrange. Some students wish to receive contraceptive coverage from a health plan arranged by an institution of higher education. But other students wish to attend an institution of higher education that adheres to its religious mission about contraceptives in health insurance. And still other students favor contraception, but are willing to attend a religious university without forcing it to violate its beliefs about contraceptive coverage. Exempting religious institutions that object to contraceptive coverage still allows contraceptive coverage to be provided by institutions of higher education more broadly. The exemption simply makes it legal under federal law for institutions to adhere to religious beliefs that oppose contraception, without facing penalties for non-compliance that could threaten their existence. This removes a possible barrier to diversity in the nation's higher education system, and makes it more possible for students to attend institutions of higher education that hold those views.

In addition, under the previous exemption and accommodation, it was possible for self-insured church plans exempt from ERISA that have religious objection to certain contraceptives to avoid any requirement that either they or their third party administrators provide contraceptive coverage. As seen

---

[66] The American College Health Association estimates that, in 2014, student health insurance plans at colleges and universities covered "more than two million college students nationwide." "Do You Know Why Student Health Insurance Matters?" available at *https://www.acha.org/*

*documents/Networks/Coalitions/Why_SHIPs_Matter.pdf.* We assume for the purposes of this estimate that those plans covered 2,100,000 million students. Data from the Department of Education shows that in 2014, there were 20,207,000 students enrolled in degree-granting postsecondary institutions. National Center for Education Statistics, Table 105.20, "Enrollment in elementary, secondary, and degree-granting postsecondary institutions, by level and control of institution, enrollment level, and attendance status and sex of student: Selected years, fall 1990 through fall 2026," available at *https://nces.ed.gov/programs/digest/d16/tables/dt16_105.20.asp?current=yes.*

in some public comments and litigation statements, some such self-insured church plans provide health coverage for students at institutions of higher education covered by those church plans. In order to avoid the situation where some student health plans sponsored by institutions with religious objections are effectively exempt from the contraceptive Mandate, and other student health plans sponsored by other institutions with similar religious objections are required to comply with the Mandate, the Departments consider it appropriate to extend the exemption, so that religious colleges and universities with objections to the Mandate would not be treated differently in this regard.

The Departments also note that the ACA does not require institutions of higher education to provide student health insurance coverage. As a result, some institutions of higher education that object to the Mandate appear to have chosen to stop providing student health insurance plans, rather than comply with the Mandate or be subject to the accommodation.[67] Extending the exemption in these rules removes an obstacle to such entities deciding to offer student health insurance plans, thereby giving students another health insurance option.

As noted above, it is not clear that studies discussing various effects of birth control access clearly and specifically demonstrate a negative impact to students in higher education because of the expanded exemption in these final rules. The Departments consider these expanded exemptions to be an appropriate and permissible policy choice in light of various interests at stake and the lack of a statutory requirement for the Departments to impose the Mandate on entities and plans that qualify for these expanded exemptions.

Finally, the Religious IFC specified that the plan sponsor exemption applied to "non-governmental" plan sponsors (§ 147.132(a)(1)(i)), including "[a]ny other non-governmental employer" (§ 147.132(a)(1)(i)(E)). Then, in § 147.132(a)(1)(ii), the rule specified that the institution of higher education exemption applicable to the arrangement of student health insurance coverage applied "in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan

[67] See, e.g., Manya Brachear Pashman, "Wheaton College ends coverage amid fight against birth control mandate," Chicago Tribune, July 29, 2015; Laura Bassett, "Franciscan University Drops Entire Student Health Insurance Plan Over Birth Control Mandate," HuffPost, May 15, 2012.

established or maintained by a plan sponsor that is an employer." Consequently, the Religious IFC's expanded exemptions only applied to non-governmental institutions of higher education, including for student health insurance coverage, not to governmental institutions of higher education. Nevertheless, the term "non-governmental," while appearing twice in § 147.132(a)(1)(i) concerning plan sponsors, was not repeated in in § 147.132(a)(1)(ii). To more clearly specify that this limitation was intended to apply to § 147.132(a)(1)(ii), we finalize this paragraph with a change by adding the phrase "which is non-governmental" after the phrase "An institution of higher education as defined in 20 U.S.C. 1002".

*L. Health Insurance Issuers (45 CFR 147.132(a)(1)(iv)*

The previous regulations did not exempt health insurance issuers. However, the Religious IFC included in its list of exemptions at § 147.132(a)(1)(iii), "[a] health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement[.]" These rules finalize this exemption with technical changes to clarify the language based on public comments, and redesignate the paragraph as § 147.132(a)(1)(iv).

The Religious IFC extends the exemption to health insurance issuers offering group or individual health insurance coverage that sincerely hold their own religious objections to providing coverage for contraceptive services. Under this exemption, the only plan sponsors—or in the case of individual insurance coverage, individuals—who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer that does not cover some or all contraceptive services, are plan sponsors or individuals who themselves object and whose plans are otherwise exempt based on their objection. An exempt issuer can then offer an exempt health insurance product to an entity or individual that is exempt based on either the moral exemptions for entities and individuals, or the religious exemptions for entities and individuals. Thus, the issuer exemption specifies

that, where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii) of this section, the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv), unless it is also exempt from that requirement.

Under these rules, issuers that hold their own objections, based on sincerely held religious beliefs, could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on their religious beliefs, or on their moral convictions under the companion final rules published elsewhere in today's **Federal Register**. Likewise, issuers with sincerely held moral convictions, that are exempt under those companion final rules, could issue policies that omit contraception to plan sponsors or individuals that are otherwise exempt based on either their religious beliefs or their moral convictions.

In the separate companion IFC to the Religious IFC—the Moral IFC—the Departments provided a similar exemption for issuers in the context of moral objections, but we used slightly different operative language. There, in the second sentence, instead of saying "the plan remains subject to any requirement to provide coverage for contraceptive services," the exemption stated, "the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services." Some commenters took note of this difference, and asked the Departments to clarify which language applies, and whether the Departments intended any difference in the operation of the two paragraphs. The Departments did not intend the language to operate differently. The language in the Moral IFC accurately, and more clearly, expresses the intent set forth in the Religious IFC about how the issuer exemption applies. Consequently, these rules finalize the issuer exemption paragraph from the Religious IFC with minor technical changes so that the final language will mirror language from the Moral IFC, stating that the exemption encompasses: "[a] health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iv) of this section, the group health plan established or maintained by the plan sponsor with

which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement[.]''

Some commenters supported including this exemption for issuers in these rules, both to protect the religious exercise of issuers, and so that in the future religious issuers that may wish to specifically serve religious plan sponsors would be free to organize. Other commenters objected to including an exemption for issuers. Some objected that issuers cannot exercise religious beliefs, while others objected that exempting issuers would threaten contraceptive coverage for women. Some commenters said that it was arbitrary and capricious for the Departments to provide an exemption for issuers if we do not know that issuers with qualifying religious objections exist.

The Departments consider it appropriate to provide this exemption for issuers. Because the issuer exemption only applies where an independently exempt policyholder (entity or individual) is involved, the issuer exemption will not serve to remove contraceptive coverage obligations from any plan or plan sponsor that is not also exempt, nor will it prevent other issuers from being required to provide contraceptive coverage in individual or group insurance coverage. The issuer exemption therefore serves several interests, even though the Departments are not currently aware of existing issuers that would use it. As noted by some commenters, allowing issuers to be exempt, at least with respect to plan sponsors and plans that independently qualify for an exemption, will remove a possible obstacle to religious issuers being organized in the future to serve entities and individuals that want plans that respect their religious beliefs and moral convictions. Furthermore, permitting issuers to object to offering contraceptive coverage based on sincerely held religious beliefs will allow issuers to continue to offer coverage to plan sponsors and individuals, without subjecting them to liability under section 2713(a)(4), or related provisions, for their failure to provide contraceptive coverage. In this way, the issuer exemption serves to protect objecting issuers from being required to issue policies that cover contraception in violation of the issuers' sincerely held religious beliefs, and from being required to issue policies that omit contraceptive coverage to non-exempt entities or individuals, thus

subjecting the issuers to potential liability if those plans are not exempt from the Guidelines.

The Departments reject the proposition that issuers cannot exercise religious beliefs. First, since RFRA protects the religious exercise of corporations as persons, the religious exercise of health insurance issuers—which are generally organized as corporations—is protected by RFRA. In addition, many federal health care conscience laws and regulations specifically protect issuers or plans. For example, 42 U.S.C. 1395w–22(j)(3)(B) and 1396u–2(b)(3) protect plans or managed care organizations in Medicaid or Medicare Advantage. The Weldon Amendment specifically protects, among other entities, provider-sponsored organizations, health maintenance organizations (HMOs), health insurance plans, and "any other kind of health care facilit[ies], organization[s], or plan[s]'' as a "health care entity'' from being required to pay for, or provide coverage of, abortions. *See for example,* Consolidated Appropriations Act of 2018, Public Law 115–141, Div. H, Sec. 507(d), 132 Stat. 348, 764 (Mar. 23, 2018).[68] Congress also declared this year that "it is the intent of Congress'' to include a "conscience clause'' which provides exceptions for religious beliefs if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans.'' *See id.* at Div. E, Sec. 808, 132 Stat. at 603. In light of the clearly expressed intent of Congress to protect religious liberty, particularly in certain health care contexts, along with the specific efforts to protect issuers, the Departments have concluded that an exemption for issuers is appropriate.

The issuer exemption does not specifically include third party administrators, although the optional accommodation process provided under these final rules specifies that third party administrators cannot be required to contract with an entity that invokes that process. Some religious third party administrators have brought suit in conjunction with suits brought by organizations enrolled in ERISA-exempt church plans. Such plans are now exempt under these final rules, and their third party administrators, as

claims processors, are under no obligation under section 2713(a)(4) to provide benefits for contraceptive services, as that section applies only to plans and issuers. In the case of ERISA-covered plans, plan administrators are obligated under ERISA to follow the plan terms, but it is the Departments' understanding that third party administrators are not typically designated as plan administrators, and, therefore, would not normally act as plan administrators, under section 3(16) of ERISA. Therefore, to the Departments' knowledge, it is only under the existing accommodation process that third party administrators are required to undertake any obligations to provide or arrange for contraceptive coverage to which they might object. These rules make the accommodation process optional for employers and other plan sponsors, and specify that third party administrators that have their own objection to complying with the accommodation process may decline to enter into, or decline to continue, contracts as third party administrators of such plans.

## M. Description of the Religious Objection (45 CFR 147.132(a)(2))

The previous regulations did not specify what, if any, religious objection applied to its exemption; however, the Religious IFC set forth the scope of the religious objection of objecting entities in § 147.132(a)(2), as follows: "The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.'' These rules finalize this description with technical changes to clarify the scope of the objection as intended in the Religious IFC, and based on public comments.

Throughout the exemptions for objecting entities, the rules specify that they apply where the entities object as specified in § 147.132(a)(2) of the Religious IFC. That paragraph describes the religious objection by specifying that exemptions for objecting entities will apply to the extent that an entity described in paragraph (a)(1) objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

---

[68] ACA section 1553 protects an identically defined group of "health care entities'' including provider-sponsored organizations, HMOs, health insurance plans, and "any other kind of . . . plan,'' from being subject to discrimination on the basis that it does not provide any health care item or service furnishing for the purpose of assisted suicide, euthanasia, mercy killing, and the like. ACA section 1553, 42 U.S.C. 18113.

In the separate companion IFC to the Religious IFC—the Moral IFC—the Departments, at § 147.133(a)(2), provided a similar description of the scope of the objection based on moral convictions rather than religious beliefs, but we used slightly different operative language. There, instead of saying the entity ''objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services,'' the paragraph stated the entity ''objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments.'' Some commenters took note of this difference, and asked the Departments to clarify which language applies, and whether the Departments intended any difference in the operation of the two paragraphs. The Departments did not intend the language to operate differently. The language in the Moral IFC accurately, and more clearly, expresses the intent set forth in the Religious IFC about how the issuer exemption applies. The Religious IFC explained that the intent of the expanded exemptions was to encompass entities that objected to providing or arranging for contraceptive coverage in their plans, and to encompass entities that objected to the previous accommodation process, by which their issuers or third party administrators were required to provide contraceptive coverage or payments in connection with their plans. In other words, an entity would be exempt from the Mandate if it objected to complying with the Mandate, or if it objected to complying with the accommodation. The language in the Religious IFC encompassed both circumstances by encompassing an objection to providing ''coverage [or] payments'' for contraceptive services, and by encompassing an objection to ''a plan that provides'' coverage or payments for contraceptive services. But the language describing the objection set forth in the Moral IFC does so more clearly, and restructuring the sentence could make it clearer still. Questions by commenters about the scope of the description suggests that we should restructure the description, in a non-substantive way, to provide more clarity. The Departments do this by breaking some of the text out into subparagraphs, and rearranging clauses so that it is clearer which words they modify. The new

structure specifies that it includes an objection to establishing, maintaining, providing, offering, or arranging for (as applicable) coverage or payments for contraceptive services, and it includes an objection to establishing, maintaining, providing, offering, or arranging for (as applicable) a plan, issuer, or third party administrator that provides contraceptive coverage. This more clearly encompasses objections to complying with either the Mandate or the accommodation. Consequently, these rules finalize the paragraph describing the religious objection in the Religious IFC with minor technical changes so that the final language will essentially mirror language from the Moral IFC. The introductory phrase of the religious objection set forth in paragraph (a)(2) is finalized to state the exemption ''will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable)''. The remainder of the paragraph is broken into two sub-paragraphs, regarding either ''coverage or payments for some or all contraceptive services,'' or ''a plan, issuer, or third party administrator that provides or arranges such coverage or payments.''

Some commenters observed that by allowing exempt groups to object to ''some or all'' contraceptives, this might yield a cafeteria-style approach where different plan sponsors choose various combinations of contraceptives that they wish to cover. Some commenters further observed that this might create a burden on issuers or third party administrators. The Departments have concluded, however, that, just as the exemption under the previous regulations allowed entities to object to some or all contraceptives, it is appropriate to maintain that flexibility for entities covered by the expanded exemption. Notably, even where an entity or individual qualifies for an exemption under these rules, these rules do not require the issuer or third party administrator to contract with that entity or individual if the issuer or third party administrator does not wish to do so, including because the issuer or third party administrator does not wish to offer an unusual variation of a plan. These rules simply remove the federal Mandate that, in some cases, could have led to penalties for an employer, issuer, or third party administrator if they wished to sponsor, provide, or administer a plan that omits contraceptive coverage in the presence

of a qualifying religious objection. Similarly, under the previous exemption, the plans of houses of worship and integrated auxiliaries were exempt from offering some or all contraceptives, but the previous regulations did not require issuers and third party administrators to contract with those exempt entities if they chose not to do so.

## N. Individuals (45 CFR 147.132(b))

The previous regulations did not provide an exemption for objecting individuals. However, the Religious IFC expanded the exemptions to encompass objecting individuals (referred to here as the ''individual exemption''), at § 147.132(b). These rules finalize the individual exemption from the Religious IFC with changes, which reflect both non-substantial technical revisions, and changes based on public comments to more clearly express the intent of the Religious IFC.

