UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| **Richard W. DeOtte**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**Alex M. Azar II**, et al.,<br><br>Defendants. | Case No. 4:18-cv-825-O |

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

CHARLES W. FILLMORE
H. DUSTIN FILLMORE
The Fillmore Law Firm, L.L.P.
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
chad@fillmorefirm.com
dusty@fillmorefirm.com

JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and
the Proposed Classes*

# TABLE OF CONTENTS

Table of contents ..............................................................................................i

Table of authorities .........................................................................................ii

   I.  Legal challenges to the contraceptive mandate ........................................5

   II.  The religious exemption to the contraceptive mandate............................8

The plainitffs are entitled to a preliminary injunction .......................................10

   I.  The plaintiffs are likely to succeed on their RFRA claims.......................11

      A.  The contraceptive mandate substantially burdens the religious freedom of objecting employers .........................................................................11

      B.  The contraceptive mandate substantially burdens the religious freedom of objecting individuals .......................................................................17

      C.  There is no compelling governmental interest in ensuring that every woman can obtain contraception free of charge ................................19

      D.  Less restrictive means are available..................................................22

   II.  The plaintiffs will suffer irreparable harm absent a preliminary injunction ..............24

   III. The balance of equities favors a preliminary injunction.........................24

   IV. The public interest favors a preliminary injunction ...............................24

Conclusion .....................................................................................................25

Certificate of conference ................................................................................26

Certificate of service ......................................................................................26

## TABLE OF AUTHORITIES

**Cases**

*Autocam Corp. v. Sebelius*, 730 F.3d 618 (6th Cir. 2013) ...................................2

*Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265 (5th Cir. 1986) ...................13

*Berman v. Parker*, 348 U.S. 26 (1954)..........................................................24

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).......................................passim

*California v. Health & Human Servs.*,
   281 F. Supp. 3d 806 (N.D. Cal. 2017) ...........................................9

*California v. Health & Human Servs.*,
   No. 4:17-cv-05783-HSG (N.D. Cal. Jan. 13, 2019) ...........................9

*Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015) ...................7

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ..............23

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ...............................19

*East Texas Baptist University v. Burwell*, 793 F.3d 449 (5th Cir. 2015)..................passim

*Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*,
   778 F.3d 422 (3d Cir. 2015)...........................................7

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013)...................2

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ...............................24

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013).......................................2

*Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*,
   794 F.3d 1151 (10th Cir. 2015)...........................................7

*Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 1022 (2014) .......................6

*March for Life v. Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015) ...................18

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014).......................................23

*Mich. Catholic Conference & Catholic Family Servs. v. Burwell*,
   755 F.3d 372 (6th Cir. 2014)...........................................7

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ...............12

*Nken v. Holder*, 556 U.S. 418 (2009) ...........................................24

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012) ...............24

*Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017) ...................9

*Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan. 14, 2019).........1, 9, 10, 25

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
   772 F.3d 229 (D.C. Cir. 2014) ...........................................7

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*,
   801 F.3d 927 (8th Cir. 2015)............................................................................7

*Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015) ........................................7

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013)....................................10

*Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014)......................................................6

*Zubik v. Burwell*, 136 S. Ct. 1557 (2016)..........................................................7, 13, 16

## Statutes

5 U.S.C. § 553 ..........................................................................................................9

26 U.S.C. § 4980D ................................................................................................2, 11

26 U.S.C. § 4980H(c)(2) .............................................................................................20

42 U.S.C. § 18011 ..........................................................................................3, 10, 20

42 U.S.C. § 2000bb-1(a) ...........................................................................................11

42 U.S.C. § 2000bb-1(b) ..............................................................................11, 19, 23

42 U.S.C. § 2000bb-1(b)(1)–(2) .................................................................................11

42 U.S.C. § 300gg-13(a)(4) .................................................................................2, 9, 20

Pub. L. No. 111-148 § 1251, codified at 42 U.S.C. § 18011(a) ..............................3, 20

## Rules

26 C.F.R. § 54.9815–2713(a)(1)(iv) .............................................................................3

29 C.F.R. § 2590.715–1251 ...................................................................................4, 20

29 C.F.R. § 2590.715–2713(a)(1)(iv) ..........................................................................3

45 C.F.R. § 147.130(a)(1)(iv) ......................................................................................3

Coverage for Contraceptive Services, 81 Fed. Reg. 47,741 (July 22, 2016) ....................16

Coverage of Certain Preventive Services Under the Affordable Care Act,
   78 Fed. Reg. 39,870 (July 2, 2013) ................................................................4, 5, 21

Coverage of Certain Preventive Services Under the Affordable Care Act,
   79 Fed. Reg. 51,092 ..............................................................................................7

Coverage of Certain Preventive Services Under the Affordable Care Act,
   80 Fed. Reg. 41318 (July 14, 2015) ......................................................................6

Coverage of Certain Preventive Services Under the Affordable Care Act,
   78 Fed. Reg. 39870 (July 2, 2013) ......................................................................11

Group Health Plans and Health Insurance Issuers Relating to Coverage of
   Preventive Services Under the Patient Protection and Affordable Care Act,
   76 Fed. Reg. 46,621 (Aug. 3, 2011) ..................................................................3, 4

Group Health Plans and Health Insurance Issuers Relating to Coverage of
   Preventive Services Under the Patient Protection and Affordable Care Act,
   77 Fed. Reg. 8,725 (Feb. 15, 2012) ...................................................................4, 21

Religious Exemptions and Accommodations for Coverage of Certain
   Preventive Services Under the Affordable Care Act,
   82 Fed. Reg. 47,792 (Oct. 13, 2017) .............................................................8, 14, 23

Religious Exemptions and Accommodations for Coverage of Certain
   Preventive Services Under the Affordable Care Act,
   83 Fed. Reg. 57,536 (Nov. 15, 2018) .............................................................1, 15, 19

## Other Authorities

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
   131 Harv. L. Rev. 417 (2017) .....................................................................................25

Mark L. Rienzi, *Fool Me Twice:* Zubik v. Burwell *and the Perils of Judicial
   Faith in Government Claims*, 2016 Cato Sup. Ct. Rev. 123 (2018) .........................7, 14

Michael D. Shear & Robert Pear, *Obama in Bind Trying to Keep Health Law
   Vow*, N.Y. Times (Nov. 12, 2013).............................................................................3, 20

U.S. Dep't of Labor, Emp. Benefits Sec. Admin., FAQs About Affordable
   Care Act Implementation Part 36 (Jan. 9, 2017)......................................................8, 16

Brief for the Respondents, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016)
   (No. 14-1418)..............................................................................................................14

Plaintiffs Richard and Yvette DeOtte, John and Alison Kelley, and Braidwood Management Inc. respectfully seek a preliminary injunction against the enforcement of the "Contraceptive Mandate," which requires all private health insurance to cover FDA-approved contraceptive methods at zero cost to the beneficiary. The Mandate violates the Religious Freedom Restoration Act because it compels employers to arrange for the provision of contraceptive methods that violate their religious beliefs. It also impermissibly burdens the religious freedom of consumers of health insurance, as it forces them to choose between purchasing insurance that subsidizes other people's contraception or foregoing health insurance entirely.

