**APPENDIX OF EXHIBITS
TO MOTION TO INTERVENE**

| EXHIBIT No. | EXHIBIT DESCRIPTION | PAGE NUMBERS |
|---|---|---|
| A. | Declaration of Beth Handler | 1-4 |
| B. | Declaration of Kathryn Kost | 5-38 |
| C. | U.S. Dep't of Labor, FAQS About Affordable Care Act Implementation Part 36 (Jan. 9, 2017) | 39-49 |
| D. | Proposed Order to Motion to Intervene | 50-55 |
| E. | Proposed Opposition to Plaintiffs' Motion for Summary Judgement and Permanent Injunction | 56-80 |
| F. | Proposed Brief Supporting Opposition | 81-97 |

AARON D. FORD
Attorney General
HEIDI PARRY STERN (NV Bar No. 8873)
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., #3900
Las Vegas, NV 89101-1068
(702) 486-3594 (phone)
E:  HStern@ag.nv.gov

*Attorneys for Intervenor-Defendant
State of Nevada*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

| | |
|---|---|
| RICHARD W. DeOTTE, on behalf of himself and others similarly situated; YVETTE DeOTTE; JOHN KELLEY; ALISON KELLEY; BRAIDWOOD MANAGEMENT INC., on behalf of itself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; STEVEN T. MNUCHIN, in his official capacity as Secretary of the Treasury; R. ALEXANDER ACOSTA, in his official capacity as Secretary of Labor; UNITED STATES OF AMERICA,<br><br>Defendants. | Case No. 4:18-cv-825-O<br><br>DECLARATION OF BETH HANDLER IN SUPPORT OF THE STATE OF NEVADA'S MOTION TO INTERVENE |

Page 1 -  DECLARATION OF BETH HANDLER IN SUPPORT OF NEVADA'S MOTION TO
INTERVENE

**I, Beth Handler, declare:**

1.      I make this declaration from personal knowledge and based on records from the Nevada Department of Health and Human Services (NDHHS) and would testify to the following facts if called as a witness at hearing or trial.

2.      In Nevada, more than 379,000 women of child bearing age (aged 15-44 years old) receive private insurance coverage and could be affected by Plaintiffs' proposed class action relief.

3.      In Nevada, childless adults and parents are eligible for full-benefit Medicaid only if they have incomes at or below 138% of the federal poverty level. *See* Kaiser Family Foundation, Medicaid income eligibility for adults as a percent of the federal poverty level, 2018, State Health Facts,   https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.   Some Nevada women who would be impacted by Plaintiffs' proposed nationwide class action would not qualify for Medicaid or Title X because they would not meet the income eligibility requirements for coverage or subsidized care under these programs.

4.      As a result, some Nevada women would be at increased risks of unintended pregnancy, either because they are not able to afford the contraception methods that work best for them or because cost would force them to forgo contraception use entirely.

5.      In total, between 600 to 1,200 Nevada women would be harmed from implementation of Plaintiffs' proposed class relief.

6.      Other Nevada women would be eligible for publicly funded family planning services through Medicaid and Title X.  However, those women could be denied the ability to obtain contraceptive counseling and services from their desired provider as the same time they

Page 2 -    DECLARATION OF BETH HANDLER IN SUPPORT OF NEVADA'S MOTION TO
            INTERVENE

NV Exh A 0002

receive other primary and preventative care, increasing the time, effort, and expense involved in getting needed contraception while interfering with health care providers' ability to holistically managing these women's health conditions.

7.      The increase in Nevada women relying on publicly funded services would strain Nevada's existing family planning programs and providers, making it more difficult for them to meet the existing need for care. For instance, in 2014, 194,000, women were in need of publicly funded family planning in Nevada, with the existing state family planning network only able to meet 10% of this need. *See* Frost JJ, Frohwirth L and Zolna MR, Contraceptive Needs and Services, 2014 Update, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

8.      Losing current access to contraception could lead to unintended pregnancies and abortions. According to the Centers for Disease Control and Prevention ("CDC"), unintended pregnancy is associated with an increased risk of health problems for the mother and child, resulting in increased healthcare costs relative to intended pregnancies.

9.      In 2010, prior to the Affordable Care Act, 29,000 unintended pregnancies occurred among Nevada residents, a rate of 54 per 1,000 women of child bearing age. *See* Kost K, Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

10.     Of those unintended pregnancies that ended in birth, 60% were paid for by Medicaid and other public insurance programs, costing Nevada $37 million and the federal government $66 million in 2010. *See* Sonfield A and Kost K, Public Costs from Unintended

Page 3 -   DECLARATION OF BETH HANDLER IN SUPPORT OF NEVADA'S MOTION TO INTERVENE

Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

11. Finally, implementation of the ACA's contraception provisions resulted in a 35% decrease in Nevada's abortion rate among women aged 15 to 19 years old and a 10% decrease among women aged 20 to 24 years old between 2012 to 2017.

12. As a result of the above listed factors, Plaintiffs' proposed class action would increase Nevada expenditures while harming the public heath of Nevada women.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED May 23, 2019.

BETH HANDLER
Deputy Administrator of Community Health
Division of Public and Behavioral Health
Nevada Department of Health and Human
Services

Page 4 -   DECLARATION OF BETH HANDLER IN SUPPORT OF NEVADA'S MOTION TO INTERVENE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| RICHARD W. DEOTTE *et al.*,<br><br>                                        Plaintiffs,<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as<br>Secretary of Health and Human Services *et al.*,<br><br>                                        Defendants. | Case No. 4:18-CV-00825-O |
| NEVADA,<br><br>                    Proposed Intervenor-Defendant. | |

**DECLARATION OF KATHRYN KOST IN SUPPORT OF NEVADA'S MOTION TO INTERVENE**

I, Kathryn Kost, declare:

1.   I am the Acting Vice President for Domestic Research at the Guttmacher Institute. I have worked for the Guttmacher Institute in a full-time or consulting capacity for nearly 30 years since joining the Institute as a Senior Research Associate in 1989. I received my BA in sociology from Reed College and my PhD in sociology from Princeton University, where I specialized in demography at the Office of Population Research.

2.   The Guttmacher Institute is a private, independent, nonprofit, nonpartisan corporation that advances sexual and reproductive health and rights through an interrelated program of research, policy analysis, and public education. The Institute's overarching goal is to ensure quality sexual and reproductive health for all people worldwide by conducting research according to the highest standards of methodological rigor and promoting evidence-based policies. It produces a wide range of resources on topics pertaining to sexual and reproductive

health and publishes two peer-reviewed journals. The information and analysis it generates on reproductive health and rights issues are widely used and cited by researchers, policymakers, the media and advocates across the ideological spectrum.

3.   Over the course of more than 30 years, I have designed, executed, and analyzed numerous quantitative and qualitative research studies in the field of reproductive health care, including those on contraceptive use and failure, unintended pregnancy, maternal and child health, and the impact on public health and fisc associated with particular reproductive health care policies or trends. My peer-reviewed research has been published in dozens of articles, including first-authored work in *Demography*, *Perspectives on Sexual and Reproductive Health*, *Contraception*, *Studies in Family Planning* and other public health, medical and demographic journals. My education, training, responsibilities and publications are set forth in greater detail in my curriculum vitae, a true and correct copy of which is attached as Exhibit A. I submit this declaration as an expert on reproductive health care, family planning, and unintended pregnancy, and the impact on individuals, families, and the public health from access to contraception and related care, or interference with that care, in the United States.

4.   I understand that this lawsuit involves a challenge to the Affordable Care Act's ("ACA") contraceptive coverage mandate and rulemaking by the U.S. Department of Health and Human Services related to the contraceptive coverage mandate. In my expert opinion, an injunction of the mandate would compromise women's ability to obtain contraceptive methods, services and counseling and, in particular, to consistently use the best methods for them, thus putting them at heightened risk of unintended pregnancy.

## Contraception Is Widely Used and the Majority of Women Rely on Numerous Contraceptive Methods for Decades of Their Lives

5.   More than 99% of women aged 15–44 who have ever had sexual intercourse have used at least one contraceptive method; this is true across a variety of religious affiliations.[1] Some 61%

---

[1] Daniels K, Mosher WD and Jones J, Contraceptive methods women have ever used: United States, 1982–2010, *National Health Statistics Reports*, 2013, No. 62, https://www.cdc.gov/nchs/products/nhsr.htm.

of all women of reproductive age are currently using a contraceptive method.[2] Among women at risk of an unintended pregnancy (i.e., women aged 15–44 who have had sexual intercourse in the past three months, are not pregnant or trying to conceive, and are not sterile for noncontraceptive reasons), 90% are currently using a contraceptive method.[3]

6.   A typical woman in the United States wishing to have two children will, on average, spend three decades—roughly 90% of her reproductive life—avoiding unintended pregnancy.[4]

**7.**   Women and couples rely on a wide range of contraceptive methods: In 2014, 25% of female contraceptive users relied on oral contraceptives and 15% on condoms as their most effective method. That means that six in 10 contraceptive users relied on other methods: female or male sterilization; hormonal or copper intrauterine devices (IUDs); other hormonal methods including the injectable, the ring, the patch and the implant; and behavioral methods, such as withdrawal and fertility awareness methods.[5]

8.   Most women rely on multiple methods over the course of their reproductive lives, with 86% having used three or more methods by their early 40s.[6] Sometimes, women and couples may try out different methods to find one that they can use consistently or that minimizes side effects. Other times, they may switch from method to method—such as from condoms to oral contraceptives to sterilization—as their relationships, life circumstances and family goals evolve.

9.   Many people use two or more methods at once: 17% of female contraceptive users did so the last time they had sex.[7] For example, they may use condoms to prevent STIs and an IUD for

---

[2] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.
[3] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.
[4] Sonfield A, Hasstedt K and Gold RB, *Moving Forward: Family Planning in the Era of Health Reform*, New York: Guttmacher Institute, 2014, https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.
[5] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012
[6] Daniels K, Mosher WD and Jones J, Contraceptive methods women have ever used: United States, 1982–2010, *National Health Statistics Reports*, 2013, No. 62, https://www.cdc.gov/nchs/products/nhsr.htm.
[7] Kavanaugh ML and Jerman J, Concurrent multiple methods of contraception in the United States, poster presented at the North American Forum on Family Planning, Atlanta, Oct. 14–16, 2017.

the most reliable prevention of pregnancy. Or they may use multiple methods simultaneously—for instance, condoms, withdrawal and oral contraceptives—to provide extra pregnancy protection.

### Women Need Access to the Full Range of Contraceptive Options to Most Effectively Avoid Unintended Pregnancies

10. Using any method of contraception greatly reduces a woman's risk of unintended pregnancy. Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.[8,9]

11. All new contraceptive drugs and devices (just like other drugs and devices) must receive approval from the U.S. Food and Drug Administration (FDA) and must be shown to be safe and effective through rigorous scientific testing. Thus, the federal government itself provides the oversight to ensure that contraception is safe and effective in preventing pregnancy.

12. The government's effort to imply in Final Rules issued in 2018 (2018 Final Rules) that there is doubt about whether contraception reduces the risk of unintended pregnancy is simply unfounded, as the data above illustrate. Though the 2018 Final Rules cite "conflicting evidence" for the effects of a contraceptive coverage requirement,[10] in the previous interim final rules, the government made positive arguments that contraceptive access did not reduce the risk of unintended pregnancy. This argument is flawed. For example, in the interim final rules the government argued, "In the longer term—from 1972 through 2002—while the percentage of

---

[8] Sundaram A et al., Contraceptive failure in the United States: estimates from the 2006-2010 National Survey of Family Growth, *Perspectives on Sexual and Reproductive Health*, 2017, 49(1):7–16, https://www.guttmacher.org/journals/psrh/2017/02/contraceptive-failure-united-states-estimates-2006-2010-national-survey-family.

[9] Trussell J, Aiken A, "Contraceptive Efficacy" pp. 829–928. In Hatcher RA et al., eds., *Contraceptive Technology,* 21st ed., New York: Ayer Company Publishers, 2018.

[10] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 83(221):57536–57590, https://www.gpo.gov/fdsys/pkg/FR-2018-11-15/pdf/2018-24512.pdf

sexually experienced women who had ever used some form of contraception rose to 98 percent, unintended pregnancy rates in the Unites States rose from 35.4 percent to 49 percent."[11]

13. However, the government's assertion in the interim final rules that unintended pregnancy rates rose between 1972 and 2002 was incorrect and based on faulty calculations and an inappropriate comparison. First, the numbers cited (35.4% and 49%) are the *percentage* of all pregnancies that were unintended, not the unintended pregnancy *rate*, which is the appropriate indicator for assessing trends in unintended pregnancy because it is not affected by changes in the incidence of *intended* pregnancy. Second, the 1972 figure includes only *births* (not all pregnancies), and then only those births that were to married women.[12] Births to unmarried women and all abortions are excluded; the proportion of both of these that were unintended were significantly higher, so excluding them results in an artificially low percentage. The 2002 figure, on the other hand, includes all pregnancies to all women. An appropriate comparison of rates based on pregnancies and on all women in the population shows a clear decline in the rate: In 1971, there were an estimated 2.041 million unintended pregnancies (including births and abortions, but excluding miscarriages),[13] and 43.6 million women of reproductive age (15–44),[14] for an unintended pregnancy rate (excluding miscarriages) of 47 per 1,000 women. By contrast, in 2011, the unintended pregnancy rate *including* miscarriages was 45 per 1,000.[15] Even when including miscarriages in the later rate, it is lower than the earlier rate; because miscarriages typically represent about 14% of all pregnancies,[16] excluding them from the 2011 figure for comparability would result in a rate of about 38 per 1,000, substantially lower than the 1971 rate.

---

[11] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 82(197):47838–47862, https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf.

[12] Weller RH and Heuser RL, Wanted and unwanted childbearing in the United States: 1968, 1969, and 1972 National Natality Surveys, *Vital and Health Statistics*, 1978, No. 32.

[13] Tietze C, Unintended pregnancies in the United States, 1970–1972, *Family Planning Perspectives,* 1979, 11(3):186–188.

[14] National Center for Health Statistics, Centers for Disease Control and Prevention, Population by age groups, race, and sex for 1960–1997, no date, https://www.cdc.gov/nchs/data/statab/pop6097.pdf.

[15] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.

[16] Finer LB and Henshaw SK, Disparities in rates of unintended pregnancy in the United States, 1994 and 2001,

14. Although using any method of contraception is more effective in preventing pregnancy than not using a method at all, having access to a *limited* set of methods is far different than being able to choose from among the full range of methods to find the *best* methods for a given point in a woman's life.

15. One important consideration for most women in a choosing a contraceptive method is how well a method works for an individual woman to prevent pregnancy.[17] IUDs and implants, for example, are effective for years after they are inserted by a health care provider, and do not require women using them to think about contraception on a day-to-day basis.[18] By contrast, birth control pills must be taken every day, at approximately the same time. Nearly half of abortion patients who were users of birth control pills reported that they had forgotten to take their pills, and another quarter reported a lack of ready access to their pills (16% were away from their pills and 10% ran out).[19] Methods of contraception designed to be used during intercourse, such as condoms or spermicide, must be available, accessible, remembered, and used properly each time intercourse occurs.

16. Beyond effectiveness, there are many other features that people say are important to them when choosing a contraceptive method.[20] These include concerns about and past experience with side effects, drug interactions or hormones; affordability and accessibility; how frequently they expect to have sex; their perceived risk of HIV and other STIs; the ability to use the method confidentially or without needing to involve their partner; and potential effects on sexual enjoyment and spontaneity. For example, methods such as male condoms, fertility awareness and

*Perspectives on Sexual and Reproductive Health*, 2006, 38(2):90–96, https://www.guttmacher.org/journals/psrh/2006/disparities-rates-unintended-pregnancy-united-states-1994-and-2001.

[17] Lessard LN et al., Contraceptive features preferred by women at high risk of unintended pregnancy, *Perspectives on Sexual and Reproductive Health*, 2012, 44(2):194–200.

[18] Winner B et al., Effectiveness of long-acting reversible contraception, *New England Journal of Medicine*, 366(21):1998–2007.

[19] Jones RK, Darroch JE and Henshaw SK, Contraceptive use among U.S. women having abortions in 2000–2001, *Perspectives on Sexual and Reproductive Health*, 2002, 34(6): 294–303, https://www.guttmacher.org/journals/psrh/2002/11/contraceptive-use-among-us-women-having-abortions-2000-2001.

[20] Lessard LN et al., Contraceptive features preferred by women at high risk of unintended pregnancy, *Perspectives on Sexual and Reproductive Health*, 2012, 44(2):194–200.

withdrawal require the active and effective participation of male partners. By contrast, methods such as IUDs, implants, and oral contraceptives can be more reliably used by the woman alone in advance of intercourse.[21]

17. Being able to select the methods that best fulfill a woman's needs and priorities is an important way to ensure that she will be satisfied with her chosen methods. Women who are satisfied with their current contraceptive methods are more likely to use them consistently and correctly. For example, one study found that 30% of neutral or dissatisfied users had a temporal gap in use, compared with 12% of completely satisfied users.[22] Similarly, 35% of satisfied oral contraceptive users had skipped at least one pill in the past three months, compared with 48% of dissatisfied users.[23]

18. Consistent contraceptive in turn use helps women and couples prevent unwanted pregnancies and plan and space those they do want. The two-thirds of U.S. women (68%) at risk of unintended pregnancy who use contraceptives consistently and correctly throughout a year account for only 5% of all unintended pregnancies. In contrast, the 18% of women at risk who use contraceptives but do so inconsistently account for 41% of unintended pregnancies, and the 14% of women at risk who do not use contraceptives at all or have a gap in use of one month or longer account for 54% of unintended pregnancies.[24]

19. In summary, the ability to choose from among the full range of contraceptive methods encourages consistent and effective contraceptive use, thereby helping women to avoid unintended pregnancies and to time and space wanted pregnancies.

---

[21] Bailey MJ, More power to the pill: the impact of contraceptive freedom on women's life cycle labor supply, *Quarterly Journal of Economics*, 2006, 121(1): 289–320, https://academic.oup.com/qje/article-abstract/121/1/289/1849021?redirectedFrom=fulltext.

[22] Guttmacher Institute, Improving contraceptive use in the United States, *In Brief*, New York: Guttmacher Institute, 2008, https://www.guttmacher.org/report/improving-contraceptive-use-united-states.

[23] Guttmacher Institute, Improving contraceptive use in the United States, *In Brief*, New York: Guttmacher Institute, 2008, https://www.guttmacher.org/report/improving-contraceptive-use-united-states.

[24] Sonfield A, Hasstedt K and Gold RB, *Moving Forward: Family Planning in the Era of Health Reform*, New York: Guttmacher Institute, 2014, https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.

## Access to Contraception Does Not Increase Adolescent Sexual Activity

20. Adolescent pregnancy has declined dramatically over the past several decades: In 2013, the U.S. pregnancy rate among 15–19-year-olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.[25] The adolescent birthrate has continued to fall sharply from 2013–2016, suggesting that the underlying pregnancy rates have likely declined even further.[26] Over these decades, adolescents' sexual activity has not increased—in fact, it has declined—while their contraceptive use has increased.

21. National data limited to adolescents attending high school document long-term increases from 1991–2015 in the share of students using contraception, and decreases over the same time period in the share of students who are sexually active.[27] Several studies have validated that contraceptive access reduces adolescent pregnancy without increasing sexual activity: The vast majority (86%) of the decline in adolescent pregnancy between 1995 and 2002 was the result of improvements in contraceptive use; only 14% could be attributed to a decrease in sexual activity.[28] Further, when examining these same two factors, all of the decline in the more recent 2007–2012 period was attributable to better contraceptive use: More adolescents were using contraception, they were using more effective methods, and they were using them more consistently, while adolescent sexual activity did not change.[29]

---

[25] Kost K, Maddow-Zimet I and Arpaia A, Pregnancies, *Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity*, New York: Guttmacher Institute, 2017, https://www.guttmacher.org/report/us-adolescent-pregnancy-trends-2013.

[26] Martin JA, Hamilton BE and Osterman MJK, Births in the United States, 2016, *NCHS Data Brief*, 2017, No. 287, https://www.cdc.gov/nchs/products/databriefs.htm.

[27] National Center for HIV/AIDS, Viral Hepatitis, TD, and TB Prevention, Centers for Disease Control and Prevention (CDC), *Trends in the Prevalence of Sexual Behaviors and HIV Testing National YRBS: 1991–2015*, Atlanta: CDC, no date, https://www.cdc.gov/healthyyouth/data/yrbs/pdf/trends/2015_us_sexual_trend_yrbs.pdf.

[28] Santelli JS et al., Explaining recent declines in adolescent pregnancy in the United States: the contribution of abstinence and improved contraceptive use, *American Journal of Public Health*, 2007, 97(1): 150–156, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1716232/.

[29] Lindberg L, Santelli J and Desai S, Understanding the decline in adolescent fertility in the United States, 2007–2012, *Journal of Adolescent Health*, 2016, 59(5): 577–583, http://www.jahonline.org/article/S1054-139X(16)30172-

22. Recent trends in adolescent contraceptive use buttress this point: During 2011–2015, 81% of adolescent girls used contraception the first time they had sex, up from 75% in 2002; the share of adolescent girls who were sexually active stayed stable.[30,31] Similarly, use of emergency contraception among sexually active female adolescents increased from 8% in 2002 to 22% in 2011–2013; there was no significant change in sexual activity during this time.[32] And in a 2010 review of seven randomized trials of emergency contraception, there was no increase in sexual activity (e.g., reported number of sexual partners or number of episodes of unprotected intercourse) in adolescents given advanced access to emergency contraception.[33]

23. Along the same lines, studies of the availability of contraception in high schools provide evidence that it does not lead to more sexual activity. Rather, while several studies of school-based health care centers that provide contraceptive methods have shown contraceptives' availability increases students' use of contraception,[34,35] other studies have not found any associated increases in sexual activity.[36] And a recent review of studies of school-based condom

---

0/fulltext.

[30] Martinez G, Copen CE and Abma JC, Teenagers in the United States: Sexual activity, contraceptive use, and childbearing, 2006–2010 National Survey of Family Growth, *Vital Health Statistics*, 2011, Series 23, No. 31, https://www.cdc.gov/nchs/products/series/series23.htm.

[31] Abma JC and Martinez G, Sexual activity and contraceptive use among teenagers in the United States, 2011–2015, *National Health Statistics Reports*, 2017, No. 104, https://www.cdc.gov/nchs/products/nhsr.htm.

[32] Martinez GM and Abma JC, Sexual activity, contraceptive use, and childbearing of teenagers aged 15–19 in the United States, *NCHS Data Brief*, 2015, No. 209, https://www.cdc.gov/nchs/products/databriefs.htm.