In the separate companion IFC to the Religious IFC—the Moral IFC—the Departments, at § 147.133(b), provided a similar individual exemption, but we used slightly different operative language. Where the Religious IFC described what may be offered to objecting individuals as ''a separate benefit package option, or a separate policy, certificate or contract of insurance,'' the Moral IFC said a willing issuer and plan sponsor may offer ''a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects'' under the individual exemption. Some commenters observed this difference and asked whether the language was intended to encompass the same options. The Departments intended these descriptions to include the same scope of options. Some commenters suggested that the individual exemption should not allow the offering of ''a separate group health plan,'' as set forth in the version found in § 147.133(b), because doing so could cause various administrative burdens. The Departments disagree, since group health plan sponsors and group and individual health insurance issuers would be free to decline to provide that option, including because of administrative burdens. In addition, the Departments wish to clarify that, where an employee claims the exemption, a willing issuer and a willing employer may, where otherwise permitted, offer the employee participation in a group health insurance policy or benefit option that complies with the employee's objection. Consequently, these rules finalize the individual

exemption by making a technical change to the language to adopt the formulation, "a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects" under the individual exemption.

Some commenters supported the individual exemption as providing appropriate protections for the religious beliefs of individuals who obtain their insurance coverage in such places as the individual market or exchanges, or who obtain coverage from a group health plan sponsor that does not object to contraceptive coverage but is willing (and, as applicable, the issuer is also willing) to provide coverage that is consistent with an individual's religious objections. Some commenters also observed that, by specifying that the individual exemption only operates where the plan sponsor and issuer, as applicable, are willing to provide coverage that is consistent with the objection, the exemption would not impose burdens on the insurance market because the possibility of such burdens would be factored into the willingness of an employer or issuer to offer such coverage. Other commenters disagreed and contended that allowing the individual exemption would cause burden and confusion in the insurance market. Some commenters also suggested that the individual exemption should not allow the offering of a separate group health plan because doing so could cause various administrative burdens.

The Departments agree with the commenters who suggested the individual exemption will not burden the insurance market, and, therefore, conclude that it is appropriate to provide the individual exemption where a plan sponsor and, as applicable, issuer are willing to cooperate in doing so. As discussed in the Religious IFC, the individual exemption only operates in the case where the group health plan sponsor or group or individual market health insurance issuer is willing to provide the separate option; in the case of coverage provided by a group health plan sponsor, where the plan sponsor is willing; or in the case where both a plan sponsor and issuer are involved, both are willing. The Departments conclude that it is appropriate to provide the individual exemption so that the Mandate will not serve as an obstacle among these various options. Practical difficulties that may be implicated by one option or another will likely be factored into whether plan sponsors and

issuers are willing to offer particular options in individual cases.

In addition, Congress has provided several protections for individuals who object to prescribing or providing contraceptives contrary to their religious beliefs. *See for example,* Consolidated Appropriations Act of 2018, Div. E, Sec. 726(c) (Financial Services and General Government Appropriations Act), Public Law 115–141, 132 Stat. 348, 593– 94 (Mar. 23, 2018). While some commenters proposed to construe this provision narrowly, Congress likewise provided that, if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions". *Id.* at Div. E, Sec. 808, 132 Stat. at 603. A religious exemption for individuals would not be effective if the government simultaneously made it illegal for issuers and group health plans to provide individuals with policies that comply with the individual's religious beliefs.

The individual exemption extends to the coverage unit in which the plan participant, or subscriber in the individual market, is enrolled (for instance, to family coverage covering the participant and his or her beneficiaries enrolled under the plan), but does not relieve the plan's or issuer's obligation to comply with the Mandate with respect to the group health plan generally, or, as applicable, to any other individual policies the issuer offers.

This individual exemption allows plan sponsors and issuers that do not specifically object to contraceptive coverage to offer religiously acceptable coverage to their participants or subscribers who do object, while offering coverage that includes contraception to participants or subscribers who do not object. This individual exemption can apply with respect to individuals in plans sponsored by private employers or governmental employers.

By its terms, the individual exemption would also apply with respect to individuals in plans arranged by institutions of higher education, if the issuers offering those plans were willing to provide plans complying with the individuals' objections. Because federal law does not require institutions of higher education to arrange such plans, the institutions would not be required by these rules to arrange a plan compliant with an individual's

objection if the institution did not wish to do so.

As an example, in one lawsuit brought against the Departments, the State of Missouri enacted a law under which the State is not permitted to discriminate against insurance issuers that offer group health insurance policies without coverage for contraception based on employees' religious beliefs, or against the individual employees who accept such offers. *See Wieland,* 196 F. Supp. 3d at 1015–16 (quoting Mo. Rev. Stat. 191.724). Under the individual exemption of these final rules, employers sponsoring governmental plans would be free to honor the objections of individual employees by offering them plans that omit contraceptive coverage, even if those governmental entities do not object to offering contraceptive coverage in general.

This individual exemption cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of State law that requires coverage of such contraceptives or sterilization. Nor can the individual exemption be construed to require the guaranteed availability of coverage omitting contraception to a plan sponsor or individual who does not have a sincerely held religious objection. This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4), and does not affect any other federal or State law governing the plan or coverage. Thus, if there are other applicable laws or plan terms governing the benefits, these final rules do not affect such other laws or terms.

Some individuals commented that they welcomed the individual exemption so that their religious beliefs were not forced to be in tension with their desire for health coverage. The Departments believe the individual exemption may help to meet the ACA's goal of increasing health coverage because it will reduce the incidence of certain individuals choosing to forego health coverage because the only coverage available would violate their sincerely held religious beliefs.[69] At the same time, this individual exemption "does not undermine the governmental interests furthered by the contraceptive

---

[69] See also, for example, *Wieland,* 196 F. Supp. 3d at 1017, and *March for Life,* 128 F. Supp. 3d at 130, where the courts noted that the individual employee plaintiffs indicated that they viewed the Mandate as pressuring them to "forgo health insurance altogether."

coverage requirement,'' [70] because, when the exemption is applicable, the individual does not want the coverage, and therefore would not use the objectionable items even if they were covered.

Some commenters welcomed the ability of individuals covered by the individual exemption to be able to assert an objection to either some or all contraceptives. Other commenters expressed concern that there might be multiple variations in the kinds of contraceptive coverage to which individuals object, and this might make it difficult for willing plan sponsors and issuers to provide coverage that complies with the religious beliefs of an exempt individual. As discussed above, where the individual exemption applies, it only affects the coverage of an individual. If an individual only objects to some contraceptives, and the individual's issuer and, as applicable, plan sponsor are willing to provide the individual a package of benefits omitting such coverage, but for practical reasons they can only do so by providing the individual with coverage that omits all—not just some— contraceptives, the Departments believe that it favors individual freedom and market choice, and does not harm others, to allow the issuer and plan sponsor to provide, in that case, a plan omitting all contraceptives if the individual is willing to enroll in that plan. The language of the individual exemption set forth in the Religious IFC implied this conclusion, by specifying that the Guidelines requirement of contraceptive coverage did not apply where the individual objected to some or all contraceptives. Notably, this was different than the language applicable to the exemptions under § 147.132(a), which specifies that the exemptions apply ''to the extent'' of the religious objections, so that, as discussed above, the exemptions include only those contraceptive methods to which the objection applied. In response to comments suggesting the language of the individual exemption was not sufficiently clear on this distinction, however, the Departments in these rules finalize the individual exemption at § 147.133(b) with the following change, by adding the following sentence at the end of the paragraph: ''Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer and, as applicable, plan sponsor, are willing to provide the individual with a separate policy, certificate or contract of insurance or a separate group health plan or benefit

package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.''

Some commenters asked for plain language guidance and examples about how the individual exemption might apply in the context of employer-sponsored insurance. Here is one such example. An employee is enrolled in group health coverage through her employer. The plan is fully insured. If the employee has sincerely held religious beliefs objecting to her plan including coverage for contraceptives, she could raise this with her employer. If the employer is willing to offer her a plan that omits contraceptives, the employer could discuss this with the insurance agent or issuer. If the issuer is also willing to offer the employer, with respect to this employee, a group health insurance policy that omits contraceptive coverage, the individual exemption would make it legal for the group health insurance issuer to omit contraceptives for her and her beneficiaries under a policy, for her employer to sponsor that plan for her, and for the issuer to issue such a plan to the employer, to cover that employee. This would not affect other employees' plans—those plans would still be subject to the Mandate and would continue to cover contraceptives. But if either the employer, or the issuer, is not willing (for whatever reason) to offer a plan or a policy for that employee that omits contraceptive coverage, these rules do not require them to. The employee would have the choice of staying enrolled in a plan with its coverage of contraceptives, not enrolling in that plan, seeking coverage elsewhere, or seeking employment elsewhere.

For all these reasons, these rules adopt the individual exemption language from the Religious IFC with clarifying changes to reflect the Departments' intent.

*O. Accommodation (45 CFR 147.131, 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A)*

The previous regulations set forth an accommodation process at 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A, as an alternative method of compliance with the Mandate. Under the accommodation, if a religious nonprofit entity, or a religious closely held for-profit business, objected to coverage of some or all contraceptive services in its health plan, it could file a notice or fill out a form expressing this objection and describing its objection to its plan and

issuer or third party administrator. Upon doing so, the plan would not cover some or all contraceptive services, and the issuer or third party administrator would be responsible for providing or arranging for persons covered by the plan to receive coverage or payments of those services (except in the case of self-insured church plans exempt from ERISA, in which case no such obligation was imposed on the third party administrator). The accommodation was set forth in regulations of each of the Departments. Based on each Department's regulatory authority, HHS regulations applied to insured group health plans, and DOL and Treasury regulations applied to both insured group health plans and self-insured group health plans.

The Religious IFC maintained the accommodation process. Nevertheless, by virtue of expanding the exemptions to encompass all entities that were eligible for the accommodation process under the previous regulations, in addition to other newly exempt entities, the Religious IFC rendered the accommodation process optional. Entities could choose not just between the Mandate and the accommodation, but between the Mandate, the exemption, and the accommodation. These rules finalize the optional accommodation process and its location in the Code of Federal Regulations at 45 CFR 147.131, 26 CFR 54.9815–2713A, and 29 CFR 2590.715–2713A, but the Departments do so with several changes based on public comments.

Many commenters supported keeping the accommodation as an optional process, including some commenters who otherwise supported creating the expanded exemptions. Some commenters opposed making the accommodation optional, but asked the Departments to return to the previous regulations in which entities that did not meet the narrower exemption could only choose between the accommodation process or direct compliance with the Mandate. Some commenters believed there should be no exemptions and no accommodation process.

The Departments continue to consider it appropriate to make the accommodation process optional for entities that are otherwise also eligible for the expanded exemptions—that is, to keep it in place as an option that exempt entities can choose. The accommodation provides contraceptive access, which is a result many opponents of the expanded exemptions said they desire. The accommodation involves some regulation of issuers and third party administrators, but the previous

---

[70] 78 FR 39874.

regulations had already put that regulatory structure in place. These rules for the most part merely keep it in place and maintain the way it operates. The Religious IFC adds some additional paperwork burdens as a result of the new interaction between the accommodation and the expanded exemptions; those are discussed below.

Above, the Departments discussed public comments concerning whether we should have merely expanded the accommodation rather than expanding the exemptions. The Religious IFC and these final rules expand the kinds of entities that may use the optional accommodation, by expanding the exemptions and allowing any exempt entities to opt to make use of the accommodation. Consequently, under these rules, objecting employers may make use of the exemption or may choose to utilize the optional accommodation process. If an eligible organization uses the optional accommodation process through the EBSA Form 700 or other specified notice to HHS, it voluntarily shifts an obligation to provide separate but seamless contraceptive coverage to its issuer or third party administrator.

Some commenters asked that these final rules create an alternative payment mechanism to cover contraceptive services for third party administrators obligated to provide or arrange such coverage under the accommodation. These rules do not concern the payment mechanism, which is set forth in separate rules at 45 CFR 156.50. The Departments do not view an alternative payment mechanism as necessary. As discussed below, although the Departments do not know how many entities will use the accommodation, it is reasonably likely that some entities previously using it will continue to do so, while others will choose the expanded exemption, leading to an overall reduction in the use of the accommodation. The Departments have reason to believe that these final rules will not lead to a significant expansion of entities using the accommodation, since nearly all of the entities of which the Departments are aware that may be interested in doing so were already able to do so prior to the Religious IFC. Moreover, it is still the case under these rules that if an entity serving as a third party administrator does not wish to satisfy the obligations it would need to satisfy under an accommodation, it could choose not to contract with an entity that opts into the accommodation. This conflict is even less likely now that entities eligible for the accommodation are also eligible for the exemption. For these reasons, the Departments do not

find it necessary to add an additional payment mechanism for the accommodation process.

If an eligible organization wishes to revoke its use of the accommodation, it can do so under these rules, and operate under its exempt status. As part of its revocation, the issuer or third party administrator of the eligible organization must provide participants and beneficiaries written notice of such revocation. Some commenters suggested HHS has not yet issued guidance on the revocation process, but CCIIO provided guidance concerning this process on November 30, 2017.[71] These rules supersede that guidance, and adopt or modify its specific guidelines as explained below. As a result, these rules delete references, set forth in the Religious IFC's accommodation regulations, to "guidance issued by the Secretary of the Department of Health and Human Services."

The guidance stated that an entity that was using the accommodation under the previous rules, or an entity that adopts the accommodation maintained by the IFCs, could revoke its use of the accommodation and use the exemption. This guideline applies under the final rules. This revocation process applies both prospectively to eligible organizations that decide at a later date to avail themselves of the optional accommodation and then decide to revoke that accommodation, as well as to organizations that invoked the accommodation prior to the effective date of the Religious IFC either by their submission of an EBSA Form 700 or notification, or by some other means under which their third party administrator or issuer was notified by DOL or HHS that the accommodation applies.

The guidance stated that, when the accommodation is revoked by an entity using the exemption, the issuer of the eligible organization must provide participants and beneficiaries written notice of such revocation. These rules adopt that guideline. Consistent with other applicable laws, the issuer or third party administrator of an eligible organization must promptly notify plan participants and beneficiaries of the change of status to the extent such participants and beneficiaries are currently being offered contraceptive coverage at the time the accommodated organization invokes its exemption. The

guidance further stated that the notice may be provided by the organization itself, its group health plan, or its third party administrator, as applicable. The guidance stated that, under the regulation at 45 CFR 147.200(b), "[t]he notice of modification must be provided in a form that is consistent with the rules of paragraph (a)(4) of this section," and (a)(4) has detailed rules on when electronic notice is permitted. These guidelines still apply under the final rules. These rules adopt those guidelines.

The guidance further specified that the revocation of the accommodation would be effective notice on the first day of the first plan year that begins on or after 30 days after the date of the revocation, or alternatively, whether or not the objecting entity's group health plan or issuer listed the contraceptive benefit in its Summary of Benefits of Coverage (SBC), the group health plan or issuer could revoke the accommodation by giving at least 60-days prior notice pursuant to section 2715(d)(4) of the PHS Act (incorporated into ERISA and the Code)[72] and applicable regulations thereunder to revoke the accommodation. The guidance noted that, unlike the SBC notification process, which can effectuate a modification of benefits in the middle of a plan year, provided it is allowed by State law and the contract of the policy, the 30 day notification process under the guidance can only effectuate a benefit modification at the beginning of a plan year. This part of the guidance is adopted in part and changed in part by these final rules, as follows, based on public comments on the issue.