The defendants acknowledge that the Contraceptive Mandate violates the Religious Freedom Restoration Act in each of these regards. On November 15, 2018, the defendants issued a final rule that exempts objecting employers from the Mandate. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536 (Nov. 15, 2018), App. 368–422 (Ex. 15). The final rule also allows insurers to offer plans that exclude contraception to any individual who holds religious objections to contraceptive coverage. *See id.* The final rule acknowledged that each of these exemptions was compelled by the Religious Freedom Restoration Act.[1]

Each of these religious exemptions was scheduled to take effect on January 14, 2019. But on that very day, Judge Wendy Beetlestone issued a nationwide preliminary injunction that blocks the defendants from enforcing the final rule of November 15, 2018. *See Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan. 14, 2019), ECF Nos. 135, 136, App. 425–26 (Ex. 16). As a result, the defendants must resume enforcing the Contraceptive Mandate against the plaintiffs and other objectors—even though the defendants *acknowledge*

---

1. *See* 83 Fed. Reg. at 57,544; App. 376 ("[W]ith respect to religious employers, the Departments conclude that, without finalizing the expanded exemptions, and therefore requiring certain religiously objecting entities to choose between the Mandate, the accommodation, or penalties for noncompliance—or requiring objecting individuals to choose between purchasing insurance with coverage to which they object or going without insurance—the Departments would violate their rights under RFRA.").

that they are violating the Religious Freedom Restoration Act by enforcing the Mandate in this manner.

The need for preliminary relief is especially urgent because Braidwood Management Inc. has already terminated contraceptive coverage in its health plan effective December 1, 2018. Dr. Steven F. Hotze, who controls Braidwood and owns the company through a family trust, implemented this policy after the religious exemptions had been announced. *See* Affidavit of Steven F. Hotze, ¶¶ 26–27, App. 8–9 (Ex. 1); *see also* App. 61–62, 161–62. But Judge Bettlestone's nationwide injunction has pulled the rug from under Braidwood, and it is now facing massive tax penalties—$100 per employee per day[2]—for conduct that is entirely within the company's rights under the Religious Freedom Restoration Act. The Court should promptly enjoin the defendants from enforcing the Contraceptive Mandate against the proposed class of objecting employers and the proposed class of objecting individuals.[3]

## BACKGROUND

The Affordable Care Act requires group health plans and health insurance issuers to cover "preventive care" for women without any cost-sharing requirements such as deductibles or co-pays. *See* 42 U.S.C. § 300gg-13(a)(4), App. 200 (Ex. 7). The statute does not require health insurance to cover contraception, and it does not define "preventive care" to include contraceptive methods. Instead, the statute instructs the Health Resources and Services Administration—an agency of the U.S. Department of Health and Human Services—to determine the "preventive care" that insurers must cover. *See id*. The Affordable Care Act categorically exempts "grandfathered" plans from the statutory requirement to cover "preventive

---

2.  *See* 26 U.S.C. § 4980D.
3.  The Anti-Injunction Act poses no obstacle to this lawsuit. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126–28 (10th Cir. 2013); *Korte v. Sebelius*, 735 F.3d 654, 669–71 (7th Cir. 2013); *Autocam Corp. v. Sebelius*, 730 F.3d 618, 622 (6th Cir. 2013).

care." *See* Pub. L. No. 111-148 § 1251, codified at 42 U.S.C. § 18011(a). A "grandfa-thered" plan is a group health plan or health insurance coverage in which an individual was enrolled on March 23, 2010 — the date the Affordable Care Act was signed into law.[4]

On August 3, 2011, the Health Resources and Services Administration issued guidelines announcing that all FDA-approved contraceptive methods must be covered as "preventive care" under the Affordable Care Act. That same day, the Department of Health and Human Services, the Department of the Treasury, and the Department of Labor issued an interim final rule requiring all group health plans and health insurance issuers to cover the "preventive care" described in the HRSA's guidelines. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Af-fordable Care Act, 76 Fed. Reg. 46,621, 46,625 (Aug. 3, 2011), App. 227 (Ex. 8). The regulations were codified at 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv). Together, these regulations form the "Contraceptive Mandate." *See* App. 493–506 (Ex. 18–20).

At the same time, the interim final rule of August 3, 2011, announced that the Health Resources and Services Administration could exempt religious employers from the Contra-ceptive Mandate. *See* 76 Fed. Reg. at 46,623 ("[I]t is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required . . . ."), App. 225. The interim rule there-fore gave HRSA discretion to decide whether to exempt "religious employers." *See id.* at 46,623–24, 46,626; App. 225–26, 228. But the interim rule defined "religious employer" narrowly to include only "churches, their integrated auxiliaries, and conventions or associa-tions of churches, as well as to the exclusively religious activities of any religious order." *Id.*

---

4. The statutory exemption for grandfathered plans was meant to fulfill President Obama's promise that "if people have insurance, and they like the insurance they have, they can keep it." *See* Michael D. Shear & Robert Pear, *Obama in Bind Trying to Keep Health Law Vow*, N.Y. Times (Nov. 12, 2013), https://nyti.ms/2HFH9JU.

at 46,623; App. 225. Religious schools, religious charities, and for-profit corporations owned by religious objectors received no exemptions or accommodations under the interim rule of August 3, 2011. *See id.*[5]

The interim final rule of August 3, 2011, took effect immediately without notice or opportunity for public comment. *See id.* at 46,621. The interim rule did, however, invite comments on its definition of "religious employer." *See id.* at 46,623; App 225. After receiving over 200,000 comments,[6] the departments left the religious exemption unchanged when they issued their final rule on February 15, 2012. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725 (Feb. 15, 2012), App. 230–35 (Ex. 9). But the final rule promised a "one-year safe harbor from enforcement" for non-profit organizations with religious objections to contraception. *See id.* at 8,728, App. 223. It also promised a future rulemaking that would enable the employees of religious non-profits to purchase contraception "in a way that religious employers are not obligated to fund it." *Id.*

On July 2, 2013, the agencies issued a final rule that established an "accommodation"—rather than an exemption—for religious non-profits that failed to meet the narrow definition of "religious employer." *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39,870, 39,896–97 (July 2, 2013); App. 264–65 (Ex. 10). Under this accommodation, an objecting employer would be required to certify that it is a religious non-profit that objects to covering some or all methods of contraception on religious grounds. *See id.* at 39,896; App. 264. Then the objecting employer would be required to

---

5.   In addition to church health plans, the Contraceptive Mandate also exempts the "grand-fathered" plans that are protected under section 1251 of the Affordable Care Act. *See* 29 C.F.R. § 2590.715–1251.