[33] Meyer JL, Gold MA and Haggerty CL, Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature, *Journal of Pediatric and Adolescent Gynecology*, 2011, 24(1):2–9, http://www.jpagonline.org/article/S1083-3188(10)00203-2/fulltext.

[34] Minguez M et al., Reproductive health impact of a school health center, *Journal of Adolescent Health*, 2015, 56(3): 338–344, https://www.ncbi.nlm.nih.gov/pubmed/25703321.

[35] Knopf FA et al., School-based health centers to advance health equity: a Community Guide systematic review, *American Journal of Preventive Medicine*, 2016, 51(1): 114-126, http://www.ajpmonline.org/article/S0749-3797(16)00035-0/fulltext.

[36] Kirby D, *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*, Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy, 2007, https://thenationalcampaign.org/sites/default/files/resource-primary-download/EA2007_full_0.pdf.

availability programs found condom use increased the odds of students using condoms, while none increased sexual activity.[37]

### Eliminating the Cost of Contraception Leads to Improved Contraceptive Use and Reduces Women's Risk of Unintended Pregnancy

24. Extensive empirical evidence demonstrates what common sense would predict: eliminating costs leads to more effective and continuous use of contraception. That is because cost can be a substantial barrier to contraceptive choice. The contraceptive methods that can be purchased over the counter at a neighborhood drugstore for a comparatively low cost—male condoms and spermicide—are far less effective than methods that require a prescription and a visit to a health care provider,[38] which have higher up-front costs.[39]

25. The most effective methods of contraception are long-acting reversible contraceptives (LARC), such as implants and IUDs. Even with discounts for volume, the cost of these devices exceeds $500, exclusive of costs relating to the insertion procedure,[40] and the total cost of initiating one of these methods generally exceeds $1,000.[41] To put that cost in perspective, beginning to use one of these devices costs nearly a month's salary for a woman working full time at the federal minimum wage of $7.25 an hour.[42] These costs are dissuasive for many women not covered by the contraceptive coverage guarantee; one pre-ACA study concluded that women who faced high out-of-pocket IUD costs were significantly less likely to obtain an IUD than women with access to the device at low or no out-of-pocket cost. And only 25% of women who requested an IUD had one placed after learning the associated costs.[43] Even oral contraceptives, which are twice as effective as condoms in practice, require a prescription and

---

37 Wang T et al., The effects of school-based condom availability programs (CAPs) on condom acquisition, use and sexual behavior: a systematic review. *AIDS and Behavior*, 2017, https://www.ncbi.nlm.nih.gov/pubmed/28625012.

38 Trussell J, Aiken A, "Contraceptive Efficacy" pp. 829–928. In Hatcher RA et al., eds., *Contraceptive Technology*, 21st ed., New York: Ayer Company Publishers, 2018.

39 Trussell J et al., Cost effectiveness of contraceptives in the United States, *Contraception*, 2009, 79(1):5–14.

40 Armstrong E et al., *Intrauterine Devices and Implants: A Guide to Reimbursement*, 2015, https://www.nationalfamilyplanning.org/file/documents----reports/LARC_Report_2014_R5_forWeb.pdf.

41 Eisenberg D et al., Cost as a barrier to long-acting reversible contraceptive (LARC) use in adolescents, *Journal of Adolescent Health*, 2013, 52(4):S59–S63, http://www.jahonline.org/article/S1054-139X(13)00054-2/fulltext.

42 29 U.S.C. § 206(a)(1)(C). At 40 hours a week, that amounts to $290 a week, before any taxes or deductions.

43 Gariepy AM et al., The impact of out-of-pocket expense on IUD utilization among women with private insurance, *Contraception*, 2011, 84(6):e39–e42, https://escholarship.org/uc/item/1dz6d3cx.

have monthly costs. And although some stores offer certain pill formulations at steep discounts, access to those cost savings can require a woman to change to a different formulation than the one prescribed by her clinician and increases her risk of adverse health effects.

26. The government acknowledges that without coverage, many methods would cost women $50 per month, or upwards of $600 per year, and in doing so, implies that such costs are a minimal burden. This is not true. For example, a national study found that about one-third of uninsured people and lower-income people in the United States would be unable to pay for an unexpected $500 medical bill, and roughly another third would have to borrow money or put it on a credit card and pay it back over time, with interest.[44]

27. Without insurance coverage to defray or eliminate the cost, the large up-front costs of the more-effective contraceptive methods put them out of reach for many women who want them, driving them to less expensive and less effective methods. In a study conducted prior to the contraceptive coverage guarantee, almost one-third of women reported that they would change their contraceptive method if cost were not an issue.[45] This figure was particularly high among women relying on male condoms and other less effective methods such as withdrawal. A study conducted after the enactment of the ACA had similar findings: among women in the study who still lacked health insurance in 2015, 44% agreed that having insurance would help them to afford and use birth control and 44% agreed that it would allow them to choose a better method for them; 48% also agreed that it would be easier to use contraception consistently if they had coverage.[46] Among insured women who still had a copayment using a prescription method (e.g., those in grandfathered plans), 40% agreed that if the copayment were eliminated, they would be

---

[44] DiJulio B et al., Data note: Americans' challenges with health care costs, 2017, https://www.kff.org/health-costs/poll-finding/data-note-americans-challenges-with-health-care-costs/?utm_campaign=KFF-2017-March-Polling-Beyond-The-ACA.

[45] Frost JJ and Darroch JE, Factors associated with contraceptive choice and inconsistent method use, United States, 2004, *Perspectives on Sexual and Reproductive Health,* 2008, 40(2):94–104, https://www.guttmacher.org/journals/psrh/2008/factors-associated-contraceptive-choice-and-inconsistent-method-use-united.

[46] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues,* 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

better able to afford and use birth control, 32% agreed this would help them choose a better method, and 30% agreed this would help them to use their methods of contraception more consistently. Other studies have found that uninsured women are less likely to use the most expensive (but most effective) contraceptive methods, such as IUDs, implants, and oral contraceptives,[47] and are more likely than insured women to report using no contraceptive method at all.[48,49]

28. Reducing financial barriers is critical to increasing access to effective contraception. Before the ACA provision went into effect, 28 states required private insurers that cover prescription drugs to provide coverage of most or all FDA-approved contraceptive drugs and devices.[50] These programs gave women access at lower prices than if contraception were not covered, but (at the time) all states still allowed insurers to require cost-sharing. Experience from these states demonstrates that having insurance coverage matters.[51] Privately insured women living in states that required private insurers to cover prescription contraceptives were 64% more likely to use some contraceptive method during each month a sexual encounter was reported than women living in states with no such requirement, even after accounting for differences including education and income.[52]

---

[47] Culwell KR and Feinglass J, The association of health insurance with use of prescription contraceptives, *Perspectives on Sexual and Reproductive Health,* 2007, 39(4):226–230.

[48] Culwell KR and Feinglass J, The association of health insurance with use of prescription contraceptives, *Perspectives on Sexual and Reproductive Health,* 2007, 39(4):226–230.

[49] Culwell KR and Feinglass J, Changes in prescription contraceptive use, 1995–2002: the effect of insurance coverage, *Obstetrics & Gynecology,* 2007, 110(6):1371–1378, https://www.ncbi.nlm.nih.gov/pubmed/18055734.

[50] Guttmacher Institute, Insurance coverage of contraceptives, *State Policies in Brief (as of July 2012)*, 2012.

[51] The government argued in the interim final rules that the state mandates have not been effective, asserting that "Additional data indicates that, in 28 States where contraceptive coverage mandates have been imposed statewide, those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall." The study the government relied on for this assertion was published in a law review rather than in a peer-reviewed scientific journal. [See New MJ, Analyzing the impact of state level contraception mandates on public health outcomes, *Ave Maria Law Review,* 2015, 13(2):345–369.] One basic flaw in this article is that, at the time, none of the state contraceptive coverage mandates eliminated out-of-pocket costs entirely, which is the major advance from the federal guarantee and the issue in this case. In addition, over the course of the period the article evaluated, contraceptive coverage quickly became the norm in the insurance industry—even in states without mandates—thus minimizing potential differences between states with laws and states without them. [Sonfield et al. U.S. insurance coverage of contraceptives and impact of contraceptive coverage mandates, 2002, *Perspectives on Sexual and Reproductive Health,* 2004, 36(2):72–79, https://www.guttmacher.org/sites/default/files/pdfs/pubs/journals/3607204.pdf.]

[52] Magnusson BM et al., Contraceptive insurance mandates and consistent contraceptive use among privately

29. Although these state policies reduced women's up-front costs, other actions to eliminate out-of-pocket costs entirely—which is what the federal contraceptive coverage guarantee does—have even greater potential to increase women's ability to use methods effectively. For example, when Kaiser Permanente Northern California eliminated patient cost-sharing requirements for IUDs, implants, and injectables in 2002, the use of these devices increased substantially, with IUD use more than doubling.[53] Another example comes from a study of more than 9,000 St. Louis-region women who were offered the reversible contraceptive method of their choice (i.e., any method other than sterilization) at no cost for two to three years, and were "read a brief script informing them of the effectiveness and safety of" IUDs and implants.[54] Three-quarters of those women chose long-acting methods (i.e., IUDs or implants), a level far higher than in the general population. Likewise, a Colorado study found that use of long-acting reversible contraceptive methods quadrupled when offered with no out-of-pocket costs along with other efforts to improve access.[55]

30. Government-funded programs to help low-income people afford family planning services provide further evidence that reducing or eliminating cost barriers to women's contraceptive choices has a dramatic impact on women's ability to choose and use the most effective forms of contraception. Each year, among the women who obtain contraceptive services from publicly funded reproductive health providers, 57% select hormone-based contraceptive methods, 18% use implants or IUDs, and 7% receive a tubal ligation.[56] It is estimated that without publicly supported access to these methods at low or no cost, nearly half (47%) of those women would

---

insured women, *Medical Care*, 2012, 50(7):562–568.

[53] Postlethwaite D et al., A comparison of contraceptive procurement pre- and post-benefit change, *Contraception*, 2007, 76(5): 360–365

[54] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012, 120(6):1291–1297.

[55] Ricketts S, Klinger G and Schwalberg G, Game change in Colorado: widespread use of long-acting reversible contraceptives and rapid decline in births among young, low-income women, *Perspectives on Sexual and Reproductive Health*, 2014, 46(3):125–132.

[56] Frost JJ and Finer LB, Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula, memo to interested parties, New York: Guttmacher Institute, June 23, 2017, https://www.guttmacher.org/sites/default/files/pdfs/pubs/Guttmacher-Memo-on-Estimation-of-Unintended-Pregnancies-Prevented-June-2017.pdf.

switch to male condoms or other nonprescription methods, and 28% would use no contraception at all.[57]

**The ACA's Contraceptive Coverage Guarantee Has Had a Positive Impact**

31. By ensuring coverage for a full range of contraceptive methods, services and counseling at no cost, the ACA's contraceptive coverage mandate has had its intended effect of removing cost barriers to obtaining contraception. Between fall 2012 and spring 2014 (during which time the coverage guarantee went into wide effect), the proportion of privately insured women who paid nothing out of pocket for the pill increased from 15% to 67%, with similar changes for injectable contraceptives, the vaginal ring and the IUD.[58] Similarly, another study found that since implementation of the ACA, the share of women of reproductive age (regardless of whether they were using contraception) who had out-of-pocket costs for oral contraceptives decreased from 21% in 2012 to just 4% in 2014.[59] These trends have translated into considerable savings for U.S. women: one study estimated that pill and IUD users saved an average of about $250 in copayments in 2013 alone because of the guarantee.[60]

32. Before the ACA, contraceptives accounted for between 30–44% of out-of-pocket health care spending for women.[61] Individual women themselves say that the ACA's contraceptive coverage guarantee is working for them. In a 2015 nationally representative survey of women aged 18–39, two-thirds of those who had health insurance and were using a hormonal contraceptive method reported having no copays; among those women, 80% agreed that paying nothing out of pocket helped them to afford and use their birth control, 71% agreed this helped

---

[57] Frost JJ and Finer LB, Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula, memo to interested parties, New York: Guttmacher Institute, June 23, 2017, https://www.guttmacher.org/sites/default/files/pdfs/pubs/Guttmacher-Memo-on-Estimation-of-Unintended-Pregnancies-Prevented-June-2017.pdf.

[58] Sonfield A et al. Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update, *Contraceptive*, 2015, 91(1):44–48.

[59] Sobel L, Salganicoff A and Rosenzweig C, *The Future of Contraceptive Coverage*, Kaiser Family Foundation (KFF) Issue Brief, Menlo Park, CA: KFF, 2017, https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[60] Becker NV and Polsky D, Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing, *Health Affairs*, 2015, 34(7):1204–1211.

[61] Becker NV and Polsky D, Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing, *Health Affairs*, 2015, 34(7):1204–1211.

NV Exh B 0018

them use their birth control consistently, and 60% agreed that having no copayment helped them choose a better method for them.[62]

33. Demonstrating the population-level impact of the ACA's coverage provision (e.g., a change in unintended pregnancy rates) is complicated, because the provision affects only a subset of U.S. women, and because there are so many additional variables that affect women's pregnancy intentions, contraceptive use and ultimately the unintended pregnancy rate in the population. The evidence on whether the ACA's provision has affected contraceptive use at the population level is not definitive, but some studies suggest the guarantee has had an impact on contraceptive use, among those benefiting from the provision.

34. A study using claims data from 30,000 privately insured women in the Midwest found that the ACA's reduction in cost sharing was tied to a significant increase in the use of prescription methods from 2008 through 2014 (before and after the ACA provision went into effect), particularly long-acting methods.[63] Another study of health insurance claims from 635,000 privately insured women nationwide showed that rates of discontinuation and inconsistent use of contraception declined from 2010 to 2013 (again, before and after the ACA provision went into effect) among women using generic oral contraceptive pills after the contraceptive guarantee's implementation (among women using brand-name oral contraceptives, only the discontinuation rate declined).[64]

35. Two other studies, looking at the broader U.S. population, found no change in overall use of contraception or an overall switch from less-effective to more-effective methods among women at risk of unintended pregnancy before and after the guarantee's implementation.[65,66]

---

[62] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues,* 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

[63] Carlin CS, Fertig AR and Down BE, Affordable Care Act's mandate eliminating contraceptive cost sharing influenced choices of women with employer coverage, *Health Affairs,* 2016, 35(9):1608–1615.

[64] Pace LE, Dusetzina SB and Keating NL, Early impact of the Affordable Care Act on oral contraceptive cost sharing, discontinuation, and nonadherence, *Health Affairs,* 2016, 35(9):1616–1624.

[65] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues,* 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

However, both studies identified some positive trends among key groups. One of them found that between 2008 and 2014, among women aged 20–24 (the age group at highest risk for unintended pregnancy), LARC use more than doubled, from 7% to 19%, without a proportional decline in sterilization.[67] The other study showed that between 2012 and 2015, use of prescription contraceptive methods, and birth control pills in particular, increased among sexually inactive women, suggesting that more women were able to start a method before becoming sexually active or use a method such as the pill for noncontraceptive reasons after implementation of the contraceptive coverage guarantee.[68]

36. There is also considerable empirical data from controlled experiments to confirm that the concept of removing cost as a barrier to women's contraceptive use is a major factor in reducing their risk for unintended pregnancy, and the abortions and unplanned births that would otherwise follow. For example, a study of more than 9,000 St. Louis-region women who were offered the reversible contraceptive method of their choice at no cost found that the number of abortions performed at St. Louis Reproductive Health Services declined by 21%.[69] Study participants' abortion rate was significantly lower than the rate in the surrounding St. Louis region, and less than half the national average.[70] Similarly, when access to both contraception and abortion increased in Iowa, the abortion rates actually declined.[71] Starting in 2006, the state expanded access to low- or no-cost family planning services through a Medicaid expansion and a privately

---

[66] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

[67] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

[68] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

[69] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012, 120(6):1291–1297.

[70] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012, 120(6):1291–1297.

[71] Biggs MA, Did increasing use of highly effective contraception contribute to declining abortions in Iowa? *Contraception,* 2015, 91(2):167–173.

funded initiative serving low-income women. Despite a simultaneous increase in access to abortion—the number of clinics offering abortions in the state actually doubled during the study period—the abortion rate dropped by over 20%.

### Expanding Exemptions Would Harm Women

37. The 2018 Final Rules or an injunction of the ACA's contraceptive coverage mandate would make it more difficult, once again, for those receiving insurance coverage through companies or schools that use the exemption (i.e., employees, students and dependents) to access the methods of contraception that are most acceptable and effective for them. That, in turn, would increase those women's risk of unintended pregnancy and interfere with their ability to plan and space wanted pregnancies. These barriers could therefore have considerable negative health, social and economic impacts for those women and their families.

38. Allowing employers or schools to exclude all contraceptive methods, services and counseling from insurance plans—or to cover some contraceptive methods, services and information but not others—would prevent women from selecting and obtaining the methods of contraception that will work best for them. For example, Hobby Lobby objected to providing four specific contraceptive methods, including copper and hormonal IUDs, which are among the most effective forms of pregnancy prevention and also have among the highest up-front costs.

39. Allowing employers to restrict access to the full range of contraceptive methods and to approve coverage only for those they deem acceptable would place inappropriate constraints on women who depend on insurance to obtain the methods best suited to their needs. Moreover, in the absence of coverage, the financial cost of obtaining a method, and the fact that some methods have higher costs than others, would incentivize women to select methods that are inexpensive, rather than methods that are best suited to their needs and that they are therefore most likely to use consistently and effectively (see 10–19, above).

40. Excluding coverage for some or all contraceptive methods, services and counseling could deny women the ability to obtain contraceptive counseling and services from their desired

provider at the same time they receive other primary and preventive care.[72,73] A woman going to her gynecologist for an annual examination, for example, may have to go to a different provider to be prescribed (or even discuss) contraception. This disjointed approach increases the time, effort and expense involved in getting needed contraception and interferes with her ability to obtain care from the provider of her choice.

41. Isolating contraceptive coverage in this way also would interfere with the ability of health care providers to treat women holistically. A woman's choice of contraception can be affected by her other medical conditions (e.g., diabetes, HIV, depression/mental health), and certain medications can significantly reduce the effectiveness of some methods of contraception, so a woman's chosen provider should be able to manage all health conditions and needs at the same time.[74,75]

42. To the extent that expanding the exemptions would burden women's contraceptive use in these ways, it would be harmful to women's health. Contraception allows women to avoid unintended pregnancies and to time and space wanted pregnancies, which has been demonstrated to improve women's health and that of their families. Specifically, pregnancies that occur too early in a woman's life or that are spaced too closely are associated with negative maternal health outcomes and/or adverse birth outcomes, including preterm birth, low birth weight, stillbirth, and early neonatal death.[76,77,78,79] Contraceptive use can also prevent preexisting health

[72] Leeman L, Medical barriers to effective contraception, *Obstetrics and Gynecology Clinics of North America,* 2007, 34(1):19–29.

[73] World Health Organization, Selected Practice Recommendations for Contraceptive Use, Third Ed., 2016, WHO: Geneva, Switzerland, http://apps.who.int/iris/bitstream/10665/252267/1/9789241565400-eng.pdf.

[74] Centers for Disease Control and Prevention, *US Medical Eligibility Criteria for Contraceptive Use, 2016,* https://www.cdc.gov/reproductivehealth/contraception/mmwr/mec/summary.html.

[75] Centers for Disease Control and Prevention, U.S. medical eligibility criteria for contraceptive use, 2010, *Morbidity and Mortality Weekly Report,* May 28, 2010, Vol. 59, https://www.cdc.gov/mmwr/pdf/rr/rr59e0528.pdf.

[76] Kavanaugh ML and Anderson RM, *Contraception and Beyond: The Health Benefits of Services Provided at Family Planning Centers,* New York: Guttmacher Institute, 2013, http://www.guttmacher.org/report/contraception-and-beyond-health-benefits-services-provided-family-planning-centers.

[77] Wendt A et al., Impact of increasing inter-pregnancy interval on maternal and infant health, Paediatric and Perinatal Epidemiology, 2012, 26(Suppl. 1):239–258.

[78] Conde-Agudelo A, Rosas-Bermúdez A and Kafury-Goeta AC, Birth spacing and risk of adverse perinatal outcomes: a meta-analysis, Journal of the American Medical Association, 2006, 295(15):1809–1823.

conditions from worsening and new health problems from occurring, because pregnancy can exacerbate existing health conditions such as diabetes, hypertension and heart disease.[80] Unintended pregnancy also affects women's mental health; notably, it is a risk factor for depression in adults.[81,82] For these reasons, the Centers for Disease Control and Prevention (CDC) included the development of and improved access to methods of family planning among the 10 great public health achievements of the 20th century.[83]

43. In the 2018 Final Rules, the government implies that there is debate about whether contraception may have negative health consequences that outweigh its benefits. In the previous interim final rules, the government implied that putative negative health consequences of contraception may outweigh its benefits. On the contrary, the government itself provides the oversight to ensure that the health benefits of contraception outweigh any potential negative consequences. Notably, the FDA's approval processes require that drugs and devices, including contraceptives, be proven safe and effective through rigorous controlled trials. In addition, the CDC publishes extensive recommendations to help clinicians and patients identify potential contraindications and decide which specific contraceptive methods are most appropriate for each patient's needs and health circumstances.[84,85] Medical experts, such as the American College of Obstetricians and Gynecologists, concur that contraception is safe and has clear health benefits that outweigh any potential risks.[86]

[79] Gipson JD, Koenig MA and Hindin MJ, The effects of unintended pregnancy on infant, child, and parental health: a review of the literature, *Studies in Family Planning,* 2008, 39(1):18–38.

[80] Lawrence HC, Testimony of American Congress of Obstetricians and Gynecologists, submitted to the Committee on Preventive Services for Women, Institute of Medicine, 2011, http://www.nationalacademies.org/hmd/~/media/8BA65BAF76894E9EB8C768C01C84380E.ashx.

[81] Herd P et al., The implications of unintended pregnancies for mental health in later life, *American Journal of Public Health,* 2016, 106(3):421–429.

[82] U.S. Preventive Services Task Force, Screening for depression in adults: recommendation statement, *American Family Physician,* 2016, 94(4):340A–340D, http://www.aafp.org/afp/2016/0815/od1.html.

[83] Centers for Disease Control and Prevention, Achievements in public health, 1900–1999: family planning, *Morbidity and Mortality Weekly Report,* 1999, 48(47): 1073–1080.