Some commenters asked that revocations only be permitted to occur on the first day of the next plan year, or no sooner than January 2019, to avoid burdens on plans and because some states do not allow for mid-year plan changes. The Departments believe that providing 60-days notice pursuant to section 2715(d)(4) of the PHS Act, where applicable, is a mechanism that already exists for making changes in health benefits covered by a group health plan during a plan year; that process already takes into consideration any applicable state laws. However, in response to public comments, these rules change the accommodation provisions from the Religious IFC to indicate that, as a transitional rule, providing 60-days notice for revoking an accommodation is only available, if applicable, to plans that are using the accommodation at the time of the

---

[71] See Randy Pate, "Notice by Issuer or Third Party Administrator for Employer/Plan Sponsor of Revocation of the Accommodation for Certain Preventive Services," CMS (Nov. 30, 2017), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Notice-Issuer-Third-Party-Employer-Preventive.pdf.

[72] See also 26 CFR 54.9815–2715(b); 29 CFR 2590.715–2715(b); 45 CFR 147.200(b).

publication of these final rules. As a general rule, for plans that use the accommodation in future plan years, the Departments believe it is appropriate to allow revocation of an accommodation only on the first day of the next plan year. Based on the objections of various litigants and public commenters, we believe that some entities already using the accommodation may have been doing so only because previous regulations denied them an exemption. For them, access to the transitional 60-days notice procedure (if applicable) is appropriate in the period immediately following the finalization of these rules. In future plan years, however—plan years that begin after the effective date of these final rules—plans and entities that qualify as exempt under these rules will have been on notice that they qualify for an exemption or the accommodation. If they have opted to enter or remain in the accommodation in those future plan years, when they could have chosen the exemption, the Departments believe it is appropriate for them to wait until the first day of the following plan year to change to exempt status.[73]

This change is implemented in the following manner. In the Religious IFC, the accommodation provisions addressing revocation were found at 45 CFR 147.131(c)(4), 26 CFR 54.9815–2713AT(a)(5),[74] and 29 CFR 2590.715–2713A(a)(5).

The provisions in the Religious IFC (with technical variations among the HHS, Labor, and Treasury rules) state that a written notice of revocation must be provided "as specified in guidance issued by the Secretary of the Department of Health and Human Services." On November 30, 2017, HHS issued the guidance regarding revocation. These final rules incorporate this guidance, with certain clarifications, and state that the revocation notice must be provided "as specified herein." The final rule incorporates the two sets of directions for revoking the accommodation initially set forth in the interim guidance in the following manner. The first, designated as subparagraph (1) as a "[t]ransitional rule," explains that if contraceptive coverage is being offered through the accommodation process on the date on which these final rules go into effect, 60-days notice may be provided to revoke the accommodation process, or they revocation may occur "on the first day of the first plan year that begins on or after 30 days after the date of the revocation" consistent with PHS Act section 2715(d)(4), 45 CFR 147.200(b), 26 CFR 54.9815–2715(b), or 29 CFR 2590.715–2715(b). The second direction, set forth in subparagraph (ii), explains the "[g]eneral rule" that, in plan years beginning after the date on which these final rules go into effect, revocation of the accommodation will be effective on "the first day of the first plan year that begins on or after 30 days after the date of the revocation."

The Religious IFC states that if an accommodated entity objects to some, but not all, contraceptives, an issuer for an insured group health plan that covers contraceptives under the accommodation may, at the issuer's option, choose to provide coverage or payments for all contraceptive services, instead of just for the narrower set of contraceptive services to which the entities object. Some commenters supported this provision, saying that it allows flexibility for issuers that might otherwise face unintended burdens from providing coverage under the accommodation for entities that object to only some contraceptive items. The Departments have maintained this provision in these final rules. Note that this provision is consistent with the other assertions in the rules saying that an entity's objection applies "to the extent" of the entity's religious beliefs, because in this instance, under the accommodation, the plan participant or beneficiary still receives coverage or payments for all contraceptives, and this provision simply allows issuers more flexibility in choosing how to help provide that coverage.

Some commenters asked that the Departments retain the "reliance" provision, contained in the previous accommodation regulations, under which an issuer is deemed to have complied with the Mandate where the issuer relied reasonably and in good faith on a representation by an eligible organization as to its eligibility for the accommodation, even if that representation was later determined to be incorrect. The Departments omitted this provision from the Religious IFC, on the grounds that this provision was less necessary where any organization eligible for the optional accommodation is also exempt. Nevertheless, in order to respond to concerns in public comments, and to prevent any risk to issuers of a mistake or misrepresentation by an organization seeking the accommodation process, the Departments have finalized the Religious IFC with an additional change that restores this clause. The clause uses the same language that was in the regulations prior to the Religious IFC, and it is inserted at 45 CFR 147.131(f), 26 CFR 54.9815–2713A(e), and 29 CFR 2590.715–2713A(e). As a result, these rules renumber the subsequent paragraphs in each of those sections.

*P. Definition of Contraceptives for the Purpose of These Final Rules*

The previous regulations did not define contraceptive services. The Guidelines issued in 2011 included, under "Contraceptive methods and counseling," "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." The previous regulations concerning the exemption and the accommodation used the terms contraceptive services and contraceptive coverage as catch-all terms to encompass all of those Guidelines' requirements. The 2016 update to the Guidelines are similarly worded. Under "Contraception," they include the "full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration," "instruction in fertility awareness-based methods," and "[c]ontraceptive care" to "include contraceptive counseling, initiation of contraceptive use, and follow-up care (for example, management, and evaluation as well as changes to and removal or discontinuation of the contraceptive method)."[75]

To more explicitly state that the exemption encompasses any of the contraceptive or sterilization services, items, or information that have been required under the Guidelines, the Religious IFC included a definition at 45

---

[73] These final rules go into effect 60 days after they are published in the **Federal Register**. Some entities currently using the accommodation may have a plan year that begins less than 30 days after the effective date of these final rules. In such cases, they may be unable, after the effective date of these final rules, to provide a revocation notice 30 days prior to the start of their next plan year. However, these final rules will be published at least 60 days prior to the start of that plan year. Therefore, entities exempt under these final rules that have been subject to the accommodation on the date these final rules are published, that wish to revoke the accommodation, and whose next plan years start after these final rules go into effect, but less than 30 days thereafter, may submit their 30 day revocation notices after these final rules are published, before these final rules are in effect, so that they will have submitted the revocation at least 30 days before their next plan year starts. In such cases, even though the revocation notice will be submitted before these final rules are in effect, the actual revocation will not occur until after these final rules are in effect, and plan participants will have been provided with 30 days' notice of the revocation.

[74] The Department of the Treasury's rule addressing the accommodation is being finalized at 26 CFR 54.9815–2713A, superseding its temporary regulation at 26 CFR 54.9815–2713AT.

[75] https://www.hrsa.gov/womens-guidelines-2016/index.html.

CFR 147.131(f) and 147.132(c), 26 CFR 54.9815–2713AT(e), and 29 CFR 2590.715–2713A(e). These rules finalize those definitions without change, but renumber them as 45 CFR 147.131(f) and 147.132(c), 26 CFR 54.9815–2713A(e), and 29 CFR 2590.715–2713A(e), respectively.

*Q. Severability*

The Departments finalize without change (except for certain paragraph redesignations) the severability clauses in the interim final rules, namely, at paragraph (g) of 26 CFR 54.9815–2713A, the redesignated paragraph (g) of 29 CFR 2590.715–2713A, and 45 CFR 147.132(d).

*R. Other Public Comments*

1. Items Approved as Contraceptives But Used To Treat Existing Conditions

Some commenters noted that some drugs included in the preventive services contraceptive Mandate can also be useful for treating certain existing health conditions, and that women use them for non-contraceptive purposes. Certain commenters urged the Departments to clarify that the final rules do not permit employers to exclude from coverage medically necessary prescription drugs used for non-preventive services. Some commenters suggested that religious objections to the Mandate should not be permitted in cases where such methods are used to treat such conditions, even if those methods can also be used for contraceptive purposes.

Section 2713(a)(4) only applies to "preventive" care and screenings. The statute does not allow the Guidelines to mandate coverage of services provided solely for a non-preventive use, such as the treatment of an existing condition. The Guidelines implementing this section of the statute are consistent with that narrow authority. They state repeatedly that they apply to "preventive" services or care.[76] The requirement in the Guidelines concerning "contraception" specifies several times that it encompasses "contraceptives," that is, medical products, methods, and services applied for "contraceptive" uses. The Guidelines do not require coverage of care and screenings that are non-preventive, and the contraception portion of those Guidelines do not require coverage of medical products, methods, care, and screenings that are non-contraceptive in purpose or use. The Guidelines' inclusion of contraceptive services requires coverage

of contraceptive methods as a type of preventive service only when a drug that FDA has approved for contraceptive use is prescribed in whole or in part for such purpose or intended use. Section 2713(a)(4) does not authorize the Departments to require coverage, without cost-sharing, of drugs prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.[77] The extent to which contraceptives are covered to treat non-preventive conditions would be determined by application of the requirement section 1302(b)(1)(F) of the ACA to cover prescription drugs (where applicable), implementing regulations at 45 CFR 156.122, and 156.125, and plans' decisions about the basket of medicines to cover for these conditions.

Some commenters observed that pharmacy claims do not include a medical diagnosis code, so plans may be unable to discern whether a drug approved by FDA for contraceptive uses is actually applied for a preventive or contraceptive use, or for another use. Section 2713(a)(4), however, draws a distinction between preventive care and screenings and other kinds of care and screenings. That subsection does not authorize the Departments to impose a coverage mandate of services that are not at least partly applied for a preventive use, and the Guidelines themselves do not require coverage of contraceptive methods or care unless such methods or care is contraceptive in purpose. These rules do not prohibit issuers from covering drugs and devices that are approved for contraceptive uses even when those drugs and devices are

prescribed for non-preventive, non-contraceptive purposes. As discussed above, these final rules also do not purport to delineate the items HRSA will include in the Guidelines, but only concern expanded exemptions and accommodations that apply to the extent the Guidelines require contraceptive coverage. Therefore, the Departments do not consider it appropriate to specify in these final rules that under section 2713(a)(4), exempt organizations must provide coverage for drugs prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition.

2. Comments Concerning Regulatory Impact

Some commenters agreed with the Departments' statement in the Religious IFC that the expanded exemptions are likely to affect only a small percentage of women otherwise receiving coverage under the Mandate. Other commenters disagreed, stating that the expanded exemptions could take contraceptive coverage away from many or most women. Still others opposed expanding the exemptions and contended that accurately determining the number of women affected by the expanded exemptions is not possible.

After reviewing the public comments, the Departments agree with commenters who said that estimating the impact of these final rules is difficult based on the limited data available to us, and with commenters who agreed with the Religious IFC that the expanded exemptions are likely to affect only a small percentage of women. The Departments do not find the estimates of large impacts submitted by some commenters more reliable than the estimates set forth in the Religious and Moral IFCs. Even certain commenters that "strongly oppos[ed]" the Religious IFC commented that merely "thousands" would be impacted, a number consistent with the Departments' estimate of the number of women who may be affected by the rule. The Departments' estimates of the impact of these final rules are discussed in more detail in the following section. Therefore, the Departments conclude that the estimates of regulatory impact made in the Religious IFC are still the best estimates available. Our estimates are discussed in more detail in the following section.

3. Interaction With State Laws

Some commenters asked the Departments to discuss the interaction between these final rules and state laws that either require contraceptive

---

[76] *Id.*

[77] The Departments previously cited the IOM's listing of existing conditions that contraceptive drugs can be used to treat (menstrual disorders, acne, and pelvic pain), and said of those uses that "there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy." 77 FR 8727 & n.7. This was not, however, an assertion that PHS Act 2713(a)(4) or the Guidelines require coverage of "contraceptive" methods when prescribed for an exclusively *non-contraceptive, non-preventive* use. Instead, it was an observation that such drugs—generally referred to as "contraceptives"—also have some alternate beneficial uses to treat existing conditions. For the purposes of these final rules, the Departments clarify here that the reference prior to the Religious IFC to the benefits of using contraceptive drugs exclusively for some non-contraceptive and non-preventive uses to treat existing conditions did not mean that the Guidelines require coverage of such uses, and consequently is not a reason to refrain from offering the expanded exemptions provided here. Where a drug approved by the FDA for contraceptive use is prescribed for both a contraceptive use and a non-contraceptive use, the Guidelines (to the extent they apply) would require its coverage for contraceptive use. Where a drug approved by the FDA for contraceptive use is prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition, it would be outside the scope of the Guidelines and the contraceptive Mandate.

coverage or provide religious exemptions from those and other requirements. Some commenters argued that providing expanded exemptions in these rules would negate state contraceptive requirements or narrower state religious exemptions. Some commenters asked that the Departments specify that these exemptions do not apply to plans governed by state laws that require contraceptive coverage. The Department agrees that these rules concern only the applicability of the Federal contraceptive Mandate imposed pursuant to section 2713(a)(4). They do not regulate state contraceptive mandates or state religious exemptions. If a plan is exempt under the Religious IFC and these rules, that exemption does not necessarily exempt the plan or other insurance issuer from state laws that may apply to it. The previous regulations, which offered exemptions for houses of worship and integrated auxiliaries, did not include regulatory language negating the exemptions in states that require contraceptive coverage, although the Departments discussed the issue to some degree in various preambles of those previous regulations. The Departments do not consider it appropriate or necessary in the regulatory text of the religious exemptions to declare that the Federal contraceptive Mandate will still apply in states that have a state contraceptive mandate, since these rules do not purport to regulate the applicability of state contraceptive mandates.[78]

Some commenters observed that, through ERISA, some entities may avoid state laws that require contraceptive coverage by self-insuring. This is a result of the application of the preemption and savings clauses contained in ERISA to state insurance regulation. *See* 29 U.S.C. 1144(a) & (b)(1). These rules cannot change statutory ERISA provisions, and do not change the standards applicable to ERISA preemption. To the extent Congress has decided that ERISA preemption includes preemption of state laws requiring contraceptive coverage, that decision occurred before the ACA and was not negated by the ACA. Congress did not mandate in the ACA that any Guidelines issued under section 2713(a)(4) must include

contraceptives, nor that the Guidelines must force entities with religious objections to cover contraceptives.

## IV. Economic Impact and Paperwork Burden

The Departments have examined the impacts of the Religious IFC and the final rules as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96 354), section 1102(b) of the Social Security Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104–4), Executive Order 13132 on Federalism (August 4, 1999), the Congressional Review Act (5 U.S.C. 804(2)), and Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017).

### A. Executive Orders 12866 and 13563— Department of HHS and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with

economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). As discussed below regarding their anticipated effects, the Religious IFC and these rules are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866. However, OMB has determined that the actions are significant within the meaning of section 3(f)(4) of the Executive Order. Therefore, OMB has reviewed these final rules, and the Departments have provided the following assessment of their impact.

### 1. Need for Regulatory Action

These final rules adopt as final and further change the amendments made by the Religious IFC, which amended the Departments' July 2015 final regulations. The Religious IFC and these final rules expand the exemption from the requirement to provide coverage for contraceptives and sterilization, established under the HRSA Guidelines, promulgated under section 2713(a)(4) of the PHS Act, section 715(a)(1) of ERISA, and section 9815(a)(1) of the Code, to include certain entities and individuals with objections to compliance with the Mandate based on sincerely held religious beliefs, and they revise the accommodation process to make it optional for eligible organizations. The expanded exemption applies to certain individuals and entities that have religious objections to some (or all) of the contraceptive and/or sterilization services that would be covered under the Guidelines. Such action has been taken, among other reasons discussed above, to provide for participation in the health insurance market by certain entities or individuals, by freeing them from penalties they could incur if they follow their sincerely held religious beliefs against contraceptive coverage.