6.   *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012); App. 231.

deliver that certification form to the organization's insurer or the plan's third-party administrator. *See id.* at 39,896, 39,893; App. 264, 261. Upon receiving this form, the issuer of the group health insurance used by the religious non-profit must exclude contraceptive coverage from that employer's plan, but the issuer must pay for contraception used by the non-profit's employees with its own money. *See id.* at 39,896; App. 264. If a religious non-profit is self-insured, then its third-party administrator must pay for the employees' contraception and seek reimbursement from the federal government. *See id.* at 39,893; App. 261.

## I.   Legal Challenges To The Contraceptive Mandate

The rules of February 15, 2012, and July 2, 2013, provoked numerous lawsuits. Businesses owners who objected to abortifacient contraception claimed that that the Mandate violated the Religious Freedom Restoration Act by refusing to provide *any* exemptions or accommodations for religious for-profit corporations. These lawsuits culminated in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), which held that the Contraceptive Mandate substantially burdened the religious freedom of objecting employers by requiring them to "arrange for" coverage of contraceptive methods that violate their religious beliefs. *Id.* at 2775. *Hobby Lobby* also declared that the Contraceptive Mandate was not the "least restrictive means" of expanding access to contraception, and it noted that the "most straightforward way" to achieve this goal without infringing religious liberty "would be for the Government to assume the cost of providing the four contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Id.* at 2780. *Hobby Lobby* held that closely held, for-profit corporations that oppose contraceptive coverage for religious reasons must, at the very least, be allowed to use the "accommodation" offered to religious non-profits. *See id.* at 2781–82.

At the same time, religious non-profits were challenging the "accommodation" because it compelled them to facilitate the provision of contraceptive methods that violated their

religious beliefs. The non-profits claimed that the act of filling out and delivering the certification form involves them in providing the disputed contraceptive methods, in the same way that an abortion referral would implicate an individual in the provision of abortion services. And on two occasions, the Supreme Court granted emergency relief to non-profit employers that sought to avoid delivering the prescribed certification form. In *Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 1022 (2014), the Court allowed an order of Catholic nuns to "inform the Secretary of Health and Human Services in writing" of its religious objections rather than deliver the certification form to their third-party administrator. And in *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014), the Court made a similar allowance for a Christian college that did not want to notify its third-party administrator of its objections. In both *Little Sisters* and *Wheaton College*, the Court made clear that its orders "should not be construed as an expression of the Court's views on the merits." 134 S. Ct. at 1022; 134 S. Ct. at 2807.

In response to *Hobby Lobby*, *Little Sisters*, and *Wheaton College*, the departments amended the Contraceptive Mandate in two ways. First, they allowed closely held for-profit corporations to use the accommodation offered to religious non-profits, as required by *Hobby Lobby*.[7] Second, they allowed objecting employers to choose whether to directly notify their health insurance issuers or third-party administrators—or whether to notify the Secretary of Health or Human Services, who would then inform the health insurance issuers or third-party administrators of the employer's religious objections and of their need to pay for the contraception of the affected employees.[8] These changes took effect when the departments issued

---

7.  *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,346 (July 14, 2015); App. 308 (Ex. 12) (describing provisions formerly codified at 45 C.F.R. § 147.131(b)); *id.* at 41,345; App. 307 (describing provisions formerly codified at 29 C.F.R. § 2590.715–2713A(a)); *id.* at 41,343; App. 305 (describing provisions formerly codified at 26 C.F.R. § 54.9815–2713A(a)).

8.  *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,346 (July 14, 2015); App. 308 (describing provisions formerly codified at 45 C.F.R. § 147.131(b)(3)); *id.* at 41345; App. 307 (describing provisions formerly codified at 29 C.F.R. § 2590.715–2713A(a)(3)); *id.* at 41,344; App. 306 (describing provisions formerly codified at 26 C.F.R. § 54.9815–2713A(b)(ii)).

their interim final rule on August 27, 2014,[9] and were codified in a final rule that issued on July 14, 2015. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41318, 41346 (July 14, 2015); App. 308 (Ex. 12).

A circuit split quickly emerged over whether this modified accommodation process violated the Religious Freedom Restoration Act. The Eighth Circuit held that the accommodation violated RFRA because it forced objecting employers to fill out and submit a form that prompts the issuer or third-party administrator to provide the disputed contraception, thereby leaving the employer directly involved and complicit in the provision of these contraceptive methods. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 937–46 (8th Cir. 2015). Seven other courts of appeals disagreed, holding that the accommodation process did not substantially burden an employer's religious exercise or beliefs.[10] In *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), an eight-member Supreme Court "expresse[d] no view" on the legality of the accommodation process, and vacated the courts of appeals' rulings and remanded with instructions to consider "whether contraceptive coverage could be provided to petitioners' employees, through petitioners' insurance companies, without any such notice from petitioners." *Id*. at 1559–60. After this order, the agencies solicited

---

9.  *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 79 Fed. Reg. 51,092 (Aug. 27, 2014); App. 269–78 (Ex. 11).

10. *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 247 (D.C. Cir. 2014); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207, 217–18 (2d Cir. 2015); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422, 435 (3d Cir. 2015); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449, 457–59 (5th Cir. 2015); *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 389–90 (6th Cir. 2014); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 615–19 (7th Cir. 2015); *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151, 1195 (10th Cir. 2015). All of these rulings and opinions were vacated when the Supreme Court announced its ruling in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

Many of these rulings—including the Fifth Circuit's ruling in *East Texas Baptist*—rested on the now-discredited notion that objecting self-insured employers would not have their plans used to provide or cover the disputed contraception. *See infra* at pp. 13–14; *see also* Mark L. Rienzi, *Fool Me Twice:* Zubik v. Burwell *and the Perils of Judicial Faith in Government Claims*, 2016 Cato Sup. Ct. Rev. 123, 132–38 (2018).

comments but eventually concluded that "no feasible approach has been identified . . . that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., FAQs About Affordable Care Act Implementation Part 36 (Jan. 9, 2017); App. 311–21 (Ex. 13).