[84] Centers for Disease Control and Prevention, *US Medical Eligibility Criteria for Contraceptive Use, 2016,* https://www.cdc.gov/reproductivehealth/contraception/mmwr/mec/summary.html.

[85] Centers for Disease Control and Prevention, U.S. medical eligibility criteria for contraceptive use, 2010, *Morbidity and Mortality Weekly Report,* May 28, 2010, Vol. 59, https://www.cdc.gov/mmwr/pdf/rr/rr59e0528.pdf.

[86] Brief of *Amici Curiae,* American College of Obstetricians and Gynecologists, Physicians for Reproductive Health,

44. Expanding the exemptions to the contraceptive coverage requirement would also have negative social and economic consequences for women, families and society. By enabling them to reliably time and space wanted pregnancies, women's ability to obtain and effectively use contraception promotes their continued educational and professional advancement, contributing to the enhanced economic stability of women and their families.[87] Economic analyses have found positive associations between women's ability to obtain and use oral contraceptives and their education, labor force participation, average earnings and a narrowing of the gender-based wage gap.[88] Moreover, the primary reasons women give for why they use and value contraception are social and economic: In a 2011 study, a majority of women reported that access to contraception had enabled them to take better care of themselves or their families (63%), support themselves financially (56%), stay in school or complete their education (51%), or get or keep a job or pursue a career (50%).[89]

45. The government contends that expanding the exemption would not impose any real harm, suggesting that the women most at risk for unintended pregnancy are not likely to be covered by employer-based group health plans or by student insurance sponsored by a college or university. That argument is misleading. Low-income women, women of color and women aged 18–24 are at disproportionately high risk for unintended pregnancy,[90] and millions of these women rely on private insurance coverage—particularly following implementation of the ACA. In fact, from 2013 to 2017, the proportion of women overall and of women below the poverty level who were

---

American Academy of Family Physicians, American Nurses Association, et al., *Zubik v. Burwell,* 2016, http://www.scotusblog.com/wp-content/uploads/2016/02/Docfoc.com-Amicus-Brief-Zubik-v.-Burwell.pdf.
[87] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children,* New York: Guttmacher Institute, 2013, https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.
[88] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children,* New York: Guttmacher Institute, 2013, https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.
[89] Frost JJ and Lindberg LD, Reasons for using contraception: perspectives of U.S. women seeking care at specialized family planning clinics, 2012, *Contraception,* http://www.guttmacher.org/pubs/journals/j.contraception.2012.08.012.pdf.
[90] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.

uninsured dropped by more than one-third nationwide, declines driven by substantial increases in both Medicaid and private insurance coverage.[91] In addition, the ACA specifically expanded coverage for people aged 26 and younger, allowing them to remain covered as dependents on their parents' plans, regardless of whether the young woman is working herself or attending college or university.

### Medicaid, Title X and State Coverage Requirements Cannot Substitute for the Federal Contraceptive Coverage Guarantee

46. State and federal programs and laws—such as the Title X national family planning program, Medicaid, and state contraceptive coverage requirements—cannot replicate or replace the gains in access made by the contraceptive coverage guarantee. In the interim final rules, the government claimed that "[i]ndividuals who are unable to obtain contraception coverage through their employer-sponsored health plans because of the exemptions created in these interim final rules…have other avenues for obtaining contraception…."[92]

47. Many women who have the benefit of the ACA's contraceptive coverage mandate are not eligible for free or subsidized care under Title X. Title X provides no-cost family planning services to people living at or below 100% of the federal poverty level ($12,060 for a single person in 2017),[93] and provides services on a sliding fee scale between 100% and 250% of poverty; women above 250% of poverty must pay the full cost of care. By contrast, the federal contraceptive coverage guarantee eliminates out-of-pocket costs for contraception regardless of income.

48. Funding for Title X has not increased sufficiently for the program even to keep up with the increasing number of women in need of publicly funded care;[94] therefore, Title X cannot

---

[91] Guttmacher Institute, Gains in insurance coverage for reproductive-age women at a crossroads, *News in Context,* Dec. 4, 2018, https://www.guttmacher.org/article/2018/12/gains-insurance-coverage-reproductive-age-women-crossroads.

[92] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 82(197):47838–47862, https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf.

[93] Office of the Assistant Secretary for Planning and Evaluation, U.S. federal poverty guidelines used to determine financial eligibility for certain federal programs, 2017, https://aspe.hhs.gov/poverty-guidelines.

[94] Women in need of publicly funded contraceptive services are defined as those women who a) are younger than 20

sustain additional beneficiaries as a result of the 2018 Final Rules or an injunction of the ACA's contraceptive coverage mandate. From 2010 to 2014, even as the number of women in need of publicly funded contraceptive care grew by 5%, representing an additional one million women in need,[95] Congress cut funding for Title X by 10%.[96] With its current resources, Title X is able to serve only one-fifth of the nationwide need for publicly funded contraceptive care.[97] Still, the government has proposed diverting already insufficient Title X funding to help cover the cost of care for any women affected by the 2018 Final Rules,[98] an action that would inevitably hurt patients who rely on publicly funded services.

49. Similarly, many women who would lose private insurance coverage of contraception under the federal government's expanded exemption would not be eligible for Medicaid. Eligibility for Medicaid varies widely from state to state, particularly in states that have not expanded Medicaid eligibility under the ACA. In almost all of those states, nondisabled, nonelderly childless adults do not qualify for Medicaid at any income level, and eligibility for parents is as low as 18% of the federal poverty level in Alabama and Texas.[99] Several of these states have expanded eligibility specifically for family planning services to people otherwise ineligible for full-benefit Medicaid; those income eligibility levels also vary considerably.[100,101]

---

or are poor or low-income (i.e., have a family income less than 250% of the federal poverty level) and b) are sexually active and able to become pregnant but do not want to become pregnant. See Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[95] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[96] Department of Health and Human Services, Office of Population Affairs, Funding history, 2017, https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html.

[97] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[98] Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714, March 4, 2019.

[99] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2018, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

[100] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of December 2018),* 2018, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.

[101] Kaiser Family Foundation, Status of state action on the Medicaid expansion decision, 2018, State Health Facts, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-

Again, by contrast, the federal contraceptive coverage guarantee applies regardless of income. And because the U.S. Supreme Court has ruled that states cannot be compelled by the federal government to expand Medicaid eligibility, the federal government cannot rely on Medicaid to fill in gaps in coverage that would result from expanding the exemption.

50. The federal government's assertion in the 2018 Final Rules that Title X and Medicaid can replace or replicate the ACA's contraceptive coverage guarantee is additionally problematic given that the government itself is at the same time moving to undermine Title X and Medicaid. For example, the government's recent budget proposals have sought to exclude Planned Parenthood Federation of America and its affiliates from Title X, Medicaid and other federal programs,[102] and have called for massive cuts to Medicaid.[103] The Department of Health and Human Services has promulgated sweeping changes to Title X regulations that would undermine quality of care and access to providers,[104] and it has encouraged states to revamp their Medicaid programs in ways that would restrict program eligibility (e.g., by imposing work requirements) and thereby interfere with coverage and care.[105] The administration has strongly backed similar congressional proposals for cutting and limiting access to Title X and Medicaid.

51. In addition, the promulgated changes to Title X would make it even more unsuitable as a substitute for contraceptive coverage under the ACA. The recent rule for Title X removes the requirement that the contraceptive methods offered by a Title X provider be "medically approved."[106] At the same time, the rule encourages participation in Title X by entities that prioritize their own religious or moral beliefs over patient-centered care and by entities that offer

---

affordable-care-act/.

[102] Hasstedt K, Beyond the rhetoric: the real-world impact of attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* 2017, 20:86–91, https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

[103] Luhby T, Not even the White House knows how much it's cutting Medicaid, *CNN,* May 24, 2017, http://money.cnn.com/2017/05/24/news/economy/medicaid-budget-trump/index.html.

[104] Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714, March 4, 2019.

[105] Sonfield A, Efforts to transform the nature of Medicaid could undermine access to reproductive health care, *Guttmacher Policy Review,* 2017, 20:97–102, https://www.guttmacher.org/gpr/2017/10/efforts-transform-nature-medicaid-could-undermine-access-reproductive-health-care.

[106] Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714, March 4, 2019.

only a single contraceptive method (such as fertility awareness–based methods). These changes, if implemented, would shift the Title X program away from its mission of offering access to a broad range of family planning methods.[107]

52. Policymakers in many states have also restricted publicly funded family planning programs and providers, further undermining the ability of these programs to serve those affected by the expanded exemption.[108]

53. Neither can state-specific contraceptive coverage laws replicate or replace the increase in access to contraception provided by the ACA's contraceptive coverage guarantee. Twenty-one have no such laws at all.[109] Of the 29 states and the District of Columbia that do have contraceptive coverage requirements, only 10 currently bar copayments and deductibles for contraception (and another four states have new requirements not yet in effect). Additionally, the federal requirement limits the use of formularies and other administrative restrictions on women's use of contraceptive services and supplies, by making it clear that health plans may seek to influence a patient's choice only within a specific contraceptive method category (e.g., to favor one hormonal IUD over another) and not across methods (e.g., to favor the pill over the ring).[110] Few of the state laws include similar protections. Similarly, most of the state requirements do not specifically require coverage of all the distinct methods that the federal requirement encompasses. For example, only eight states currently require coverage of female sterilization, and few state laws make explicit distinctions between methods that some insurance plans have attempted to treat as interchangeable (such as hormonal versus copper IUDs, or the contraceptive patch versus the contraceptive ring).[111] Finally, state laws cannot regulate self-

---

[107] Hasstedt K, What the Trump Administration's Final Regulatory Changes Mean for Title X, *Health Affairs* Blog, March 4, 2019, https://www.guttmacher.org/article/2019/03/what-trump-administrations-final-regulatory-changes-mean-title-x.

[108] Gold RB and Hasstedt K, Publicly funded family planning under unprecedented attack, *American Journal of Public Health*, 2017, 107(12):1895–1897, http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2017.304124.

[109] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of December 2018)*, 2018, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[110] Department of Labor, FAQs about Affordable Care Act implementation (part XXVI), May 11, 2015, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxvi.pdf.

[111] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of December 2018)*,

insured employers at all, and those employers account for 60% of all workers with employer-sponsored health coverage.[112]

### State-Specific Impacts

54. An injunction of the ACA's contraceptive coverage mandate would have public health and fiscal consequences in states across the country. If unable to access contraception coverage through their employer or university, some lower-income women who meet the strict income requirements of public programs would rely on publicly funded services to access this beneficial service. Many women who lose or lack contraceptive coverage because their employer or university objects, however, would not meet the strict income and eligibility requirements of public programs, and if as a result they are not using their preferred or the most effective methods for them, or if cost forces them to forgo contraceptive use periodically or altogether, they would be at increased risk of unintended pregnancy. The costs of the resulting unintended pregnancies often then fall to the states because the federal government cannot or will not withstand these costs. An example of this impact is included below for Nevada. Data for all 50 states and the District of Columbia are included in a table as Exhibit B.

### Nevada

55. In Nevada, some women impacted by an injunction would not qualify for Medicaid or Title X because they would not meet the income eligibility requirements for coverage or subsidized care under these programs.

56. For example, in Nevada, childless adults and parents are eligible for full-benefit Medicaid only if they have incomes at or below 138% of the federal poverty level.[113] (Nevada has not

---

2018, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[112] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey,* Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.
[113] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2018, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

expanded Medicaid eligibility specifically for family planning services.[114]) This means that affected women who lose coverage as a result of an injunction may not be eligible.

57. As a result, some women would be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost would force them to forgo contraception use entirely.

58. Other women would be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way would interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

59. The increase in the number of women relying on publicly funded services would increase the strain on the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 194,000 women were in need of publicly funded family planning in Nevada, and the state's family planning network was able to only meet 10% of this need.[115]

60. Another indicator of the existing unmet need for contraception in Nevada is that substantial numbers of state residents experience unintended pregnancy each year. In 2010, 29,000 unintended pregnancies occurred among Nevada residents, a rate of 54 per 1,000 women aged 15–44.[116]

---

[114] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of December 2018),* 2018, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[115] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.
[116] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

61. Of those unintended pregnancies that ended in birth, 60% were paid for by Medicaid and other public insurance programs.[117] Unintended pregnancies cost the state approximately $37 million and the federal government approximately $66 million in 2010. An injunction is likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

62. In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of Nevada or its residents.

***

Ample evidence demonstrates that an injunction of the ACA's contraceptive coverage mandate would interfere with women's ability to identify and consistently use the contraceptive methods that would work best for them, thus putting them at heightened risk of unintended pregnancy and the health, social and economic harms that would result.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on the 22nd day of May, 2019, in New York, New York.

Kathryn Kost
Acting Vice President for Domestic Research
The Guttmacher Institute

---

[117] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

NV Exh B 0031

# EXHIBIT A

NV Exh B 0032

# Kathryn Kost

The Guttmacher Institute · 125 Maiden Lane · New York, NY 10038
(212) 248-1111 · kkost@guttmacher.org

## EDUCATION

**Princeton University**, Princeton, New Jersey
Ph.D., Sociology, 1990; Area of Specialization: Demography

**Reed College,** Portland, Oregon
Bachelor of Arts, Sociology, 1982

## PROFESSIONAL EXPERIENCE

**The Guttmacher Institute, New York, New York**
Acting Vice President of Domestic Research 2018 - present
Director of Domestic Research 2016-2018
Principal Research Scientist 2015-2016
Senior Research Associate, 1989-1998, 2009-2014
Consultant, 2004-2009

**Gynuity Health Projects, New York, New York**
Consultant, 2009

**Princeton University, Princeton, New Jersey**
Teaching Assistant, Introductory Statistics (graduate-level), Woodrow Wilson School, 1986-1987

**East-West Population Institute, Population Research Division, University of Hawaii, Honolulu, HI**
Research Intern, 1987

**Princeton University, Princeton, New Jersey**
Teaching Assistant, Introductory Statistics (graduate-level), Woodrow Wilson School, 1986

**National Academy of Sciences, Institute of Medicine, Washington, D.C.**
Research Intern, Committee on Contraceptive Development, 1986

**Princeton University, Princeton, New Jersey**
NICHD Trainee, Office of Population Research, 1985-1989

**American Health Foundation, New York, New York**
Head of Data Management, Division of Child Health, 1983-1985

## AREAS OF SPECIALIZATION

Sexual and Reproductive Health; Unintended Pregnancy and Childbearing; Pregnancy Surveillance and Statistics; Contraceptive Effectiveness.

## PEER-REVIEWED PUBLICATIONS

Sundaram A, Vaughan B, Kost K, Bankole A, Finer LB, Singh S. (2017). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health, 49(1)*:7-16.

Kavanaugh MK, Kost K, Frohwirth L, Maddow-Zimet I. (2016). Parent's experience of unintended childbearing: A qualitative study of factors that mitigate or exacerbate effects. *Social Science and Medicine,* 174:133-141.

Lindberg LD, Kost K, Maddow-Zimet I. (2016). The role of men's childbearing intentions in father involvement. *Journal of Marriage and Family*, *79(1)*:44-59.

Maddow-Zimet I, Lindberg LD, Kost K, and Lincoln A. (2016).  Are pregnancy intentions associated with transitions into and out of marriage? *Perspectives on Sexual and Reproductive Health*, 48(1):35–43, DOI: 10.1363/ 48e8116

Vlassoff M, Diallo A, Philbin J, Kost K, Bankole A. (2016) Cost-effectiveness of two interventions for the prevention of postpartum hemorrhage in Senegal. *International Journal of Gynecology & Obstetrics* online, DOI:10.1016/ j.ijgo.2015.10.015

Lindberg LD, Maddow-Zimet I, Kost K, Lincoln A. (2015). Pregnancy intentions and maternal and child health: An analysis of longitudinal data in Oklahoma. *Maternal and Child Health Journal*, *19(5)*:1087-96.

Kost K and Lindberg LD. (2014). Pregnancy Intentions, Maternal Behaviors and Infant Health: Investigating Relationships with New Measures and Propensity Score Analysis. *Demography*, 52(1):83-111.

Lindberg LD and Kost K. (2014) Exploring U.S. men's birth intentions, *Maternal and Child Health Journal*, 18(3): 625-633.

Kost K, Finer LB, Singh S, (2012) Variation in State Unintended Pregnancy Rates in the United States, Perspectives in Sexual and Reproductive Health, 44(1):57-64.

Kavanaugh MK, Jerman J, Hubacher D, Kost K and Finer LB. (2011). Characteristics of women in the United States who use long-acting reversible contraceptive methods, *Obstetrics & Gynecology*, 117(6):1349-1357.

Finer LB and Kost K. (2011). Unintended pregnancy rates at the state level, *Perspectives on Sexual and Reproductive Health*, 43(2):78–87.

Sonfield A, Gold RB, Kost K and Finer LB. (2011). The public costs of births from unintended pregnancies: national and state-level estimates, *Perspectives on Sexual and Reproductive Health*, 43(2):94–102.

Jones RK, Kost K, Singh S, Henshaw SK and Finer LB. (2009). Trends in abortion in the United States, Clinical Obstetrics and Gynecology, 52 (2):119–129.

Vaughan, B, Trussell J, Kost K, Singh S and Jones R, Discontinuation and resumption of contraceptive use: results from the 2002 National Survey of Family Growth, *Contraception*, 2008, 78(4): 271-283. PMCID: PMC2800035

Santelli J, Lindberg L, Finer LB, Rickert V, Bensyl D, Posner S, Makleff S, Kost K and Singh, S. Comparability of contraceptive prevalence estimates for women from the 2002 Behavioral Risk Factor Surveillance System, *Public Health Reports*, 2008, 123(2):147–154.

Kost K, Singh S, Vaughan B, Trussell J and Bankole A, Estimates of Contraceptive Failure from the 2002 National Survey of Family Growth, *Contraception*, 2008, 77(1):10-21. PMCID: PMC2811396

Jones RK and Kost K, Underreporting of induced and spontaneous abortion in the United States: an analysis of the 2002 National Survey of Family Growth, *Studies in Family Planning*, 2007, 38(3):187-197.

NV Exh B 0034

Kost K, Landry DJ, and Darroch JE, The effects of pregnancy planning status on birth outcomes and infant care, *Family Planning Perspectives*, 1998, 30(5):223-30.

Kost K, Landry DJ, and Darroch JE, Predicting maternal behaviors during pregnancy: does intention status matter? *Family Planning Perspectives*, 1998, 30(2):79-88.

Henshaw SK and Kost K, Abortion patients in 1994-1995: characteristics and contraceptive use, *Family Planning Perspectives*, 1996, 28(4):140-7, 158.

Kost K and Forrest JD, Intention status of U.S. births in 1988: differences by mothers' socioeconomic and demographic characteristics, *Family Planning Perspectives*, 1995, 27(1):11-7.

Kost K, The dynamics of contraceptive use in Peru, *Studies in Family Planning*, 1993, 24(2):109-19.

Kost K and Forrest JD, American women's sexual behavior and exposure to risk of sexually transmitted diseases. *Family Planning Perspectives*, 1992, 24(6):244-54.

Henshaw SK and Kost K, Parental involvement in minors' abortion decisions, *Family Planning Perspectives*, 1992, 24(5):196-207, 213.

Kost K and Amin S. Reproductive and socioeconomic determinants of child survival: confounded, interactive, and age-dependent effects, *Social Biology*, 1992, 39(1-2):139-50.

Kost K, Using the DHS calendar history of events to study the dynamics of contraceptive use. In: Demographic and Health Surveys World Conference, August 5-7, 1991, Washington, D.C.: proceedings. Volume 2. 1991. pp:837-856, Institute for Resource Development/ Macro International, Demographic and Health Surveys [DHS]: Columbia, Maryland.

Trussell J, Hatcher RA, Cates W, Stewart FH, and Kost K, A guide to interpreting contraceptive efficacy studies, *Obstetrics and Gynecology*, 1990, 76(3):558-67.

Harlap S, Kost K, and Forrest JD, Preventing pregnancy, Protecting health: a new look at birth control choices in the United States. ISBN 0-939253-21-6. 1991. 129 pp. Alan Guttmacher Institute: New York, New York

Kost K, Forrest JD, and Harlap S, Comparing the health risks and benefits of contraceptive choices, *Family Planning Perspectives*, 1991, 23(2):54-61.

Kost K, Contraceptive discontinuation in Peru: patterns and demographic implications. Pub. Order No. DA9026411. 1990. 227 pp. University Microfilms International: Ann Arbor, Michigan.

Zablan Z, Choe MK, Palmore JA, Ahmed T, Alcantara A, and Kost K, Contraceptive method choice in the Philippines, 1973-83. In: Dynamics of Contraceptive Use, edited by Amy O. Tsui and M. A. Herbertson. Journal of Biosocial Science, Supplement, No. 11, 1989. 61-74 pp. Parkes Foundation: Cambridge, England.

Trussell J, Hatcher RA., Cates W, Stewart FH, and Kost K, Contraceptive failure in the United States: an update, *Studies in Family Planning*, 1990, 21(1):51-54.

Trussell J, and Kost K, Contraceptive failure in the United States: a critical review of the literature, *Studies in Family Planning*, 1987, 18(5):237-283.

Walter HJ, Hofman A, Barrett LT, Connelly PA, Kost K, Walk EH, and Rebecca Patterson, "Primary Prevention of Cardiovascular Disease Among Children: Three-Year Results of a Randomized Intervention Trial," in B. Hetzel and G. S. Berenson, eds., *Cardiovascular Risk Factors in Childhood: Epidemiology and Prevention*, New York, NY: Elsevier Science Publishers B.V. (Biomedical Division), 1987.

Walter HJ, Hofman A, Barrett LT, Connelly PA, and Kost K, Coronary Heart Disease Prevention in Childhood: One-Year Results of a Randomized Intervention Study, *American Journal of Preventive Medicine*, 1986, 2(4):239-245.

NV Exh B 0035

Kathryn Kost                                                                                               12/4/2018

## GUTTMACHER PAPERS

Kost K, Maddow-Zimet I, Arpaia A., Pregnancies, Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2017.

Kost K and Maddow-Zimet I, U.S. Teenage Pregnancies, Births and Abortions, 2011: National Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2016.

Kost K and Maddow-Zimet I, U.S. Teenage Pregnancies, Births and Abortions, 2011: State Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2016.

Kost K, Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002, New York: Guttmacher Institute, 2015.

Kost K and Henshaw S, U.S. Teenage Pregnancies, Births and Abortions, 2010: National and State Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2014.

Sonfield A and Kost K, Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy and Infant Care: Estimates for 2008, New York: Guttmacher Institute, 2013.