### 2. Anticipated Effects

#### a. Removal of Burdens on Religious Exercise

Regarding entities and individuals that are extended an exemption by the Religious IFC and these final rules, without that exemption the Guidelines would require many of them to either pay for coverage of contraceptive services that they find religiously objectionable; submit self-certifications that would result in their issuer or third party administrator paying for such services for their employees, which

---

[78] Some commenters also asked that these final rules specify that exempt entities must comply with other applicable laws concerning such things as notice to plan participants or collective bargaining agreements. These final rules relieve the application of the Federal contraceptive Mandate under section 2713(a)(4) to qualified exempt entities; they do not affect the applicability of other laws. Elsewhere in this preamble, the Departments provide guidance applicable to notices of revocation and changes that an entity may seek to make during its plan year.

some entities also believe entangles them in the provision of such objectionable coverage; or pay tax penalties, or be subject to other adverse consequences, for non-compliance with these requirements. These final rules remove certain associated burdens imposed on these entities and individuals—that is, by recognizing their religious objections to, and exempting them on the basis of such objections from, the contraceptive and/or sterilization coverage requirement of the HRSA Guidelines and making the accommodation process optional for eligible organizations.

b. Notices When Revoking Accommodated Status

To the extent that entities choose to revoke their accommodated status to make use of the expanded exemption, a notice will need to be sent to enrollees (either by the objecting entity or by the issuer or third party administrator) that their contraceptive coverage is changing, and guidance will reflect that such a notice requirement is imposed no more than is already required by preexisting rules that require notices to be sent to enrollees of changes to coverage during a plan year. If the entities wait until the start of their next plan year to change to exempt status, instead of doing so during the current plan year, those entities generally will also be able to avoid sending any supplementary notices in addition to what they would otherwise normally send prior to the start of a new plan year. Additionally, these final rules provide such entities with an offsetting regulatory benefit by the exemption itself and its relief of burdens on their religious beliefs. As discussed below, assuming that more than half of the entities that have been using the previous accommodation will seek immediate revocation of their accommodated status and notices will be sent to all their enrollees, the total estimated cost of sending those notices will be $302,036.

c. Impacts on Third Party Administrators and Issuers

The Departments estimate that these final rules will not result in any additional burdens or costs on issuers or third party administrators. As discussed below, the Departments believe that 109 of the 209 entities making use of the accommodation process will instead make use of their new exempt status. In contrast, the Departments expect that a much smaller number (which we assume to be 9) will make use of the accommodation to which they were not previously provided access. Reduced

burdens for issuers and third party administrators due to reductions in use of the accommodation will more than offset increased obligations for serving the fewer number of entities that will now opt into the accommodation. This will lead to a net decrease in burdens and costs on issuers and third party administrators, who will no longer have continuing obligations imposed on them by the accommodation. While these rules make it legal for issuers to offer insurance coverage that omits contraceptives to exempt entities and individuals, these final rules do not require issuers to do so.

The Departments anticipate that the effect of these rules on adjustments made to the federally facilitated Exchange user fees under 45 CFR 156.50 will be that fewer overall adjustments will be made using the accommodation process, because there will be more entities who previously were reluctant users of the accommodation that will choose to operate under the newly expanded exemption than there will be entities not previously eligible to use the accommodation that will opt into it. The Departments' estimates of each number of those entities is set forth in more detail below.

d. Impacts on Persons Covered by Newly Exempt Plans

These final rules will result in some persons covered in plans of newly exempt entities not receiving coverage or payments for contraceptive services. As discussed in the Religious IFC, the Departments did not have sufficient data on a variety of relevant factors to precisely estimate how many women would be impacted by the expanded exemptions or any related costs they may incur for contraceptive coverage or the results associated with any unintended pregnancies.

i. Unknown Factors Concerning Impact on Persons in Newly Exempt Plans

As referenced above and for reasons explained here, there are multiple levels of uncertainty involved in measuring the effect of the expanded exemption, including but not limited to—

• How many entities will make use of their newly exempt status.
• How many entities will opt into the accommodation maintained by these rules, under which their plan participants will continue receiving contraceptive coverage.
• Which contraceptive methods some newly exempt entities will continue to provide without cost-sharing despite the entity objecting to other methods (for example, as reflected in *Hobby Lobby*, several objecting entities have still

provided coverage for 14 of the 18 FDA-approved women's contraceptive or sterilization methods, 134 S. Ct. at 2766).

• How many women will be covered by plans of entities using their newly exempt status.
• Which of the women covered by those plans want and would have used contraceptive coverage or payments for contraceptive methods that are no longer covered by such plans.
• Whether, given the broad availability of contraceptives and their relatively low cost, such women will obtain and use contraception even if it is not covered.
• The degree to which such women are in the category of women identified by IOM as most at risk of unintended pregnancy.
• The degree to which unintended pregnancies may result among those women, which would be attributable as an effect of these rules only if the women did not otherwise use contraception or a particular contraceptive method due to their plan making use of its newly exempt status.
• The degree to which such unintended pregnancies may be associated with negative health effects, or whether such effects may be offset by other factors, such as the fact that those women will be otherwise enrolled in insurance coverage.
• The extent to which such women will qualify for alternative sources of contraceptive access, such as through a parent's or spouse's plan, or through one of the many governmental programs that subsidize contraceptive coverage to supplement their access.

ii. Public Comments Concerning Estimates in Religious IFC

In the public comments, some commenters agreed with the Departments' estimate that, at most, the economic impact would lead to a potential transfer cost, from employers (or other plan sponsors) to affected women, of $63.8 million. Some commenters said the impact would be much smaller. Other commenters disagreed, suggesting that the expanded exemptions risked removing contraceptive coverage from more than 55 million women receiving the benefits of the preventive services Guidelines, or even risked removing contraceptive coverage from over 100 million women. Some commenters cited studies indicating that, nationally, unintended pregnancies have large public costs, and the Mandate overall led to large out-of-pocket savings for women.

These general comments do not, however, substantially assist us in

estimating how many women would be affected by these expanded exemptions specifically, or among them, how many unintended pregnancies would result, or how many of the affected women would nevertheless use contraceptives not covered under the health plans of their objecting employers and, thus, be subject to the transfer costs the Departments estimate, or instead, how many women might avoid unintended pregnancies by changing their activities in other ways besides using contraceptives. The Departments conclude, therefore, that our estimates of the anticipated effect in the Religious IFC are still the best estimates we have based on the limited data available to make those estimates. We do not believe that the higher estimates submitted by various public commenters sufficiently took into consideration, or analyzed, the various factors that suggest the small percentage of entities that will now use the expanded exemptions out of the large number of entities subject to the Mandate overall. Instead, the Departments agree with various public commenters providing comment and analysis that, for a variety of reasons, the best estimate of the impact of the expanded exemptions finalized in these rules is that most women receiving contraceptive coverage under the Mandate will not be affected. We agree with such commenters that the number of women covered by entities likely to make use of the expanded exemptions in these rules is likely to be very small in comparison to the overall number of women receiving contraceptive coverage as a result of the Mandate.

### iii. Possible Sources of Information for Estimating Impact

The Departments have access to the following general sources of information that are relevant to this issue, but these sources do not provide a full picture of the impact of these final rules. First, the regulations prior to the Religious IFC already exempted certain houses of worship and their integrated auxiliaries and, as explained elsewhere, effectively did not apply contraceptive coverage requirements to various entities in self-insured church plans. The effect of those previous exemptions or limitations are not included as effects of these rules, which leave those impacts in place. Second, in the Departments' previous regulations creating or expanding exemptions and the accommodation process we concluded that no significant burden or costs would result. 76 FR 46625; 78 FR 39889. Third, some entities, including some for-profit entities, object to only some but not all contraceptives, and in some

cases will cover 14 of 18 FDA-approved women's contraceptive and sterilization methods.[79] *See Hobby Lobby,* 134 S. Ct. at 2766. The effects of the expanded exemptions will be mitigated to that extent. No publicly traded for-profit entities sued challenging the Mandate, and the public comments did not reveal any that specifically would seek to use the expanded exemptions. Consequently, the Departments agree with the estimate from the Religious IFC that publicly traded companies would not likely make use of these expanded exemptions.

Fourth, HHS previously estimated that 209 entities would make use of the accommodation process. To arrive at this number, the Departments used, as a placeholder, the approximately 122 nonprofit entities that brought litigation challenging the accommodation process, and the approximately 87 closely held for-profit entities that filed suit challenging the Mandate in general. The Departments' records indicate, as noted in the Religious IFC, that approximately 63 entities affirmatively submitted notices to HHS to use the accommodation,[80] and approximately 60 plans took advantage of the

[79] By reference to the FDA Birth Control Guide's list of 18 birth control methods for women and 2 for men, *https://www.fda.gov/downloads/ forconsumers/byaudience/forwomen/ freepublications/ucm517406.pdf,* Hobby Lobby and entities with similar beliefs were not willing to cover: IUD copper; IUD with progestin; emergency contraceptive (Levonorgestrel); and emergency contraceptive (Ulipristal Acetate). *See* 134 S. Ct. at 2765–66. Hobby Lobby was willing to cover: sterilization surgery for women; sterilization implant for women; implantable rod; shot/injection; oral contraceptives ("the Pill"—combined pill); oral contraceptives ("the Pill"—extended/continuous use/combined pill); oral contraceptives ("the Mini Pill"—progestin only); patch; vaginal contraceptive ring; diaphragm with spermicide; sponge with spermicide; cervical cap with spermicide; female condom; spermicide alone. *Id.* Among women using these 18 female contraceptive methods, 85 percent use the 14 methods that Hobby Lobby and entities with similar beliefs were willing to cover (22,446,000 out of 26,436,000), and "[t]he pill and female sterilization have been the two most commonly used methods since 1982.'' *See* Guttmacher Institute, "Contraceptive Use in the United States'' (Sept. 2016), *https:// www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[80] This includes some fully insured and some self-insured plans, but it does not include entities that may have used the accommodation by submitting an EBSA form 700 self-certification directly to their issuer or third party administrator. In addition, the Departments have deemed some other entities as being subject to the accommodation through their litigation filings, but that might not have led to contraceptive coverage being provided to persons covered in some of those plans, either because they are exempt as houses of worship or integrated auxiliaries, they are in self-insured church plans, or the Departments were not aware of their issuers or third party administrators so as to send them letters obligating them to provide such coverage.

contraceptive user fees adjustments, in the 2015 plan year, to obtain reimbursement for contraceptive service payments made for coverage of such services for women covered by self-insured plans that were accommodated. Overall, while recognizing the limited data available, the Departments assumed that, under an expanded exemption and accommodation, approximately 109 previously accommodated entities would use an expanded exemption, and about 100 would continue their accommodated status. We also estimated that another 9 entities would use the accommodation where the entities were not previously eligible to do so.

These sources of information were outlined in the Religious IFC. Some commenters agreed with the Departments' estimates based on those sources, and while others disagreed, the Departments conclude that commenters did not provide information that allows us to make better estimates.

### iv. Estimates Based on Litigating Entities That May Use Expanded Exemptions

Based on these and other factors, the Departments considered two approaches in the Religious IFC to estimate the number of women affected among entities using the expanded exemptions. First, following the use in previous regulations of litigating entities to estimate the effect of the exemption and accommodation, the Departments attempted to estimate the number of women covered by plans of litigating entities that could be affected by expanded exemptions. Based on papers filed in litigation, and public sources, the Departments estimated in the Religious IFC that approximately 8,700 women of childbearing age could have their contraception costs affected by plans of litigating entities using these expanded exemptions. The Departments believe that number is lower based upon the receipt, by many of those litigating entities, of permanent injunctions against the enforcement of section 2713(a)(4) to the extent it supports a contraceptive Mandate, which have been entered by federal district courts since the issuance of the Religious IFC.[81] As a result, these final rules will not affect whether such entities will be subject to the contraceptive Mandate. Subtracting those entities from the total, the Departments estimate that the remaining litigating entities employ

[81] *See, for example, Catholic Benefits Ass'n LCA v. Hargan,* No. 5:14–cv–00240–R (W.D. Okla. order filed Mar. 7, 2018), and *Dordt Coll. v. Burwell,* No. 5:13–cv–04100 (N.D. Iowa order filed June 12, 2018).

approximately 49,000 persons, male and female. The average percent of workers at firms offering health benefits that are actually covered by those benefits is 60 percent.[82] This amounts to approximately 29,000 employees covered under those plans. EBSA estimates that for each employee policyholder, there is approximately one dependent.[83] This amounts to approximately 58,000 covered persons. Census data indicate that women of childbearing age—that is, women aged 15 to 44—compose 20.2 percent of the general population.[84] Furthermore, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines.[85] Therefore, the Departments estimate that approximately 5,200 women of childbearing age that use contraception covered by the Guidelines are covered by employer sponsored plans of entities that might be affected by these final rules. The Departments also estimate that, for the educational institutions that brought litigation challenges objecting to the Mandate as applied to student coverage that they arranged—where (1) the institutions were not exempt under the prior rule, (2) their student plans were not self-insured, and (3) they have not received permanent injunctions preventing the application of the previous regulations—such student plans likely covered approximately 2,600 students. Thus, the Departments estimate the female members of those plans is 2,600 women.[86] Assuming, as

referenced above, that 43.6 percent of such women use contraception covered by the Guidelines, the Departments estimate that 1,150 of those women would be affected by these final rules.

Together, this leads the Departments to estimate that approximately 6,400 women of childbearing age may have their contraception costs affected by plans of litigating entities using these expanded exemptions. As noted previously, the Departments do not have data indicating how many of those women agree with their employers' or educational institutions' opposition to contraception (so that fewer of them than the national average might actually use contraception). Nor do the Departments know how many would have alternative contraceptive access from a parent's or spouse's plan, or from federal, state, or local governmental programs, nor how many of those women would fall in the category of being most at risk of unintended pregnancy, nor how many of those entities would provide some contraception in their plans while only objecting to certain contraceptives.

**v. Estimates of Accommodated Entities That May Use Expanded Exemptions**

In the Religious IFC, the Departments also examined data concerning user-fee reductions to estimate how many women might be affected by entities that are using the accommodation and would use the expanded exemptions under these final rules. Under the accommodation, HHS has received information from issuers that seek user fees adjustments under 45 CFR 156.50(d)(3)(ii), for providing contraceptive payments for self-insured plans that make use of the accommodation. HHS receives requests for fees adjustments both where Third Party Administrators (TPAs) for those self-insured accommodated plans are themselves issuers, and where the TPAs use separate issuers to provide the payments and those issuers seek fees

adjustments. Where the issuers seeking adjustments are separate from the TPAs, the TPAs are asked to report the number of persons covered by those plans. Some users do not enter all the requested data, and not all the data for the 2017 plan year is complete. Nevertheless, HHS has reviewed the user fees adjustment data received for the 2017 plan year. HHS's best estimate from the data is that there were $38.4 million in contraception claims sought as the basis for user fees adjustments for plans, and that these claims were for plans covering approximately 1,823,000 plan participants and beneficiaries of all ages, male and female.

This number fluctuates from year to year. It is larger than the estimate used in the Religious IFC, but on closer examination of the data, this number better accounts for plans where TPAs were also issuers seeking user fees adjustments, in addition to plans where the TPA is separate from the issuer seeking user fees adjustments. The number of employers using the accommodation where user fees adjustments were sought cannot be determined from HHS data, because not all users are required to submit that information, and HHS does not necessarily receive information about fully insured plans using the accommodation. Therefore, the Departments still consider our previous estimate of 209 entities using the accommodation as the best estimate available.