## II.   THE RELIGIOUS EXEMPTION TO THE CONTRACEPTIVE MANDATE

Because the agencies were unable to find a way to avoid burdening the religious freedom of objecting employers while simultaneously preserving their employees' contraceptive coverage, the agencies decided to exempt objecting employers from the Contraceptive Mandate. On October 13, 2017, the departments issued an interim final rule that categorically exempts any non-profit or for-profit employer from the Mandate if it opposes the coverage of contraception for sincere religious reasons. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017); App. 323–66 (Ex. 14). Objecting employers would no longer be required to use the "accommodation" process that requires them to notify their insurance issuer or third-party administrator. *Id*. at 47,835; App. 366 (codified at 45 C.F.R. § 147.132(a)). And they would not be required to notify the government or take any steps that trigger or facilitate the provision of contraception. *Id*. (codified at 45 C.F.R. § 147.132(a)(2)).

The interim final rule also protects individual religious objectors who have been unable to purchase health insurance that excludes contraception on account of the Mandate. *See id*. (creating a new provision in 45 C.F.R. § 147.132(b)). The interim final rule permits any willing health insurer to offer policies that exclude contraception to any individual who objects to contraceptive coverage for religious reasons. *See id*.

The interim final rule became effective on October 6, 2017, but its enforcement was promptly enjoined by two federal district judges, each of whom issued nationwide prelimi-

nary injunctions. *See Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017) (Beetle-stone, J.); *California v. Health & Human Servs.*, 281 F. Supp. 3d 806 (N.D. Cal. 2017) (Gilliam, J.). The departments then issued a final rule on November 15, 2018, which preserved the interim final rule's exemptions for objecting employers and individuals. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536 (Nov. 15, 2018); App. 368–422 (Ex. 15). The final rule was scheduled to take effect on January 14, 2019, but Judge Beetlestone issued a nationwide preliminary injunction against its enforcement on the day it was to take effect. *See Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan. 14, 2019), ECF Nos. 135, 136; App. 424–91 (Ex. 16–17).[11]

Judge Beetlestone first held that the interim final rule of October 13, 2017, was required to go through notice-and-comment rulemaking, and that the failure to use notice-and-comment procedures rendered the interim final rule invalid. *See id.*, ECF No. 136 at 24–25; App. 450–51; *see also* 5 U.S.C. § 553. Then Judge Beetlestone went on to hold that the *final* rule of November 15, 2018—which *did* go through notice and comment—was likewise invalid because it was "tainted" by the interim final rule's failure to use notice-and-comment procedures. *See Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan. 14, 2019), ECF No. 136 at 27–33; App. 453–59.

Judge Beetlestone also held that the religious exemptions violated the Affordable Care Act's requirement that group health plans and insurance issuers cover "preventive care" without any cost-sharing arrangements. *See* 42 U.S.C. § 300gg-13(a)(4). Judge Beetlestone acknowledged that the statute nowhere requires *contraception* to be covered as "preventive care," as it leaves the definition of "preventive care" entirely in the discretion of the Health

---

11. Judge Gilliam also issued a preliminary injunction against the enforcement of the final rule, but he limited his injunction to the 13 States (plus the District of Columbia) that were parties to the lawsuit. *See California v. Health & Human Servs.*, No. 4:17-cv-05783-HSG (N.D. Cal. Jan. 13, 2019), ECF No. 234 at 1–2. Texas was not among those States, so Judge Gilliam's ruling does not affect the representative plaintiffs.

Resources and Services Administration. *See Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan. 14, 2019), ECF No. 136 at 35; App. 461. But Judge Beetlestone ruled that once the Health Resources and Services Administration decided to include contraception within the meaning of "preventive care," the government became powerless to exempt *any* plan or issuer from the Contraceptive Mandate unless a statutory exception applies.[12] *See id.* at 35–42; App. 461–68. In Judge Beetlestone's view, the delegation of authority to the Health Resources and Services Administration established an all-or-nothing choice: Contraceptive services must be either be covered by *every* non-grandfathered plan, or contraception must be excluded from the definition of "preventive care." Finally, Judge Beetlestone held that Third Circuit precedent foreclosed any argument that the final rule was compelled by the Religious Freedom Restoration Act. *See id.* at 42–52; App. 468–78 (citing *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 356 (3d Cir. 2017)).

Because Judge Beetlestone issued a nationwide injunction against the enforcement of the final rule of November 15, 2018, the plaintiffs and their fellow class members remain subject to the Contraceptive Mandate. But the Mandate violates RFRA as applied to these religious objectors—and that remains the case even if the final rule of November 15, 2018, violated the APA. The Court should promptly enjoin the defendants from enforcing the Contraceptive Mandate against the plaintiffs and their fellow class members.

## THE PLAINITFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

There are four factors to consider when deciding whether to issue a preliminary injunction: (1) whether the plaintiffs are likely to succeed on the merits; (2) whether the plaintiffs are likely to suffer irreparable harm absent a preliminary injunction; (3) whether the balance of equities tips in the plaintiffs' favor; and (4) the public interest. *See Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). All four factors favor preliminary relief.

---

12. Such as the statutory exception for grandfathered health plans, *see* 42 U.S.C. § 18011, or exemptions required by the Religious Freedom Restoration Act.

## I.   THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR RFRA CLAIMS

The Religious Freedom Restoration Act "was designed to provide very broad protection for religious liberty." *Hobby Lobby*, 134 S. Ct. at 2767. To prevail on a RFRA claim, the plaintiffs need only show that the Contraceptive Mandate substantially burdens their exercise of religion. 42 U.S.C. § 2000bb-1(a). Then the burden shifts to the government to demonstrate that its imposition furthers a "compelling governmental interest" and is the "least restrictive means" of doing so. 42 U.S.C. § 2000bb-1(b)(1)–(2).