Kost K, Unintended Pregnancy Rates at the State Level: Estimates for 2002, 2004, 2006 and 2008, New York: Guttmacher Institute, 2013.

Kost K and Henshaw S, U.S. Teenage Pregnancies, Births and Abortions, 2008: State Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2013.

Kost K and Henshaw S, U.S. Teenage Pregnancies, Births and Abortions, 2008: National Trends by Age, Race and Ethnicity, New York: Guttmacher Institute, 2012.

Kost K, Henshaw S and Carlin L, U.S. Teenage Pregnancies, Births and Abortions: National and State Trends and Trends by Race and Ethnicity, New York: Guttmacher Institute, 2010.

Henshaw SK and Kost K, Trends in the Characteristics of Women Obtaining Abortions, 1974 to 2004, New York: Guttmacher Institute, 2008.

## OTHER PUBLICATONS

Curtin SC, Abma JC, Kost K. Pregnancy rates for U.S. women continue to drop: an update. NCHS Health E-stat, November 2015. Available at: http://www.cdc.gov/nchs/data/hestat/pregnancy/rates_1990_2010.

## HONORS, AWARDS AND FELLOWSHIPS

East-West Center, University of Hawaii, Summer Fellowship (1987)

## PROFESSIONAL ASSOCIATIONS

Population Association of America
American Sociological Association
PRAMS Steering Committee, New York City Department of Health & Mental Hygiene
Editorial Board, International Journal of Population Research
Full Fellow, Society of Family Planning
Member, Social Science and Population Studies Review Panel, National Institutes of Health (2012-2015)

4

NV Exh B 0036

# EXHIBIT B

NV Exh B 0037

**Exhibit B: State-Specific Data on Impact**

| | Medicaid eligibility, as % of federal poverty level (as of January 2018) | | | Women needing publicly supported contraceptive services and supplies, 2014 | | Unintended pregnancies, 2010 | | % of unplanned births paid for by public insurance programs, 2010 | Public costs for unintended pregnancies, 2010 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Childless adults | Parents | Family planning specific | Number | % of need met by publicly supported providers | Number | Rate per 1,000 women 15–44 | | State (in millions) | Federal (in millions) |
| Alabama | — | 18% | 146% | 332,750 | 31% | 46,000 | 48 | 61.6% | $72.6 | $250.5 |
| Alaska | 138% | 139% | — | 41,200 | 63% | 8,000 | 54 | 64.3% | 42.9 | 70.8 |
| Arizona | 138% | 138% | — | 465,450 | 15% | 61,000 | 49 | 64.6% | 161.5 | 509.4 |
| Arkansas | 138% | 138% | — | 204,850 | 29% | 29,000 | 50 | 72.3% | 61.9 | 266.8 |
| California | 138% | 138% | 200% | 2,643,580 | 50% | 393,000 | 50 | 64.3% | 689.3 | 1,062.1 |
| Colorado | 138% | 138% | — | 326,490 | 38% | 43,000 | 42 | 63.8% | 91.1 | 146.1 |
| Connecticut | 138% | 138% | 263% | 183,070 | 38% | 32,000 | 46 | 60.8% | 80.1 | 128.4 |
| Delaware | 138% | 138% | — | 50,100 | 30% | 11,000 | 62 | 71.3% | 36.0 | 58.2 |
| District of Columbia | 215% | 221% | — | 44,910 | 84% | 10,000 | 58 | 84.6% | 13.3 | 50.9 |
| Florida | — | 33% | — | 1,216,520 | 17% | 207,000 | 58 | 70.6% | 427.1 | 892.8 |
| Georgia | — | 36% | 200% | 695,120 | 16% | 119,000 | 57 | 80.5% | 229.7 | 687.7 |
| Hawaii | 138% | 138% | — | 73,090 | 25% | 16,000 | 61 | 49.9% | 37.8 | 76.7 |
| Idaho | — | 26% | — | 113,020 | 21% | 12,000 | 38 | 60.4% | 18.5 | 70.2 |
| Illinois | 138% | 138% | — | 772,510 | 20% | 128,000 | 49 | 78.3% | 352.2 | 571.5 |
| Indiana | 139% | 139% | 146% | 446,230 | 19% | 55,000 | 43 | 64.6% | 91.4 | 284.6 |
| Iowa | 138% | 138% | — | 190,270 | 29% | 23,000 | 39 | 61.5% | 48.3 | 127.6 |
| Kansas | — | 38% | — | 188,100 | 17% | 24,000 | 43 | 47.2% | 50.4 | 115.7 |
| Kentucky | 138% | 138% | — | 284,530 | 24% | 34,000 | 40 | 66.8% | 75.0 | 302.8 |
| Louisiana | 138% | 138% | 138% | 321,480 | 15% | 53,000 | 57 | 78.7% | 120.6 | 530.4 |
| Maine | — | 105% | 214% | 78,880 | 33% | 9,000 | 37 | 74.7% | 14.6 | 43.6 |
| Maryland | 138% | 138% | 200% | 298,190 | 25% | 71,000 | 60 | 58.2% | 180.9 | 285.4 |
| Massachusetts | 138% | 138% | — | 373,060 | 25% | 54,000 | 40 | 56.4% | 138.3 | 219.6 |
| Michigan | 138% | 138% | — | 635,660 | 16% | 93,000 | 49 | 71.9% | 177.0 | 485.1 |
| Minnesota | 138% | 138% | 200% | 294,680 | 29% | 38,000 | 36 | 66.7% | 128.7 | 203.9 |
| Mississippi | — | 27% | 199% | 213,930 | 28% | 35,000 | 57 | 81.9% | 40.4 | 226.7 |
| Missouri | — | 22% | — | 391,510 | 18% | 54,000 | 46 | 72.2% | 132.6 | 385.9 |
| Montana | 138% | 138% | 216% | 66,380 | 41% | 7,000 | 42 | 47.8% | 9.1 | 31.7 |
| Nebraska | — | 63% | — | 118,170 | 20% | 14,000 | 41 | 63.1% | 41.7 | 91.9 |
| Nevada | 138% | 138% | — | 194,430 | 10% | 29,000 | 54 | 60.0% | 37.1 | 65.8 |
| New Hampshire | 138% | 138% | 201% | 65,530 | 29% | 8,000 | 32 | 52.7% | 10.3 | 16.5 |
| New Jersey | 138% | 138% | — | 455,260 | 22% | 97,000 | 56 | 52.4% | 186.1 | 291.0 |
| New Mexico | 138% | 138% | 255% | 151,950 | 28% | 22,000 | 56 | 77.1% | 47.9 | 191.2 |
| New York | 138% | 138% | 223% | 1,227,170 | 32% | 246,000 | 61 | 70.2% | 601.1 | 937.7 |
| North Carolina | — | 43% | 200% | 667,910 | 20% | 95,000 | 49 | 74.8% | 214.7 | 643.5 |
| North Dakota | 138% | 138% | — | 44,180 | 26% | 5,000 | 41 | 36.8% | 7.7 | 17.9 |
| Ohio | 138% | 138% | — | 730,110 | 14% | 109,000 | 49 | 68.7% | 218.8 | 605.8 |
| Oklahoma | — | 45% | 138% | 256,880 | 31% | 36,000 | 49 | 80.7% | 77.0 | 254.0 |
| Oregon | 138% | 138% | 250% | 270,990 | 39% | 31,000 | 41 | 69.9% | 47.2 | 122.7 |
| Pennsylvania | 138% | 138% | 220% | 745,550 | 29% | 115,000 | 47 | 53.5% | 248.2 | 478.6 |
| Rhode Island | 138% | 138% | — | 71,320 | 35% | 9,000 | 43 | 70.1% | 27.5 | 48.7 |
| South Carolina | — | 67% | 199% | 323,140 | 31% | 42,000 | 46 | 78.6% | 84.0 | 327.3 |
| South Dakota | — | 50% | — | 52,610 | 27% | 7,000 | 46 | 46.2% | 14.4 | 35.0 |
| Tennessee | — | 98% | — | 434,440 | 26% | 62,000 | 49 | 73.7% | 130.7 | 400.0 |
| Texas | — | 18% | — | 1,795,160 | 10% | 298,000 | 56 | 73.7% | 842.6 | 2,056.8 |
| Utah | — | 60% | — | 207,350 | 22% | 24,000 | 40 | 53.3% | 30.4 | 127.6 |
| Vermont | 138% | 138% | — | 35,810 | 59% | 4,000 | 36 | 73.5% | 9.6 | 21.8 |
| Virginia | — | 38% | 205% | 447,970 | 17% | 84,000 | 51 | 45.4% | 194.6 | 312.0 |
| Washington | 138% | 138% | 260% | 429,300 | 26% | 61,000 | 45 | 63.1% | 177.1 | 290.7 |
| West Virginia | 138% | 138% | — | 110,910 | 47% | 15,000 | 43 | 76.0% | 24.9 | 120.5 |
| Wisconsin | 100% | 100% | 306% | 353,620 | 22% | 42,000 | 38 | 62.0% | 92.1 | 221.4 |
| Wyoming | — | 55% | — | 34,630 | 30% | 4,000 | 42 | 67.4% | 21.3 | 34.1 |

*Sources:* References 113–117.

December 2018

# FAQs About Affordable Care Act Implementation Part 36



U.S. Department of Labor
Employee Benefits Security Administration
January 9, 2017

Set out below is an additional Frequently Asked Question (FAQ) regarding implementation of the Affordable Care Act. This FAQ has been prepared jointly by the Departments of Labor (DOL), Health and Human Services (HHS), and the Treasury (collectively, the Departments). Like previously issued FAQs (available at www.dol.gov/ebsa/healthreform/index.html and www.cms.gov/cciio/resources/fact-sheets-and-faqs/index.html), this FAQ answers a question from stakeholders to help people understand the law and benefit from it, as intended.

## COVERAGE OF PREVENTIVE SERVICES

Section 2713 of the Public Health Service Act (PHS Act), as added by the Affordable Care Act and incorporated into the Employee Retirement Income Security Act (ERISA) and the Internal Revenue Code (the Code), requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide coverage of certain specified preventive services without cost sharing.

As originally drafted, the bill that became the Affordable Care Act would not have covered additional preventive services that "many women's health advocates and medical professionals believe are critically important" to meeting women's unique health needs. 155 Cong. Rec. 28,841 (2009) (Sen. Boxer). To address that concern, the Senate adopted a "Women's Health Amendment," adding a new category of preventive services specific to women's health. This provision requires coverage without cost sharing of preventive care and screenings for women provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA). Supporters of the Women's Health Amendment emphasized that it would reduce unintended pregnancies by ensuring that women receive coverage for "contraceptive services" without cost-sharing. 155 Cong. Rec. at 29,768 (Sen. Durbin).[1]

On August 1, 2011, the Departments issued amended regulations requiring coverage of women's preventive services provided for in the HRSA guidelines,[2] and HRSA adopted and released such guidelines, which were based on recommendations of the independent organization, the National Academy of Medicine (formerly Institute of Medicine).[3] The preventive services identified in the HRSA guidelines include all Food and Drug Administration (FDA)-approved contraceptives, sterilization

---

[1] *See also, e.g.*, 155 Cong. Rec. at 28,841 (Sen. Boxer) ("family planning services"); *id*. at 28,843 (Sen. Gillibrand) ("family planning"); *id*. at 28,844 (Sen. Mikulski) (same); *id*. at 28,869 (Sen. Franken) ("contraception"); *id*. at 29,070 (Sen. Feinstein) ("family planning services"); id. at 29,307 (Sen. Murray) (same).

[2] 26 CFR 54.9815-2713, 29 CFR 2590.715-2713, 45 CFR 147.130.

[3] The 2011 amended regulations were issued and effective on August 1, 2011, and published on August 3, 2011 (76 FR 46621).

NV Exh C 0039

procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[4]  Under the regulations issued in August 2011 and the contemporaneously issued HRSA guidelines, group health plans of "religious employers" (organizations that are organized and operate as nonprofit entities and are referred to in section 6033(a)(3)(A)(i) or (iii) of the Code) are exempt from the requirement to provide contraceptive coverage.  That exemption reflects "the longstanding governmental recognition of a particular sphere of autonomy for houses of worship."  80 FR 41318, 41325 (July 15, 2015); see 26 U.S.C.  6033(a)(3)(A)(i) or (iii) (referring to "churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order").

Subsequently, on July 2, 2013, the Departments published regulations that provide an accommodation for eligible organizations[5] that object on religious grounds to providing coverage for contraceptive services, but are not eligible for the exemption for religious employers (78 FR 39870).[6] Under the accommodation, an eligible organization is not required to contract, arrange, pay, or provide a referral for contraceptive coverage.  At the same time, the accommodation generally ensures that women enrolled in the health plan established by the eligible organization, like women enrolled in health plans maintained by other employers, receive contraceptive coverage seamlessly—that is, through the same issuers or third party administrators that provide or administer the health coverage furnished by the eligible organization, and without financial, logistical, or administrative obstacles.[7]  Minimizing such obstacles is essential to achieving the purpose of the Affordable Care Act's preventive services provision, which seeks to remove barriers to the use of preventive services and to ensure that women receive full and equal health coverage appropriate to their medical needs.

In Burwell v.  Hobby Lobby Stores, Inc., 134 S.  Ct.  2751 (2014), which addressed claims brought under the Religious Freedom Restoration Act (RFRA), the Supreme Court held that the contraceptive-coverage requirement substantially burdened the religious exercise of the closely held for-profit corporations that had religious objections to providing contraceptive coverage, and that the accommodation was a less restrictive means of providing coverage to their employees.  In light of the Hobby Lobby decision, the Departments extended the accommodation to closely held for-profit entities.[8]

---

[4]  On December 20, 2016, HRSA updated the women's preventive services guidelines, which go into effect for non-grandfathered group health plans and health insurance coverage for plan years (in the individual market, policy years) beginning on or after December 20, 2017.  The HRSA guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and male condoms.

[5]  An eligible organization, which may seek the accommodation based on its sincerely held religious objection to providing contraceptive coverage, is defined at 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a), and 45 CFR 147.131(b),

[6]  26 CFR 54.9815-2713A, 29 CFR 2590.715-2713A, 45 CFR 147.131.

[7]  An accommodation is also available with respect to student health insurance coverage arranged by eligible organizations that are institutions of higher education. 45 CFR 147.131(f).  For ease of use, this FAQ refers only to "employers" with religious objections to the contraceptive-coverage requirement, but references to employers with respect to insured group health plans should also be considered to include institutions of higher education that are eligible organizations with respect to student health insurance coverage.

[8]  26 CFR 54.9815-2713A(b)(2)(ii); 29 CFR 2590.715-2713A(b)(2)(ii); 45 CFR. 147.131(b)(2)(ii).

3

Under the accommodation, an eligible organization that objects to providing contraceptive coverage for religious reasons may either:

> (1) self-certify its objection to its health insurance issuer (to the extent it has an insured plan) or third party administrator (to the extent it has a self-insured plan) using a form provided by the Department of Labor (EBSA Form 700);[9] or

> (2) self-certify its objection and provide certain information to HHS without using any particular form.[10]

In *Zubik* v. Burwell, 136 S. Ct. 1557 (2016), the Supreme Court considered claims by a number of employers that, even with the accommodation provided in the regulations, the contraceptive-coverage requirement violates RFRA. Following oral argument, the Court issued an order requesting supplemental briefing from the parties. The Court's order noted that under the existing regulations, an objecting employer with an insured plan that seeks to invoke the accommodation by contacting its issuer must use a form of written notice stating that the employer objects on religious grounds to providing contraceptive coverage.[11] The Court directed the parties to file supplemental briefs addressing "whether contraceptive coverage could be provided to [the objecting employers'] employees, through [the employers'] insurance companies, without any such notice."[12] After consideration of the supplemental briefing, the Supreme Court vacated the judgments of the lower courts and remanded *Zubik* and several other cases raising parallel RFRA challenges to the accommodation. 136 S. Ct. at 1560-1561. The Court emphasized that it "expresse[d] no view on the merits of the cases" and, in particular, that it did not "decide whether [the employers'] religious exercise has been substantially burdened, whether the Government has a compelling interest, or whether the current regulations are the least restrictive means of serving that interest." Id. at 1560. The Court, however, stated that in light of what it viewed as "the substantial clarification and refinement in the positions of the parties" in their supplemental briefs, the parties "should be afforded an opportunity to arrive at an approach going forward that accommodates [the objecting employers'] religious exercise while at the same time ensuring that women covered by [the employers'] health plans 'receive full and equal health coverage, including contraceptive coverage.'" Id. (citation omitted).[13]

---

[9] The EBSA Form 700 serves as a certification that the organization is an "eligible organization" (as described in 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a), and 45 CFR 147.131(b)) that has a religious objection to providing coverage for some or all of any contraceptive services that would otherwise be required to be covered. The EBSA Form 700 is available at: https://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf.

[10] A model notice to HHS that eligible organizations may use, but are not required to use, is available at: http://www.cms.gov/cciio/resources/Regulations-and-Guidance/index.html#Prevention.

[11] *Zubik v. Burwell*, Nos. 14-1418 et al., 2016 WL 1203818, at °2 (Mar. 29, 2016).

[12] *Id.*

[13] The Supreme Court specified that, while the RFRA litigation remains pending, "the Government may not impose taxes or penalties on [the plaintiffs] for failure to provide the ... notice" required under the existing accommodation regulations. *Zubik*, 136 S. Ct. at 1561. At the same time, the Court also emphasized that "[n]othing in [its] opinion, or in the opinions or orders of the courts below, is to affect the ability of the Government to ensure that women covered by [plaintiffs'] health plans 'obtain, without cost, the full range of FDA approved contraceptives.'" *Id.* at 1560-1561 (quoting *Wheaton College v. Burwell*, 134 S. Ct. 2806, 2807 (2014)).

On July 22, 2016, the Departments published a request for information (RFI) (81 FR 47741) seeking input from interested parties to determine, as contemplated by the Supreme Court's opinion in *Zubik*, whether modifications to the existing accommodation procedure could resolve the objections asserted by the plaintiffs in the pending RFRA cases, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage.

The Departments explained that they were using the RFI procedure because the issues addressed in the supplemental briefing in *Zubik* affect a wide variety of stakeholders, including many who are not parties to the cases that were before the Supreme Court. Other employers also have brought RFRA challenges to the accommodation, and their views may differ from the views held by the employers in *Zubik* and the consolidated cases. In addition, any change to the accommodation could have implications for the rights and obligations of issuers, group health plans, third party administrators, and women enrolled in health plans established by objecting employers. The RFI was intended to assist the Departments in determining whether there are modifications to the accommodation that would be available under current law and that could resolve the pending RFRA claims brought by objecting organizations. The Departments sought feedback from all interested stakeholders, including objecting organizations, and specifically requested that such organizations address the particular issues outlined in the RFI.

In response to the RFI, the Departments received over 54,000 public comments by the comment closing date of September 20, 2016. Commenters included the plaintiffs in *Zubik* and other religiously affiliated organizations, consumer advocacy groups, women's organizations, health insurance issuers, third party administrators and pharmaceutical benefit managers, other industry representatives, employers, members of the public, and other interested stakeholders.[14] The Departments are issuing this FAQ after consideration of comments submitted by a broad array of stakeholders, including the *Zubik* plaintiffs and similar religious organizations, issuers or third party administrators, and commenters representing women's and consumer advocacy organizations.

## Q: ARE THE DEPARTMENTS MAKING CHANGES TO THE ACCOMMODATION AT THIS TIME?

No. As described in more detail below, the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage. The comments demonstrate that a process like the one described in the Court's supplemental briefing order would not be acceptable to those with religious objections to the contraceptive-coverage requirement. Further, a number of comments illustrate that the administrative and operational challenges to a process like the one described in the Court's order are more significant than the Departments had previously understood and would potentially undermine women's access to full and equal coverage. For these reasons, the Departments are not modifying the accommodation regulations at this time.

As the government explained in its briefs in *Zubik*, the Departments continue to believe that the existing accommodation regulations are consistent with RFRA for two independent reasons. First, as eight of the nine courts of appeals to consider the issue have held, by virtue of objecting employers'

---

[14] The public comments are accessible at https://www.regulations.gov/docket?D=CMS-2016-0123.

NV Exh C 0042

ability to avail themselves of the accommodation, the contraceptive-coverage requirement does not substantially burden their exercise of religion. Second, as some of those courts have also held, the accommodation is the least restrictive means of furthering the government's compelling interest in ensuring that women receive full and equal health coverage, including contraceptive coverage.

## NOTIFICATION TO ISSUERS WITHOUT SELF-CERTIFICATION

In its request for supplemental briefing in *Zubik*, the Supreme Court asked the parties to address "whether and how contraceptive coverage may be obtained by [objecting employers'] employees through [the employers'] insurance companies, but in a way that does not require any involvement of [the employers] beyond their own decision to provide health insurance without contraceptive coverage to their employees."[15] Specifically, the Court described—

> a situation in which [objecting employers] would contract to provide health insurance for their employees, and in the course of obtaining such insurance, inform their insurance company that they do not want their health plan to include contraceptive coverage of the type to which they object on religious grounds. [The employers] would have no legal obligation to provide such contraceptive coverage, would not pay for such coverage, and would not be required to submit any separate notice to their insurer, to the Federal government, or to their employees. At the same time, [the employers'] insurance compan[ies]—aware that [the employers] are not providing certain contraceptive coverage on religious grounds— would separately notify [the employers'] employees that the insurance company will provide cost-free contraceptive coverage, and that such coverage is not paid for by [the employers] and is not provided through [the employers'] health plan[s].[16]

The Departments sought comments on whether this alternative would be acceptable to objecting organizations, and if not, whether further procedures or systems could resolve their RFRA concerns. The Departments asked if organizations specifically object on RFRA grounds to informing their issuers that they object to contraceptive coverage "on religious grounds," or to a requirement that the request by an eligible organization to its issuer be made in writing or through use of a particular form. The Departments also sought comments on whether it would be feasible for issuers to implement the accommodation without the written notification requirement and what effect this alternative procedure would have on the access of women to seamless contraceptive coverage.

In light of the comments received, the Departments have determined not to amend the regulations at this time. On the one hand, comments from parties before the Supreme Court (and other objecting employers) do not suggest that the change identified by the Supreme Court would resolve their concerns. On the other hand, the Departments received comments stating that eliminating written notification would create significant administrative problems and potential legal liabilities for issuers, and would hinder women's access to care. As described in greater detail below, these comments

---

[15] *Zubik*, 2016 WL 1203818, at *2.
[16] *Id.*

6

have shown that the elimination of the written notification requirement would raise complications that would undermine the statute's goal of ensuring full and equal health coverage for women, the extent of which were not known to the Departments at the time the government filed its supplemental briefs in *Zubik*.