As noted in the Religious IFC, HHS's information indicates that religious nonprofit hospitals or health systems sponsored a significant minority of the accommodated self-insured plans that were using contraceptive user fees adjustments, yet those plans covered more than 80 percent of the persons covered in all plans using contraceptive user fees adjustments. Some of those plans cover nearly tens of thousands of persons each and are proportionately much larger than the plans provided by other entities using the contraceptive user fees adjustments.

The Departments continue to believe that a significant fraction of the persons covered by previously accommodated plans provided by religious nonprofit hospitals or health systems may not be affected by the expanded exemption. A broad range of religious hospitals or health systems have publicly indicated that they do not conscientiously oppose participating in the accommodation.[87]

---

[82] See Kaiser Family Foundation and Health Research and Educational Trust, "Employer Health Benefits: 2018 Annual Survey" at 62, available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018.*

[83] Employee Benefits Security Administration, "Health Insurance Coverage Bulletin" Table 4, page 21. Using Data for the March 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[84] United States Census Bureau, "Age and Sex Composition: 2010" (May 2011), available at *https://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf.* The Guidelines' requirement of contraceptive coverage only applies "for all women with reproductive capacity." *https://www.hrsa.gov/womensguidelines/;* also, see 80 FR 40318. In addition, studies commonly consider the 15–44 age range to assess contraceptive use by women of childbearing age. See, for example, Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), available at *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.*

[85] See *https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states* (reporting that of 61,491,766 women aged 15–44, 26,809,5550 use women's contraceptive methods covered by the Guidelines).

[86] On average, the Departments expect that approximately half of those students (1,300) are

female. For the purposes of this estimate, we also assume that female policyholders covered by plans arranged by institutions of higher education are women of childbearing age. The Departments expect that they would have less than the average number of dependents per policyholder than exists in standard plans, but for the purposes of providing an upper bound to this estimate, the Departments assume that they would have an average of one dependent per policyholder, thus bringing the number of policyholders and dependents back up to 2,6,00. Many of those dependents are likely not to be women of childbearing age, but in order to provide an upper bound to this estimate, the Departments assume they are. Therefore, for the purposes of this estimate, the Departments assume that the effect of these expanded exemptions on student plans of litigating entities includes 2,600 women.

[87] See, *e.g., https://www.chausa.org/newsroom/women%27s-preventive-health-services-final-rule* ("HHS has now established an accommodation that will allow our ministries to continue offering health

Of course, some of these religious hospitals or health systems may opt for the expanded exemption under these final rules, but others might not. In addition, among plans of religious nonprofit hospitals or health systems, some have indicated that they might be eligible for status as a self-insured church plan.[88] As discussed above, some litigants challenging the Mandate have appeared, after their complaints were filed, to make use of self-insured church plan status.[89] (The Departments take no view on the status of these particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.) Nevertheless, considering all these factors, it generally seems likely that many of the remaining religious hospital or health systems plans previously using the accommodation will continue to opt into the voluntary accommodation under these final rules, under which their employees will still receive contraceptive coverage. To the extent that plans of religious hospitals or health systems are able to make use of self-insured church plan status, the previous accommodation rule would already have allowed them to relieve themselves and their third party administrators of obligations to provide contraceptive coverage or payments. Therefore, in such situations, the Religious IFC and these final rules would not have an anticipated effect on the contraceptive coverage of women in those plans.

### vi. Combined Estimates of Litigating and Accommodated Entities

Considering all these data points and limitations, the Departments offer the following estimate of the number of women who will be impacted by the expanded exemption in these final rules. In addition to the estimate of 6,400 women of childbearing age that use contraception covered by the Guidelines, who will be affected by use of the expanded exemption among litigating entities, the Departments calculate the following number of women who we estimate to be affected by accommodated entities using the expanded exemption. As noted above, approximately 1,823,000 plan participants and beneficiaries were covered by self-insured plans that received contraceptive user fee adjustments in 2017. Although additional self-insured entities may have participated in the accommodation without making use of contraceptive user fees adjustments, the Departments do not know what number of entities did so. We consider it likely that self-insured entities with relatively larger numbers of covered persons had sufficient financial incentive to make use of the contraceptive user fees adjustments. Therefore, without better data available, the Departments assume that the number of persons covered by self-insured plans using contraceptive user fees adjustments approximates the number of persons covered by all self-insured plans using the accommodation.

An additional but unknown number of persons were likely covered in fully insured plans using the accommodation. The Departments do not have data on how many fully insured plans have been using the accommodation, nor on how many persons were covered by those plans. DOL estimates that, among persons covered by employer-sponsored insurance in the private sector, 62.7 percent are covered by self-insured plans and 37.3 percent are covered by fully insured plans.[90] Therefore, corresponding to the approximately 1,823,000 persons covered by self-insured plans using user fee adjustments, we estimate an additional 1,084,000 persons were covered by fully insured plans using the accommodation. This yields approximately 2,907,000 persons of all ages and sexes whom the Departments estimate were covered in

plans using the accommodation under the previous regulations.

Although recognizing the limited data available for our estimates, the Departments estimate that 100 of the 209 entities that were using the accommodation under the previous regulations will continue to opt into it under these final rules and that those entities will cover the substantial majority of persons previously covered in accommodated plans. The data concerning accommodated self-insured plans indicates that plans sponsored by religious hospitals and health systems and other entities likely to continue using the accommodation constitute over 60 percent of plans using the accommodation, and encompass more than 90 percent of the persons covered in accommodated plans.[91] In other words, plans sponsored by such entities appear to be a majority of plans using the accommodation, and also have a proportionately larger number of covered persons than do plans sponsored by other accommodated entities, which have smaller numbers of covered persons. Moreover, as cited above, many religious hospitals and health systems have indicated that they do not object to the accommodation, and some of those entities might also qualify as self-insured church plans, so that these final rules would not impact the contraceptive coverage their employees receive.

The Departments do not have specific data on which plans of which sizes will actually continue to opt into the accommodation, nor how many will make use of self-insured church plan status. The Departments assume that the proportions of covered persons in self-insured plans using contraceptive user fees adjustments also apply in fully insured plans, for which the Departments lack representative data. Based on these assumptions and without better data available, the Departments assume that the 100 accommodated entities that will remain in the accommodation will account for 75 percent of all the persons previously covered in accommodated plans. In comparison, the Departments assume the 109 accommodated entities that will make use of the expanded exemption will encompass 25 percent of persons

---

insurance plans for their employees as they have always done. . . . We are pleased that our members now have an accommodation that will not require them to contract, provide, pay or refer for contraceptive coverage. . . . We will work with our members to implement this accommodation."). In comments submitted in previous rules concerning this Mandate, the Catholic Health Association has stated it "is the national leadership organization for the Catholic health ministry, consisting of more than 2,000 Catholic health care sponsors, systems, hospitals, long-term care facilities, and related organizations. Our ministry is represented in all 50 states and the District of Columbia." Comments on CMS–9968–ANPRM (dated June 15, 2012).

[88] See, for example, Brief of the Catholic Health Association of the United States as Amicus Curiae in Support of Petitioners, Advocate Health Care Network, Nos. 16–74, 16–86, 16–258, 2017 WL 371934 at *1 (U.S. filed Jan. 24, 2017) ("CHA members have relied for decades that the 'church plan' exemption contained in" ERISA.).

[89] See *https://www.franciscanhealth.org/sites/default/files/2015%20employee%20benefit%20booklet.pdf*; see, for example, *Roman Catholic Archdiocese of N.Y.* v. *Sebelius*, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013).

[90] "Health Insurance Coverage Bulletin" Table 3A, page 14. Using Data for the March 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[91] The data also reflects a religious university using the accommodation that has publicly affirmed the accommodation is consistent with its religious views, and two houses of worship that are using the accommodation despite already qualifying for the previous exemption. We assume for the purposes of this estimate these three entities will also continue using the accommodation instead of the expanded exemption.

previously covered in accommodated plans.

Applying these percentages to the estimated 2,907,000 persons covered in previously accommodated plans, the Departments estimate that approximately 727,000 persons will be covered in the 109 plans that use the expanded exemption, and 2,180,000 persons will be covered in the estimated 100 plans that continue to use the accommodation. According to the Census data cited above, women of childbearing age comprise 20.2 percent of the population, which means that approximately 147,000 women of childbearing age are covered in previously accommodated plans that the Departments estimate will use the expanded exemption. As noted above, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines, so that the Departments expect approximately 64,000 women that use contraception covered by the Guidelines will be affected by accommodated entities using the expanded exemption.

It is not clear the extent to which this number overlaps with the number estimated above of 6,400 women in plans of litigating entities that may be affected by these rules. In order to more broadly estimate the possible effects of these rules, the Departments assume there is no overlap between the two numbers, and therefore that these final rules would affect the contraceptive costs of approximately 70,500 women.

Under the assumptions just discussed, the number of women whose contraceptive costs will be impacted by the expanded exemption in these final rules is approximately 0.1 percent of the 55.6 million women in private plans that HHS's Office of the Assistant Secretary for Planning and Evaluation (ASPE) estimated in 2015 received preventive services coverage under the Guidelines.

In order to estimate the cost of contraception to women affected by the expanded exemption, the Departments are aware that, under the previous accommodation process, the total amount of contraceptive claims sought for self-insured plans for the 2017 benefit year was $38.5 million.[92] These adjustments covered the cost of contraceptive coverage provided to women. As also discussed above, the Departments estimate that amount corresponded to plans covering

1,823,000 persons. Among those persons, as cited above, approximately 20.2 percent on average were women of childbearing age, and of those, approximately 43.6 percent use women's contraceptive methods covered by the Guidelines. This amounts to approximately 161,000 women. Therefore, entities using contraceptive user fees adjustments received approximately $239 per year per woman of childbearing age that used contraception covered by the Guidelines and covered in their plans. But in the Religious IFC, we estimated that the average annual cost of contraception per woman per year is $584. As noted above, public commenters cited similar estimates of the annual cost of various contraceptive methods, if calculated for the life of the method's effectiveness. Therefore, to estimate the annual transfer effects of these final rules, the Departments will continue to use the estimate of $584 per woman per year. With an estimated impact of these final rules of 70,500 women per year, the financial transfer effects attributable to these final rules on those women would be approximately $41.2 million.

Some commenters suggested that the Departments' estimate of women affected among litigating entities was too low, but they did not support their proposed higher numbers with citations or specific data that could be verified as more reliable than the estimates in the Religious IFC. Their estimates appeared to be overinclusive, for example, by counting all litigating entities and not just those that may be affected by these rules because they are not in church plans, or by counting all plan participants and not just women of childbearing age that use contraception. Moreover, since the Religious IFC was issued, additional entities have received permanent injunctions against enforcement of any regulations implementing the contraceptive Mandate and so will not be affected by these final rules. Taking all of these factors into account, the Departments are not aware of a better method of estimating the number of women affected by these expanded exemptions.

vii. Alternate Estimates Based on Consideration of Pre-ACA Plans

To account for uncertainty in the estimates above, the Departments conducted a second analysis using an alternative framework, in order to thoroughly consider the possible upper bound economic impact of these final rules.

In 2015, ASPE estimated that 55.6 million women aged 15 to 64 were covered by private insurance had

preventive services coverage under the Affordable Care Act.[93] The Religious IFC used this estimate in this second analysis of the possible impact of the expanded exemptions in the interim final rules. ASPE has not issued an update to its report. Some commenters noted that a private organization published a fact sheet in 2017 claiming to make similar estimates based on more recent data, in which it estimated that 62.4 million aged 15 to 64 were covered by private insurance had preventive services coverage under the Affordable Care Act.[94] The primary difference between these numbers appears to be a change in the number of persons covered by grandfathered plans.

The methodology of both reports do not fully correspond to the number the Departments seek to estimate here for the purposes of *Executive Orders 12866 and 13563.* These final rules will not affect all women aged 15 to 64 who are covered by private insurance and have coverage of preventive services under the Affordable Care Act. This is partly because the Departments do not have evidence to suggest that most employers will have sincerely held religious objections to contraceptive coverage and will use the expanded exemptions. In addition, both reports include women covered by plans that are not likely affected by the expanded exemptions for other reasons. For example, even though the estimates in those reports do not include enrollees in public plans such as Medicare or Medicaid, they do include enrollees in plans obtained on the health insurance marketplaces, purchased in the individual market, obtained by self-employed persons, or offered by government employers. Women who purchase plans in the marketplaces, the individual market, or as self-employed persons are not required to use the exemptions in these rules. Government employers are also not affected by the exemptions in these rules.

In response to public comments citing the more recent report, the Departments offer the following estimates based on more recent data than used in the Religious IFC. Data from the U.S. Census Bureau indicates that 167.6 million individuals, male and female, under 65 years of age, were covered by

---

[92] The amount of user fees adjustments provided was higher than this, since an additional administrative amount was added to the amount of contraceptive costs claimed.

[93] Available at *https://aspe.hhs.gov/system/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf.*

[94] The commenters cited the National Women's Law Center's Fact Sheet from September 2017, available at *https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.*

employment-based insurance in 2017.[95] Of those, 50.1 percent were female, that is, 84 million.[96] The most recent Health Insurance Coverage Bulletin from EBSA states that, within employer-sponsored insurance, 76.5% are covered by private sector employers.[97] As noted above, these expanded exemptions do not apply to public sector employers. Assuming the same percentage applies to the Census data for 2017, 64.2 million women under 65 years of age were covered by private sector employment based insurance. EBSA's bulletin also states that, among those covered by private sector employer sponsored insurance, 5% receive health insurance coverage from a different primary source.[98] We assume for the purposes of this estimate that an exemption claimed by an employer under these rules need not affect contraceptive coverage of a person who receives health insurance coverage from a different primary source. Again assuming this percentage applies to the 2017 coverage year, we estimate that 61 million women under 65 years of age received primary health coverage from private sector, employment-based insurance. In conducting this analysis, the Departments also observed that for 3.8 percent of those covered by private sector employment sponsored insurance, the plan was purchased by a self-employed person, not by a third party employer. Self-employed persons who direct firms are not required to use the exemptions in these final rules, but if they do, they would not be losing contraceptive coverage that they want to have, since they would be using the exemption based on their sincerely held religious beliefs. If those persons have employees, the employees would be included in this estimate in the number of people who receive employer sponsored insurance from a third party. Assuming this percentage applies to the 2017 coverage year, we estimate that 58.7 million women under 65 years of age received primary health coverage

from private sector insurance from a third party employer plan sponsor.

The Kaiser Family Foundation's Employer Health Benefits Annual Survey 2018 states that 16% of covered workers at all firms are enrolled in a plan grandfathered under the ACA (and thus not subject to the preventive services coverage requirements), but that only 14% of workers receiving coverage from state and local government employer plans are in grandfathered plans.[99] Using the data cited above in EBSA's bulletin concerning the number of persons covered in public and private sector employer sponsored insurance, this suggests 16.6% of persons covered by private sector employer sponsored plans are in grandfathered plans, and 83.4% in non-grandfathered plans.[100] Applying this percentage to the Census data, 49 million women under 65 years of age received primary health insurance coverage from private sector, third party employment-based, non-grandfathered plans. Census data indicates that among women under age 65, 46.7% are of childbearing age (aged 15 to 44).[101] Therefore, we estimate that 22.9 million women aged 15–44 received primary health insurance coverage from private sector, third party employment based, non-grandfathered insurance plans.