### A.   The Contraceptive Mandate Substantially Burdens The Religious Freedom Of Objecting Employers

The Contraceptive Mandate requires employers to choose one of the following three options: (1) Provide contraceptive coverage in their employees' health insurance; (2) Fill out and submit a form that leads directly to the provision of objectionable contraception by their insurer or the third-party administrator; or (3) Pay a heavy financial penalty.[13] *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39870, 39896–97 (July 2, 2013); App. 264–65. The Supreme Court has already held that forcing employers to choose between options (1) and (3) imposes a "substantial burden" on religious freedom. *See Hobby Lobby*, 134 S. Ct. at 2775–79. So the only question for this Court to resolve is whether option (2) eliminates the "substantial burden" imposed on objecting employers.

The Mandate calls option (2) an "accommodation"—apparently because it removes the compelled financial subsidy that the earlier Mandate had imposed on objecting for-profit corporations. But this does nothing to alleviate the burden that the Contraceptive Mandate places on the exercise of religion. The Supreme Court made clear in *Hobby Lobby* that the "substantial burden" was *not* that employers were compelled to spend money on the provision of objectionable contraception, but that they were *compelled through their own conduct* to "arrange for" the coverage of these alleged abortifacients. The Court explained:

---

13. *See* 26 U.S.C. § 4980D (imposing a "tax" on employers who refuse to comply with the preventive-care mandate of $100 per employee per day of noncompliance).

> By requiring the Hahns and Greens and their companies *to arrange for such coverage*, the HHS mandate demands that they engage in conduct that seriously violates their religious beliefs.

*Hobby Lobby*, 134 S. Ct. at 2775 (emphasis added). This so-called accommodation continues to compel religious employers to "arrange for" the coverage of contraception—either by providing it directly or by executing the form that leads others to provide it. And by forcing those employers through their own conduct to assist in the provision of this objectionable contraception, the revised mandate "demands that they engage in conduct that seriously violates their religious beliefs." *See id*.

This regime is no different from a law that compels doctors to perform abortions upon a patient's request, but permits doctors with religious objections to escape this requirement if they fill out and a deliver a form that refers the patient to the nearest abortion provider. The compelled referral forces the objecting doctor to facilitate the delivery of abortion services and makes him complicit in the resulting abortion, which undeniably constitutes a "substantial burden" on his religious exercise. *Cf. Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (anti-abortion pregnancy centers cannot be compelled to post notices regarding the availability of state-funded abortion services). The "accommodation" in the Contraceptive Mandate works the same way: An objecting employer must execute documents that lead directly to the provision of contraception by others, which compels the employer to lend its aid to the delivery of these disputed contraceptive methods.

If an employer sincerely believes that submitting the self-certification form would violate its religious convictions, then the courts are forbidden to question the reasonableness of that belief. *See Hobby Lobby*, 134 S. Ct. at 2778 ("[C]ourts have no business addressing whether the religious belief asserted in a RFRA case is reasonable." (parentheses omitted)). The *only* question to resolve is whether the Contraceptive Mandate substantially burdens the objecting employer's ability to conduct his business in accordance with those beliefs. *See id*. at 2779. ("[T]he Hahns and Greens and their companies sincerely believe that providing the insurance coverage demanded by the HHS regulations lies on the forbidden side of the line, and it is

not for us to say that their religious beliefs are mistaken or insubstantial."). Dr. Hotze sincerely believes that the use and submission of the self-certification form is sufficiently connected to the destruction of human embryos and non-marital sexual activities as to make it immoral and contrary to his religious beliefs for his company to execute that form. *See* Affidavit of Steven F. Hotze ¶ 13–17, 21–24; App. 6, 7–8). And it cannot be denied that the Contraceptive Mandate substantially burdens Dr. Hotze's right to conduct his business in accordance with that belief, given the heavy financial penalties imposed on Braidwood for its refusal to cover contraception and its refusal to execute the certification form. *See Hobby Lobby*, 134 S. Ct. at 2779.

Braidwood and its proposed class remain likely to succeed on their RFRA challenge even though a panel of the Fifth Circuit previously upheld the "accommodation" process for objecting employers. *See East Texas Baptist University v. Burwell*, 793 F.3d 449, 455–63 (5th Cir. 2015) (holding that the accommodation did not "substantially burden" an employer's religious exercise), *vacated*, *Zubik*, 136 S. Ct. 1557. *East Texas Baptist* should not be followed for at least four reasons.

First, the ruling in *East Texas Baptist* was vacated by the Supreme Court in *Zubik*, 136 S. Ct. at 1561, so it is no longer binding precedent and may not be followed unless this Court—in its independent judgment—finds the analysis persuasive. *See Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1273 n.11 (5th Cir. 1986) (vacated panel opinions of the Fifth Circuit are not binding precedent).

Second, the opinion in *East Texas Baptist* rested on a mistaken factual premise that the Department of Justice repudiated at the Supreme Court. In holding that the "accommodation" process did not impose substantial burdens, the panel opinion repeatedly stated that the employer's plan would *not* be used to provide the disputed contraceptive methods, and that the insurer or third-party administrator would provide the coverage without involving the employer's plan in any manner. *See East Texas Baptist*, 793 F.3d at 460 ("[T]he plaintiffs urge that the accommodation uses their plans as vehicles for payments for contraceptives.

But that is just what the regulations prohibit. Once the plaintiffs apply for the accommodation, the insurers may not include contraceptive coverage in the plans. . . . The payments for contraceptives are completely independent of the plans."); *id*. at 461 ("[T]he government is requiring the insurers and third-party administrators to offer it—separately from the plans—despite the plaintiffs' opposition."). At the Supreme Court, however, the Solicitor General expressly disavowed this claim, acknowledging that for self-insured objecting employers, "the coverage provided by the [third-party administrator] is, as a formal ERISA matter, part of the same 'plan' as the coverage provided by the employer." Brief for the Respondents at 38, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418).[14] Braidwood is self-insured and would therefore have contraceptive coverage provided through its plan if it opts for the accommodation—contrary to the Fifth Circuit's representations in *East Texas Baptist*. Indeed, Braidwood's third-party administrator has told the company that there is no way to invoke the "accommodation" without involving Braidwood's plan in the provision of contraceptive methods that violate its religious beliefs. *See* Affidavit of Steven F. Hotze ¶ 23; App. 7.