First, comments on behalf of issuers stated that eliminating written notifications would impose administrative costs by forcing them to create new systems to distinguish and track different employers, employees, and the coverage to be provided.[17] For example, commenters stated that issuers currently rely on the written notifications to track the differences between eligible organizations that are seeking an accommodation due to their religious objections -- organizations that the Supreme Court has said are "effectively exempt" from the contraceptive-coverage requirement – and religious employers that are automatically exempt under the HRSA guidelines. These comments asserted that eliminating written notifications would burden issuers with creating new systems to distinguish and track these two categories of employers.

Given the different ways in which issuers must treat and respond to these two types of entities, the Departments understand that issuers must be able to easily and separately track the coverage issued to the plans sponsored by these different organizations. With respect to exempt organizations, issuers merely need to eliminate contraceptive benefits from the group health insurance policy. However, with respect to eligible organizations that avail themselves of the accommodation, issuers must take the additional step of making separate payments for contraceptive services, along with providing notice of the availability of such payments. Furthermore, some eligible organizations may object to covering all forms of contraceptive services in their group health coverage while others may object only to certain types of contraceptive services. The Departments conclude therefore that written notification from employers significantly improves issuers' ability to appropriately identify and administer coverage for each of these two categories of employers. The commenters also said that issuers might be subject to legal risks if written notification were eliminated, because they would have no written record to demonstrate compliance with applicable law and regulations to the extent they relied on an organization's oral representation of its eligibility for the accommodation that was later determined to be incorrect. Such legal risks would be magnified, according to the commenters, in circumstances in which issuers would have to rely on agents and brokers to verify eligibility.

Based on these concerns, comments indicated that, even without a legal requirement to use a required form, issuers would likely seek written documentation, such as an attestation, from objecting employers to confirm the employer's eligibility as a condition of administering the accommodation. For example, an issuer might demand written documentation as a pre-condition for entering into a contract with an organization seeking the accommodation. The commenters indicated that if the written notification requirement were eliminated, employers might object to providing this type of verification, which is currently commonplace for certain purposes, such as communicating grandfathered status. The Departments note that, under the current accommodation,

---

[17] Related to these comments with respect to the administrative costs of distinguishing and tracking different coverage to be provided, the Departments note that an eligible organization may seek an accommodation so that it need not contract, arrange, pay, or provide a referral for *all* otherwise required contraceptive services, or any subset of such services. Thus, there could be many different combinations of contraceptive services that an issuer must cover, and within each such combination, some such benefits must be provided by the group health insurance policy, and others for which the issuer must make separate payments.

once an issuer has been provided the documentation specified in the accommodation regulations, it may not require any further documentation from an eligible organization regarding its status as such.[18]

Second, several commenters suggested that the lack of written notice would create confusion and miscommunication, which in turn would lead to disputes between the parties, billing problems, and reduced access to care for women. For example, comments from women's advocacy organizations stated that lack of written notice could have repercussions for processing payments to a provider. This could disrupt continuity of care and burden women seeking to resolve any miscommunication between the objecting entity and the issuer. Further, according to these commenters, it could also impose the additional burden of affected women having to affirmatively assert their eligibility in situations where an employer has not timely provided its oral objection.

One commenter stated that, without a written notification, an eligible employer's representative may misstate an employer's wishes or incorrectly assert eligibility for the accommodation, resulting in a dispute that delays the process of arranging contraceptive coverage for women.

Several commenters representing women's and consumer advocacy organizations stressed the importance of written documentation for verifying compliance and ensuring that women are able to obtain direct, continuous access to the full range of contraceptive methods without cost. These commenters also suggested that eliminating written documentation could hamper the Departments' oversight and enforcement efforts.

Third, as noted above, the Departments have not identified any comments from objecting employers, including any of the *Zubik* plaintiffs, stating that eliminating the written notification requirement would be sufficient to satisfy their RFRA concerns. For example, one comment indicate that employers would object to "any requirement . . . that has the purpose or effect of providing access to or increasing the use of contraceptive services."

The Departments agree that written documentation establishing that a given employer requested the accommodation, and that it satisfies the definition of an eligible organization, is of value to document the legal responsibilities and rights of employees, issuers, and beneficiaries, as well as to minimize the number of disputes between employers and issuers regarding the accommodation. In turn, the Departments conclude that, by minimizing such disputes and providing certainty regarding which organizations have and have not requested the accommodation, the written notice requirement minimizes the potential number of employers that will be in violation of the contraceptive-coverage requirement. By helping to define which organizations have and have not availed themselves of the accommodation, written documentation also ensures that women receive timely access to contraceptive coverage, as it will help issuers to quickly and effectively determine the appropriate source of payment for such services, i.e., payment through the group health insurance policy, or separate payment for contraceptive services. And as the government explained in its Supreme Court briefs, the regulatory requirement for eligible organizations to provide written notification of their objection is consistent with RFRA.

---

[18] 26 CFR 54.8815-2713A(c)(1)(i), 29 CFR 2590.715-2713A(c)(1)(i), 45 CFR 147.131(c)(1)(i).

## OTHER APPROACHES WITH RESPECT TO INSURED PLANS DESCRIBED IN THE SUPPLEMENTAL BRIEFING

The *Zubik* plaintiffs proposed that when an eligible employer with an insured plan requests insurance coverage that excludes contraceptive coverage to which it objects on religious grounds, the employer's issuer should be required to provide the required coverage through separate insurance policies that cover only contraceptives and in which women should have to affirmatively enroll. Pet. Supp. Br. 3-12.[19] The Departments sought comments on whether this alternative procedure would resolve the RFRA claims of objecting organizations; whether it would be feasible for health insurance issuers and consistent with State insurance laws; what effect this approach would have on the ability of women enrolled in group health plans established by objecting employers to obtain seamless coverage for contraceptive services; and whether there might be alternatives other than contraceptive-only policies or affirmative enrollment requirements that would resolve the RFRA objections of objecting organizations.

In response to the RFI, objecting employers argued that to be truly independent, contraceptive coverage must be provided to women enrolled in health plans of objecting employers through separate insurance policies. The Departments identified no comments indicating that eliminating written notification by itself would be sufficient. In fact, several commenters stated that, even if the government were to eliminate the written notice requirement, the accommodation would have to be modified in other ways to satisfy their concerns. One commenter, quoting from the petitioners' brief in *Zubik*, stated that there must be an enrollment process that is distinct from (and not an automatic consequence of) enrolling in the employer's plan. Another commenter stated that the issuer or third party administrator should be required to provide eligible participants and beneficiaries with a separate enrollment card for contraceptive coverage that would require activation by each participant or beneficiary. The commenter stated that this should replace the current requirement that participants automatically receive coverage for contraceptive services. (For further discussion of this issue, see section below titled "Separate Enrollment Cards and Activation.")

A number of commenters emphasized the significant problems posed by requiring separate contraceptive-only coverage. Commenters identified several obstacles under State contract and insurance law. Comments submitted on behalf of issuers asserted that some State insurance regulators do not have authority under State law to approve single-benefit policies (other than dental or vision). The commenters also explained that cost-free contraception policies would not satisfy laws conditioning policy approval on a "reasonable premium" or constitute valid contracts because the prospective policyholder would not provide consideration. In addition, they commented that under State licensure laws, issuers that sell group coverage could not offer contraceptive-only policies to individual women because they are not licensed to offer coverage in the individual market and that State laws would prevent issuers licensed to issue group coverage in one State from issuing individual policies to employees of an eligible organization residing in other States.

---

[19] As of the date of publication of this FAQ, petitioners' supplemental brief is available at http://www.scotusblog.com/wp-content/uploads/2016/04/Non-profits-response-to-Zubik-order-4-12-16.pdf. Petitioners' supplemental reply brief is available at http://www.scotusblog.com/wp-content/uploads/2016/04/Zubik-order-non-profits-reply-brief-4-20-161.pdf.

NV Exh C 0046

In addition, several commenters stated that separate contraceptive coverage policies may have a different provider network from that of the group health plan that provides the women's other health benefits, which would mean that the separate contraceptive policies would not necessarily include women's regular doctors.  One commenter stated that it would be costly and administratively burdensome for issuers to develop and implement new eligibility, enrollment, and claims-adjudication systems for contraception-only coverage, as they would differ from their existing systems.  Several commenters also maintained that requiring women to seek out separate contraceptive coverage would create the same barriers in access that the Affordable Care Act's preventive services provision was designed to eliminate.  The Departments agree these approaches would potentially undermine women's access to full and equal coverage, contrary to the statutory objective of reducing barriers to the use of important preventive services.

## SELF-INSURED PLANS

The Supreme Court's supplemental briefing order in *Zubik* addressed only employers with "insured plans."[20]  In its supplemental brief, the government described the operation of the accommodation for self-insured plans and explained that an alternative process like the one the Court posited for insured plans could not work for the many employers with self-insured plans:

> If an employer has a self-insured plan, the statutory obligation to provide contraceptive coverage falls only on the plan—there is no insurer with a preexisting duty to provide coverage.  Accordingly, to relieve self-insured employers of any obligation to provide contraceptive coverage while still ensuring that the affected women receive coverage without the employer's involvement, the accommodation establishes a mechanism for the government to designate the employer's TPA [third party administrator] as a 'plan administrator' responsible for separately providing the required coverage under [ERISA].  That designation is made by the government, not the employer, and the employer does not fund, control, or have any other involvement with the separate portion of the ERISA plan administered by the TPA.

> The government's designation of the TPA must be reflected in a written plan instrument.  To satisfy that requirement, the accommodation relies on either (1) a written designation sent by the government to the TPA, which requires the government to know the TPA's identity, or (2) the self-certification form, which the regulations treat as a plan instrument in which the government designates the TPA as a plan administrator.  There is no mechanism for requiring TPAs to provide separate contraceptive coverage without a plan instrument; self-insured employers could not opt out of the contraceptive-coverage requirement by simply informing their TPAs that they do not want to provide coverage for contraceptives.  Gov't Supp. Br. 16-17 (citations omitted).

---

[20] *Zubik*, 2016 WL 1203818, at *2.

NV Exh C 0047

The *Zubik* plaintiffs also stated that an arrangement like the one posited in the Supreme Court's briefing order for insured plans could not work for self-insured plans. See Pet. Supp. Br. 16-17.

The RFI sought comment on any possible modifications to the current accommodation for self-insured plans, including self-insured church plans, which would resolve objecting organizations' RFRA objections while still providing women full and equal access to coverage. Specifically, the RFI asked whether there are any reasonable alternative means available under existing law by which the Departments could ensure that women enrolled in self-insured plans maintained by objecting employers receive separate contraceptive coverage that is not contracted, arranged, paid, or referred for by the objecting organization but that is provided through the same third party administrators that administer the rest of their health benefits.

The Departments did not identify any comments in response to the RFI that described a feasible pathway for oral notification to third party administrators with respect to self-insured plans to allow full and equal provision of contraceptive services to the women enrolled in those plans.

Some commenters noted that third party administrators often do not require separate notification, written or oral, that a self-insured plan will not be providing contraceptive coverage because other documentation, such as summary plan descriptions or provider contracts, will indicate that such coverage is not provided under the plan. However, without a written plan instrument, which is provided for in the current accommodation, there is no mechanism to designate a third party administrator as the ERISA plan administrator for purposes of arranging or providing separate payments for contraceptive services.

Many commenters suggested that cost-free contraception should be provided by the federal government through mechanisms that differ substantially from the procedure for insured plans described in the Supreme Court's supplemental briefing order. For example, some commenters suggested that for those self-insured plans that have third party administrators that are not able to provide separate cost-free contraceptive coverage to covered employees, the objecting employer could simply inform such third party administrators of the employer's objection and the government would "exempt" such self-insured plans and third party administrators from the requirement to provide separate cost-free contraceptive coverage. In those cases, commenters proposed that the government could provide coverage by having the employer notify HHS that the employer will not provide coverage and HHS would then coordinate with IRS to determine the identity of that employer's employees through W-2 or other tax information otherwise supplied by the objecting employer. These commenters suggest that such a program could be paid for by using credits against Federally-facilitated Exchange (FFE) user fees (which are already being used for the existing accommodation).

One commenter asserted that the federal government could directly subsidize the cost of purchasing contraceptive items and services for those employees who participate in an eligible organization's group health plan. However, as the Departments have previously indicated in rulemaking in response to comments suggesting that the government reimburse plan participants for the costs of contraceptive services,[21] and in its briefs to the Supreme Court, this approach raises legal and

---

[21] 80 FR 41317, 41328 (July 14, 2015).

NV Exh C 0048

practical obstacles to access to seamless coverage. Consistent with the statutory objective of promoting access to preventive services, such as contraceptive coverage, without cost-sharing, plan participants and beneficiaries should not be required to incur additional costs or burdens to receive access. Therefore, they should not be required to enroll in new programs or to surmount other hurdles to receive access to coverage.

## SEPARATE ENROLLMENT CARDS AND ACTIVATION

As stated above, several objecting organizations have suggested that some of their objections to the accommodation could be alleviated by providing a separate enrollment card for contraceptive coverage. Under this approach, women would not enroll in a separate insurance policy for contraceptive coverage, but would receive a separate enrollment card that would be automatically activated only when a woman who is enrolled in the group health plan attempts to obtain contraceptive benefits.

If objecting employers prefer the use of a separate enrollment card for contraceptive coverage, the Departments note that under the current accommodation regulations, issuers or third party administrators could provide a separate enrollment card for contraceptive coverage. The current regulations do not specify the manner in which an issuer or third party administrator provides "enrollment cards" or other means of providing similar, relevant information to enrollees, as long as the manner in which the card or other information is provided does not unduly inhibit or hamper access to the benefit. See 29 CFR 2560.503-1, which is applicable to ERISA plans and incorporated in 26 CFR 54.9815-2719(b)(2)(i), 29 CFR 2590.715-2719(b)(2)(i), and 45 CFR 147.136(b)(2)(i), which are applicable to non-grandfathered health plans and coverage. As stated above, under current rules, the issuer or third party administrator could provide a separate enrollment card for contraceptive coverage.[22] The card could bear a different design to distinguish it from enrollment cards used to access services covered by the employer's group health plan, and could omit the name of the employer and/or the plan as well. The card could use the same identification number as is used on the enrollment card for services covered by the group health plan, or could have a different number provided there is a mechanism in place (such as by linking the two numbers in the issuer's or third party administrator's processing systems) that enables the issuer or third party administrator to easily identify enrollees. The foregoing arrangements are permissible if they are not used as an impediment to obtaining benefits and do not unduly inhibit or hamper a plan participant or beneficiary from accessing benefits provided pursuant to the accommodation (e.g., a plan procedure providing for the denial of benefits based on failure to present or "activate" the enrollment card or "opt in," even when the provider has otherwise verified participant status).

---

[22] *Id.*

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | |
|---|---|
| RICHARD W. DEOTTE, *et al.* , | CIVIL ACTION NO. 4:18-cv-00825-O |
| Plaintiffs, | |
| v. | |
| ALEX M. AZAR, *et al.*, | |
| Defendants. | |

**[PROPOSED] ORDER**

Before the Court is Proposed Intervenor State of Nevada's ("Nevada") Motion to Intervene (ECF No. ___), filed May 24, 2019.  In its Motion, Nevada seeks to intervene as a Defendant in this case under Federal Rule of Civil Procedure 24(a)(2), arguing that it meets the standard for intervention as a matter of right, and alternatively, it moves for permissive intervention under Federal Rule of Civil Procedure 24(b).  More specifically, Nevada states that it seeks intervention to oppose Plaintiffs' Motion for Preliminary Injunction (ECF No. 21), which was ordered by this Court to be treated as a motion for summary judgment and permanent injunction on April 11, 2019. (ECF No. 37 at 1).  As part of its Motion to Intervene, Nevada has submitted a proposed opposition to Plaintiffs' motion for summary judgment.  (ECF No. ___ at ___).

The Federal Defendants take no position on Nevada's Motion, but Plaintiffs oppose it. (ECF No. ___) at Certificate of Conference.

Having considered the Motion, briefing, and applicable law, the Court finds that the State of Nevada's Motion to Intervene (ECF No. ___) should be and is hereby **GRANTED** for the reasons stated below.

1

## I.     BACKGROUND

Plaintiffs have successfully been certified as a class action, seeking nationwide class relief for themselves and those similarly situated who contend that the Affordable Care Act's requirements pertaining to contraceptive coverage constitute violations of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  (ECF No. 33 at 3).  Current Defendants have not yet answered or responded to Plaintiffs' original or amended complaint.  Under these circumstances, Nevada has moved to intervene as defendants to offer what it terms a merits-based defense to what this Court has termed the "Contraceptive Mandate."[1]

## II.    LEGAL STANDARD

### A.     Intervention as a Matter of Right (Rule 24(a))

Rule 24 of the Federal Rules of Civil Procedure governs intervention.  Rule 24(a) provides that'[o]n timely motion, the court *must* permit anyone to intervene who … claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a) (emphasis added).  Accordingly, to intervene as a matter of right under Rule 24(a)(2), the Fifth Circuit requires that (1) the motion is timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the outcome of the action may, as a practical matter, impair or impede his ability to protect that interest; and (4) the existing parties cannot adequately represent that interest.  *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016).  This test applies whether a party seeks to intervene as a plaintiff or a defendant.  *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015).

---

[1] Codified at 42 U.S.C. § 300gg-13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715 – 2713(a)(1)(iv), and 26 C.F.R. § 54.9815-2713(a)(1)(iv).

NV Exh D 0051

Rule 24 is "liberally construed" in favor of intervention. *Blumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014). "[D]oubts [are] resolved in favor of the proposed intervenor." *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir. 2009). Intervention as a matter of right "must be measured by a practical rather than a technical yardstick," and the inquiry is a "flexible one" focused on the "particular facts and circumstances" of each case. *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) (*en banc*). "Federal courts should allow intervention where no one would be hurt and the greater justice could be obtained." *Texas*, 805 F.3d at 657; *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994).

### B.      Permissive Intervention (Rule 24(b))

Rule 24(b)(2), which allows a state such as Nevada to intervene on a timely motion where a claim is premised on "a statute or executive order administered by [Nevada]." Permissive intervention is discretionary by definition, but is appropriate when (1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties.   ,

## III.    ANALYSIS

Nevada argues that it has met its burden to intervene as a matter of right under Rule 24(a), and, in the alternative, that the Court should permit it to intervene under Rule 24(b).

### A.      Intervention as a Matter of Right (Rule 24(a))

There is no genuine dispute that Nevada has expressed an interest in the property or transaction that is the subject of the action and that it has expressed a practical risk that disposition of the action would impair or impede Nevada's ability to protect this interest. The timeliness of the motion and the adequacy of representation by the Federal Defendants of Nevada in this case are addressed below.

NV Exh D 0052

### 1.     The Motion is Timely

The Fifth Circuit considers four factors when evaluating the timeliness of a motion to intervene:

> (1)    The length of time the applicants knew or should have known of their interest in the case;
>
> (2)    Prejudice to existing parties caused by the applicant's delay;
>
> (3)    Prejudice to the applicant if the motion is denied; and
>
> (4)    Any unusual circumstances.

*Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977).  Each factor here demonstrates the timeliness of Nevada's motion under the circumstances of this case.

The first inquiry is contextual, as "absolute measures of timeliness should be ignored." *Espy*, 18 F.3d at 1205.  The clock beings to run when the applicants knew or reasonably should have known of their interests, or from the time they became aware that their interests would no longer be protected by the existing parties to the lawsuit.  *Edwards*, 78 F.3d at 1000; *Espy*, 18 F.3d at 1206.

Nevada files this motion less than six weeks after the Federal Defendants filed their "Response to Plaintiffs' Motion for Summary Judgment and Permanent Injunction," by which they stated they "do not oppose an order by this Court entering partial summary judgment on the legal question whether any employers or individuals who in fact fall within the certified classes have stated a valid RFRA claim."  (ECF No. 38 at 3).  Prior to this, the Federal Defendants had not yet filed a responsive pleading.  The Fifth Circuit has found motions to intervene to be timely even when filed at substantially later points in litigation.  *Wal-Mart*, 834 F.3d at 565–66 (finding intervention timely after denial of motion to dismiss, three months after answer was filed, and "before discovery progressed"); *Association of Professional Flight Attendants v Gibbs*, 804 F.2d 318, 320–21 (5th Cir. 1986) (finding intervention timely following a five month delay when all *Stallworth* factors considered).

NV Exh D 0053

None of the other *Stallworth* factors weigh against Nevada.  Prejudice to the existing parties is measured by any delay in seeking intervention (of which there is none), not based on potential inconvenience of permitting Nevada from participating in the litigation.  *Espy*, 18 F.3d at 1206. This action has not advanced to a stage where any existing party would be prejudiced.  To the contrary, this Court has issued an "Unopposed Motion for Temporary Restraining Order" to shield class representatives from tax penalties pending briefing on the pending motions.  (ECF Nos. 28-29 at 2).  No unusual circumstances weigh against a finding of timeliness.

### 2.     Nevada has Identified Divergent Interests with the Federal Defendants

In this case, the Federal Defendants:

- Have not filed a formal response to Plaintiffs' original or amended complaint;

- Did not oppose Plaintiffs' motion for a temporary restraining order; and

- Do not oppose partial summary judgment or a permanent injunction on the legal question of whether any employers or individuals who in fact fall within the certified classes have stated a valid RFRA claim.

Nevada contends that this demonstrates divergent interests, arguing that the Federal Defendants have failed to offer a merits-based defense of the ACA's contraception provisions premised on the Fifth Circuit's prior analysis in *East Texas Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), which was subsequently vacated by the United States Supreme Court in *Zubik v. Burwell* , 136 S.Ct. 1557 (2016).  Without prejudging the merits of any such argument, Nevada has demonstrated that they are inadequately represented, and therefore it is entitled to intervene under Rule 24(a). On this basis, the Court **GRANTS** Nevada's motion to intervene under Rule 24(a).

### B.     Permissive Intervention (Rule 24(b))

Nevada alternatively moves for intervention under Rule 24(b).  The Fifth Circuit has also instructed that "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be obtained."  *Texas*, 805 F.3d at 657 (citing *Sierra Club*, 18 F.2d at 1205).

NV Exh D 0054

First, for the reasons discussed above, Nevada's Motion is timely.  Second, it is clear that Nevada, without judging the merits, has a defense that shares a question of law with Plaintiffs pertaining to whether the ACA's contraception provisions constitute a RCRA violation.  Third, given the existing temporary restraining order protecting named Plaintiffs and the ability of any other class member to seek similar relief, there is no reason why the intervention would cause undue delay or prejudice to the original parties.  The Court will allow Nevada to file its proposed Opposition, and allow Plaintiffs an opportunity to file a reply.  Under these circumstances, full and adequate briefing on all sides of this case will not cause prejudice.  *Cf. Texas*, 805 F.3d at 657 (where greater justice can be obtained, intervention should be permitted).