Prior to the implementation of the Affordable Care Act, approximately 6 percent of employer survey respondents did not offer contraceptive coverage, with 31 percent of respondents not knowing whether they offered such coverage.[102] The 6 percent may have included approximately 1.37 million of the women aged 15 to 44 primarily covered by employer-sponsored insurance plans in the private sector. And as noted above, approximately 43.6 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines. Therefore, the Departments estimate that 599,000

women of childbearing age that use contraceptives covered by the Guidelines were covered by plans that omitted contraceptive coverage prior to the Affordable Care Act.[103]

It is unknown what motivated those employers to omit contraceptive coverage—whether they did so for religious or other reasons. Despite the lack of information about their motives, the Departments attempt to make a reasonable estimate of the upper bound of the number of those employers that omitted contraception before the Affordable Care Act and that would make use of these expanded exemptions based on sincerely held religious beliefs.

To begin, the Departments estimate that publicly traded companies would not likely make use of these expanded exemptions. Even though the rule does not preclude publicly traded companies from dropping coverage based on a sincerely held religious belief, it is likely that attempts to object on religious grounds by publicly traded companies would be rare. The Departments take note of the Supreme Court's decision in *Hobby Lobby,* where the Court observed that "HHS has not pointed to any example of a publicly traded corporation asserting RFRA rights, and numerous practical restraints would likely prevent that from occurring. For example, the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable." 134 S. Ct. at 2774. The Departments are aware of several federal health care conscience

[95] See U.S. Census Bureau Current Population Survey Table HI–01, "Health Insurance Coverage in 2017: All Races," available at *https://www2.census.gov/programs-surveys/cps/tables/hi-01/2018/hi01_1.xls.*

[96] *Id.*

[97] Table 1A, page 5 (stating that in coverage year 2015, 177.5 million persons of all ages were covered by employer sponsored insurance, with 135.7 million of those being covered by private sector employers), available at *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[98] *Id.* at Table 1C, page 8 (168.7 million persons received health insurance coverage from employer sponsored insurance as their primary source, compared to 177.5 million persons covered by employer sponsored insurance overall).

[99] "Employer Health Benefits: 2018 Annual Survey" at 211, available at *http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018.*

[100] This bulletin shows 168.7 million persons with primary coverage from employer sponsored insurance, with 131.6 million in the private sector and 37.1 million in the public sector. 16% of 168.7 million is 26.9 million. 14% of 37.1 million is 5.2 million. 26.9 million − 5.2 million is 21.8 million, which is 16.6% of the 131.6 million persons with primary coverage from private sector employer sponsored insurance.

[101] U.S. Census Bureau, Table S0101 "Age and Sex" (available at *https://data.census.gov/cedsci/results/tables?q=S0101:%20AGE%20AND%20SEX&ps=table*currentPage@1*).

[102] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2010 Annual Survey" at 196, available at *https://kaiserfamilyfoundation.files.wordpress.com/2013/04/8085.pdf.*

[103] Some of the 31 percent of survey respondents that did not know about contraceptive coverage may not have offered such coverage. If it were possible to account for this non-coverage, the estimate of potentially affected covered women could increase. On the other hand, these employers' lack of knowledge about contraceptive coverage suggests that they lacked sincerely held religious beliefs specifically objecting to such coverage—beliefs without which they would not qualify for the expanded exemptions offered by these final rules. In that case, omission of such employers and covered women from this estimation approach would be appropriate. Correspondingly, the 6 percent of employers that had direct knowledge about the absence of coverage may be more likely to have omitted such coverage on the basis of religious beliefs than were the 31 percent of survey respondents who did not know whether the coverage was offered. Yet an entity's mere knowledge about its coverage status does not itself reflect its motive for omitting coverage. In responding to the survey, the entity may have simply examined its plan document to determine whether or not contraceptive coverage was offered. As will be relevant in a later portion of the analysis, we have no data indicating what portion of the entities that omitted contraceptive coverage pre-Affordable Care Act did so on the basis of sincerely held religious beliefs, as opposed to doing so for other reasons that would not qualify them for the expanded exemption offered in these final rules.

laws [104] that in some cases have existed for decades and that protect companies, including publicly traded companies, from discrimination if, for example, they decline to facilitate abortion, but the Departments are not aware of examples where publicly traded companies have made use of these exemptions. Thus, while the Departments consider it important to include publicly traded companies in the scope of these expanded exemptions for reasons similar to those reasons used by the Congress in RFRA and some health care conscience laws, in estimating the anticipated effects of the expanded exemptions, the Departments agree with the Supreme Court that it is improbable any will do so.

This assumption is significant because 31.3 percent of employees in the private sector work for publicly traded companies.[105] That means that only approximately 411,000 women aged 15 to 44 that use contraceptives covered by the Guidelines were covered by plans of non-publicly traded companies that did not provide contraceptive coverage pre-Affordable Care Act.

Moreover, because these final rules build on previous regulations that already exempted houses of worship and integrated auxiliaries and, as explained above, effectively eliminated obligations to provide contraceptive coverage within objecting self-insured church plans, the Departments attempt to estimate the number of such employers whose employees would not be affected by these rules. In attempting to estimate the number of such employers, the Departments consider the following information. Many Catholic dioceses have litigated or filed public comments opposing the Mandate, representing to the Departments and to courts around the country that official Catholic Church teaching opposes contraception. There are 17,651 Catholic parishes in the United States,[106] 197 Catholic dioceses,[107] 5,224 Catholic elementary schools, and 1,205 Catholic secondary schools.[108] Not all Catholic schools are integrated auxiliaries of Catholic churches, but there are other Catholic entities that are integrated auxiliaries that are not schools, so the Departments use the number of schools as an estimate of the number of integrated auxiliaries. Among self-insured church plans that oppose the Mandate, the Department has been sued by two—Guidestone and Christian Brothers. Guidestone is a plan organized by the Southern Baptist convention covering 38,000 employers, some of which are exempt as churches or integrated auxiliaries, and some of which are not.[109] Christian Brothers is a plan that covers Catholic organizations including Catholic churches and integrated auxiliaries, which are estimated above, but has also said in litigation that it covers about 500 additional entities that are not exempt as churches.[110] In total, therefore, without having certain data on the number of entities exempt under the previous rules, the Departments estimate that approximately 62,000 employers among houses of worship, integrated auxiliaries, and church plans, were exempt or relieved of contraceptive coverage obligations under the previous regulations. The Departments do not know how many persons are covered in the plans of those employers. Guidestone reports that among its 38,000 employers, its plan covers approximately 220,000 persons, and its employers include "churches, mission-sending agencies, hospitals, educational institutions and other related ministries." Using that ratio, the Departments estimate that the 62,000 church and church plan employers among Guidestone, Christian Brothers, and Catholic churches would include 359,000 persons. Among them, as referenced above, 72,500 women would be of childbearing age, and 32,100 may use contraceptives covered by the Guidelines.

Taking all of these factors into account, the Departments estimate that the private, non-publicly traded employers that did not cover contraception pre-Affordable Care Act, and that were not exempt by the previous regulations nor were participants in self-insured church plans that oppose contraceptive coverage, covered approximately 379,000 women aged 15 to 44 that use contraceptives covered by the Guidelines. But to estimate the likely actual transfer impact of these final rules, the Departments must estimate not just the number of such women covered by those entities, but how many of those entities would actually qualify for, and use, the expanded exemptions.

The Departments do not have data indicating how many of the entities that omitted coverage of contraception pre-Affordable Care Act did so on the basis of sincerely held religious beliefs that might qualify them for exempt status under these final rules, as opposed to having done so for other reasons. Besides the entities that filed lawsuits or submitted public comments concerning previous regulations on this matter, the Departments are not aware of entities that omitted contraception pre-Affordable Care Act and then opposed the contraceptive coverage requirement after it was imposed by the Guidelines. For the following reasons, however, the Departments believe that a reasonable estimate is that no more than approximately one third of the persons covered by relevant entities—that is, no more than approximately 126,400 affected women—would likely be subject to potential transfer impacts under the expanded religious exemptions offered in these final rules. Consequently, as explained below, the Departments believe that the potential impact of these final rules falls substantially below the $100 million threshold for an economically significant major rule.

First, as mentioned, the Departments are not aware of information, or of data from public comments, that would lead us to estimate that all or most entities that omitted coverage of contraception pre-Affordable Care Act did so on the basis of sincerely held conscientious objections in general or, specifically, religious beliefs, as opposed to having done so for other reasons. It would seem reasonable to assume that many of those entities did not do so based on sincerely held religious beliefs. According to a 2016 poll, only 4% of Americans believe that using contraceptives is morally wrong (including from a religious perspective).[111] In addition,

[104] For example, 42 U.S.C. 300a–7(b), 42 U.S.C. 238n, and Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d), Public Law 115–31.

[105] John Asker, et al., "Corporate Investment and Stock Market Listing: A Puzzle?" 28 *Review of Financial Studies* Issue 2, at 342–390 (Oct. 7, 2014), available at *https://doi.org/10.1093/rfs/hhu077*. This is true even though there are only about 4,300 publicly traded companies in the U.S. See Rayhanul Ibrahim, "The number of publicly-traded US companies is down 46% in the past two decades," *Yahoo! Finance* (Aug. 8, 2016), available at *https://finance.yahoo.com/news/jp-startup-public-companies-fewer-000000709.html*.

[106] Roman Catholic Diocese of Reno, "Diocese of Reno Directory: 2016–2017," available at *http://www.renodiocese.org/documents/2016/9/2016%202017%20directory.pdf*.

[107] Wikipedia, "List of Catholic dioceses in the United States," available at *https://en.wikipedia.org/wiki/List_of_Catholic_dioceses_in_the_United_States*.

[108] National Catholic Educational Association, "Catholic School Data," available at *http://www.ncea.org/NCEA/Proclaim/Catholic_School_Data/Catholic_School_Data.aspx*.

[109] Guidestone Financial Resources, "Who We Serve," available at *https://www.guidestone.org/AboutUs/WhoWeServe*.

[110] The Departments take no view on the status of particular plans under the Employee Retirement Income Security Act of 1974 (ERISA), but simply make this observation for the purpose of seeking to estimate the impact of these final rules.

[111] Pew Research Center, "Where the Public Stands on Religious Liberty vs. Nondiscrimination"

various reasons exist for some employers not to return to a pre-ACA situation in which they did not provide contraceptive coverage, such as avoiding negative publicity, the difficulty of taking away a fringe benefit that employees have become accustomed to having, and avoiding the administrative cost of renegotiating insurance contracts. Additionally, as discussed above, many employers with objections to contraception, including several of the largest litigants, only object to some contraceptives and cover as many as 14 of 18 of the contraceptive methods included in the Guidelines. This will reduce, and potentially eliminate, the contraceptive cost transfer for women covered in their plans.[112] Moreover, as suggested by the Guidestone data mentioned previously, employers with conscientious objections may tend to have relatively few employees and, among nonprofit entities that object to the Mandate, it is possible that a greater share of their employees oppose contraception than among the general population, which should lead to a reduction in the estimate of how many women in those plans actually use contraception.

It may not be the case that all entities that objected on religious grounds to contraceptive coverage before the ACA brought suit against the Mandate. However, it is worth noting that, while less than 100 for-profit entities challenged the Mandate in court (and an unknown number joined two newly formed associational organizations bringing suit on their behalf), there are more than 3 million for-profit private sector establishments in the United States that offer health insurance.[113] Six

percent of those would be 185,000, and one third of that number would be 62,000. The Departments consider it unlikely that tens or hundreds of thousands of for-profit private sector establishments omitted contraceptive coverage pre-ACA specifically because of sincerely held religious beliefs, when, after six years of litigation and multiple public comment periods, the Departments are aware of less than 100 such entities. The Departments do not know how many additional nonprofit entities would use the expanded exemptions, but as noted above, under the rules predating the Religious IFC, tens of thousands were already exempt as churches or integrated auxiliaries, or were covered by self-insured church plans that are not penalized if no contraceptive coverage is offered.

Finally, among entities that omitted contraceptive coverage based on sincerely held conscientious objections as opposed to other reasons, it is likely that some, albeit a minority, did so based on moral objections that are non-religious, and therefore would not be compassed by the expanded exemptions in these final rules.[114] Among the general public, polls vary about religious beliefs, but one prominent poll shows that 13 percent of Americans say they do not believe in God or have no opinion on the question.[115] Therefore, the Departments estimate that, of the entities that omitted contraception pre-Affordable Care Act based on sincerely held conscientious objections as opposed to other reasons, a small fraction did so based on sincerely held non-religious moral convictions, and therefore would not be affected by the expanded exemption provided by these final rules for religious beliefs.

For the reasons stated above, the Departments believe it would be incorrect to assume that all or even most of the plans that did not cover contraceptives before the ACA did so on the basis of religious objections. Instead, without data available on the reasons those plans omitted contraceptive coverage before the ACA, we assume that no more than one third of those plans omitted contraceptive coverage based on sincerely held religious beliefs. Thus, of the estimated 379,000 women aged 15 to 44 that use contraceptives

covered by the Guidelines, who received primary coverage from plans of private, non-publicly traded, third party employers that did not cover contraception pre-Affordable Care Act, and whose plans were neither exempt nor omitted from mandatory contraceptive coverage under the previous regulations, we estimate that no more than 126,400 women would be in plans that will use these expanded exemptions.

### viii. Final Estimates of Persons Affected by Expanded Exemptions

Based on the estimate of an average annual expenditure on contraceptive products and services of $584 per user, the effect of the expanded exemptions on 126,400 women would give rise to approximately $73.8 million in potential transfer impact. It is possible, however, that premiums would adjust to reflect changes in coverage, thus partially offsetting the transfer experienced by women who use the affected contraceptives. As referenced elsewhere in this analysis, such women may make up approximately 8.8 percent of the covered population,[116] in which case the offset would also be approximately 8.8 percent, yielding a potential transfer of $67.3 million.

Thus, in their most expansive estimate, the Departments conclude that no more than approximately 126,400 women would likely be subject to potential transfer impacts under the expanded religious exemptions offered in these final rules. The Departments estimate this financial transfer to be approximately $67.3 million. This falls substantially below the $100 million threshold for an economically significant and major rule.

As noted above, the Departments view this alternative estimate as being the highest possible bound of the transfer effects of these rules, but believe the number of establishments that will actually exempt their plans as the result of these rules will be far fewer than contemplated by this estimate. The Departments make these estimates only for the purposes of determining whether the rules are economically significant under Executive Orders 12866 and 13563.

After reviewing public comments, both those supporting and those disagreeing with these estimates and similar estimates from the Religious IFC, and because the Departments do not have sufficient data to precisely

---

at page 26 (Sept. 28, 2016), available at *http://assets.pewresearch.org/wp-content/uploads/sites/11/2016/09/Religious-Liberty-full-for-web.pdf.*

[112] On the other hand, a key input in the approach that generated the one third threshold estimate was a survey indicating that six percent of employers did not provide contraceptive coverage pre-Affordable Care Act. Employers that covered some contraceptives pre-Affordable Care Act may have answered "yes" or "don't know" to the survey. In such cases, the potential transfer estimate has a tendency toward underestimation because the rule's effects on such women—causing their contraceptive coverage to be reduced from all 18 methods to some smaller subset—have been omitted from the calculation.