Third, the federal agencies that were sued in *East Texas Baptist* now agree with the plaintiffs that the "accommodation" process substantially burdens the religious freedom of objecting employers.[15] And for good reason: The accommodation—like the Mandate—forces

---

14. The Solicitor General continued to insist objecting employers with *insured* plans (rather than self-insured plans) will have contraceptive coverage expressly excluded from those plans. *See* Brief for the Respondents at 38, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418). But the plaintiffs in *East Texas Baptist* included employers with both insured and self-insured plans, so the panel opinion's insistence that the employers' plans would have no involvement in the provision of contraception is incompatible with the Solicitor General's concession at the Supreme Court. For detailed discussion of the Solicitor General's concession, see Mark L. Rienzi, *Fool Me Twice:* Zubik v. Burwell *and the Perils of Judicial Faith in Government Claims*, 2016 Cato Sup. Ct. Rev. 123, 132–38 (2018).

15. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,800 (Oct. 13, 2017); App. 331 ("[R]equiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA. We believe that the Court's analysis in *Hobby*

objecting employers to "arrange for" the coverage of contraception that violates their religious beliefs. *See Hobby Lobby*, 134 S. Ct. at 2775. The only difference between the Mandate and the accommodation is that the Mandate requires objecting employers to provide the coverage themselves, while the "accommodation" requires them to execute the paperwork needed for others to provide the objectionable contraception. In both situations, however, the employer is compelled to affirmatively assist and "arrange for" the disputed coverage. That substantially burdens employers whose religious beliefs compel them to withhold *all* assistance from the provision of these contraceptive methods.

Finally, the panel opinion in *East Texas Baptist* did not accurately describe the burdens that the "accommodation" imposes on objecting employers. The opinion, for example, repeatedly denied that the accommodation requires objecting employers to "facilitate" access to contraceptives. *See East Texas Baptist*, 793 F.3d at 459 ("Although the plaintiffs have identified several acts that offend their religious beliefs, the acts *they* are required to perform do not include providing or facilitating access to contraceptives."); *id.* at 460 ("Providing the names and contact information facilitates only the plaintiffs' exemption, not contraceptive coverage."); *id.* at 462 ("[T]he act at issue in this case is not one that authorizes or facilitates the use of contraceptives."); *id.* at 463 ("[T]he acts the *plaintiffs* are required to perform do not involve providing or facilitating access to contraceptives."). With all respect to the panel, those statements are simply untrue. The employer's submission of the form is the *but-for*

---

*Lobby* extends, for the purposes of analyzing a substantial burden, to the burdens that an entity faces when it religiously opposes participating in the accommodation process or the straightforward Mandate, and is subject to penalties or disadvantages that apply in this context if it chooses neither."); Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536, 57,546 (Nov. 15, 2018); App. 378 ("The Mandate and accommodation under the previous regulation forced certain non-exempt religious entities to choose between complying with the Mandate, complying with the accommodation, or facing significant penalties. . . . The Departments have concluded that withholding an exemption from those entities has imposed a substantial burden on their exercise of religion, either by compelling an act inconsistent with that observance or practice, or by substantially pressuring the adherents to modify such observance or practice.").

*cause* of the issuer or third-party administrator's provision of the disputed contraception coverage, and without this form there is no way for the issuer or third-party administrator to know that it must ensure coverage for an employee's contraception and pay for it with its own resources. Indeed, if the form does nothing to "facilitate" access to contraceptives, as the panel opinion in *East Texas Baptist* claimed, then why else would the government have required objecting employers to submit it?

If there were any doubt on this score, it is dispelled by the Department of Labor's response to *Zubik*. The Supreme Court in *Zubik* instructed the parties to "arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage.'" *Zubik*, 136 S. Ct. at 1560. In response to this order, the agencies published a request for information, asking whether there was a way to exempt objecting employers from submitting the certification form while simultaneously ensuring that their employees would receive contraceptive coverage from the insurer or third-party administrator. *See* Coverage for Contraceptive Services, 81 Fed. Reg. 47,741 (July 22, 2016). After considering over 54,000 public comments, the agencies concluded that "no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., FAQs About Affordable Care Act Implementation Part 36 (Jan. 9, 2017); App. 314. Given these post-*Zubik* developments, it is impossible for a court to accept *East Texas Baptist*'s holding that the certification form does nothing to "facilitate" or "trigger"[16] access to contraception.

The panel opinion in *East Texas Baptist* was also wrong to deny that an objecting employer violates his religious beliefs by filling out and submitting the certification form. *See*

---

16. *See East Texas Baptist*, 793 F.3d at 459 ("Accordingly, the plaintiffs' completion of Form 700 or submission of a notice to HHS does not authorize or trigger payments for contraceptives . . . .").

*East Texas Baptist*, 793 F.3d at 459 ("Although the plaintiffs have identified several acts that offend their religious beliefs, the acts *they* are required to perform do not include providing or facilitating access to contraceptives. Instead, the acts that violate their faith are those of third parties."). The panel opinion claimed that the only acts that could violate an objecting employer's religious beliefs would be performed by third parties, *see id.*, but this overlooks the fact that Dr. Hotze's religious beliefs forbid him to lend *any* affirmative assistance to the provision of the disputed contraceptive methods. *See* Affidavit of Steven F. Hotze ¶ 21; App. 7 ("Executing the certification form that enables my employees to obtain and use abortifacient contraceptive methods, or that enables them to obtain non-abortifacient contraception for use in non-marital sexual activity, is as much a violation of my sincerely held religious beliefs as providing the contraception directly."). The courts *must* accept Dr. Hotze's claim that his religious beliefs preclude him from executing the certification form; they cannot second-guess his religious beliefs or dismiss them as wrong or unreasonable. *See Hobby Lobby*, 134 S. Ct. at 2779 ("[I]t is not for us to say that their religious beliefs are mistaken or insubstantial. Instead, our narrow function in this context is to determine whether the line drawn reflects an honest conviction" (citation, ellipsis, and internal quotation marks omitted)).

Finally, the requirement to submit the certification form is no different from a law that compels devoutly pro-life doctors to fill out and submit forms that refer their patients to abortion providers. In these situations, the abortion itself will be performed by third parties, but the act of assisting a patient in obtaining an abortion remains a violation of the objector's religious convictions.

### B.   The Contraceptive Mandate Substantially Burdens The Religious Freedom Of Objecting Individuals

The Contraceptive Mandate also substantially burdens the religious freedom of individual consumers of health insurance who oppose contraception, because it compels them to choose between subsidizing coverage of contraceptive methods that violate their religious

beliefs and foregoing health insurance entirely. *See, e.g.*, *March for Life v. Burwell*, 128 F. Supp. 3d 116, 129–30 (D.D.C. 2015) (Contraceptive Mandate violates the Religious Freedom Restoration Act as applied to individuals who "hold religious beliefs against participating in a health insurance plan that covers contraceptives."). Under the Contraceptive Mandate, every individual who purchases health insurance will pay premiums that subsidize the provision of other people's contraception. The only way to avoid this subsidy is to forego health insurance, or to obtain insurance through a church employer or a grandfathered health plan exempt from the Contraceptive Mandate.