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Nevada's Motion to Intervene (ECF No. ___) should be and is hereby **GRANTED**.  Nevada shall file its proposed Opposition to Plaintiffs' Motion for Summary Judgment and Permanent Injunction with all due haste.  Plaintiffs shall be provided the opportunity to submit any Reply they deem necessary.

**SO ORDERED** on this ___ day of _____, 2019.


By: _____
HON. REED O'CONNOR
UNITED STATES DISTRICT JUDGE

NV Exh D 0055

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| RICHARD W. DEOTTE, *et al.* , | CIVIL ACTION NO. 4:18-cv-00825-O |
| Plaintiffs, | |
| v. | |
| ALEX M. AZAR, *et al.*, | |
| Defendants. | |

## [PROPOSED] BRIEF OPPOSING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.5, the State of Nevada (hereinafter "Nevada" or "Proposed Intervenor") respectfully submits this Brief opposing Plaintiffs' Motion for Summary Judgment and Permanent Injunction.

AARON FORD
  Attorney General
HEIDI PARRY STERN (BAR NO. 08873)
  Solicitor General
CRAIG A. NEWBY (Bar No. 8591)
  Deputy Solicitor General (*pro hac vice* to follow)
State of Nevada
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717
(775) 684-1100 (phone)
(775) 684-1108 (fax)
hstern@ag.nv.gov
cnewby@ag.nv.gov

*Attorneys for Proposed Intervenor*
*State of Nevada*

NV Exh E 0056

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................................ii-v

INTRODUCTION .............................................................................................................. 1

PROCEDURAL BACKGROUND.......................................................................................... 1

    A.    The Affordable Care Act ........................................................................... 1

    B.    Prior Litigation Pertaining to ACA-Contraceptive Coverage...................................... 4

LEGAL ANALYSIS ........................................................................................................... 7

    A.    Standard of Review.................................................................................... 7

    B.    The Contraception Mandate does not Substantially Burden the Religious Freedom of the Members of the Certified Classes....................................................... 7

    C.    There is a Compelling Governmental Interest in Ensuring Equal Access to Preventive Health Care, Specifically Including Contraception .......................... 10

        1.    Nevada Has a Compelling Interest in Contraception Coverage .................... 11

        2.    Plaintiffs' Argument Against a Compelling Interest Lack Evidentiary Support and Run Contrary to Applicable Supreme Court Precedent ............. 13

    D.    Present Law Accommodates These Competing Governmental Interests through the Least Restrictive Means Available ....................................................... 15

    E.    Nevada Joins the Federal Defendants' Opposition to Additional Relief Beyond Named Plaintiffs at This Time.............................................................................. 17

CONCLUSION................................................................................................................. 18

CERTIFICATE OF SERVICE ............................................................................................. 19

NV Exh E 0057

# TABLE OF AUTHORITIES

**PAGE**

*CASES*

*Bob Jones Univ. v. United States,*
  461 U.S. 574, 604 (1983) ......................................................................................... 15

*Bolton v. City of Dallas,*
  472 F.3d 261, 263 (5th Cir. 2006) ........................................................................... 7

*Bowen v. Roy,*
  476 U.S. 693, 106 S. Ct. 2147, 90 L.Ed.2d 735 (1986) ............................................. 4

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 572, 573, 682, 134 S. Ct. 2751, 189 L.Ed.2d 675, (2014) ...................... 4, 17

*California v. Health & Human Servs.,*
  No. 4:17-cv-05783-HSG (N.D. Cal. Jan. 13, 2019) .................................................. 6

*Cutter v. Wilkinson,*
  544 U.S. 709, 720 (2005) .......................................................................................... 17

*Dole v. Shenandoah Baptist Church,*
  899 F.2d 1389, 1392 (4th Cir. 1990),
    *cert. denied*, 498 U.S. 846 (1990) ........................................................................ 14

*East Tex. Baptist Univ. v. Burwell,*
  793 F.3d 449, 459, 461 (5th Cir. 2015),
    *vacated, Zubik*, 136 S. Ct. 1557, 1561 (2016) ............................................... *Passim*

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
  565 U.S. 171, 188–189, 132 S. Ct. 694, 181 L.Ed. 2d 650 (2012) .......................... 15

*Little Sisters of the Poor v. Sebelius,*
  571 U.S. 1171, 134 S. Ct. 1022, 187 L.Ed. 2d 867 (2014) ....................................... 4

*Lyng v. Northwest Indian Cemetery Protective Ass'n,*
  485 U.S. 439, 108 S. Ct. 1319, 99 L.Ed.2d 534 (1988) ............................................. 4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) ..................................................... 7

*Pennsylvania v. Trump,*
  No. 2:17-cv-04540-WB (E.D. Pa. Jan 14, 2019) ....................................................... 6

ii

*Priests for Life v. U.S. Dept. of Health and Human Services,*
  772 F.3d 229, 255 (D.C. Cir. 2014) ........................................................... 9

*Tony & Susan Alamo Found. v. Secretary of Labor,*
  471 U.S. 290, 303–306 (1985) ................................................................ 15

*United States v. Lee,*
  455 U.S. 252, 259–61 (1982) .................................................................. 15

*University of Notre Dame v. Burwell,*
  786 F.3d 606, 625 (7th Cir. 2015) (Hamilton, J., concurring) ................... 16

*Walz v. Tax Comm'n,*
  397 U.S. 664, 676 (1970) ....................................................................... 15

*Wheaton College v. Burwell,*
  573 U.S. 959, 134 S. Ct. 2806, 189 L.Ed. 2d 856 (2014) ........................... 4

*Zubik v. Burwell,*
  136 S. Ct. 1557, 194 L.Ed. 2d 696 (2016) ................................................ 5

## *STATUTES*

42 U.S.C. § 300gg-13(a) ............................................................................ 2

42 U.S.C. § 300gg-13(a)(4) ....................................................................... 2

42 U.S.C. § 300gg-13(a)(54) ..................................................................... 2

42 U.S.C. *2000bb-4 ............................................................................... 15

42 U.S.C. *2000e(b) ................................................................................ 14

42 U.S.C. *300gg-13 ............................................................................... 14

42 U.S.C. *300gg-13(a)(4) ....................................................................... 14

NV Exh E 0059

**PAGE**

## *OTHER AUTHORITIES*

155 Cong. Rec. S12027 (Dec. 1, 2009) ........................................................................... 2

158 Cong. Rec. S539 (Feb. 9, 2012). ............................................................................. 2

159 Cong. Rec. S2268 (Mar. 22, 2013)…………………………………………………..2

*American College of Obstetricians and Gynecologists,* (2016)
https://www.hrsa.gov/womens-guidelines/index.html. ................................................3

Frost JJ, Frohwirth L and Zolna MR,
  *Contraceptive Needs and Services*, 2014 Update, New York: Guttmacher Institute, 2016
https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-
  2014_1.pdf ................................................................................................................ 12

Kaiser Family Foundation,
*Medicaid income eligibility for adults as a percent of the federal poverty level*, 2018, State
  Health Facts
https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-
  limits-for-adults-as-a-percent-of-the-federal-poverty-level..................................... 11

Kost K, *Unintended Pregnancy Rates at the State Level*:  Estimates for 2010 and Trends Since
  2002, New York: Guttmacher Institute, 2015
https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-
  2010-and-trends-2002)............................................................................................. 12

Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public
  Insurance Programs in Paying for Pregnancy-Related Care*: National and State Estimates for
  2010, New York: Guttmacher Institute, 2015
https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-
  insurance-programs-paying-pregnancy .................................................................... 12

*Clinical Prevention Services for Women*: Closing the Gaps (2011) ("IOM Report"),
https://www.nap.edu/read/13181/chapter/1 ................................................................. 3
https://www.nap.edu/read/13181/chapter/7#104 ......................................................... 3
https://www.nap.edu/read/13181/chapter/7#107 ......................................................... 3

Pub. L. No. 91-572 § 2, 84 Stat. 1504 (1970)............................................................... 13

*Zubik v. Burwell*, Brief of Baptist Joint Committee for Regligious Liberty
  2016 WL 692850 (Feb. 17, 2016)............................................................................... 9

*Zubik v. Burwell,* Resp. Br.,
  2016 WL 537623, (Feb. 10, 2016)............................................................................... 8

NV Exh E 0060

## *RULES* PAGE

26 C.F.R. § 54.9815-2713(a)(1)(iv) ............................................................................................ 3

29 C.F.R. § 2590.715-2713(a)(1)(iv) .......................................................................................... 3

45 C.F.R. § 147.130(a)(1)(iv) ..................................................................................................... 3

45 C.F.R. § 147.131(d)-(e) .......................................................................................................... 8

## *REGULATIONS*

77 Fed. Reg. at 16,503 ............................................................................................................... 16

78 Fed. Reg. at 39,888 ............................................................................................................... 16

80 Fed. Reg. at 41,325 ............................................................................................................... 14

*Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,536 (November 15, 2018) ....................................... 6

*Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592 (November 15, 2018)………………………………..6

NV Exh E 0061

Intervening Defendant Nevada hereby opposes Plaintiffs' motion for summary judgment and permanent injunction, (ECF No. 34) ("Plaintiffs' Motion").

## INTRODUCTION

Plaintiffs seek to impose a nationwide class action without any considered analysis of existing law, this Circuit's prior analysis of existing law, and without any discovery. Material facts matter when seeking summary judgment. This is particularly true here, where Plaintiffs seek to have this Court presume facts without the opportunity for discovery and where Plaintiffs misinterpret this Circuit's analysis of what existing law requires of it, all in an effort to turn their subjective belief as to what existing law requires into a shield against Congress' legitimate efforts to provide equal access to preventive care to all Americans (regardless of gender), to both reduce health care costs and to promote healthier results. Nothing under established Supreme Court precedent interpreting the RFRA requires such an outcome premised solely on a party's subjective beliefs, particularly for nationwide classes that have not yet demonstrated sincere religious objections in accordance with the RFRA.

Accordingly, this Court should deny this Motion absent evidence (rather than argument) as to what the ACA accommodation provisions require of Plaintiffs in practice, rather than Plaintiff's subjective beliefs and presumptions.

This Opposition is based upon the following Memorandum of Points and Authorities, the pleadings and papers on file in this matter, the Declaration of Beth Handler (**Exhibit A**), the Declaration of Kathryn Kost (**Exhibit B**), any oral argument that the Court may wish to entertain, and any other matters the Court deems appropriate to consider.

## PROCEDURAL BACKGROUND

This is one of the most recent challenges to the Affordable Care Act's provision of preventive health care, on an equal basis, as determined by scientists.

### A.    The Affordable Care Act

This Court has familiarity with the Affordable Care Act. Specifically, the ACA provides that certain group health insurance plans cover preventive care and screenings without imposing

1

costs on the employee and his/her covered dependents.  42 U.S.C. § 300gg-13(a).  Importantly, this includes women's "preventive care and screenings… as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. § 300gg-13(a)(54).

During the 2009 health reform debates leading up to the ACA's passage, the United States Congress specifically proposed an amendment to require health plans to cover comprehensive women's preventive care and screenings.  This amendment, which came to be called the Women's Health Amendment requires coverage for "preventive care and screenings" for women with no out of pocket costs to the woman, ensuring essential protections for women's access to preventive healthcare not currently covered in other prevention sections of the ACA.

The Women's Health Amendment sought to redress the "fundamental inequity" that women were systematically charged more for preventive services than men.  155 Cong. Rec. S12027 (Dec. 1, 2009) (statement of Sen. Gillibrand).  At the time, "more than half of women delay[ed] or avoid[ed] preventive care because of its costs."  *Id.*  Supporters of the amendment expected that eradicating these discriminatory barriers to preventive care – including contraceptive care – would result in substantially improved health outcomes for women.  *See, e.g.*, *id.* at S12052 (statement of Sen. Franken); *id.* at. S12059 (statement of Sen. Cardin); *id.* (statement of Sen. Feinstein) (same).  While the Women's Health Amendment was ultimately adopted, Congress rejected a competing amendment that would have permitted broad moral and religious exemptions to the ACA's coverage requirements – the same moral and religious exemptions that are reflected by Plaintiffs' proposed nationwide class.  158 Cong. Rec. S539 (Feb. 9, 2012); 159 Cong. Rec. S2268 (Mar. 22, 2013).

Rather than set forth a comprehensive definition of women's preventive services that must be covered, Congress opted to rely on the expertise of HRSA.  42 U.S.C. § 300gg-13(a)(4).  HRSA, in turn, commissioned the Institute of Medicine (IOM) to study the issue, and make evidence-based recommendations.  The IOM assembled a panel of independent experts who surveyed the relevant literature and peer-reviewed medical research, and ultimately issued a final Report.

2

NV Exh E 0063

*See* IOM, *Clinical Prevention Services for Women*: Closing the Gaps  ("IOM Report") (2011), available at https://www.nap.edu/read/13181/chapter/1.  The IOM Report acknowledged many of the concerns raised by Congress during adoption of the Women's Health Amendment and recommended covering all FDA-approved contraceptive methods.  Specifically the IOM considers these services essential so that "women can better avoid unwanted pregnancies and space their pregnancies to promote optimal birth outcomes."  *Id.* at https://www.nap.edu/read/13181/chapter/7#104.  The IOM also recommended that "preventive care" include not only contraceptive coverage such as access to all FDA-approved contraceptive methods, but also counseling and education to ensure that women received information on the best method for their individual set of circumstances. *Id.* at https://www.nap.edu/read/13181/chapter/7#107.

Following the IOM's recommendations relating to contraceptive coverage, HRSA adopted the IOM Report's recommendations in its Guidelines, and the three federal agencies responsible for implementing the ACA promulgated regulations requiring that regulated-entities cover all FDA-approved contraceptive methods without cost to women and their covered dependents.[1]  45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 26 C.F.R. § 54.9815-2713(a)(1)(iv).  In implementing this statutory scheme, HHS made clear that these coverage requirements were not applicable to group health plans sponsored by religious employers.  Further, HHS made available a religious accommodation to certain employers who seek to not provide this coverage.  Through this religious accommodation, the federal government ensured that women had access to seamless contraceptive coverage as entitled under the ACA, while also providing employers with a mechanism to opt out of providing or paying for this coverage.

---

[1]  HRSA reaffirmed their Guidelines based on recommendations by the American College of Obstetricians and Gynecologists in 2016 and these remain the standard.  *See* https://www.hrsa.gov/womens-guidelines/index.html.

3

NV Exh E 0064

### B.     Prior Litigation Pertaining to ACA-Contraceptive Coverage

As noted by Plaintiffs in their Motion for Preliminary Injunction, there has been significant litigation within this Circuit and before the United States Supreme Court pertaining to the balance struck between providing equal access to preventive care and respecting sincerely held religious beliefs pertaining to contraception.  These initial lawsuits culminated in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), which held that for-profit corporations that oppose contraceptive coverage for religious reasons must be allowed to use the "accommodation" offered to religious non-profits.  *See id.* at 2781–82.  The Supreme Court also issued emergency relief to non-profit employers that sought to avoid delivering the prescribed certification by permitting the employees to directly notify the federal government.  *See Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 1022 (2014); *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014).  As noted by Plaintiffs, the federal government subsequently amended regulations implementing the ACA to allow closely held for profit corporations to use the accommodation offered to religious non-profits and to allow objecting employers to choose whether to notify the Secretary of Health and Human Services directly or their health insurance issuers or third-party administrators absent their religious objections.

Further litigation ensued throughout various Circuits, including this one.  In *East Texas Baptist University v. Burwell*, 793 F.3d 449 (5th Cir. 2015), this Circuit held that the ACA's accommodation process did not violate RFRA because religious objectors had "not shown and [were] not likely to show that the requirement substantially burdens their religious exercise under established law."  *Id.* at 452.  In its analysis, this Circuit noted that plaintiffs must show that the challenged regulations "substantially burden their religious exercise" to establish a RFRA violation.  *Id.* at 456.  In that case, this Circuit considered the extent to which it should "defer to a religious objector's view on whether there is a substantial burden."  *Id.*  Based on two applicable free-exercise decisions by the Supreme Court in *Bowen v. Roy*, 476 U.S. 693, 106 S. Ct. 2147, 90 L.Ed.2d 735 (1986) (pertaining to the issuance of a Social Security number) and *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 108 S. Ct. 1319, 99 L.Ed.2d 534 (1988)

4

(pertaining to road and permit logging on federal land), this Circuit concluded it was bound by precedent to decide, as a question of law, whether the challenged  law pressures the objector to modify his religious exercise.[2] *Id.* at 456–58.

This Circuit's analysis of the ACA's accommodation process concluded that "the acts [religious objectors] are required to perform do not include providing or facilitating access to contraceptives.  Instead, the acts that violate their faith are those of third parties." *East Texas Baptist University*, 793 F.3d at 459.  First, this Circuit rejected the argument that submitting a notice seeking exemption from the ACA's contraception requirements "will authorize or trigger payments for contraceptives" because the "ACA already requires contraceptive coverage." *Id.* Second, this Circuit rejected the argument that held that the accommodation uses the insurance plans as vehicles for payments for contraceptives, recognizing that this is just what the regulations prohibit. *Id.* Third, this Circuit rejected the argument that offering a group health plan pressures objectors to authorize or facilitate the use of contraceptives, recognizing that the accommodation excludes contraceptive coverage from their plans and allowing objectors to express their disapproval of it. *Id.* at 461.  Stated differently, this Circuit held that "RFRA does not entitle [objectors] to block third parties from engaging in conduct with which they disagree." *East Texas Baptist University*, 793 F.3d at 461.  "In short, the acts *the plaintiffs* are required to perform do not involve providing or facilitating access to contraceptives, and the plaintiffs have no right under RFRA to challenge the independent conduct of third parties." *Id.* at 463. (emphasis in original).

Subsequently, the United States Supreme Court vacated these various rulings in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).  It did not do so on the merits.  Instead, the Court, following supplemental briefing from the parties addressing "whether contraceptive coverage could be provided to petitioners' employees, through petitioners' insurance companies, without any such notice from petitioners," remanded the cases to provide "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring

---

[2] These two Supreme Court cases remain binding precedent.

NV Exh E 0066

that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage." *Id.* at 1560.

Following *Zubik*, the Departments published a request for information to determine whether modification to the existing accommodation procedure could resolve the objections asserted by religious objectors while still ensuring that the affected women receive full and equal health coverage, including contraception coverage. *See* Ex. 13 at 315. The Departments received over 54,000 public comments. *Id.* In response, the Departments concluded that the "comments demonstrate that a process like the one described in the [*Zubik*] Court's supplemental briefing order would not be acceptable to those with religious objections to the contraceptive-coverage requirement."[3] *Id.* at 315–316, 318. Accordingly, the Departments did not modify the accommodation regulations at that time. *Id.* at 315.

Following the change in administrations and consistent with this Administration's general opposition to the ACA, the Departments instituted rulemaking proceedings to provide further exemptions for objecting employers and individuals, eventually issuing final rules that allow employers and individuals to object to the ACA's preventive care requirements on sincerely held religious or moral grounds. *See Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,536 (November 15, 2018) (attached as Exhibit 9 to Plaintiffs' Motion); *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,* 83 Fed. Reg. 57,592 (November 15, 2018). The Departments' revised rules are subject to litigation in multiple federal courts and stayed by one nationwide preliminary injunction (*see Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan 14, 2019), (ECF No. 136) and by one preliminary injunction for the 13 States (plus the District of Columbia) that were parties to the lawsuit. *See California v. Health & Human Servs.*, No. 4:17-cv-05783-HSG (N.D. Cal. Jan. 13, 2019), (ECF No. 234).

---

[3] It is unclear whether the Plaintiffs in this case would have found such a process acceptable, although they note the Departments' conclusion that "no feasible approach had been identified at this time that would resolve the concerns of religious objectors." *Id.*

6

This case seeks a nationwide class action against the ACA's contraceptive provisions because of purported violations of the RFRA. This case was filed on October 6, 2018. (ECF No. 1). Plaintiffs subsequently submitted an amended complaint on February 5, 2019. *See* (ECF No. 19). To date, the Federal Defendants have not filed an answer or other responsive pleading in this case, notwithstanding this Court's prior order to do so. (*See* ECF No. 14). The Federal Defendants have not opposed Plaintiffs' request for a temporary restraining order. (*See* ECF No. 28). The Federal Defendants "are not raising a substantive defense of the Mandate or the accommodation process with respect to Plaintiffs' Religious Freedom Restoration Act ("RFRA") challenge." (ECF No. 38 at 3). Nevada sought to intervene to ensure its sovereign interests in the existing ACA contraception protections, along with Nevada's statutory provision requiring contraception coverage absent objection by religious organizations with sincerely held religious beliefs.

For the foregoing reasons, summary judgment is inappropriate at this time.

## LEGAL ANALYSIS

### A.     Standard of Review

This Court is well aware of the standards for awarding summary judgment. The court views all evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bolton v. City of Dallas*, 472 F.3d 261, 263 (5th Cir. 2006).

### B.     The Contraception Mandate does not Substantially Burden the Religious Freedom of the Members of the Certified Classes.

This Circuit has previously analyzed the acts required to comply with the "accommodation" provided for under the Contraception Mandate in *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated, Zubik*, 136 S. Ct. 1557, 1561 (2016). There, this Circuit held that "the acts [objectors] are required to perform do not include providing or facilitating access to contraceptives." *Id.* at 459. Accordingly, because "RFRA confers no right to challenge the independent conduct of third parties," [this Circuit joined other circuits] in

7

concluding that the plaintiffs have not shown a substantial burden on their religious exercise." *Id.* Stated differently, this Circuit held that "RFRA does not entitle [objectors] to block third parties from engaging in conduct with which they disagree." *East Texas Baptist University*, 793 F.3d at 461.

Without any opportunity for discovery, Plaintiffs argue that this Circuit's prior analysis should be ignored.  This is mistaken for numerous reasons.