[113] Tables I.A.1 and I.A.2, Medical Expenditure Panel Survey, "Private-Sector Data by Firm Size, Industry Group, Ownership, Age of Firm, and Other Characteristics: 2017," HHS Agency for Healthcare Research and Quality (indicating total number of for-profit incorporated, for-profit unincorporated, and non-profit establishments in the United States, and the percentage of each that offer health insurance), available at *https://meps.ahrq.gov/data_stats/summ_tables/insr/national/series_1/2017/tia1.htm* and *https://meps.ahrq.gov/data_stats/summ_tables/insr/national/series_1/2017/tia2.htm.* 2523.

[114] Such objections may be encompassed by companion final rules published elsewhere in today's **Federal Register**. Those final rules, however, are narrower in scope than these final rules. For example, in providing expanded exemptions for plan sponsors, they do not encompass companies with certain publicly traded ownership interests.

[115] Gallup, "Religion," available at *https://news.gallup.com/poll/1690/religion.aspx.*

[116] As cited above, women of childbearing age are 20.2 percent of woman aged 15–65, and 43.6 percent of women of childbearing age use contraceptives covered by the Guidelines.

estimate the amount by which these factors render our estimate too high, or too low, the Departments simply conclude that the financial transfer falls substantially below the $100 million threshold for an economically significant rule based on the calculations set forth above.

*B. Special Analyses—Department of the Treasury*

These regulations are not subject to review under section 6(b) of Executive Order 12866 pursuant to the Memorandum of Agreement (April 11, 2018) between the Department of the Treasury and the Office of Management and Budget regarding review of tax regulations.

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) (RFA) imposes certain requirements with respect to federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 *et seq.*) and that are likely to have a significant economic impact on a substantial number of small entities. The Religious IFC was an interim final rule with comment period, and in these final rules, the Departments adopt the Religious IFC as final with certain changes. These final rules are, thus, being issued after a notice and comment period.

The Departments also carefully considered the likely impact of the rule on small entities in connection with their assessment under Executive Order 12866 and do not expect that these final rules will have a significant economic effect on a substantial number of small entities. These final rules will not result in any additional costs to affected entities, and, in many cases, may relieve burdens and costs from such entities. By exempting from the Mandate small businesses and nonprofit organizations with religious objections to some (or all) contraceptives and/or sterilization— businesses and organizations that would otherwise be faced with the dilemma of complying with the Mandate (and violating their religious beliefs) or following their beliefs (and incurring potentially significant financial penalties for noncompliance)—the Departments have reduced regulatory burden on such small entities. Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding these regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

*D. Paperwork Reduction Act— Department of Health and Human Services*

Under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), we are required to provide 30-day notice in the **Federal Register** and solicit public comment before a collection of information is submitted to the Office of Management and Budget (OMB) for review and approval. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 (PRA) requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

Recommendations to minimize the information collection burden on the affected public, including automated collection techniques. In the October 13, 2017 (82 FR 47792) interim final rules, we solicited public comment on each of these issues for the following sections of the rule containing information collection requirements (ICRs). A description of the information collection provisions implicated in these final rules is given in the following section with an estimate of the annual burden. The burden related to these ICRs received emergency review and approval under OMB control number 0938–1344. They have been resubmitted to OMB in conjunction with these final rules and are pending re-approval. The Departments sought public comments on PRA estimates set forth in the Religious IFC, and are not aware of significant comments submitted that suggest there is a better way to estimate these burdens.

1. Wage Data

Average labor costs (including 100 percent fringe benefits and overhead) used to estimate the costs are calculated using data available derived from the Bureau of Labor Statistics.[117]

TABLE 1—NATIONAL OCCUPATIONAL EMPLOYMENT AND WAGE ESTIMATES

| BLS occupation title | Occupational code | Mean hourly wage ($/hr) | Fringe benefits and overhead ($/hr) | Adjusted hourly wage ($/hr) |
|---|---|---|---|---|
| Executive Secretaries and Executive Administrative Assistants | 43–6011 | $27.84 | $27.84 | $55.68 |
| Compensation and Benefits Manager | 11–3111 | 61.01 | 61.01 | 122.02 |
| Legal Counsel | 23–1011 | 67.25 | 67.25 | 134.50 |
| Senior Executive | 11–1011 | 93.44 | 93.44 | 186.88 |
| General and Operations Managers | 11–1021 | 58.70 | 58.70 | 117.40 |

2. ICRs Regarding Self-Certification or Notices to HHS (§ 147.131(c)(3))

Each organization seeking to be treated as an eligible organization that wishes to use the optional accommodation process offered under these final rules must either use the EBSA Form 700 method of self-certification or provide notice to HHS of its religious objection to coverage of all or a subset of contraceptive services. Specifically, these final rules continue to allow eligible organizations to notify an issuer or third party administrator using EBSA Form 700, or to notify HHS, of their religious objection to coverage of all or a subset of contraceptive services, as set forth in the July 2015 final regulations (80 FR 41318).

Notably, however, entities that are participating in the previous accommodation process, where a self-certification or notice has already been submitted, and where the entities choose to continue their accommodated status under these final rules, generally do not need to file a new self-certification or notice (unless they change their issuer or third party

---

[117] May 2016 National Occupational Employment and Wage Estimates United States found at *https://www.bls.gov/oes/current/oes_nat.htm.*

administrator). As explained above, HHS assumes that, among the 209 entities the Departments estimated are using the previous accommodation, 109 will use the expanded exemption and 100 will continue under the voluntary accommodation. Those 100 entities will not need to file additional self-certifications or notices. HHS also assumes that an additional 9 entities that were not using the previous accommodation will opt into it. Those entities will be subject to the self-certification or notice requirement.

In order to estimate the cost for an entity that chooses to opt into the accommodation process, HHS assumes that clerical staff for each eligible organization will gather and enter the necessary information and send the self-certification to the issuer or third party administrator as appropriate, or send the notice to HHS.[118] HHS assumes that a compensation and benefits manager and inside legal counsel will review the self-certification or notice to HHS and a senior executive would execute it. HHS estimates that an eligible organization would spend approximately 50 minutes (30 minutes of clerical labor at a cost of $55.68 per hour, 10 minutes for a compensation and benefits manager at a cost of $122.02 per hour, 5 minutes for legal counsel at a cost of $134.50 per hour, and 5 minutes by a senior executive at a cost of $186.88 per hour) preparing and sending the self-certification or notice to HHS and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the information in the self-certification or notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost of approximately $74.96 for a total hour burden of approximately 7.5 hours and an associated equivalent cost of approximately $675 for 9 entities. As DOL and HHS share jurisdiction, they are splitting the hour burden so that each will account for approximately 3.75 burden hours with an equivalent cost of approximately $337.

HHS estimates that each self-certification or notice to HHS will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each self-certification or notice sent via mail will be $0.55. For purposes of this analysis, HHS assumes that 50 percent of self-certifications or notices to HHS will be mailed. The total cost for

sending the self-certifications or notices to HHS by mail is approximately $2.75 for 5 entities. As DOL and HHS share jurisdiction they are splitting the cost burden so that each will account for $1.38 of the cost burden.

3. ICRs Regarding Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(e))

As required by the July 2015 final regulations (80 FR 41318), a health insurance issuer or third party administrator providing or arranging separate payments for contraceptive services for participants and beneficiaries in insured or self-insured group health plans (or student enrollees and covered dependents in student health insurance coverage) of eligible organizations is required to provide a written notice to plan participants and beneficiaries (or student enrollees and covered dependents) informing them of the availability of such payments. The notice must be separate from, but contemporaneous with (to the extent possible), any application materials distributed in connection with enrollment (or re-enrollment) in group or student coverage of the eligible organization in any plan year to which the accommodation is to apply and will be provided annually. To satisfy the notice requirement, issuers and third party administrators may, but are not required to, use the model language previously provided by HHS or substantially similar language.

As mentioned, HHS is anticipating that approximately 109 entities will use the optional accommodation (100 that used it previously, and 9 that will newly opt into it). It is unknown how many issuers or third party administrators provide health insurance coverage or services in connection with health plans of eligible organizations, but HHS will assume at least 109. It is estimated that each issuer or third party administrator will need approximately 1 hour of clerical labor (at $55.68 per hour) and 15 minutes of management review (at $117.40 per hour) to prepare the notices. The total burden for each issuer or third party administrator to prepare notices will be 1.25 hours with an associated cost of approximately $85.03. The total burden for all 109 issuers or third party administrators will be 136 hours, with an associated cost of approximately $9,268. As DOL and HHS share jurisdiction, they are splitting the burden each will account for 68 burden hours with an associated cost of $4,634, with approximately 55 respondents.

The Departments estimate that approximately 2,180,000 plan participants and beneficiaries will be

covered in the plans of the 100 entities that previously used the accommodation and will continue doing so, and that an additional 9 entities will newly opt into the accommodation. We reach this estimate using calculations set forth above, in which we used 2017 data available to HHS for contraceptive user fees adjustments to estimate that approximately 2,907,000 plan participants and beneficiaries were covered by plans using the accommodation. We further estimated that the 100 entities that previously used the accommodation and will continue doing so will cover approximately 75 percent of the persons in all accommodated plans, based on HHS data concerning accommodated self-insured plans that indicates plans sponsored by religious hospitals and health systems encompass more than 80 percent of the persons covered in such plans. In other words, plans sponsored by such entities have a proportionately larger number of covered persons than do plans sponsored by other accommodated entities, which have smaller numbers of covered persons. As noted above, many religious hospitals and health systems have indicated that they do not object to the accommodation, and some of those entities might also qualify as self-insured church plans. The Departments do not have specific data on which plans of which employer sizes will actually continue to opt into the accommodation, nor how many will make use of self-insured church plan status. The Departments assume that the proportions of covered persons in self-insured plans using contraceptive user fees adjustments also apply in fully insured plans, for which we lack representative data.

Based on these assumptions and without better data available, the Departments estimate that previously accommodated entities encompassed approximately 2,907,000 persons; the estimated 100 entities that previously used the accommodation and continue to use it will account for 75 percent of those persons (that is, approximately 2,180,000 persons); and the estimated 109 entities that previously used the accommodation and will now use their exempt status will account for 25 percent of those persons (that is, approximately 727,000 persons). It is not known how many persons will be covered in the plans of the 9 entities we estimate will newly use the accommodation. Assuming that those 9 entities will have a similar number of covered persons per entity as the 100 entities encompassing 2,180,000

---

[118] For purposes of this analysis, the Department assumes that the same amount of time will be required to prepare the self-certification and the notice to HHS.

persons, the Departments estimate that all 109 accommodated entities will encompass approximately 2,376,000 covered persons.

The Departments assume that sending one notice to each policyholder will satisfy the need to send the notices to all participants and beneficiaries. Among persons covered by insurance plans sponsored by large employers in the private sector, approximately 50.1 percent are participants and 49.9 percent are dependents.[119] For 109 entities, the total number of notices will be 1,190,613. For purposes of this analysis, the Departments also assume that 53.7 percent of notices will be sent electronically, and 46.3 percent will be mailed.[120] Therefore, approximately 551,254 notices will be mailed. HHS estimates that each notice will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.55. The total cost for sending approximately 551,254 notices by mail will be approximately $303,190. As DOL and HHS share jurisdiction, they are splitting the cost burden so each will account for $151,595 of the cost burden.

4. ICRs Regarding Notice of Revocation of Accommodation (§ 147.131(c)(4))

An eligible organization that now wishes to take advantage of the

expanded exemption may revoke its use of the accommodation process; its issuer or third party administrator must provide written notice of such revocation to participants and beneficiaries as soon as practicable. As discussed above, HHS estimates that 109 entities that are using the accommodation process will revoke their use of the accommodation, and will therefore be required to send the notification; the issuer or third party administrator can send the notice on behalf of the entity. For the purpose of calculating the ICRs associated with revocations of the accommodation, and for various reasons discussed above, HHS assumes that litigating entities that were previously using the accommodation and that will revoke their use of the accommodation fall within the estimated 109 entities that will revoke the accommodation overall.

As before, HHS assumes that, for each issuer or third party administrator, a manager and inside legal counsel and clerical staff will need approximately 2 hours to prepare and send the notification to participants and beneficiaries and maintain records (30 minutes for a manager at a cost of $117.40 per hour, 30 minutes for legal counsel at a cost of $134.50 per hour, 1 hour for clerical staff at a cost of $55.68 per hour). The burden per respondent will be 2 hours with an associated cost

of approximately $182; for 109 entities, the total hour burden will be 218 hours with an associated cost of approximately $19,798. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 109 burden hours with an associated cost of approximately $9,899.

As discussed above, HHS estimates that there are approximately 727,000 covered persons in accommodated plans that will revoke their accommodated status and use the expanded exemption.[121] As before, the Departments use the average of 50.1 percent of covered persons who are policyholders, and estimate that an average of 53.7 percent of notices will be sent electronically and 46.3 percent by mail. Therefore, approximately 364,102 notices will be distributed, of which 168,579 notices will be mailed. HHS estimates that each mailed notice will require $0.50 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.55. The total cost for sending approximately 168,579 notices by mail is approximately $93,545. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 182,051 notices, with an associated cost of approximately $46,772.

TABLE 1—SUMMARY OF INFORMATION COLLECTION BURDENS

| Regulation section | OMB Control No. | Number of respondents | Responses | Burden per respondent (hours) | Total annual burden (hours) | Hourly labor cost of reporting ($) | Total labor cost of reporting ($) | Total cost ($) |
|---|---|---|---|---|---|---|---|---|
| Self-Certification or Notices to HHS | 0938–1344 | * 5 | 5 | 0.83 | 3.75 | $89.95 | $337 | $339 |
| Notice of Availability of Separate Payments for Contraceptive Services | 0938–1344 | * 55 | 595,307 | 1.25 | 68.13 | 68.02 | 4,634 | 156,229 |
| Notice of Revocation of Accommodation | 0938–1344 | * 55 | 182,051 | 2.00 | 109 | 90.82 | 9,899 | 56,671 |
| Total | .................. | * 115 | 777,363 | .................. | 180.88 | .................. | 14,870 | 213,239 |

* The total number of respondents is 227 (= 9+109+109) for both HHS and DOL, but the summaries here and below exceed that total because of rounding up that occurs when sharing the burden between HHS and DOL.

**Note:** There are no capital/maintenance costs associated with the ICRs contained in this rule; therefore, we have removed the associated column from Table 1. Postage and material costs are included in Total Cost.

---

[119] "Health Insurance Coverage Bulletin" Table 4, page 21. Using Data for the 2016 Annual Social and Economic Supplement to the Current Population Survey. *https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.*

[120] According to data from the National Telecommunications and Information Agency (NTIA), 36.0 percent of individuals age 25 and over have access to the internet at work. According to a Greenwald & Associates survey, 84 percent of plan participants find it acceptable to make electronic delivery the default option, which is used as the proxy for the number of participants who will not opt out that are automatically enrolled (for a total of 30.2 percent receiving electronic

disclosure at work). Additionally, the NTIA reports that 38.5 percent of individuals age 25 and over have access to the internet outside of work. According to a Pew Research Center survey, 61 percent of internet users use online banking, which is used as the proxy for the number of internet users who will opt in for electronic disclosure (for a total of 23.5 percent receiving electronic disclosure outside of work). Combining the 30.2 percent who receive electronic disclosure at work with the 23.5 percent who receive electronic disclosure outside of work produces a total of 53.7 percent who will receive electronic disclosure overall.