It is a "substantial burden" to close off the entire health-insurance market to individuals who are unwilling, for religious reasons, to purchase insurance that is used to subsidize other people's contraception. The Contraceptive Mandate is no different in this regard from a law that requires all private health insurance to cover abortions without any deductibles or co-pays. In each of these worlds, religious objectors are unable to purchase health insurance unless they pay for practices that are anathema to their religious beliefs.

The individual plaintiffs in this case have chosen to forego health insurance rather than pay for other people's contraception—and they have made this decision on account of their sincere religious beliefs, which forbid them to lend financial support to abortifacient contraception. *See* Affidavit of Richard W. DeOtte ¶¶ 7–9; App. 217 (Ex. 6). But shutting religious objectors out of the health-insurance market "substantially burdens" the exercise of their religion, even though the plaintiffs in this case have been willing to undertake that burden to avoid subsidizing conduct that they oppose. *See Hobby Lobby*, 134 S. Ct. at 2770 ("[A] law that operates so as to make the practice of religious beliefs more expensive in the context of business activities imposes a burden on the exercise of religion." (citation, ellipsis, and internal quotation marks omitted)).

Finally, the defendants agree that the Contraceptive Mandate substantially burdens the religious beliefs of individuals who must forego health insurance to avoid subsidizing practices that violate their religious faith. *See* Religious Exemptions and Accommodations for

Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536, 57,546 (Nov. 15, 2018); App. 378 ("[T]he Mandate imposes a substantial burden on the religious beliefs of an individual employee who opposes coverage of some (or all) contraceptives in his or her plan on the basis of his or her religious beliefs, and would be able to obtain a plan that omits contraception from a willing employer or issuer (as applicable), but cannot obtain one solely because the Mandate requires that employer or issuer to provide a plan that covers all FDA-approved contraceptives.").

* * *

Having shown a "substantial burden" on the plaintiffs' religious liberty, the burden now shifts to the government to demonstrate that the Contraceptive Mandate advances a "compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). This is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), and the Contraceptive Mandate comes nowhere close to satisfying this standard.

### C.  There Is No Compelling Governmental Interest In Ensuring That Every Woman Can Obtain Contraception Free of Charge

The relevant "governmental interest" cannot be described with vague abstractions, such as "promoting public health" or "gender equality." *See Hobby Lobby*, 134 S. Ct. at 2779 (rejecting the government's attempt to frame the "governmental interests" in those terms). Instead, a court must "'look beyond broadly formulated interests' and . . . 'scrutinize the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing the contraceptive mandate in these cases." *Id*. (quoting *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)). The relevant question is not whether the Contraceptive Mandate advances a compelling governmental interest, but whether its *refusal to exempt religious objectors* advances such an interest. And the government cannot possibly show that providing free contraception is a policy of such overriding importance that no exceptions can be made.

The first problem is that the Affordable Care Act does not even require insurers to cover contraception, because the statute is entirely agnostic on whether contraception should be included within the definition of "preventive care." *See* 42 U.S.C. § 300gg-13(a)(4); App. 220. If there were a "compelling governmental interest" in ensuring access to free contraception, then would expect to see that policy embodied in the Affordable Care Act or in some other act of Congress. Yet Congress was unwilling to require anyone—religious or non-religious—to provide coverage for contraception. Instead, Congress shrugged and punted the issue to the Health Resources and Services Administration.

The second problem is that the Affordable Care Act explicitly exempts "grandfathered" plans from the *entire* preventive-care mandate, including the Contraceptive Mandate that the agencies later imposed. *See* Pub. L. No. 111-148 § 1251, codified at 42 U.S.C. § 18011(a); *see also* 29 C.F.R. § 2590.715–1251 (exempting "grandfathered" plans from the Contraceptive Mandate). So defenders of the Contraceptive Mandate must explain how the government's interest in ensuring access to zero-cost contraception was not quite "compelling" enough to prevail over President Obama's desire to allow individuals to keep their existing health-insurance plans,[17] yet *is* compelling enough to prevail over another person's religious freedom.

The third problem is that the Affordable Care Act categorically exempts employers with fewer than 50 employees from the requirement to provide health insurance to their employees. *See* 26 U.S.C. § 4980H(c)(2). To be sure, those employers must comply with the preventive-care mandate (and the Contraceptive Mandate) if they *choose* to provide health insurance, but there is no requirement that they provide insurance in the first place. This cannot be squared with the notion that the government has a "compelling" interest in making all

---

17. *See generally* Michael D. Shear & Robert Pear, *Obama in Bind Trying to Keep Health Law Vow*, N.Y. Times (Nov. 12, 2013), https://nyti.ms/2HFH9JU.

contraception free of charge, and it proves that other policies—such as protecting small businesses from onerous regulatory burdens—can and should prevail over the goal of expanding access to contraception.

The fourth problem is that the Contraceptive Mandate itself recognizes that the "interest" in providing free contraception is not "compelling" enough to trump religious-freedom claims, because the Mandate categorically exempts church employers and did so from the outset of its existence. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725 (Feb. 15, 2012); App. 231–35; Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39870, 39,896 (July 2, 2013); App. 264. If ensuring access to free contraception is not "compelling" enough to require the involvement of church employers—who are not even required to use the "accommodation" process offered to religious non-profits—then it cannot be "compelling" enough to trump the religious freedom of other objecting employers and individuals, whose religious convictions are as sincere and as deeply held.

Of course, some people believe very strongly that every woman should have the right to access every form of FDA-approved contraception at zero cost—and that they should therefore have the prerogative to compel others (including religious objectors) to involve themselves in providing the contraceptive methods that they want. People who subscribe to that view will regard the Contraceptive Mandate as furthering "compelling governmental interests," to which any claim of religious freedom (or any other claim of constitutional right) should give way. *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2799–81 (Ginsburg, J., dissenting). But that belief is not reflected in *any* statute enacted by the people's elected representatives—and it is not reflected the Contraceptive Mandate either, which exempted church employers from the get-go even though nothing in the Affordable Care Act required this exemption. There is no doubt that the Contraceptive Mandate furthers important policies, but they are

not the type of "compelling" interests that must always prevail over other competing values or policy objectives.