First, Defendants inaccurately asserts that contraception coverage would be "provided through its plan if it opts for the accommodation," based on a statement pertaining to ERISA formalities during briefing for *Zubik*.  (ECF No. 21-1 at 19).  This assertion ignores the plain language of the accommodation, which excludes contraceptive coverage from the group coverage, segregates all premium revenue, and provides separate notice regarding the separate contraceptive coverage. *See* 45 C.F.R. § 147.131(d)-(e).  As the federal government told the Supreme Court in *Zubik*, "[i]n all cases, the regulations mandate strict separation between the contraceptive coverage provided by an insurer or [third party administrator] TPA and other coverage provided on behalf of the employer." *Zubik,* Resp. Br., 2016 WL 537623, at *18.  Plaintiffs point to no evidence demonstrating that their own health plans "sponsor" the entirely separate contraceptive coverage, because none exists.  That result is impermissible under the existing regulations. *See* 45 C.F.R. § 147.131(d)-(e).

Although Plaintiffs cite the federal government's brief in *Zubik* as allegedly conceding this point, that brief directly refutes it: "Nor does the government, in fact, provide contraceptive coverage using any 'plan infrastructure' belonging to petitioners." *Zubik*, Resp. Br., 2016 WL 537623, at *38.  It is true that in *Zubik*, the government explained that if an objecting employer has a self-insured plan subject to ERISA, "the Departments' authority to require the TPA to provide contraceptive coverage derives from ERISA." *Zubik*, Resp. Br., 2016 WL 537623, at *38. That means that the separate contraceptive coverage between the TPA and the employee—for purposes of ERISA only—is part of the same ERISA plan as the coverage provided by the employer. *Id.*  But that does not change the fact that even for those self-insured plans, the "rules

8

governing contraceptive coverage are established by the government, not the employer, and the employer does not fund, control, or have any other involvement in that separate coverage—instead, the TPA alone does so." *Id.*

In short, the ERISA status of the separate contraceptive coverage between the TPA and the employee does not affect the terms of the group health coverage that the employer and the insurer have contractually agreed upon— coverage that excludes contraceptives. *See, e.g., Priests for Life*, 772 F.3d 229, 255 (D.C. Cir. 2014) *vacated by Zubik*, 136 S. Ct. 1357 (2016) (the fact that the government names the TPA as the plan administrator of the separate contraceptive coverage, for purposes of ERISA only, "does not . . . amend or alter Plaintiffs' own plan instruments . . ."). The Fifth Circuit's prior analysis was not based "on a mistaken factual premise."

Second, Plaintiffs contend that this Circuit "did not accurately describe the burdens that the 'accommodation' imposes on objecting employers." Stated differently, Plaintiffs argue that the submission of the form is the but-for cause of providing contraception. (ECF No. 21-1 at 20–21). However, this Circuit specifically noted that the ACA itself "already requires contraceptive coverage" and that nothing "suggests that insurers' or third-party administrators' obligations would be waived if the plaintiffs refused to apply for the accommodation." *East Texas Baptist University*, 793 F.3d at 459. Stated differently, this Circuit recognized that "the plaintiffs cannot authorize or trigger what others are already required by law to do." *Id.* Plaintiffs are not entitled to absolute deference on the issue of substantial burden under these circumstances. *See* Brief of the Baptist Joint Committee for Religious Liberty as Amicus Curiae in Support of Respondents, *Zubik v. Burwell*, 2016 WL 692850 (Feb. 17, 2016) (opposing efforts to seek absolute deference to objectors' assessment of substantial burden).

Third, Plaintiffs' arguments pertaining to the post-*Zubik* administrative process are misleading. Here, Plaintiffs argue that the administrative response to *Zubik* shows that "it is impossible for a court to accept *East Texas Baptist*'s holding that the certification form does nothing to 'facilitate' or 'trigger' access to contraception." (ECF No. 21 at 16). This is based on comments that "a process like the one described in the Court's supplemental briefing

9

order [in *Zubik*] would not be acceptable to those with religious objections to the contraceptive-coverage requirement." (Ex. 14 at 4). Plaintiffs' objections to the proposed process, without further evidence, do not make it impossible for this Court to follow this Circuit's prior, persuasive analysis.

Plaintiffs contend without evidence that individual insurance requirements substantially burdens their religious freedom because it compels them to subsidize coverage of contraceptive methods or forego insurance entirely. However, there is no evidence that one's purchase of health insurance necessarily subsidizes another's contraception. As noted by this Circuit, "insurers will not lose money by paying for contraceptives, because the savings on pregnancy care at least are expected to equal the costs of contraceptives." *Id.* at 460. Stated differently, providing preventive health care results in reduced health care costs, and constituting long-term savings for insurers that is passed along to all insureds. Without record evidence showing an actual subsidy, Plaintiffs' argument has no merit.

### C.     There is a Compelling Governmental Interest in Ensuring Equal Access to Preventive Health Care, Specifically Including Contraception.

Without evidence, Plaintiffs argue that there is no compelling interest in ensuring that everyone (regardless of gender) has access to preventive care, as determined by a nonpartisan committee of health experts subject to rigorous, independent external review. This ignores the Supreme Court's recognition in *Hobby Lobby* that the contraceptive-coverage requirement "serves the Government's compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee." *Id.* at 2785-2786 (Kennedy, J., concurring); accord *id.* at 2799-2800 & n.23 (Ginsburg, J., dissenting). This also ignores significant evidence from Nevada and elsewhere that there is a compelling governmental interest in ensuring equal access to health care, specifically including contraception. *See* Ex. B (addressing importance of contraception generally and state-specific information).

NV Exh E 0071

### 1.     Nevada Has a Compelling Interest in Contraception Coverage.

In Nevada, more than 379,000 women of child bearing age (aged 15–44) receive private insurance coverage and could be affected by Plaintiffs' proposed class action relief. (Ex. A at ¶ 2).  In Nevada, some women who would be impacted by Plaintiffs' proposed nationwide class action would not qualify for Medicaid or Title X because they would not meet the income eligibility requirements for coverage or subsidized care under these programs. (*Id.; see also* Kaiser Family Foundation, *Medicaid income eligibility for adults as a percent of the federal poverty level*, 2018, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level).  For example, in Nevada, childless adults and parents are eligible for full-benefit Medicaid only if they have incomes at or below 138% of the federal poverty level.  *Id.*  As a result, some women would be at increased risks of unintended pregnancy, either because they are not able to afford the contraception methods that work best for them or because cost would force them to forgo contraception use entirely.  (Ex. A at ¶ 4).  Even based on the calculations in the Federal Government's proposed Final Rules, between 600 to 1,200 Nevadan women would be harmed from implementation of Plaintiffs' proposed class relief.  (*Id.* at ¶ 5).

Even Nevada women eligible for publicly funded family planning services through Medicaid and Title X could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care.  This situation would increase the time, effort, and expense involved in getting needed contraception while interfering with health care providers' ability to holistically managing these women's health conditions.  (*Id.* at ¶ 6).

Finally, the increase in Nevada women relying on publicly funded services would strain Nevada's existing family planning programs and providers, making it more difficult for them to meet the current need for care.  For instance, in 2014, 194,000 women were in need of publicly funded family planning in Nevada, with the existing state family planning network only able to

11

meet 10% of this need.  (*Id.* at ¶ 5; Ex. B at § 59;[4] *see also* Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services*, 2014 Update, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf).

Nevada is particularly concerned that loss of access to contraception would lead to unintended pregnancies and abortions.  According to the Centers for Disease Control and Prevention ("CDC"), unintended pregnancy is associated with an increased risk of health problems for the mother and child, resulting in increased healthcare costs relative to intended pregnancies.  (Ex. A at ¶ 8).  Before implementation of the Affordable Care Act, 29,000 unintended pregnancies occurred in 2010 among Nevada residents, a rate of 54 per 1,000 women of child bearing age.  (*Id.* at ¶ 9; Ex. B at ¶ 60; *see also* Kost K, *Unintended Pregnancy Rates at the State Level*:  Estimates for 2010 and Trends Since 2002, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002).  Of those unintended pregnancies that ended in birth, 60% were paid for by Medicaid and other public insurance programs, costing Nevada $37 million and the federal government $66 million in 2010.  (Ex. A at ¶ 10; Ex. B. at 61; *see also* Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care*: *National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy).

Further, the CDC notes that women with unintended pregnancies are more likely to delay prenatal care, with is imperative to positive birth outcomes.  Implementation of the ACA resulted in a 35% decrease in Nevada's abortion rate among women aged 15 to 19 and a 10% decrease

---

[4]  Ms. Kost, is the Acting Vice President for Domestic Research at the Guttmacher Institute, having served in various capacities there for nearly 30 years.  Ex. B at § 1.  Her declaration describes harms associated with Plaintiffs' proposed permanent injunction, both on a nationwide and Nevada-specific basis.

NV Exh E 0073

amount women aged 20 to 24 between 2012 to 2017.  Ex. A at ¶ 11.  Plaintiffs' proposed class action would increase Nevada expenditures while harming the public heath of Nevada women.  *Id.* at ¶ 12.

> **2.** **Plaintiffs' Argument Against a Compelling Interest Lack Evidentiary Support and Run Contrary to Applicable Supreme Court Precedent.**

Plaintiffs' arguments at this early stage of litigation lack evidentiary support and are genuinely disputed for the following reasons.

First, Congress, when approving the Affordable Care Act, specifically adopted the Women's Health Amendment, which provided for a nonpartisan committee of health experts, subject to rigorous, independent external review, to determine what constitutes cost-free "preventive care" coverage for women.  Review of the legislative history associated with the Women's Health Amendment shows that Congress wanted science, rather than politics, to determine what constitutes "preventive care."  Plaintiffs' argument that the ACA does not require preventive care is without statutory or legislative support.

Second, Plaintiffs ignore Congress' long held recognition of the importance of contraception access under Title X, which makes comprehensive, voluntary family planning services available to "all persons desiring such services."  *See* Pub. L. No. 91-572 § 2, 84 Stat. 1504 (1970).  Congress also intended to support "public and nonprofit private entities to plan and develop comprehensive programs of family planning services" and to evaluate and improve the effectiveness of these programs.  *Id.*  In short, there is longstanding Congressional policy recognizing the importance of contraception.

Third, Plaintiffs argue without evidentiary support that the ACA's exemption of "grandfathered" plans constitutes evidence that contraception is not a compelling interest.  (ECF No. 21-1 at 25).  However, it makes no sense to suggest that the government cannot have a compelling interest in the application of a law because that law allows for some exceptions - particularly a law like the ACA.  Current law allows numerous organizations to not pay taxes; half the country's draft-age population is exempt from registering for the draft; and Title VII does not

NV Exh E 0074

apply to millions of employers with fewer than 15 employees, *see* 42 U.S.C. 2000e(b).  No one would suggest that raising tax revenue, raising an army, and combating employment discrimination are not compelling interests.  Taken Plaintiffs' argument further, an employer who asserted a religious objection to hiring women or paying them equally, *cf. Dole v. Shenandoah Baptist Church,* 899 F.2d 1389, 1392 (4th Cir.), *cert. denied*, 498 U.S. 846 (1990), would be entitled to a RFRA exemption from Title VII because the government would lack a compelling interest in enforcing that law because it does not protect the millions of Americans who work for small employers.  This makes no sense and such arguments should be rejected by this Court.

Fourth, Plaintiffs argue without evidentiary support that the ACA's treatment of small employers constitutes evidence that contraception coverage is not a compelling interest.  (ECF No. 21-1 at 25–26).  This ignores the fact that those small employers that do provide coverage also must comply with the preventive-services requirement and are subject to the same enforcement mechanisms as other employers.  42 U.S.C. 300gg-13.  If a small employer elects not to provide health coverage (or if a large employer chooses to pay the tax rather than provide coverage), employees will usually obtain coverage through a family member's employer, through an individual insurance policy purchased on a health exchange or directly from an insurer, or through Medicaid or another government program.  Each source would include contraceptive coverage.  42 U.S.C. 300gg-13(a)(4).  Further, federal statutes often include exemptions for small employers, and such provisions have never been held to undermine such statute's interests, including Title VII, the Age Discrimination in Employment Act of 1967 (ADEA), and the Family and Medical Leave Act of 1993 (FMLA).  Taken to its logical conclusion, Plaintiffs' argument, if accepted, would entitle employers with religious objections to opt out of virtually every statute protecting their employees.  Nothing from the Supreme Court or this Circuit requires such a result.

Fifth, Plaintiffs argue without evidentiary support that the ACA's exemption of church employers constitutes evidence that contraception is not a compelling interest.  (ECF No. 21-1 at 26).  However, this exemption "was provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship."  80 Fed. Reg.

NV Exh E 0075

at 41,325.  Such special solicitude for houses of worship has deep historical roots.  *See Walz v. Tax Comm'n*, 397 U.S. 664, 676 (1970); *cf. Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 705–706 (2012).  Taking Plaintiffs' argument to its logical conclusion, providing such an exemption would *discourage* government exemptions for houses of worship, contrary to RFRA's intent or with its express provision recognizing the permissibility of discretionary religious exemptions beyond those that RFRA compels.  *See* 42 U.S.C. 2000bb-4 ("Granting … exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of [RFRA].").

In short, Plaintiffs cannot establish with evidence that there is not a compelling interest in the government's provision of preventive health care without regard to gender.

### D.   Present Law Accommodates These Competing Governmental Interests through the Least Restrictive Means Available.

Plaintiffs presume without evidence that present law requires them to provide access to free contraception.  The Fifth Circuit addressed the factual infirmities with this presumption in *East Texas Baptist University. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated, Zubik*, 136 S. Ct. 1557, 1561 (2016).

Once it is established that the challenged policy serves a compelling interest, the question is whether the government has pursued that interest through the least-restrictive means "available." *Bob Jones Univ. v. United States,* 461 U.S. 574, 604 (1983).  Under Plaintiff's logic, an employer with religious objections to certain immunizations would be entitled an exemption from the obligation to cover immunizations, because Congress could enact a new law establishing separate insurance or could be exempt from minimum-wage laws because Congress could pass a law to make up the difference.  *See Tony & Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 303–306 (1985).

This analysis has no support under Supreme Court precedent and is impossible to reconcile with *United States v. Lee*, 455 U.S. 252, 259–61 (1982).  There, the Supreme Court denied an exemption to an Amish employer with religious objections to participating in the Social Security

15

system in part because the exemption would have resulted in the denial of benefits to employees. *Id.* Under Plaintiffs' argument, the government itself should have stepped in to pay Social Security benefits directly to the employees, or restructured the Social Security system to rely on direct employee contributions or general tax revenues rather than employer withholding. Each step was theoretically within Congress's power, and each would have been less burdensome on the employer than requiring his participation in the Social Security system. The Supreme Court rejected that logic under the Free Exercise Clause, and this Court should not attribute to Congress an intent to take such a dramatic step in RFRA.

The accommodation amply satisfies this standard for the least restrictive means available. "The heart of the Affordable Care Act was a decision to approach universal health insurance by expanding" and improving the existing "employer-based system of private health insurance that had evolved in our country, rather than to substitute a new 'single payer' government program to pay for health care, like the systems in place in the United Kingdom and Canada." *University of Notre Dame v. Burwell,* 786 F.3d at 625 (Hamilton, J., concurring) (*vacated based on Zubik*); *see also,* 78 Fed. Reg. at 39,888. The accommodation works within that system of private, employer-based coverage to ensure that the compelling interests served by the contraceptive-coverage requirement are met, while also eliminating any role for objecting employers.

Specifically, the Departments engaged in an extensive rulemaking process that included multiple rounds of public comment and consultation with "representatives of religious organizations, insurers, women's groups, insurance experts, and other interested stakeholders." 77 Fed. Reg. at 16,503. They considered a wide variety of alternative approaches, but concluded that those alternatives "were not feasible and/or would not advance the government's compelling interests as effectively" as the accommodation. 78 Fed. Reg. at 39,888. The post-*Zubik* request for information process confirmed that there was no such process would resolve religious objections to the accommodation, which appear to apply to *any* system in which their employees gain an entitlement to contraceptive coverage from third parties after petitioners opt out.

16

Unlike *Hobby Lobby,* this is not a case in which a proposed less-restrictive alternative is "an existing, recognized, workable, and already-implemented framework to provide coverage." *Hobby Lobby,* 134 S. Ct. at 2786 (Kennedy, J., concurring). The Supreme Court explained that accepting the RFRA challenge in *Hobby Lobby* "need not result in any detrimental effect on any third party" because the accommodation already in place for religious nonprofit organizations could be extended to closely held for-profit companies. *Id.* at 2781 n.37. The Court thus repeatedly emphasized that the effect of its decision on female employees and beneficiaries "would be precisely zero." *Id.* at 2760; *see id.* at 2759, 2782–2783. Here, Plaintiffs seek to invalidate the very regulatory accommodation that *Hobby Lobby* identified, while conceding that it would require Congress to establish "a whole new program" of contraceptive coverage, *id.* at 2786 (Kennedy, J., concurring), or to significantly modify an existing program. Unless Congress took such action, women who rely on objecting employers for their health coverage would be denied contraceptive coverage altogether.

The accommodation serves the government's compelling interest while minimizing the burden on objecting employers. In contending that even more is required, and that RFRA grants them a right to prevent the affected women from obtaining separate coverage from third parties, Plaintiffs disregard the Supreme Court's admonition that courts applying RFRA "must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Hobby Lobby,* 134 S. Ct. at 2781 n.37 (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 720 (2005)). The free exercise of religion protected by RFRA cannot "unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling." *Id.* at 2787 (Kennedy, J., concurring).

### E. Nevada Joins the Federal Defendants' Opposition to Additional Relief Beyond Named Plaintiffs at This Time.

The Federal Defendants oppose additional relief beyond named plaintiffs because "unnamed class members have not yet established that they in fact have a sincere religious objection to the Mandate." (ECF No. 38 at 4). The Federal Defendants submit that they are

NV Exh E 0078

required to have "an opportunity … to contest such a showing" (*id.* at 6) and that the "proposed injunction puts Defendants at risk of contempt when enforcing the Mandate."  *Id.* at 8.  Finally, the Federal Defendants argue that "Plaintiffs are improperly proposing that this Court enter final judgment," effectively putting "the cart before the horse."  (ECF No. 38 at 9).

While Nevada and the Federal Defendants have a fundamental disagreement pertaining to the validity of the ACA contraception provisions, such that Nevada's interest in the existing statute is not being adequately defended by the Federal Defendants, it joins in the other Defendants opposition to additional relief beyond the named Plaintiffs at this time.

## CONCLUSION

For the foregoing reasons, Nevada respectfully requests respectfully requests that this Court deny Plaintiffs' Motion for Summary Judgment and Permanent Injunction.

DATED: May 24, 2019.

AARON D. FORD
Attorney General

By: /s/ *Craig A. Newby*
HEIDI PARRY STERN (NV Bar. No. 8873)
Solicitor General
CRAIG A. NEWBY (NV Bar No. 8591)
Deputy Solicitor General
hstern@ag.nv.gov
cnewby@ag.nv.gov

*Attorneys for Proposed Intervenor*
*State of Nevada*

18

NV Exh E 0079

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing by using the CM/ECF system on the 24th day of May, 2019.

I further certify that that I placed a true and correct copy postage prepaid in the U.S. mail, Carson City, Nevada to the following counsel of record:

By:     /s/ *Sandra Geyer*
        Sandra Geyer, Employee of the Office
        of the Attorney General

19

NV Exh E 0080

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

|  |  |
|---|---|
| RICHARD W. DEOTTE, *et al.*, | CIVIL ACTION NO. 4:18-cv-00825-O |
| Plaintiffs, | |
| v. | |
| ALEX M. AZAR, *et al.*, | |
| Defendants. | |

## BRIEF IN SUPPORT OF MOTION TO INTERVENE
## BY THE STATE OF NEVADA

Pursuant to Federal Rule of Civil Procedure 24, the State of Nevada (hereinafter "Nevada" or "Proposed Intervenor") respectfully submits this Brief in support of their Motion to Intervene as a defendant.