[121] In estimating the number of women that might have their contraceptive coverage affected by the expanded exemption, the Departments indicated that we do not know the extent to which the

number of women in accommodated plans affected by these final rules overlap with the number of women in plans offered by litigating entities that will be affected by these final rules, though we assume there is significant overlap. That uncertainty should not affect the calculation of the ICRs for revocation notices, however. If the two numbers overlap, the estimates of plans revoking the accommodation and policyholders covered in those plans would already include plans and policyholders of litigating entities. If the numbers do not overlap, those litigating entity plans would not presently be enrolled in the accommodation, and therefore would not need to send notices concerning revocation of accommodated status.

5. Submission of PRA-Related Comments

We have submitted a copy of this rule to OMB for its review of the rule's information collection and recordkeeping requirements. These requirements are not effective until they have been approved by OMB.

*E. Paperwork Reduction Act— Department of Labor*

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the ICR for the EBSA Form 700 and alternative notice have previously been approved by OMB under control numbers 1210–0150 and 1210–0152. A copy of the ICR may be obtained by contacting the PRA addressee shown below or at *http:// www.RegInfo.gov.* PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW, Room N–5718, Washington, DC 20210. Telephone: 202–693–8410; Fax: 202–219–4745. These are not toll-free numbers.

The Religious final rules amended the ICR by changing the accommodation process to an optional process for exempt organizations and requiring a notice of revocation to be sent by the issuer or third party administrator to participants and beneficiaries in plans whose employer revokes their accommodation; these final rules confirm as final the Religious IFC provisions on the accommodation process. DOL submitted the ICRs to OMB in order to obtain OMB approval under the PRA for the regulatory revision. In an effort to consolidate the number of information collection requests, DOL is combining the ICR related to the OMB control number 1210–0152 with the ICR related to the OMB control number 1210–0150 and discontinuing OMB control number 1210–0152. Consistent with the analysis in the HHS PRA section above, the Departments expect that each of the estimated 9 eligible organizations newly opting into the accommodation will spend approximately 50 minutes in preparation time and incur $0.54 mailing cost to self-certify or notify HHS. Each of the 109 issuers or third party administrators for the 109 eligible organizations that make use of the accommodation overall will distribute Notices of Availability of Separate Payments for Contraceptive Services.

These issuers and third party administrators will spend approximately 1.25 hours in preparation time and incur $0.54 cost per mailed notice. Notices of Availability of Separate Payments for Contraceptive Services will need to be sent to 1,190,613 policyholders, and 53.7 percent of the notices will be sent electronically, while 46.3 percent will be mailed. Finally, 109 entities using the previous accommodation process will revoke their use of the accommodation (in favor of the expanded exemption) and will therefore be required to cause the Notice of Revocation of Accommodation to be sent, with the issuer or third party administrator able to send the notice on behalf of the entity. These entities will spend approximately two hours in preparation time and incur $0.54 cost per mailed notice. Notice of Revocation of Accommodation will need to be sent to an average of 364,102 policyholders and 53.7 percent of the notices will be sent electronically. The DOL information collections in this rule are found in 29 CFR 2510.3–16 and 2590.715–2713A and are summarized as follows:

*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.
*Title:* Coverage of Certain Preventive Services under the Affordable Care Act—Private Sector.
*OMB Numbers:* 1210–0150.
*Affected Public:* Private Sector—Not for profit and religious organizations; businesses or other for-profits.
*Total Respondents:* 114 [122] (combined with HHS total is 227).
*Total Responses:* 777,362 (combined with HHS total is 1,554,724).
*Frequency of Response:* On occasion.
*Estimated Total Annual Burden Hours:* 181 (combined with HHS total is 362 hours).
*Estimated Total Annual Burden Cost:* $197,955 (combined with HHS total is $395,911).
*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.

*F. Regulatory Reform Executive Orders 13765, 13771 and 13777*

Executive Order 13765 (January 20, 2017) directs that, "[t]o the maximum extent permitted by law, the Secretary of the Department of Health and Human Services and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the Act shall

exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any state or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications." In addition, agencies are directed to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the [Affordable Care Act], and prepare to afford the states more flexibility and control to create a freer and open healthcare market." These final rules exercise the discretion provided to the Departments under the Affordable Care Act, RFRA, and other laws to grant exemptions and thereby minimize regulatory burdens of the Affordable Care Act on the affected entities and recipients of health care services.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), the Departments have estimated the costs and cost savings attributable to these final rules. As discussed in more detail in the preceding analysis, these final rules lessen incremental reporting costs.[123] However, in order to avoid double-counting with the Religious IFC, which has already been tallied as an Executive Order 13771 deregulatory action, this finalization of the IFC's policy is not considered a deregulatory action under the Executive Order.

---

[122] Denotes that there is an overlap between jurisdiction shared by HHS and DOL over these respondents and therefore they are included only once in the total.

[123] Other noteworthy potential impacts encompass potential changes in medical expenditures, including potential decreased expenditures on contraceptive devices and drugs and potential increased expenditures on pregnancy-related medical services. OMB's guidance on E.O. 13771 implementation (Dominic J. Mancini, "Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs," Office of Mgmt. & Budget (Apr. 5, 2017), *https://www.whitehouse.gov/sites/ whitehouse.gov/files/omb/memoranda/2017/M-17-21-OMB.pdf)* states that impacts should be categorized as consistently as possible within Departments. The Food and Drug Administration, within HHS, and the Occupational Safety and Health Administration (OSHA) and Mine Safety and Health Administration (MSHA), within DOL, regularly estimate medical expenditure impacts in the analyses that accompany their regulations, with the results being categorized as benefits (positive benefits if expenditures are reduced, negative benefits if expenditures are raised). Following the FDA, OSHA and MSHA accounting convention leads to this final rule's medical expenditure impacts being categorized as (positive or negative) benefits, rather than as costs, thus placing them outside of consideration for E.O. 13771 designation purposes.

## G. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (section 202(a) of Pub. L. 104–4), requires the Departments to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing ''any rule that includes any federal mandate that may result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year.'' In 2018, that threshold after adjustment for inflation is $150 million. For purposes of the Unfunded Mandates Reform Act, the Religious IFC and these final rules do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $150 million, adjusted for inflation, or more on the private sector.

## H. Federalism

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have ''substantial direct effects'' on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

These final rules do not have any federalism implications, since they only provide exemptions from the contraceptive and sterilization coverage requirement in HRSA Guidelines supplied under section 2713 of the PHS Act.

## V. Statutory Authority

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code, and Public Law 103–141, 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4).

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–

200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Pub. L. 103–141, 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4); Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701); and Public Law 103–141, 107 Stat. 1488 (42 U.S.C. 2000bb–2000bb–4).

## List of Subjects

### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

**Kirsten Wielobob,**

*Deputy Commissioner for Services and Enforcement.*

Approved: October 30, 2018.

**David J. Kautter,**

*Assistant Secretary for Tax Policy.*

Signed this 29th day of October 2018.

**Preston Rutledge,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: October 17, 2018.

**Seema Verma,**

*Administrator, Centers for Medicare & Medicaid Services.*

Dated: October 18, 2018.

**Alex M. Azar II,**

*Secretary, Department of Health and Human Services.*

# DEPARTMENT OF THE TREASURY

## Internal Revenue Service

Accordingly, 26 CFR part 54 is amended as follows:

## PART 54—PENSION EXCISE TAXES

■ 1. The authority citation for part 54 continues to read, in part, as follows:

**Authority:** 26 U.S.C. 7805. * * *

■ 2. Section 54.9815–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 54.9815–2713   Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 54.9815–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for and must not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

* * * * *

(iv) With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to 45 CFR 147.131 and 147.132.

* * * * *

■ 3. Section 54.9815–2713A is revised to read as follows:

### § 54.9815–2713A   Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations for optional accommodation.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (4) of this section.

(1) The organization is an objecting entity described in 45 CFR 147.132(a)(1)(i) or (ii);

(2) Notwithstanding its status under paragraph (a)(1) of this section and under 45 CFR 147.132(a), the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (b) or (c) of this section as applicable; and

(3) [Reserved]

(4) The organization self-certifies in the form and manner specified by the

Secretary of Labor or provides notice to the Secretary of the Department of Health and Human Services as described in paragraph (b) or (c) of this section. To qualify as an eligible organization, the organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or provide the notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(5) An eligible organization may revoke its use of the accommodation process, and its issuer or third party administrator must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on the date on which these final rules go into effect, by an issuer or third party administrator through the accommodation process, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act and § 54.9815–2715(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(b) *Optional accommodation—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis may voluntarily elect an optional accommodation under which this third party administrator(s) will provide or arrange payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more third party administrators.

(ii) The eligible organization must provide either a copy of the self-certification to each third party administrator or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable), but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's third party administrators. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Labor (working with the Department of Health and Human Services) will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of the Department of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3–16 and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and is willing to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, then the third party administrator will provide or arrange payments for contraceptive services, using one of the following methods—

(i) Provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the federally facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(5) Where an otherwise eligible organization does not contract with a third party administrator and files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The plan administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, arrange for payments for contraceptive services from an issuer or other entity in accordance with paragraph (b)(2)(ii) of this section, and such issuer or other entity may receive reimbursements in accordance with paragraph (b)(3) of this section.

(6) Where an otherwise eligible organization is an ERISA-exempt church plan within the meaning of section 3(33) of ERISA and it files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not

apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects. The third party administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, provide or arrange payments for contraceptive services in accordance with paragraphs (b)(2)(i) or (ii) of this section, and receive reimbursements in accordance with paragraph (b)(3) of this section.

(c) *Optional accommodation— insured group health plans—*(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process—

(i) The eligible organization or its plan must contract with one or more health insurance issuers.

(ii) The eligible organization must provide either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage for all or a subset of contraceptive services.

(A) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 54.9815–2713.

(B) When a notice is provided to the Secretary of the Department Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable) but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's health insurance issuers. If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of

Department of Health and Human Services for the optional accommodation process to remain in effect. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of the Department Health and Human Services has received a notice under paragraph (c)(2)(ii) of this section and describing the obligations of the issuer under this section.

(2) If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (c)(2)(ii) of this section and does not have its own objection as described in 45 CFR 147.132 to providing the contraceptive services to which the eligible organization objects, then the issuer will provide payments for contraceptive services as follows—

(i) The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 9815 of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(3) A health insurance issuer may not require any documentation other than a copy of the self-certification from the

eligible organization or the notification from the Department of Health and Human Services described in paragraph (c)(1)(ii) of this section.

(d) *Notice of availability of separate payments for contraceptive services— self-insured and insured group health plans.* For each plan year to which the optional accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides or arranges separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): ''Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer].''

(e) *Reliance—insured group health plans—*(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be

incorrect, the issuer is considered to comply with any applicable requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

(f) *Definition.* For the purposes of this section, reference to ''contraceptive'' services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 54.9815–2713(a)(1)(iv).

(g) *Severability.* Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

### § 54.9815–2713T   [Removed]

■ 4. Section 54.9815–2713T is removed.

### § 54.9815–2713AT   [Removed]

■ 5. Section 54.9815–2713AT is removed.

## DEPARTMENT OF LABOR

### Employee Benefits Security Administration

For the reasons set forth in the preamble, the Department of Labor adopts as final the interim final rules amending 29 CFR part 2590 published on October 13, 2017 (82 FR 47792) with the following changes:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 6. The authority citation for part 2590 continues to read, as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L.

110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Division M, Pub. L. 113–235, 128 Stat. 2130; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

■ 7. Section 2590.715–2713A is amended by:
■ a. Revising paragraph (a)(5);
■ b. Redesignating paragraphs (e) and (f) as paragraphs (f) and (g); and
■ c. Adding new paragraph (e).
The revision and addition read as follows:

### § 2590.715–2713A   Accommodations in connection with coverage of preventive health services.

(a) * * *

(5) An eligible organization may revoke its use of the accommodation process, and its issuer or third party administrator must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on the date on which these final rules go into effect, by an issuer or third party administrator through the accommodation process, an eligible organization may give 60-days notice pursuant to PHS Act section 2715(d)(4) and § 2590.715–2715(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after the date on which these final rules go into effect, if contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

* * * * *

(e) *Reliance—insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

* * * * *

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons set forth in the preamble, the Department of Health and Human Services adopts as final the interim final rules amending 45 CFR part 147 published on October 13, 2017 (82 FR 47792) with the following changes:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 8. The authority citation for part 147 is revised to read as follows:

**Authority:** 42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92, as amended.

■ 9. Section 147.131 is amended by:
■ a. Revising paragraph (c)(4);
■ b. Redesignating paragraphs (f) and (g) as (g) and (h); and
■ c. Adding new paragraph (f).
The revision and addition read as follows:

### § 147.131   Accommodations in connection with coverage of certain preventive health services.

* * * * *

(c) * * *

(4) An eligible organization may revoke its use of the accommodation process, and its issuer must provide participants and beneficiaries written notice of such revocation, as specified herein.

(i) *Transitional rule*—If contraceptive coverage is being offered on January 14, 2019, by an issuer through the accommodation process, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act and § 147.200(b), if applicable, to revoke its use of the accommodation process (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, such eligible organization may revoke its use of the accommodation process effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation.

(ii) *General rule*—In plan years that begin after January 14, 2019, if

contraceptive coverage is being offered by an issuer through the accommodation process, an eligible organization's revocation of use of the accommodation process will be effective no sooner than the first day of the first plan year that begins on or after 30 days after the date of the revocation.

\* \* \* \* \*

(f) *Reliance*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (d) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any applicable requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any applicable requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (d) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

\* \* \* \* \*

■ 10. Section 147.132 is amended by:
■ a. Revising paragraph (a)(1) introductory text;
■ b. Redesignating paragraphs (a)(1)(ii) and (iii) as paragraphs (iii) and (iv);
■ c. Adding new paragraph (a)(1)(ii);
■ d. Revising newly designated paragraph (a)(1)(iii);
■ e. Revising newly designated paragraph (a)(1)(iv); and
■ f. Revising paragraphs (a)(2) and (b).
   The revisions and addition read as follows:

**§ 147.132 Religious exemptions in connection with coverage of certain preventive health services.**

   (a) \* \* \*

   (1) Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections specified below. Thus the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

\* \* \* \* \*

   (ii) A group health plan, and health insurance coverage provided in connection with a group health plan, where the plan or coverage is established or maintained by a church, an integrated auxiliary of a church, a convention or association of churches, a religious order, a nonprofit organization, or other non-governmental organization or association, to the extent the plan sponsor responsible for establishing and/or maintaining the plan objects as specified in paragraph (a)(2) of this section. The exemption in this paragraph applies to each employer, organization, or plan sponsor that adopts the plan;

   (iii) An institution of higher education as defined in 20 U.S.C. 1002, which is non-governmental, in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section. In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

   (iv) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section. Where a health insurance issuer providing group health insurance coverage is exempt under this subparagraph (iv), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement.

   (2) The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable):

   (i) Coverage or payments for some or all contraceptive services; or

   (ii) A plan, issuer, or third party administrator that provides or arranges such coverage or payments.

   (b) *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any group health plan sponsor (with respect to an individual) or individual, as applicable, who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs. Under this exemption, if an individual objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the individual agrees, then the exemption applies as if the individual objects to all contraceptive services.

\* \* \* \* \*

[FR Doc. 2018–24512 Filed 11–7–18; 4:15 pm]

**BILLING CODE 4830–01–P; 4510–29–P; 4120–01–P**