### D.   Less Restrictive Means Are Available

Even if one thinks that the government has a "compelling" interest in ensuring access to free contraception, the plaintiffs still prevail because the Contraceptive Mandate flunks the least-restrictive-means test. There is a simple and obvious alternative that avoids any imposition on the plaintiffs' religious freedom while ensuring that every woman in America can obtain contraception at zero marginal cost: The government could require all non-objecting doctors, pharmacists, hospitals, and other health-care providers to dispense FDA-approved contraception free of charge to any woman whose insurance will not cover it, and allow those providers to seek reimbursement from the government for the contraception that they provide to uninsured or underinsured patients.[18]

This regime would eliminate any involvement of religious objectors in the provision of contraception. It would also ensure that *every* woman in America can access *every* FDA-approved contraceptive method free of charge. It would cover uninsured women and those with grandfathered or church plans that exclude contraception—all of whom are left in the cold by the present-day iteration of the Contraceptive Mandate. And it would leave in place the requirements that existing insurers cover contraception without any cost-sharing arrangements; the only exceptions would arise when an employer or beneficiary objects to this coverage on religious grounds. This would free religious objectors of involvement while simultaneously expanding the number of women who will obtain contraception free of charge.

Of course, Congress would need to enact legislation to implement this less restrictive alternative. But the least-restrictive-means test does not turn on whether a less restrictive

---

18. *Cf. Hobby Lobby*, 134 S. Ct. at 2780 ("The most straightforward way of doing this would be for the Government to assume the cost of providing the four contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections.").

alternative is currently authorized by law. The statute requires the government to use "the least restrictive means" of advancing a compelling interest; it does not limit this requirement to the least restrictive means available under existing law. *See* 42 U.S.C. § 2000bb-1(b)(2); *see also Hobby Lobby*, 134 S. Ct. at 2781 ("[W]e see nothing in RFRA that supports" the argument that "'RFRA cannot be used to require creation of entirely new programs' . . . and drawing the line between the 'creation of an entirely new program' and the modification of an existing program (which RFRA surely allows) would be fraught with problems."). Courts that apply strict scrutiny in other contexts consider only whether it is possible to imagine a way to accomplish the purported goal in a manner that is less restrictive of constitutional freedoms—and they are entirely unconcerned with whether their imagined alternatives are authorized by existing law. *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014) ("In discussing whether the Act is narrowly tailored, . . . we identify a number of less-restrictive alternative measures that the Massachusetts Legislature *might have adopted*." (emphasis added)); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993) ("The proffered objectives . . . *could be achieved by narrower ordinances* that burdened religion to a far lesser degree." (emphasis added)). RFRA's strict scrutiny must be applied with at least as much rigor. *See Hobby Lobby*, 134 S. Ct. at 2780 ("The least-restrictive-means-standard is exceptionally demanding").

The defendants agree that the Contraceptive Mandate is not the least restrictive means of ensuring access to free contraception. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,806 (Oct. 13, 2017); App. 337 ("[A]lternative approaches can further the interests the Departments previously identified behind the Mandate."); *id*. ("[C]ontraception access can be provided through means other than coverage offered by religious objectors"). So there is no dispute between the parties that the Contraceptive Mandate is more burdensome on religious freedom than necessary to achieve this goal.

## II. The Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction

A violation of one's RFRA or RLUIPA rights inflicts irreparable harm *per se*, in the same manner as an alleged violation of the First Amendment. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("[A] plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA." (quoting *Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001)); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("Courts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA."). If this Court concludes that the plaintiffs are likely to succeed on their RFRA claims, then the plaintiffs will satisfy the irreparable-injury requirement.

## III. The Balance of Equities Favors A Preliminary Injunction

The defendants will not be harmed by a preliminary injunction because they have already amended their rules to incorporate the precise relief that the plaintiffs are requesting. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536 (Nov. 15, 2018); App. 368–422. The defendants also acknowledge that the requested relief is compelled by the Religious Freedom Restoration Act. *See id*. at 57,546–48; App. 378–80. Indeed, the defendants will benefit from a class-wide preliminary injunction because it will spare them from lawsuits brought by other objecting employers or individuals in the wake of Judge Beetlestone's ruling.

## IV. The Public Interest Favors A Preliminary Injunction

The enforcement of a federal statute such as RFRA is by definition in the public interest. *See Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."); *cf. Nken v. Holder*, 556 U.S. 418, 436 (2009) (recognizing that there is always a "public interest" in the enforcement of the lawful removal orders). If this Court agrees with

the plaintiffs that RFRA requires the exemptions that the plaintiffs seek, then a preliminary injunction is necessarily in the public interest.

Finally, nothing in Judge Beetlestone's nationwide injunction precludes this Court from enjoining the defendants from enforcing the Contraceptive Mandate. Judge Beetlestone enjoined the defendants from enforcing the final rule of November 15, 2018; this Court, by contrast, is being asked to enjoin the defendants from enforcing the Contraceptive Mandate that predates that final rule. There is no "conflict" between these injunctions, and the defendants can fully comply with the proposed injunction without violating anything in Judge Beetlestone's order. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 462–64 (2017). Judge Beetlestone also made clear that her nationwide injunction was not intended to "foreclose percolation" or "foreclos[e] adjudication" in other courts. *Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan. 14, 2019), ECF No. 136 at 65; App. 491 (citations omitted). This Court is obligated to enforce the Religious Freedom Restoration Act if it concludes that the Contraceptive Mandate violates that statute.

## CONCLUSION

The motion for preliminary injunction should be granted.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

CHARLES W. FILLMORE
H. DUSTIN FILLMORE
The Fillmore Law Firm, L.L.P.
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
chad@fillmorefirm.com
dusty@fillmorefirm.com

Dated: February 5, 2019

JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and
the Proposed Classes*

## CERTIFICATE OF CONFERENCE

I certify that on January 28, 2018, I conferred with Daniel Riess, counsel for the defendants, and he informed me that the defendants reserve the right to object to this motion pending their review of the papers that we file.


 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs and*
*the Proposed Classes*


## CERTIFICATE OF SERVICE

I certify that on February 5, 2019, I served this document through CM/ECF upon:

DANIEL RIESS
U.S. Department of Justice
Civil Division, Room 6122
20 Massachusetts Avenue NW
Washington, D.C. 20530
(202) 353-3098
daniel.riess@usdoj.gov

*Counsel for Defendants*


 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs and*
*the Proposed Classes*