AARON FORD
   Attorney General
HEIDI PARRY STERN (Bar No. 08873)
   Solicitor General
CRAIG A. NEWBY (Bar No. 8591)
   Deputy Solicitor General (*pro hac vice* to follow)
State of Nevada
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717
(775) 684-1100 (phone)
(775) 684-1108 (fax)
hstern@ag.nv.gov
cnewby@ag.nv.gov

*Attorneys for Proposed Intervenor*
*State of Nevada*

NV Exh F0081

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ......................................................................................ii-iv

INTRODUCTION ................................................................................................... 1

I.    Nevada Is Entitled to Intervene as a Matter of Right............................................ 2

    A.    Nevada's Motion Is Timely Because It Was Filed Six Weeks
        After this Court  Granted Its Amended Class Certification Order,
        Converted Pending Motions into Dispositive Motions, and the
        Federal Government Stated it Would not Defend the ACA Provisions ................... 3

    B.    Nevada Has Direct, Substantial, and Legally Protectable Interests
        that Will Likely be Impaired by this Litigation ........................................................ 4

    C.    This Suit Will Impair Nevada's Ability to Protect Its Interests
        in the ACA's Contraception Provisions.................................................................... 7

    D.    The Federal Defendants Do Not Adequately Represent Nevada's Interests ............ 8

        1.   No Party Has Defended Current Federal Statute ................................................ 8

        2.   No Presumption of Adequate Representation Applies Here................................ 9

        3.   The Federal Defendants Have Adversity of Interest or Nonfeasance Here......... 9

II.    In the Alternative, Nevada Should Be Granted Permissive Intervention ........................ 10

CONCLUSION.................................................................................................... 11

CERTIFICATE OF SERVICE ................................................................................ 12

NV Exh F0082

## TABLE OF AUTHORITIES

**PAGE**

### *CASES*

*Alfred L. Snapp & Son v. Puerto Rico*,
  458 U.S. 592, 607-608 (1982) ............................................................ 7

*Association of Professional Flight Attendants v Gibbs*,
  804 F.2d 318, 320–21 (5th Cir. 1986) ................................................ 4

*Blumfield v. Dodd*,
  749 F.3d 339, 341, 344-346 (5th Cir. 2014) ................................ 2,8,9,10

*East Texas Baptist Univ. v. Burwell*,
  793 F.3d 449 (5th Cir. 2015) ........................................................ 1, 8

*Edwards v. City of Houston*,
  78 F.3d 983, 999, 1000, 1005 (5th Cir. 1996) (*en banc*) ...................... 3,8

*Entergy Gulf States La., LLC v. E.P.A.*,
  817 F.3d 198, 203, 204-205 (5th Cir. 2016) ...................................... 9, 10

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
  229 F.R.D. 126, 131 (S.D. Tex. 2005)............................................. 10

*In re Lease Oil Antitrust Litig.*,
  570 F.3d 244, 248 (5th Cir. 2009) ................................................... 3

*Kneeland v. Nat'l Collegiate Athletic Ass'n*,
  806 F.2d 1285, 1289 (5th Cir. 1987) ............................................... 10

*League of United Latin American Citizens, District 19 v. City of Boerne*,
  659 F.3d 421, 434 (5th Cir. 2011) ................................................... 5

*Massachusetts v. E.P.A.*,
  549 U.S. 497, 519-20 (2007) ......................................................... 7

*Sierra Club v. Espy*,
  18 F.3d 1202, 1205,1206, 1207 (5th Cir. 1994) ............................ 3,4,8,10

*Stallworth v. Monsanto Co.*,
  558 F.2d 257, 264–66 (5th Cir. 1977) ............................................... 3

*Texas v. United States*,
  805 F.3d 653, 657, 663 (5th Cir. 2015) ....................................*Passim*

ii

**PAGE**

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
   834 F.3d 562, 565, 566, 568, 569 (5th Cir. 2016) ............................................................*Passim*

*Zubik v. Burwell*,
   136 S. Ct. 1557, 194 L.Ed. 2d 696 (2016) ................................................................................. 8

## *STATUTES*

42 U.S.C. § 300gg-13(a)(4) ........................................................................................................ 1

Nev. Rev. Stat. §§ 689A.0418 .................................................................................................... 1

## *OTHER AUTHORITIES*

*Contraceptive Needs and Services*, 2014 Update, New York: Guttmacher Institute, 2016,
   https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-
   2014_1.pdf ............................................................................................................................. 6

*Medicaid Income Eligibility for Adults as a Percent of the Federal Poverty Level*, State Health
   Facts, 2018,
   https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-
   as-a-percent-of-the-federal-poverty-level ............................................................................... 5

*Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in
   Paying for Pregnancy-Related Care*: *National and State Estimates for 2010*, New York:
   Guttmacher Institute, 2015,
   https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-
   insurance-programs-paying-pregnancy ................................................................................... 7

*U.S. Dep't of Labor, Emp. Benefits Sec. Admin.*, FAQs About Affordable Care Act
   Implementation Part 36, (Jan. 9, 2017) .................................................................................. 9

*Unintended Pregnancy Rates at the State Level*: *Estimates for 2010 and Trends Since 2002*,
   New York: Guttmacher Institute, 2015,
   https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-
   trends-2002 ............................................................................................................................. 7

NV Exh F0084

## *RULES*                                          **PAGE**

26 C.F.R. § 54.9815-2713(a)(1)(iv) ............................................................................... 1

29 C.F.R. § 2590.715 – 2713(a)(1)(iv) .......................................................................... 1

45 C.F.R. § 147.130(a)(1)(iv) ....................................................................................... 1

Rule 24(a) ....................................................................................................................... 5

Rule 24(a)(2) ............................................................................................................... 2, 4

Rule 24(b)(2) ............................................................................................................... 10

NV Exh F0085

## INTRODUCTION

Plaintiffs seek nationwide class relief establishing that the Religious Freedom Restoration Act excuses "every current and future" employer or individual who has a "sincerely held religious belief" from "establishing, maintaining, providing, offering, or arranging for" contraception coverage, without regard to the health needs or beliefs of insured employees. (*See* ECF No. 37 at 2). Plaintiffs' Motion for Class Certification was granted on March 30, 2019 (*See* ECF No. 33) and Plaintiffs' Motion for Preliminary Injunction was ordered to be treated as a motion for summary judgment and permanent injunction by this Court on April 11, 2019. (*See* ECF No. 37). This has all happened without Defendants providing a merits-based defense to what this Court has termed the "Contraceptive Mandate,"[1] notwithstanding binding United States Supreme Court precedent on religious exercise, as persuasively analyzed by the Fifth Circuit on this issue. *See East Texas Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015).

Plaintiffs seek to impose their nationwide class onto Nevada with no consideration of the ACA's existing contraception provisions or Nevada's statutorily-expressed compelling interests in insuring similar protections for its citizens. Nevada statutes specifically require Nevada-licensed insurance plans to provide coverage for contraception services, except for those *affiliated with a religious organization* that objects on religious grounds. *See* Nev. Rev. Stat. §§ 689A.0418 (individual health care plans), 689B.0378 (group and blanket health care plans), 689C.1676 (health insurance for small employers), 695A.1865 (fraternal benefit societies), 695B.1919 (nonprofit corporations for hospital, medical and dental services), and 695C.1696 (health maintenance organizations) (emphasis added). Plaintiffs disregard these statutes and the harms to Nevada's citizens and budget that would be caused by implementation of such nationwide class relief. These harms include increased unintentional pregnancy, reversal of significant decreases in abortions,

---

[1] Codified at 42 U.S.C. § 300gg-13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715 – 2713(a)(1)(iv), and 26 C.F.R. § 54.9815-2713(a)(1)(iv),

NV Exh F0086

increased state-borne health care costs, and unsustainable reliance on federal Title X funds designed to provide contraceptives and family planning support to low income women.

Under these circumstances, mandatory intervention pursuant to Rule 24(a)(2) is warranted. Nevada has a sovereign interest in the provision of preventive care equitably, including contraceptive care, to ensure public health and safety. Resolution of this case without Nevada's intervention impedes Nevada's ability to protect those interests.  Respectfully, the Federal Defendants are not defending Nevada's sovereign interest in its right to provide contraceptive care to its citizens, as provided for by the ACA's preventive care provisions.  This Motion is timely, based on this Court's recent conversion of a motion for preliminary injunction into a motion for summary judgment and permanent injunction where the Federal Defendants have not yet *answered or otherwise responded* to Plaintiffs' original or amended complaint and only recently stated they would not defend existing law on the merits.  In the alternative, Nevada should be permitted to intervene pursuant to Rule 24(b).

This Motion is based upon the following Memorandum of Points and Authorities, the pleadings and papers on file in this matter, the Declaration of Beth Handler (**Exhibit A**), the Declaration of Kathryn Kost (**Exhibit B**), any oral argument that the Court may wish to entertain, and any other matters the Court deems appropriate to consider.

## I.      Nevada Is Entitled to Intervene as a Matter of Right.

A party is entitled to intervene as a matter of right if: (1) its motion is timely; (2) it has an interest "relating to the property or transaction which is the subject of the action;" (3) the outcome of the action may, "as a practical matter, impair or impede his ability to protect that interest;" and (4) the existing parties cannot adequately represent that interest.  *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016).  This test applies whether a party seeks to intervene as a plaintiff or a defendant.  *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015).

Rule 24 is "liberally construed" in favor of intervention.  *Blumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014).  "[D]oubts [are] resolved in favor of the proposed intervenor."  *In re Lease*

2

*Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir. 2009).  Intervention as a matter of right "must be measured by a practical rather than a technical yardstick," and the inquiry is a "flexible one" focused on the "particular facts and circumstances" of each case.  *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) (*en banc*).  "Federal courts should allow intervention where no one would be hurt and the greater justice could be obtained."  *Texas*, 805 F.3d at 657; *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994).

Nevada satisfies all four requirements.

**A.      Nevada's Motion Is Timely Because It Was Filed Six Weeks After this Court Granted Its Amended Class Certification Order, Converted Pending Motions into Dispositive Motions, and the Federal Government Stated it Would not Defend the ACA Provisions.**

Here, a court considers four factors when evaluating the timeliness of a motion to intervene:

(1)    The length of time the applicants knew or should have known of their interest in the case;

(2)    Prejudice to existing parties caused by the applicant's delay;

(3)    Prejudice to the applicant if the motion is denied; and

(4)    Any unusual circumstances.

*Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977).  Each factor here demonstrates the timeliness of Nevada's motion under the circumstances of this case.

The first inquiry is contextual, as "absolute measures of timeliness should be ignored." *Espy*, 18 F.3d at 1205.  The clock beings to run when the applicants knew or reasonably should have known of their interests, or from the time they became aware that their interests would no longer be protected by the existing parties to the lawsuit.  *Edwards*, 78 F.3d at 1000; *Espy*, 18 F.3d at 1206.

Nevada files this motion less than six weeks after the Federal Government Defendants filed their "Response to Plaintiffs' Motion for Summary Judgment and Permanent Injunction," by which they stated they "do not oppose an order by this Court entering partial summary judgment on the legal question whether any employers or individuals who in fact fall within the certified classes

NV Exh F0088

have stated a valid RFRA claim." (ECF No. 38 at 3). This is so even though the Defendants have not yet filed a responsive pleading to Plaintiffs' original or amended complaint and no discovery appears to have taken place. The Fifth Circuit has found motions to intervene to be timely even when filed at substantially later points in litigation. *Wal-Mart*, 834 F.3d at 565–66 (finding intervention timely after denial of motion to dismiss, three months after answer was filed, and "before discovery progressed"); *Association of Professional Flight Attendants v Gibbs*, 804 F.2d 318, 320–21 (5th Cir. 1986) (finding intervention timely following a five month delay when all *Stallworth* factors considered).

None of the other *Stallworth* factors weigh against Nevada. Prejudice to the existing parties is measured by any delay in seeking intervention (of which there is none), not based on potential inconvenience of permitting Nevada from participating in the litigation. *Espy*, 18 F.3d at 1206. This action has not advanced to a stage where any existing party would be prejudiced. To the contrary, this Court has issued an "Unopposed Motion for Temporary Restraining Order" to shield class representatives from tax penalties pending briefing on the pending motions. (ECF Nos. 28-29 at 2). No unusual circumstances weigh against a finding of timeliness.

As described below, Nevada will be significantly prejudiced if not permitted to intervene. This Court must permit Nevada to defend the merits of existing federal law, and to explain the effects of nationwide relief on Nevada law, which balance religious objections with the compelling interest Nevada has financially and for its citizens' health outcomes resulting from providing contraceptive care to its citizens. Courts should permit intervention "where no one would be hurt and the greater justice could be attained." *Espy*, 18 F.3d at 1205. The motion satisfies Rule 24(a)(2)'s timeliness requirement.

### B. Nevada Has Direct, Substantial, and Legally Protectable Interests that Will Likely be Impaired by this Litigation.

Nevada also satisfies Rule 24's requirement that intervenors must have a "direct, substantial, legally protectable interest in the proceedings." *Texas*, 805 F.3d at 657. This requires a showing that Nevada has a "stake in the matter" beyond a "generalized preference

4

that the case come out a certain way." *Id.* Property or pecuniary interests are the "most elementary type[s] of right[s]" protected by Rule 24(a) and "are almost always adequate." *Id.* at 658. Rule 24(a) also safeguards less tangible interests, however, such as a right to vote. *See, e.g., League of United Latin American Citizens, District 19 v. City of Boerne*, 659 F.3d 421, 434 (5th Cir. 2011).

Nevada meets this test. Plaintiffs propose a nationwide class that would circumvent existing federal statutes and allow employers to not provide contraception coverage, reversing significant reductions in unplanned pregnancies and abortions in Nevada, necessitating significant additional spending in Nevada on contraception access and corresponding increased hospital costs for said unplanned pregnancies. This increase in spending constitutes a sufficiently adequate injury to establish Nevada's interest in this litigation. *See, e.g., Wal-Mart*, 834 F.3d at 568 ("[W]e have continued to hold that economic interests can justify intervention when they are directly related to the litigation.").

In Nevada, more than 379,000 women of child bearing age (aged 15–44) receive private insurance coverage and could be affected by Plaintiffs' proposed class action relief. (Ex. A at ¶ 2). In Nevada, some women who would be impacted by Plaintiffs' proposed nationwide class action would not qualify for Medicaid or Title X because they would not meet the income eligibility requirements for coverage or subsidized care under these programs. (*Id.; see also* Kaiser Family Foundation, *Medicaid Income Eligibility for Adults as a Percent of the Federal Poverty Level*, State Health Facts, 2018, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level). For example, in Nevada, childless adults and parents are eligible for full-benefit Medicaid only if they have incomes at or below 138% of the federal poverty level. *Id.* As a result, some women would be at increased risks of unintended pregnancy, either because they are not able to afford the contraception methods that work best for them or because cost would force them to forgo contraception use entirely. (Ex. A at ¶ 4). Even based on the calculations in the Federal

NV Exh F0090

Government's proposed Final Rules, between 600 to 1,200 Nevadan women would be harmed from implementation of Plaintiffs' proposed class relief. (*Id.* at ¶ 5).

Even Nevada women eligible for publicly funded family planning services through Medicaid and Title X could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care. This situation would increase the time, effort, and expense involved in getting needed contraception while interfering with health care providers' ability to holistically managing these women's health conditions. (*Id.* at ¶ 6).

Finally, the increase in Nevada women relying on publicly funded services would strain Nevada's existing family planning programs and providers, making it more difficult for them to meet the current need for care. For instance, in 2014, 194,000 women were in need of publicly funded family planning in Nevada, with the existing state family planning network only able to meet 10% of this need. (*Id.* at ¶ 5; Ex. B at § 59;[2] *see also* Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services*, 2014 Update, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf).

Nevada is particularly concerned that loss of access to contraception would lead to unintended pregnancies and abortions. According to the Centers for Disease Control and Prevention ("CDC"), unintended pregnancy is associated with an increased risk of health problems for the mother and child, resulting in increased healthcare costs relative to intended pregnancies. (Ex. A at ¶ 8). Before implementation of the Affordable Care Act, 29,000 unintended pregnancies occurred in 2010 among Nevada residents, a rate of 54 per 1,000 women of child bearing age. (*Id.* at ¶ 9; Ex. B at ¶ 60; *see also* Kost K, *Unintended Pregnancy*

---

[2]    Ms. Kost, is the Acting Vice President for Domestic Research at the Guttmacher Institute, having served in various capacities there for nearly 30 years. Ex. B at § 1. Her declaration describes harms associated with Plaintiffs' proposed permanent injunction, both on a nationwide and Nevada-specific basis.

6

*Rates at the State Level*:  *Estimates for 2010 and Trends Since 2002*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002).  Of those unintended pregnancies that ended in birth, 60% were paid for by Medicaid and other public insurance programs, costing Nevada $37 million and the federal government $66 million in 2010.  (Ex. A at ¶ 10; Ex. B. at 61; *see also* Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care*: *National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy).

Further, the CDC notes that women with unintended pregnancies are more likely to delay prenatal care, with is imperative to positive birth outcomes.  Implementation of the ACA resulted in a 35% decrease in Nevada's abortion rate among women aged 15 to 19 and a 10% decrease amount women aged 20 to 24 between 2012 to 2017.  Ex. A at ¶ 11.  Plaintiffs' proposed class action would increase Nevada expenditures while harming the public heath of Nevada women.  *Id.* at ¶ 12.

In addition to Nevada's proprietary injuries, the Supreme Court has recognized that States have a quasi-sovereign interest in the physical and economic well-being of their residents.  *See, e.g., Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607-608 (1982), *Massachusetts v. E.P.A.*, 549 U.S. 497, 519-20 (2007).  Nevada has demonstrated the extensive harm to itself and its residents that would flow from Plaintiffs' unopposed prosecution of this lawsuit.

**C.     This Suit Will Impair Nevada's Ability to Protect Its Interests in the ACA's Contraception Provisions.**

If Plaintiffs prevail, the proposed nationwide class action would "impair or impede" Nevada's ability to protect its interests detailed above.  *Wal-Mart*, 834 F.3d at 565.  Without regard to Nevada's interests, Plaintiffs seek to impose nationwide restrictions outside the ongoing federal rulemaking process—a process that requires opportunities for interested parties to participate.

NV Exh F0092

Significant numbers of Nevadan women will lose access to necessary healthcare, reversing significant public health gains achieved following adoption of the ACA.

Nevada should not be forced to "wait on the sidelines" while a court decides issues "contrary to their interests." *Brumfield*, 749 F.3d at 344–45. Rather, the "very purposes of intervention is to allow interested parties to air their views so that a court may consider them *before* making potentially adverse decisions." *Id.* at 345 (emphasis added). Indeed, the mere "*stare decisis* effects of the district court's judgment" sufficiently impairs Nevada's interests to allow it to intervene now. *Espy*, 18 F.3d at 1207.

> **D.      The Federal Defendants Do Not Adequately Represent Nevada's Interests.**

> **1.      No Party Has Defended Current Federal Statute.**

No current party represents Nevada's interests in defense of current law. The Federal Defendants:

- Have not filed a formal response to Plaintiffs' original or amended complaint;

- Did not oppose Plaintiffs' motion for a temporary restraining order; and

- Do not oppose partial summary judgment or a permanent injunction on the legal question of whether any employers or individuals who in fact fall within the certified classes have stated a valid RFRA claim.

Federal Defendants take this position even though this Circuit has concluded that similarly situated Plaintiffs have not shown and are not likely to show that the Contraception Mandate substantially burdens their religious exercise. *See East Texas Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015).[3] These circumstances more than satisfy the "minimal" requirement that the Federal Defendants' representation of Nevada's interests "may be inadequate." *Edwards*, 78 F.3d at 1005.

---

[3]      Nevada recognizes that the United States Supreme Court vacated this Circuit's decision in *Zubik v. Burwell*, 136 S. Ct. 1557, 194 L.Ed. 2d 696 (2016), to allow the parties to those cases to explore whether further modifications to the existing accommodation procedure could resolve the asserted objections while still ensuring affected women receive full and equal health coverage, including contraceptive coverage. Based in part on comments that the process described in *Zubik*

NV Exh F0093

### 2.      No Presumption of Adequate Representation Applies Here.

Further, no presumptions associated with adequate representation apply here. Federal Defendants are neither "charged by law" with representing Nevada's interests, nor do they share the same "ultimate objective" in this case.  *See Entergy Gulf States La., LLC v. E.P.A.*, 817 F.3d 198, 203 (5th Cir. 2016).  In particular, Federal Defendants do not share Nevada's "ultimate objective" to preserve the balance of religious beliefs and public health created in the ACA's contraception provisions, which this Circuit previously recognized complied with RFRA.  As made clear throughout this case and others throughout the United States, the Federal Defendants do not support existing law.

### 3.      The Federal Defendants Have Adversity of Interest or Nonfeasance Here.

Any presumption that the Federal Defendants adequately represent Nevada's interests is defeated by the demonstration of "adversity of interest" or "nonfeasance" by the Federal Defendants in this case.  *Id.*  Here, as demonstrated by the case's docket, the Federal Defendants demonstrate nonfeasance by their inactions and concessions in this case.  Further, to demonstrate an "adversity of interest," Nevada needs to only show that its "interests may not align precisely" with the Federal Defendants.  *Brumfield*, 749 F.3d at 345.  This Circuit has repeatedly held that "the lack of unity in *all* objectives, combined with real and legitimate additional or contrary arguments, is sufficient to demonstrate that the representation *may* be inadequate.  *Id.* at 346 (emphasis added).

The Federal Defendants inadequately represent Nevada's interests.  Thus, Nevada itself must protect the public health of its citizens and preserve millions of dollars no longer spent on

---

would not resolve the concerns of religious objectors, the Departments concluded that there was no feasible approach "identified at this time."  *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., FAQs About Affordable Care Act Implementation Part 36, (Jan. 9, 2017), attached hereto as **Exhibit C**.  The Departments further noted that they "continue to believe the existing accommodation regulations are consistent with RFRA" based on the prior holdings by eight other Circuits (including this one) that the requirement does not substantially burden their exercise of religion.  *Id.*  Nevada submits (and would argue, upon intervention) that the prior analysis undertaken by this Circuit should govern this Court's analysis of that legal question.

NV Exh F0094

unplanned pregnancies, as accounted for under the ACA's contraception provisions.  Nor do the Federal Defendants defend existing federal statutes in this case, as previously upheld by this Circuit.  Rather, they seek to alter those statutes through the rulemaking process presently challenged in other federal courts.  Again, the Federal Defendants do not represent Nevada's interest.

Because Nevada has identified "particular ways in which their interests diverge" from the Federal Defendants, they are entitled to intervene.  *Texas*, 805 F.3d at 663.  This Circuit has repeatedly held that intervention is required under these circumstance, where the proposed intervenor sought intervention as a defendant, rebutted the presumption of adequate representation, and showed adversity of interest from divergent interests and legal arguments from the existing defendants.  *See Brumfield*, 749 F.3d at 346, *Texas*, 805 F.3d at 663, *Entergy Gulf States*, 817 F.3d at 204–205; *Wal-Mart*, 834 F.3d at 569.  Because Nevada has met those requirements, this Court should grant it intervention as a matter of right.

## II.     In the Alternative, Nevada Should Be Granted Permissive Intervention.

Alternatively, Nevada is entitled to permissive intervention under Rule 24(b), which permits the Court to use its discretion to grant intervention where the application is timely, there is a common question of law or fact, and there will be no undue delay or prejudice to the original parties.  *Kneeland v. Nat'l Collegiate Athletic Ass'n*, 806 F.2d 1285, 1289 (5th Cir. 1987); *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 229 F.R.D. 126, 131 (S.D. Tex. 2005).  Rule 24(b)(2) further allows a state such as Nevada to intervene on a timely motion where a claim is premised on "a statute or executive order administered by [Nevada]."  The Fifth Circuit has also instructed that "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be obtained."  *Texas*, 805 F.3d at 657 (citing *Epsy*, 18 F.2d at 1205).

First, as discussed above, Nevada's motion is timely.  Second, it is clear that Nevada, without a final determination of the merits, has asserted a defense that shares a question of law

10

with Plaintiffs pertaining to whether the ACA's contraception provisions constitute a RFRA violation.  Third, given the existing temporary restraining order protecting named Plaintiffs and the ability of any other class member to seek similar relief, the intervention would not cause undue delay or prejudice to the original parties.  This Court should allow Nevada to file its proposed opposition, and provide Plaintiffs an opportunity to file a reply.  Under these circumstances, full and adequate briefing on all sides of this case will not cause prejudice.  *Cf. Texas*, 805 F.3d at 657 (where greater justice can be obtained, intervention should be permitted).

## CONCLUSION

For the foregoing reasons, Nevada respectfully requests this Court to grant their motion to intervene as of right, or alternatively for permissive intervention, allowing them to intervene in this lawsuit as defendants.  As part of its Appendix to this Brief, Nevada submits a proposed Order granting this Motion (**Exhibit D**), its proposed Opposition to Plaintiffs' Motion for Summary Judgment and Permanent Injunction (**Exhibit E**), and a proposed Brief supporting said Opposition (**Exhibit F**).

DATED: May 24, 2019.

AARON D. FORD
Attorney General

By: */s/ Craig A. Newby*
   HEIDI PARRY STERN (NV Bar No. 8873)
   Solicitor General
   CRAIG A. NEWBY (NV Bar No. 8591)
   Deputy Solicitor General

NV Exh F0096

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing by using the CM/ECF system on the 24th day of May, 2019.


By:    /s/ *Sandra Geyer*
          Sandra Geyer, Employee of the Office
          of the Attorney General

12

NV Exh F0097