**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **RICHARD W. DEOTTE et al.,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  4:18-cv-00825-O** |
| | § | |
| **ALEX M. AZAR II et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

Before the Court are Plaintiffs' Motion for Summary Judgment and Permanent Injunction, ECF No. 34, filed April 1, 2019; Defendants' Response, ECF No. 38, filed April 15, 2019; and Plaintiffs' Reply, ECF No. 39, filed April 19, 2019. Having reviewed the motion, briefing, and applicable law, the Court finds the Motion for Summary Judgment and Permanent Injunction, ECF No. 34, should be and is hereby **GRANTED**.

## I.    BACKGROUND

### A.    The Contraceptive Mandate and Related Litigation

In 2010, Congress mandated through the Patient Protection and Affordable Care Act (ACA) that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall . . . provide coverage for and shall not impose any cost sharing requirements for" such "preventive care and screenings" for women "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [(HRSA)] . . .." 42 U.S.C. § 300gg-13(a)(4). Congress did not make a policy choice about what "preventive care and screenings" must be covered but instead left that decision to HRSA, an administrative agency of the Department of Health and Human Services (HHS). *Id.*

In August 2011, HRSA made the policy choice Congress left open by requiring coverage of all FDA-approved contraceptive methods—the "Contraceptive Mandate."[1] *See* 77 Fed. Reg. 8,725 (Feb. 15, 2012). On August 3, 2011, the Departments of the Treasury, Labor, and HHS ("the Departments") issued amended interim final rules to "take[] into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate." 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011). The interim final rules created exemptions from the Contraceptive Mandate for religious employers, limited to "churches, their integrated auxiliaries, and conventions or associations of churches, as well as . . . the exclusively religious activities of any religious order." *Id.* And on July 2, 2013, the Departments issued a final rule that created a separate accommodation process for religious non-profits who did not qualify for the religious-employer exemption. *See* 78 Fed. Reg. 39,870, 39,896–97 (July 2, 2013).

Plaintiffs emphasize that the process created for religious non-profits was "an 'accommodation'—not an exemption." Am. Compl. 3, ECF No. 19. They explain, "To use this accommodation, an entity was required to certify that it is a religious non-profit that objects to covering some or all methods of contraception on religious grounds," at which point "the issuer of the group health insurance used by the religious non-profit must exclude contraceptive coverage from that employer's plan, but the issuer must pay for any contraception used by the non-profit's employees." *Id.* at 4. "The issuer may not shift any of those costs on to the religious non-profit, its insurance plan, or its employee beneficiaries." *Id.* (citing 78 Fed. Reg. at 39896–97). And "[i]f a religious non-profit is self-insured, then its third-party administrator must

---

[1] *See Burwell v. Hobby Lobby*, 573 U.S. 682, 692 (2014) (referring to the regulations as "the contraceptive mandate").

pay for the employees' contraception, without shifting any costs on to the religious non-profit, its insurance plan, or its employee beneficiaries." *Id.* (citing 78 Fed. Reg. at 39893).

More or less, that was the state of things until *Burwell v. Hobby Lobby*, where the Supreme Court held the Contraceptive Mandate violated the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb et seq., as applied to three for-profit corporations. 573 U.S. at 688–91. *Hobby Lobby* was a defining decision for the civil rights of religious employers. There, the Supreme Court held RFRA prohibited the Government from forcing the for-profit, plaintiff employers to "provide health-insurance coverage for methods of contraception that violate[d] the sincerely held religious beliefs of the companies' owners." *Id.* at 689–90. In reaching this conclusion, the Supreme Court noted "Congress enacted RFRA . . . to provide very broad protection for religious liberty." *Id.* at 693. And "a law that 'operates so as to make the practice of . . . religious beliefs more expensive' in the context of business activities imposes a burden on the exercise of religion." *Id.* at 710 (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961)).

Important to the Supreme Court's analysis was that "nothing in the text of RFRA as originally enacted suggested that the statutory phrase 'exercise of religion under the First Amendment' was meant to be tied to [the Supreme] Court's pre-*Smith* interpretation of that Amendment"—plus, "the amendment of RFRA through RLUIPA . . . provid[ed] that the exercise of religion 'shall be construed in favor of a broad protection of religious exercise.'" *Id.* at 714 (quoting 42 U.S.C. § 2000cc–3(g)). After finding the Contraceptive Mandate burdened the employers' religious beliefs—beliefs the Court could not question, *id.* at 723–26—the Supreme Court held the Government failed the least-restrictive-means test because "[t]he most straightforward way" of furthering the Government's interests "would be for the Government to

assume the cost of providing the four contraceptives at issue," *id.* at 728. Ultimately, however, the Supreme Court held the plaintiff for-profit corporations were at least entitled to use the "accommodation for nonprofit organizations with religious objections." *Id.* at 730–31.

The Supreme Court issued two other relevant rulings that year. *See Wheaton Coll. v. Burwell*, 573 U.S. 958 (2014); *Little Sisters of the Poor Home for the Aged v. Sebelius*, 571 U.S. 1171 (2014). As things stood in 2014, the accommodation process required a religious, non-profit employer to inform its third-party administrator (TPA) or group-health-insurance issuer via EBSA Form 700 of its religious objections to providing contraceptive coverage. In *Little Sisters of the Poor* and in *Wheaton College*, the Supreme Court issued interim injunctive relief—expressly reserving its views on the merits—that allowed the religious, non-profit applicants to inform the Secretary of HHS directly of their religious objections, rather than complete Form 700 and send it to a TPA or issuer. *See Wheaton Coll.*, 573 U.S. at 958; *Little Sisters of the Poor*, 571 U.S. at 1171.

Following *Hobby Lobby*, *Little Sisters of the Poor*, and *Wheaton College*, the Departments issued new rules to effectively codify the outcomes of those cases. Consistent with *Hobby Lobby*, the Departments gave closely held, for-profit corporations access to the accommodation process previously reserved for religious non-profits. *See* 80 Fed. Reg. 41,318, 41,346 (July 14, 2015). And consistent with *Little Sisters of the Poor* and *Wheaton College*, the Departments allowed employers using the accommodation process to choose whether to (1) complete Form 700 and notify their TPA or issuer or (2) notify the Secretary of HHS of their religious objections directly. *See id.*

As sure as the sun sets in the west, "Years of litigation in dozens of cases followed." Defs.' Resp. Mot. Certification 1, ECF No. 30. At this point, a major question remained: Does

the accommodation *itself* violate RFRA? This question caused a circuit split. Importantly, the Fifth Circuit addressed the issue. *See E. Texas Baptist Univ. v. Burwell*, 793 F.3d 449, 452 (5th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016), and *cert. granted, judgment vacated sub nom. Univ. of Dallas v. Burwell*, 136 S. Ct. 2008 (2016). In *East Texas Baptist*, "religious organizations" challenged the "requirement that they either offer their employees health insurance that covers certain contraceptive services or submit a form or notification declaring their religious opposition to that coverage"—i.e., the Contraceptive Mandate's accommodation. *Id.* at 452. The panel reasoned, "Although the plaintiffs have identified several acts that offend their religious beliefs, the acts *they* are required to perform do not include providing or facilitating access to contraceptives." *Id.* at 459 (emphasis in original). "In short," the panel concluded, "the acts *the plaintiffs* are required to perform do not involve providing or facilitating access to contraceptives, and the plaintiffs have no right under RFRA to challenge the independent conduct of third parties." *Id.* at 463 (emphasis in original). The RFRA challenge failed.

Stepping into the fray yet again, the Supreme Court granted certiorari in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), to resolve the circuit split on the accommodation's legality under RFRA. But after oral argument, the Supreme Court requested supplemental briefing and the parties represented that "an option [was] feasible" to provide "contraceptive coverage . . . to petitioners' employees, through petitioners' insurance companies, without any [accommodating-process] notice from petitioners.'" *Id.* at 1559–60. The Supreme Court therefore vacated all lower-court opinions—including *East Texas Baptist*—"anticipat[ing] that the Courts of Appeals [would] allow the parties sufficient time to resolve any outstanding issues between them." *Id.* at 1560.

5

In January 2017, the federal government reported, despite its representations to the Supreme Court, "no feasible approach ha[d] been identified . . . that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage." Departments of Labor, Health and Human Services, and the Treasury, ''FAQs About Affordable Care Act Implementation Part 36,'' (Jan. 9, 2017), *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf *and* https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACAFAQs-Part36_1-9-17-Final.pdf

In the following months, the Departments went back to the drawing board. Eventually, they "issued rules that preserve the [contraceptive] mandate, but *exempt* employers with religious or moral objections." Defs.' Resp. Mot. Certification 1–2, ECF No. 30 (citing 83 Fed. Reg. 57,536 (Nov. 15, 2018); 83 Fed. Reg. 57,592 (Nov. 15, 2018)) (emphasis added). The Government explains, "The rules also allow *individuals* with religious or moral objections to contraceptive coverage to obtain a health plan that conforms to their beliefs if an issuer is willing to provide it." *Id.* at 2 (emphasis added). Notably, the Departments concluded the exemptions were necessary under RFRA. *See, e.g.*, 83 Fed. Reg. at 57,544 ("[W]ith respect to religious employers, the Departments conclude that, without finalizing the expanded exemptions, and therefore requiring certain religiously objecting entities to choose between the [Contraceptive] Mandate, the accommodation, or penalties for noncompliance—or requiring objecting individuals to choose between purchasing insurance with coverage to which they object or going without insurance—the Departments would violate their rights under RFRA.").

On January 14, 2019, however, the United States District Court for the Eastern District of Pennsylvania enjoined the Government from implementing the revised civil-rights protections.

*See Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan. 14, 2019) (order granting nationwide preliminary injunction). Plaintiffs filed this suit.

### B.    Plaintiffs' Claims

Individual Plaintiffs Richard DeOtte, Yvette DeOtte, John Kelley, and Alison Kelley "are Christians who believe that life begins at conception" and they "regard the use of abortifacient contraception as morally equivalent to abortion." Am. Compl. 7, ECF No. 19. "Mr. DeOtte and Mr. Kelley are self-employed and responsible for purchasing their own health insurance for themselves and for their families." *Id.* The Individual Plaintiffs "have opted to forego health insurance rather than pay for insurance that subsidizes abortifacient contraception." *Id.* at 8. They allege they would "be willing to purchase health insurance if it were possible to buy insurance that excludes contraceptive coverage." *Id.* They argue the Contraceptive Mandate violates their RFRA rights "because it forces [them], and other religious believers, to choose between purchasing health insurance that makes them complicit in abortifacient contraception, or forgoing health insurance entirely." *Id.* at 7.

Plaintiff "Braidwood Management Inc. employs approximately 70 individuals, and its employees work at one of . . . three business entities, each of which is owned or controlled by Dr. Hotze." *Id.* at 9. "Dr. Hotze is a Christian, and he operates his business according to Christian principles and teaching." *Id.* "Dr. Hotze believes that life begins at conception, and that the use of abortifacient contraception is tantamount to abortion. Dr. Hotze's beliefs on this matter are rooted in his Christian faith." *Id.* Dr. Hotze also "objects to the Contraceptive Mandate's requirement that he provide non-abortifacient contraception to his employees at zero marginal cost because it facilitates sexual activity outside of marriage." *Id.*

Braidwood "is self-insured and . . . compelled to offer ACA-compliant health insurance to its employees or face heavy financial penalties." *Id.* Braidwood argues the Contraceptive Mandate forces it to "choose between: (1) Providing contraception to its employees; (2) Executing a self-certification form that leads to the provision of contraception by others; or (3) Paying a tax penalty of $100 per employee per day." *Id.* at 10. "Dr. Hotze refuses to allow Braidwood to execute the self-certification form that the Contraceptive Mandate offers to objecting employers" because he "regards the submission of that form as an act that affirmatively assists and facilitates the provision of abortifacient and non-abortifacient contraception." *Id.* Dr. Hotze had "instructed Braidwood to terminate contraceptive coverage in its self-insured health plan . . . after the religious exemptions had been announced," but in the wake of the nationwide injunction rolling the religious protections back Braidwood is "facing substantial tax penalties—$100 per employee per day." *Id.*

Plaintiffs previously sought to certify two separate classes—one consisting of individuals who object to some or all contraceptives for religious reasons, and one consisting of employers who object to the Contraceptive Mandate's accommodation process for religious reasons. *See* Mot. Class Certification, ECF No. 20. The Government objected, but the Court certified the classes. *See* Mar. 30, 2019 Order Certifying Classes, ECF No. 33; Apr. 11, 2019 Order Amending Classes, ECF No. 37. The Employer Class is represented by Braidwood and is defined as:

> Every current and future employer in the United States that objects, based on its sincerely held religious beliefs, to establishing, maintaining, providing, offering, or arranging for: (i) coverage or payments for some or all contraceptive services; or (ii) a plan, issuer, or third-party administrator that provides or arranges for such coverage or payments.

*Id.* at 2. The Individual Class is represented by Richard W. DeOtte and is defined as:

> All current and future individuals in the United States who: (1) object to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs; and (2) would be willing to purchase or obtain health insurance that excludes coverage or payments for some or all contraceptive services from a health insurance issuer, or from a plan sponsor of a group plan, who is willing to offer a separate benefit package option, or a separate policy, certificate, or contract of insurance that excludes coverage or payments for some or all contraceptive services.

*Id.* at 2–3.

Plaintiffs now move for summary judgment and permanent injunction. Mot. Summ. J. and Permanent Inj., ECF No. 34. The Government opposes any class-wide injunction. Defs.' Resp. Mot. Permanent Inj., ECF No. 38.

## II.    LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is proper when the pleadings and evidence show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record that reveal there are no genuine material-fact issues. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When reviewing the evidence on a motion for summary judgment, the court must resolve all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at

255. And if there appears to be some support for the disputed allegations, such that "reasonable minds could differ as to the import of the evidence," a court must deny the motion for summary judgment. *Id.* at 250.

### B.      Permanent Injunction

A "court may grant a permanent injunction without a trial on the merits if there are no material issues of fact and the issues of law have been correctly resolved." *Calmes v. United States*, 926 F. Supp. 582, 591 (N.D. Tex. 1996). The standard is "essentially the same" as the standard for a preliminary injunction. *Id.* "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). But unlike for a preliminary injunction, a plaintiff seeking a permanent injunction "must demonstrate actual success on the merits." *Millennium Restaurants Grp., Inc. v. City of Dallas*, 191 F. Supp. 2d 802, 809 (N.D. Tex. 2002). A "trial court's granting or denial of permanent injunction" is reviewed "for abuse of discretion." *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995).

## III.    APPLICATION

### A.      The Plaintiffs' Motion for Summary Judgment

The first question before the Court is whether Plaintiffs are "entitled to judgment as a matter of law" on their RFRA claims. FED. R. CIV. P. 56(a). Defendants concede this point. That is to be expected—the Departments concluded independently of this lawsuit that RFRA necessitates essentially the same protections Plaintiffs seek here. *See, e.g.*, 83 Fed. Reg. at

57,544. But whatever the Parties' positions, it is for the Court to say whether Plaintiffs prevail. "A motion for summary judgment cannot be granted simply because there is no opposition" but "a court may grant an unopposed summary judgment motion if the undisputed facts show that the movant is entitled to judgment as a matter of law." *Day v. Wells Fargo Bank Nat. Ass'n*, 768 F.3d 435, 435 (5th Cir. 2014) (unpublished) (quoting *Hibernia Nat. Bank v. Administracion Cent. S.A.*, 776 F.2d 1277, 1279 (5th Cir. 1985)).

### 1.   Members of the Employer Class Bring a Meritorious RFRA Claim

Plaintiff Braidwood represents the Employer Class, and Braidwood's RFRA claim is as follows. Dr. Hotze operates Braidwood "according to Christian principles and teaching." Am. Compl. 9, ECF No. 19. Given his sincerely held religious beliefs, "Dr. Hotze refuses to allow Braidwood to execute the self-certification form" used in the accommodation process because he "regards the submission of that form as an act that affirmatively assists and facilitates the provision of abortifacient and non-abortifacient contraception, in violation of his sincere religious beliefs." *Id.* at 10. Put plainly, Dr. Hotze asserts the act of "executing a certification form that enables his company's employees to obtain and use abortifacient contraceptive methods free of charge, or that enables them to obtain non-abortifacient contraception for use in nonmarital sexual activity, is . . . a violation of his religious beliefs." *Id.*; *see also* Br. Supp. Mot. Permanent Inj. 13, ECF No. 21-1 ("Dr. Hotze sincerely believes that the use and submission of the self-certification form is sufficiently connected to the destruction of human embryos and non-marital sexual activities as to make it immoral and contrary to his religious beliefs for his company to execute that form."). Braidwood therefore argues the Contraceptive Mandate violates RFRA by putting Braidwood to a choice "between: (1) Providing contraception to its employees; (2) Executing a self-certification form that leads to the provision of contraception by

others; or (3) Paying a tax penalty of $100 per employee per day." Am. Compl. 10, ECF No. 19. That is, a choice between (1) violating its beliefs, (2) violating its beliefs, or (3) paying a penalty.

In *Hobby Lobby*, the Supreme Court held that putting an employer to a choice between options (1) and (3)—providing objected-to contraception or paying a penalty—violates RFRA. *See* 573 U.S. at 731. In reaching this conclusion, the Supreme Court identified the accommodation process Braidwood now challenges as a less-restrictive means to furthering the Government's interests. *Id.* at 730. But the *Hobby Lobby* plaintiffs did not challenge the accommodation process, *see id.* at 720, and the Supreme Court expressly declined to say whether the accommodation process "complies with RFRA for purposes of all religious claims," *id.* at 731.

Here, Braidwood specifically challenges the accommodation process because "Dr. Hotze sincerely believes . . . it immoral and contrary to his religious beliefs for his company to execute [the required certification] form." Br. Supp. Mot. Permanent Inj. 13, ECF No. 21-1. In other words, the only RFRA question before the Court, vis-à-vis Braidwood and the Employer Class, is the one left open by *Hobby Lobby*: Does the accommodation process violate RFRA's protection of a religious employer's civil rights if the employer's sincerely held religious beliefs prohibit it from executing the required forms?[2] The Court finds it does.

RFRA states the "Government shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1. But the Government "may substantially burden a person's exercise of religion . . . if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* "The threshold inquiry . . . is whether the

---

[2] *See* 29 C.F.R. § 2590.715-2713A(b) (Optional accommodation—self-insured group health plans); 29 C.F.R. § 2590.715-2713A(c) (Optional accommodation—insured group health plans).

challenged governmental action substantially burdens the exercise of religion." *Diaz v. Collins*, 114 F.3d 69, 71 (5th Cir. 1997) (citation omitted). The religious objector bears the burden of proving a substantial burden, and if that burden is met, "it is then up to the government to demonstrate that the compelling interest test is satisfied." *Id.* at 71–72 (citations omitted).

> a.      *The burden on religious exercise*

> i.      The *East Texas Baptist* decision

While *Hobby Lobby* did not resolve the precise legal claim Braidwood presents here, the Fifth Circuit addressed a substantially similar question in *East Texas Baptist*. There, the Fifth Circuit held the accommodation process did not violate RFRA as applied to the plaintiffs in that case. *See E. Tex. Baptist. Univ.*, 793 F.3d at 463. Because the Supreme Court vacated the decision in *East Texas Baptist*, it is not binding. *See, e.g.*, *Munn v. City of Ocean Springs*, 763 F.3d 437, 441 n.2 (5th Cir. 2014); *Beiser v. Weyler*, 284 F.3d 665, 668 (5th Cir. 2002). But it is important to articulate why the reasoning of the vacated opinion addresses facts that are different that what is presented here.

First, two major developments since *East Texas Baptist* call into question whether the same panel would issue the same decision today. The first and most salient development is a Government clarification before the Supreme Court. When appearing before the Fifth Circuit in *East Texas Baptist*, the Government briefed the intricacies of "self-insured church plans that are exempt from ERISA" but made no mention of self-insured plans *governed by* ERISA. Brief of Appellant at 35, *E. Tex. Baptist*, 793 F.3d 449 (5th Cir. 2015) (No. 14-20112). That omission was material, because the *East Texas Baptist* panel acknowledged the plaintiffs' argument "that the accommodation uses their plans as vehicles for payments for contraceptives" but dismissed it in three sentences. *E. Tex. Baptist*, 793 F.3d at 461. Yet at the Supreme Court, the Government

clarified that "the coverage provided by [an objecting employer's] TPA is, as a formal ERISA matter, part of the same 'plan' as the coverage provided by the employer." Brief of Respondent at 38, *Zubik*, 136 S. Ct. 1557 (2016) (Nos. 14–1418, 14–1453, 14–1505, 15–35, 15–105, 15–119, and 15–191). This clarification lends credibility to the argument raised by the *East Texas Baptist* plaintiffs but dismissed by the panel. It is far from clear the panel would have dismissed the "plans as vehicles" argument had the Government made the same representations in the Fifth Circuit it later made in the Supreme Court.[3]

There has been a second material development. Since *East Texas Baptist*, the Government has concluded it is unable to adequately protect religious employers' civil rights through the accommodation process. *See, e.g.*, 83 Fed. Reg. at 57,544 ("The Departments conclude that it would be inadequate to merely attempt to amend or expand the accommodation process instead of expanding the exemption."). This development traces its roots to *Zubik*, the Supreme Court case into which *East Texas Baptist* was consolidated and which presented essentially the same legal question before the Court today. *See Zubik*, 136 S. Ct. at 1559 ("Petitioners allege that submitting [the accommodation] notice substantially burdens the exercise of their religion.").

After oral argument in *Zubik*, the Supreme Court "requested supplemental briefing from the parties addressing 'whether contraceptive coverage could be provided to petitioners' employees, through petitioners' insurance companies, without any such notice from petitioners." *Id.* at 1559–60. "Both petitioners and the Government . . . confirm[ed] that such an option is feasible." *Id.* at 1560. But after the Supreme Court remanded based on the

---

[3] Importantly, Braidwood asserts it "is self-insured and would therefore have contraceptive coverage provided through its plan if it opts for the accommodation"—based on the Government's representations in *Zubik*—and further asserts that "Braidwood's third-party administrator has told the company that there is no way to invoke the 'accommodation' without involving Braidwood's plan in the provision of contraceptive methods that violate its religious beliefs." Br. Supp. Mot. Permanent Inj. 14, ECF No. 21-1.

supplemental briefing, the Government concluded it was unable to identify a feasible means of using *the accommodation process* to both protect the civil rights of religious employers and mandate free contraception. *See* Departments of Labor, Health and Human Services, and the Treasury, ''FAQs About Affordable Care Act Implementation Part 36,'' (Jan. 9, 2017), *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf *and* https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACAFAQs-Part36_1-9-17-Final.pdf. The Government continues to agree with this conclusion, which it first proffered well after *East Texas Baptist* was decided: "The Departments continue to believe that, because of the nature of the accommodation process, merely amending that accommodation process without expanding the exemptions would not adequately address religious objections to compliance with the Mandate." 83 Fed. Reg. at 57,544. Thus, in contrast to its arguments at the time of *East Texas Baptist*, the Government's legal position now, based on years of soliciting tens of thousands of comments across two Administrations,[4] is that "requiring certain religiously objecting entities to choose between the [Contraceptive] Mandate, the accommodation, or penalties for noncompliance . . . would violate their rights under RFRA." *Id.*; *see also* Summ. J. and Permanent Inj. Hr'g Tr. 33, May 29, 2019 (undocketed version) (Counsel for the Government arguing *East Texas Baptist* "has, to some extent, been overtaken by an enhanced understanding of exactly how these religious objections work in the context of these plans" because "HHS has concluded after a very long rulemaking

---

[4] The district court that entered a nationwide injunction preventing the Government from expanding its protections for religious employers specifically found the Government sufficiently solicited and addressed public comments before implementing the final version of the protections. *See Pennsylvania v. Trump*, No. 2:17-cv-04540-WB (E.D. Pa. Jan. 14, 2019), ECF No. 136 at 26 ("[A] review of the Final Rules demonstrates that the Agencies acknowledged the comments and provided an explanation as to why the Agencies did (or did not) amend the Final Rules based on the comment." (citing 83 Fed. Reg. at 57,548, 57,551, and 57,555)); *id.* at 27 ("[T]he Final Rules demonstrate to a commenter that the the [sic] Agencies considered and rejected, the arguments put forth by a commenter, which is all that the APA requires." (cleaned up)).

process of hundreds of—I think it's over 200,000 comments, that this is a cognizable, substantial burden").

In sum, the Government explained to the Supreme Court that the coverage provided by a religious employer's TPA "is, as a formal ERISA matter," part of the employer's plan, but it omitted that information when briefing *East Texas Baptist*. And after *Zubik*—and well after *East Texas Baptist*—the Government formally concluded it cannot adequately protect the rights of religious employers through the accommodation process. These developments demonstrate the facts before the Court today are much different than those before the panel in *East Texas Baptist*.

Second, the panel in *East Texas Baptist* did not anchor its RFRA analysis to the religious exercise alleged by Braidwood, and that matters. There, the panel stated, "The plaintiffs are religious organizations that oppose the use of some or all contraceptives." *E. Texas Baptist Univ.*, 793 F.3d at 454; *see also id.* at 455 ("The plaintiffs oppose abortion and believe that emergency contraceptives and intrauterine devices . . . can cause abortions. They are unwilling to provide or facilitate access to those products."); *id.* ("The plaintiffs oppose the use of any contraceptives to prevent pregnancy or induce abortion, and providing or facilitating access to them for those purposes would violate their faith."); *id.* ("[T]hey oppose the use of any contraceptives to prevent pregnancy or induce abortion, and they object to providing or facilitating access to them for those purposes."). And in what must be viewed as the definitive formulation of the issue before it, the panel reasoned, "Although the plaintiffs have identified several acts that offend their religious beliefs, the acts *they* are required to perform do not include *providing or facilitating access to contraceptives*." *Id.* at 459 (second emphasis added).

Like an earthquake at sea, the framing of a religious belief is a seemingly subtle thing. But the consequences can be catastrophic. Because the *East Texas Baptist* panel framed its

RFRA analysis around the belief that it is wrong to provide or facilitate access to contraceptives, *id.* at 454–55, the pivotal question became whether *the court believed* the accommodation process provides or facilitates access to contraceptives, *id.* at 456–60. Under that rubric, the panel never questioned the plaintiffs' beliefs when it said, "the acts [*plaintiffs*] are required to perform do not include providing or facilitating access to contraceptives." *Id.* at 459 (emphasis in original). Within the *East Texas Baptist* framework, that was not an improper critique of belief, it was an appropriate analysis of burden. *Id.* at 456 (deciding for the first time in the Fifth Circuit that courts decide whether a "challenged law pressure[s] [a religious objector] to modify [their religious] exercise").

Cutting to chase, that framework is not pleaded here. Neither Dr. Hotze nor Braidwood challenges the Contraceptive Mandate on the ground that completing the accommodation-process forms burdens *other* religious exercise. To the contrary, Dr. Hotze asserts that the act of "executing a certification form" is *itself* "a violation of his religious beliefs." Am. Compl. 10, ECF No. 19; *see also* Br. Supp. Mot. Permanent Inj. 13, ECF No. 21-1 ("Dr. Hotze sincerely believes . . . it immoral and contrary to his religious beliefs for his company to execute [the required certification] form."). And while it is true Dr. Hotze views execution of the forms as complicity in—if not facilitation of—the provision of contraception, the Court *cannot* question a person's religious belief that the act of executing the accommodation forms is itself immoral. *See E. Tex. Baptist*, 793 F.3d at 458 ("[C]ourts defer to the objector's description of his religious exercise upon finding that his beliefs are sincerely held and religious."). Refraining from executing the accommodation forms, in other words, *is* the religious exercise here. So, whatever the plaintiffs' precise articulation of their beliefs in *East Texas Baptist*, the Court cannot apply that decision's vacated legal reasoning on these facts. To do so would be to "dodge[] the

question that RFRA presents (whether the HHS mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*) and instead address[] a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)." *Hobby Lobby*, 573 U.S. at 724 (emphasis in original).

## ii. Braidwood's beliefs

The Court therefore anchors its analysis, as it must, to Braidwood's assertion that its exercise of religion includes abstaining from executing the forms required by the accommodation process.[5] *See id.* at 710 ("[T]he 'exercise of religion' involves 'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.' . . . Business practices that are compelled or limited by the tenets of a religious doctrine fall comfortably within that definition." (quoting *Employment Div., Dep't Human Res. of Oregon v. Smith,* 494 U.S. 872, 877 (1990)). That is the line Braidwood has drawn, and it is not for the Court to say it is misplaced.[6] *See id.* at 725 ("[I]t is not for us to say

---

[5] Not only is the Court bound by Supreme Court precedent to accept Braidwood's beliefs, *see Hobby Lobby*, 573 U.S. at 725, it is also bound by the separation of powers to respect Congress's intent "that the exercise of religion 'shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Id.* at 714 (quoting 42 U.S.C. § 2000cc–3(g)). The Supreme Court also instructed in *Hobby Lobby* that Congress did not "want[] to tie RFRA coverage tightly to the specific holdings of . . . pre-*Smith* free-exercise cases." *Id.*; *see also id.* ("[N]othing in the text of RFRA as originally enacted suggested that the statutory phrase 'exercise of religion under the First Amendment' was meant to be tied to this Court's pre-*Smith* interpretation of that Amendment."); *id.* ("RLUIPA . . . deleted the prior reference to the First Amendment . . . and neither HHS nor the principal dissent can explain why Congress did this if it wanted to tie RFRA coverage tightly to the specific holdings of our pre-*Smith* free-exercise cases . . . It is simply not possible to read these provisions as restricting the concept of the 'exercise of religion' to those practices specifically addressed in our pre-*Smith* decisions." (citations omitted)). *But see E. Tex. Baptist Univ.*, 793F.3d at 456 (finding "[t]wo free-exercise cases" decided pre-*Smith* to be "especially instructive" in denying the plaintiffs' claims). As the Supreme Court said, "When Congress wants to link the meaning of a statutory provision to a body of [the Supreme] Court's case law, it knows how to do so." *Hobby Lobby*, 573 U.S. at 714.

[6] It is worth noting that, while the Court's agreement or disagreement with Braidwood's religious beliefs is of no legal significance, the religious exercise Braidwood describes is analogous to the religious direction once given by Pope John Paul II regarding abortion counseling in Germany. "In the late 1990s,

that the line" a religious objector "drew was an unreasonable one." (quoting *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 715 (1981))).

Under this framework, the question is whether the accommodation process compels Braidwood—and any other employer that meets the Employer Class definition—to violate its religious beliefs by altering its religious exercise. To ask the question is to answer it—the very thing Braidwood and the Employer Class members object to is what the accommodation requires. *See* 29 C.F.R. § 2590.715-2713A(b) (Optional accommodation—self-insured group health plans); 29 C.F.R. § 2590.715-2713A(c) (Optional accommodation—insured group health plans). And the only two other options—provide the objected-to contraceptives or pay exorbitant fines—are the two options the Supreme Court held illegal under RFRA in *Hobby Lobby*. 573 U.S. at 726 ("Because the contraceptive mandate forces them to pay an enormous sum of money . . . if they insist on providing insurance coverage in accordance with their religious beliefs, the mandate clearly imposes a substantial burden on those beliefs."). "Make no mistake: the harm Plaintiffs complain of—and the harm this Court therefore is called to assess—is from their inability to conform *their own* actions and inactions to their religious beliefs without facing massive penalties from the government." *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 808 F.3d 1, 7 (D.C. Cir. 2015) (Brown, J., dissenting from denial of reh'g en banc).

---

Germany allowed abortions within the first 12 weeks of pregnancy for health-related reasons if the pregnant woman received state-mandated counseling. Representatives from Catholic churches in Germany agreed to act as counselors. After counseling, a church had to issue a certificate stating that the pregnant woman had received counseling. If the pregnant woman rejected the church's counsel not to have an abortion, she could present the certificate issued by the church and obtain an abortion." *Eternal Word Television Network, Inc. v. Burwell*, 756 F.3d 1339, 1343 (11th Cir. 2014) (Pryor, J., specially concurring). Much like the self-certification forms involved here, many actions of many third parties would have been required to connect a church's execution of a counseling form to an ultimate abortion—and indeed women would have had access to counseling, certifications, and abortions whether churches involved themselves or not. Yet "Pope John Paul II wrote to the bishops that the certification issued by the churches was a necessary condition for abortion without punishment and, as a result, the practice had to cease." *Id.* Of course, here Braidwood does not currently have the luxury of simply abstaining—that decision would be met with "draconian penalties." *E. Tex. Baptist Univ.*, 793 F.3d at 453.

Accordingly, the Court finds Braidwood—and any employer that meets the definition of the Employer Class—has met its burden to show that the accommodation process "substantially burdens the exercise of religion." *Diaz*, 114 F.3d at 71. *Accord Priests for Life*, 808 F.3d at 15 (Kavanaugh, J., dissenting from denial of reh'g en banc) ("[U[nder *Hobby Lobby*, the regulations substantially burden the religious organizations' exercise of religion because the regulations require the organizations to take an action contrary to their sincere religious beliefs (submitting the form) or else pay significant monetary penalties.").

### b.      The least-restrictive-means test

Since Braidwood has shown a substantial burden on its religious exercise, it is "up to the government to demonstrate that the compelling interest test is satisfied." *Diaz*, 114 F.3d at 71–72 (citations omitted). This requires the Government to show that requiring Braidwood and other employers in the Employer Class to utilize the accommodation process both "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(b). A failure on either factor is fatal. The Court therefore assumes—without finding—a compelling governmental interest in ensuring the availability of free contraception, because the Court finds the accommodation process is not the least-restrictive means of furthering that interest. *Cf. Hobby Lobby*, 573 U.S. at 728 ("We will assume that the interest in guaranteeing cost-free access to the four challenged contraceptive methods is compelling within the meaning of RFRA, and we will proceed to consider the final prong of the RFRA test.").

"The least-restrictive-means standard is exceptionally demanding," *id.* (citing *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997)), and the Government cannot clear that hurdle here. In *Hobby Lobby*, the Supreme Court held the Contraceptive Mandate was not the least-restrictive

means of "achieving [HHS's] desired goal without imposing a substantial burden on the exercise

of religion by the objecting parties." *Id.* at 728. In reaching that conclusion, the Supreme Court

relied on the accommodation now under attack as evidence of a less-restrictive means.[7] *Id.* at

728–31. But it also stated, "The most straightforward way of [achieving HHS's interests] would

be for the Government to assume the cost of providing the four contraceptives at issue to any

women who are unable to obtain them under their health-insurance policies due to their

employers' religious objections." *Id.* at 728. Braidwood argues essentially the same point here.

*See* Br. Supp. Mot. Permanent Inj. 22, ECF No. 21-1 ("The government could require all non-

objecting doctors, pharmacists, hospitals, and other health-care providers to dispense FDA-

approved contraception free of charge to any woman whose insurance will not cover it, and

allow those providers to seek reimbursement from the government."). Braidwood further argues

this method would not only protect the rights of religious employers, but "[i]t would also ensure

that *every* woman in America can access *every* FDA-approved contraceptive method free of

charge." *Id.*

    The reasoning in *Hobby Lobby* controls. If the Government has a compelling interest in

ensuring access to free contraception, it has ample options at its disposal that do not involve

conscripting religious employers. As the Supreme Court suggested, for example, if the

Government itself were to assume the cost and responsibility of a program to ensure free access

to contraception, objecting religious employers—like the plaintiffs in *Hobby Lobby* or members

of the Employer Class—would not be forced to alter their religious exercise. *Hobby Lobby*, 573

---

[7] *But see Priests for Life*, 808 F.3d at 6 (Brown, J., dissenting from denial reh'g en banc) ("Where the government imposes a substantial burden on religious exercise and labels it an 'accommodation,' that burden is surely as distressing to adherents as it would be if imposed without such a designation. Therefore, heightened skepticism is not appropriate. We should look at Plaintiffs' claims as we would any RFRA claim. After all, in the substantial burden analysis, the government's motivations—no matter how benevolent—are irrelevant.").

U.S. at 729. Indeed, "[t]he government could treat employees whose employers do not provide *complete* coverage for religious reasons the same as it does employees whose employers provide *no* coverage. This would entail providing for subsidized—or in this case free—contraceptive coverage to be made available on health care exchanges." *Priests for Life*, 808 F.3d at 13 (Brown, J., dissenting from denial of reh'g en banc) (emphasis added).

While this may entail new costs for the Government, "both RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs"—and the "view that RFRA can never require the Government to spend even a small amount reflects a judgment about the importance of religious liberty that was not shared by the Congress that enacted that law." *Id.* at 730. Just as the Supreme Court explained in *Hobby Lobby*, then, the Government's assumption of the cost of providing free contraception is an available and less-restrictive means of achieving that very goal.

"[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)). Plus, by the promulgation of its revised civil-rights protections, the Government has already demonstrated its ability to engineer less-restrictive means of furthering its interests. *See* 83 Fed. Reg. at 57,536 ("These rules expand exemptions to protect religious beliefs . . . These rules do not alter the discretion of the Health Resources and Services Administration . . . to maintain the guidelines requiring contraceptive coverage where no regulatorily recognized objection exists . . . These rules do not alter multiple other federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy.").

Accordingly, the Court finds Braidwood—and, by definition, any member of the Employer Class[8]—has stated a successful RFRA claim and is entitled to judgment as a matter of law.

### 2. Members of the Individual Class Bring a Meritorious RFRA Claim

Plaintiff Richard W. DeOtte represents the Individual Class, and he and the other Individual Plaintiffs—Yvette DeOtte, John Kelley, and Alison Kelley—claim "[t]he Contraceptive Mandate violates the Religious Freedom Restoration Act because it forces [them], and other religious believers, to choose between purchasing health insurance that makes them complicit in abortifacient contraception, or forgoing health insurance entirely." Am. Compl. 7, ECF No. 19. More specifically, the Individual Plaintiffs argue that, "[u]nder the Contraceptive Mandate," they are compelled to "pay premiums that subsidize the provision of other people's contraception." Br. Supp. Mot. Permanent Inj. 18, ECF No. 21-1. "The only way to avoid this subsidy," they continue, "is to forego health insurance, or to obtain insurance through a church employer or a grandfathered health plan exempt from the Contraceptive Mandate." *Id.* Because "their sincere religious beliefs . . . forbid them to lend financial support to abortifacient

---

[8] Braidwood, like the plaintiffs in *Hobby Lobby*, "is a for-profit, closely held corporation." Am. Compl. 2, ECF No. 19; 573 U.S. 702–05. The Employer Class, however, is not limited to closely held corporations and could include publicly traded corporations. But "the first question" *Hobby Lobby* addressed was "whether [RFRA] applies to regulations that govern the activities of for-profit corporations," and it concluded the answer is "yes" by interpreting the term "persons" as used in RFRA. *See id.* at 705–09. Yet the more important question was whether a for-profit corporation could engage in the "exercise of religion" or otherwise demonstrate religious beliefs. The Supreme Court suggested the corporate form was no per se barrier to the exercise of religion, *id.* at 709–17, but it ultimately concluded, "[W]e have no occasion in these cases to consider RFRA's applicability to [publicly traded] companies" because "[t]he companies in the cases before us are closely held corporations," *id.* at 717. Whatever the corporate form of the plaintiffs in *Hobby Lobby*, the Supreme Court was satisfied there existed sincerely held religious beliefs—and that is what ultimately matters. Here, the Employer Class is limited to "[e]very current and future employer in the United States that objects, *based on its sincerely held religious beliefs*," to the Contraceptive Mandate's accommodation process. Apr. 11, 2019 Order Amending Classes 2, ECF No. 37. So, by definition, no employer—publicly traded or not—will be entitled to class membership and relief unless it has sincerely held religious belief. And if the Government questions an employer's religious beliefs, it may utilize the process described below to dispute them.

23

contraception," *id.*, the Individual Plaintiffs "have opted to forego health insurance rather than pay for insurance that subsidizes abortifacient contraception." Am. Compl. 8, ECF No. 19. And they assert "[i]t is a 'substantial burden' to close off the entire health-insurance market to individuals who are unwilling, for religious reasons, to purchase insurance that is used to subsidize other people's contraception." Br. Supp. Mot. Permanent Inj. 18, ECF No. 21-1. The Individual Plaintiffs note they would "be willing to purchase health insurance if it were possible to buy insurance that excludes contraceptive coverage." Am. Compl. 8, ECF No. 19.

The Court finds the Individual Plaintiffs—and, through them, the Individual Class—have identified a substantial burden on their religious exercise. They assert the Contraceptive Mandate effectively forces "every individual who purchases health insurance [to] pay premiums that subsidize the provision of other people's contraception." Br. Supp. Mot. Permanent Inj. 18, ECF No. 21-1. That is correct.

The point of the Contraceptive Mandate is to ensure all ACA-compliant insurance plans include cost-free coverage of all FDA-approved contraceptive methods. *See* 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv). And the point of the Individual Mandate is to ensure individuals purchase ACA-compliant insurance plans. The result? The Individual Plaintiffs are forced out of either the health-insurance market or their religious exercise. And by choosing to adhere to their religious beliefs, not only are the Individual Plaintiffs excluded from the insurance market, they are forced to violate federal law.

That the Contraceptive Mandate systematically discriminates against the Individual Class by blocking members' entrance into the marketplace—*due to religious exercise*—is a substantial burden of the highest order. The Court is therefore in agreement with District Judge Leon, who

found the Contraceptive Mandate substantially burdened the religious exercise of individual employees because it "ma[de] it impossible for employee plaintiffs to purchase a health insurance plan that does not include coverage of contraceptives to which they object." *Mar. for Life v. Burwell*, 128 F. Supp. 3d 116, 129 (D.D.C. 2015).

It is important to highlight that Judge Leon reasoned, in part, "Employee plaintiffs are . . . caught between the proverbial rock and a hard place: they can either buy into and participate in a health insurance plan that includes the coverage they find objectionable . . . or they can forgo health insurance altogether and thereby subject themselves to penalties for violating the ACA's individual mandate." *Id.* at 130. Because of the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054 (2017), the Individual Plaintiffs are not currently subject to "penalties for violating the individual mandate." But if the text of a law communicates what the law requires—and it does[9]— the Individual Plaintiffs *are required by law* to purchase ACA-compliant health insurance because the 2017 Congress did not repeal the Individual Mandate.[10] And if federal law is binding on all within its jurisdiction—and it is[11]—the Individual Plaintiffs,

---

[9] "'The text is the law, and it is the text that must be observed.' When a judge goes beyond the meaning of the words that were enacted—to the unexpressed intentions of the legislature, or to what the courts think would meet the needs and goals of society—the judge has no democratic warrant." Michael W. McConnell, *Textualism and the Dead Hand of the Past*, 66 Geo. Wash. L. Rev. 1127, 1136 (1997) (quoting Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, in A Matter of Interpretation: Federal Courts and the Law 3, 22 (Amy Gutmann ed., 1997)).

[10] *See Texas v. United States*, 340 F. Supp. 3d 579, 603 (N.D. Tex. 2018) ("The Individual Mandate is law. To be precise, the '*[r]equirement* to maintain minimum essential coverage' is still law. As the Intervenor Defendants concede, Congress 'deliberately left the rest of the ACA untouched'—including the Individual Mandate." (citations omitted)).

[11] *See id.* at 602 ("It is the attribute of law, of course, that it binds; it states a rule that will be regarded as compulsory for all who come within its jurisdiction." (quoting Hadley Arkes, First Things: An Inquiry Into the First Principles of Morals and Justice 11 (1986))); *see also, e.g.*, *Brackeen v. Zinke*, 338 F. Supp. 3d 514, 536 (N.D. Tex. 2018) ("Congress plainly cannot delegate its inherent legislative power to create law, defined as the power to formulate binding rules generally applicable to private individuals." (citing *Dep't. of Transp. v. Ass'n of Am. R.R.'s*, 135 S.Ct. 1225, 1246 (2015) (Thomas, J. concurring))). *But see* Brief for Intervenor U.S. House of Representatives at 21–24, *Texas v. Azar*, No. 19-10011 (5th Cir. Mar. 25, 2019) (federal lawmakers arguing federal law is not binding). *Compare* 26 U.S.C. § 5000A(a) ("An applicable individual shall . . . ensure that the individual . . . is

like the employee plaintiffs in *March for Life v. Burwell*, are forced to choose between violating their beliefs or violating the law. Live lawfully or flout faithfully, that is their burdened reality.

The Individual Plaintiffs have deemed the latter the lesser evil. But for many in the Individual Class, it is likely the Individual Mandate and the Contraceptive Mandate, acting in tandem, "coerce [them] into acting contrary to their religious beliefs, requir[ing] government to bring forward a compelling justification for its otherwise lawful actions."[12] *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51 (1988). Whichever route an Individual Class member chooses, the problem is the same: The class members cannot participate in the health-insurance market without violating their beliefs, which means they cannot comply with federal law without violating their beliefs. That is a substantial burden. In recognition of this, the Government concedes "that the [Contraceptive] Mandate imposes a substantial burden on the religious beliefs of an individual employee who opposes coverage of some (or all) contraceptives in his or her plan on the basis of his or her religious beliefs, and would be able to obtain a plan that omits contraception from a willing employer or issuer (as applicable), but cannot obtain one solely because the [Contraceptive] Mandate requires that employer or issuer to provide a plan that covers all FDA-approved contraceptives." 83 Fed. Reg. at 57,546.

---

covered under minimum essential coverage.") *with* Brief for Intervenor U.S. House of Representatives at 21, *Texas v. Azar*, No. 19-10011 (5th Cir. Mar. 25, 2019) ("[T]he Act imposes no legal requirement to obtain insurance.").

[12] *See, e.g.*, Josh Blackman, *Undone: The New Constitutional Challenge to Obamacare*, 23 TEX. REV. L. & POL. 1, 5 (2018) ("Even without a penalty, the [individual] mandate will not be toothless. The Congressional Budget Office (CBO) recognized in 2008 that '[p]ersonal [v]alues and [s]ocial [n]orms,' apart from a monetary penalty, also enforce compliance with a requirement to purchase insurance. Indeed, a November 8, 2017 report from CBO and the Joint Committee on Taxation observed that 'with no penalty at all, only a small number of people who enroll in insurance because of the mandate under current law would continue to do so solely because of a willingness to comply with the law.' The number is no doubt 'small,' but it is not zero. At bottom, *some* people who are subject to the mandate will still comply with the mandate, even though there is no penalty for failing to comply with the mandate." (citations omitted)).

The Individual Plaintiffs having demonstrated a substantial burden on their religious exercise, it is again "up to the government to demonstrate that the compelling interest test is satisfied." *Diaz*, 114 F.3d at 71–72 (citations omitted). But as the Court already found, the Government cannot do so. That is, even assuming a compelling governmental interest in ensuring cost-free contraceptive coverage, the availability of the less-restrictive means identified above and articulated by the Supreme Court, *see Hobby Lobby*, 573 U.S. at 728–30, demonstrates the Government is unable to satisfy the least-restrictive-means test.

Accordingly, the Court finds the Individual Plaintiffs—and, by definition, any member of the Individual Class—have stated a successful RFRA claim and are entitled to judgment as a matter of law.

### B.     The Plaintiffs' Motion for Permanent Injunction

A plaintiff seeking a permanent injunction "must demonstrate actual success on the merits." *Millennium Restaurants Grp.*, 191 F. Supp. 2d at 809. As discussed above, both Braidwood and the Individual Plaintiffs—and, through them, the Employer Class and Individual Class—have demonstrated actual success on the merits of their RFRA claims, entitling them to summary judgment. This threshold factor is met.

To prevail on their motion for permanent injunction, Plaintiffs must further show "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between [Plaintiffs and the Government], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc.*, 547 U.S. at 391. Having succeeded on their RFRA claims, Plaintiffs easily satisfy the permanent-injunction factors, which largely mirror the RFRA analysis itself.

As to the first two factors, the Fifth Circuit recognizes that a violation of RFRA *is* irreparable harm. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("Opulent Life has satisfied the irreparable-harm requirement because it has alleged violations of its First Amendment and RLUIPA rights. 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976))). In *Opulent Life Church*, the Fifth Circuit noted the long-established principle that a violation of First-Amendment rights per se constitutes irreparable harm and reasoned that "[t]his principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise." *Id.* (citing 42 U.S.C. § 2000cc–3(g)). It then noted approvingly, "In the closely related RFRA context (the predecessor statute to RLUIPA), courts have recognized that this same principle applies." *Id.* (citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("[C]ourts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA.")). Plaintiffs have therefore shown irreparable harm by succeeding on their RFRA claims.

"Often times the concepts of 'irreparable injury' and 'no adequate remedy at law' are indistinguishable." *Lewis v. S. S. Baune*, 534 F.2d 1115, 1124 (5th Cir. 1976). That is the case here. Unlike the "irreparable injury" prong, "the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury." *Id.* (citation omitted). Here, the injury takes the form of ongoing violations of Plaintiffs' civil rights, which cannot be remedied by the payment of damages or any other remedy at law—in the absence of an injunction, Plaintiffs rights will be violated day after day. The Court therefore finds that, by succeeding on their RFRA claims, Plaintiffs have established an irreparable injury that will continue unless

enjoined, meaning there is no adequate remedy at law for the injury shown. *See Millennium Restaurants Grp.*, 191 F. Supp. 2d at 809 (reasoning a permanent injunction is warranted where the injury alleged "cannot be redressed by the application of a judicial remedy" (quoting *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 573 (5th Cir. 1974))).

The Court finds the third and fourth injunction factors are also resolved by the RFRA analysis. That is to say, the Court finds the balance of hardships favors an injunction because the Government, even in the face of an injunction, will have access to other, less-restrictive means to furthering its interests. It would be illogically to (1) conclude under RFRA that Plaintiffs are injured by the Contraceptive Mandate while the Government is not injured by losing the Contraceptive Mandate and then (2) find under the injunction analysis that enjoining enforcement of the Contraceptive Mandate injures the Government more than continued enforcement of the Contraceptive Mandate injures Plaintiffs. And as to the public interest factor, the *Opulent Life Church* panel noted, "Injunctions protecting First Amendment freedoms are always in the public interest." 697 F.3d at 298 (citing *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir. 2006); *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.,* 88 F.3d 274, 280 (5th Cir. 1996)). Just as it did in assessing the irreparable-harm factor, the panel then reasoned, "This principle applies equally to injunctions protecting RLUIPA rights because, as discussed, RLUIPA enforces the First Amendment and must be construed broadly." *Id.* The Court finds this reasoning applies as much to RFRA as to RLUIPA because, like RLUIPA, RFRA is designed "to ensure broad protection for religious liberty"—a First Amendment right. *Hobby Lobby*, 573 U.S. at 694.

Accordingly, the Court finds Plaintiffs—and, by definition, any member of the Employer Class or the Individual Class—are entitled to a permanent injunction, as further described below.

*Accord Little Sisters v. Azar*, No. 1:13-cv-02611 (D. Colo. May 29, 2018), ECF No. 82, at 1–2 (finding the accommodation process violates RFRA and permanently enjoining enforcement of the Contraceptive Mandate); *Reaching Souls Int'l, Inc. v. Azar*, No. 5:13-cv-01092 (W.D. Okla. Mar. 15, 2018), ECF No. 95, at 3–4 (finding "enforcement of the contraceptive mandate against Plaintiffs, either through the accommodation or other regulatory means" violates RFRA and permanently enjoining enforcement of the Contraceptive Mandate); *Wheaton Coll. v. Azar*, No. 1:13-cv-8910 (N.D. Ill. Feb. 22, 2018), ECF No. 119, at 3 (finding "enforcement of the contraceptive mandate against Wheaton would violate Wheaton's rights under" RFRA and permanently enjoining enforcement of the Contraceptive Mandate).

## IV.    CONCLUSION

Throughout this litigation, the Government has opposed Plaintiffs' requested relief. *See, e.g.*, Defs.' Resp. Mot. Certify, ECF No. 30; Defs.' Resp. Mot. Permanent Inj., ECF No. 38. Although the Court certified the two plaintiff classes over the Government's objections, the Government reiterates its opposition to Plaintiffs' requested relief in responding to the pending motion for permanent injunction. The Government asserts that, "because the identity of the certified class has not yet been resolved, class-wide injunctive relief would be overly vague under [Federal Rule of Civil Procedure] 65 and pose a risk that Defendants will be subject to contempt of court for unintentionally violating such an injunction." *Id.* at 4.

For the reasons set forth in the Court's Order Granting Class Certification, the Court's finds the Government's vagueness arguments are still unavailing. *See* Mar. 30, 2018 Order Granting Class Certification 13–16, ECF No. 33. This leaves the Government's concern that "the proposed injunction puts Defendants at risk of contempt when enforcing the Mandate, if they inadvertently apply it to an employer or individual who happens to be a class member." Defs.'

Resp. Mot. Permanent Inj. 8, ECF No. 38. As an initial matter, the Court notes the Government complains of a problem—not knowing an employer's or individual's status—while conceding it currently "do[es] not require exempt entities or individuals to submit notices of their exempt status." *Id.* If the Government does not require exempt entities or individuals to prove their exempt status, it is unclear why the problem would arise for class members. As Plaintiffs argue, class members should be able to simply decline the offending coverage with the comfort that, like other exempt entities and individuals, they will not be subjected to a religious test. And to the extent the Government is concerned about "inadvertently apply[ing]" the Contraceptive Mandate "to an employer or individual who happens to be a class member," *id.* at 8, Plaintiffs represent they "conferred with counsel for the defendants and informed them that [they] would include [a] proposal for injunctive relief as an attachment to [their] reply" that expressly creates a safe harbor for such inadvertent enforcement, Pls.' Reply Mot. Permanent Inj. 2 n.1, ECF No. 39. The Government did "not oppose [the] inclusion of this proposed order, and the plaintiffs . . . agreed not to oppose the defendants' request to file a sur-reply." *Id.* The Government did not file a sur-reply. The Court therefore includes the proposed safe harbor in the proposed injunctive relief, which the Court finds alleviates the practical concerns raised by the Government.

Accordingly, judgment is entered in favor of Plaintiff Braidwood Management Inc. and the certified Employer Class Braidwood represents, consisting of:

Every current and future employer in the United States that objects, based on its sincerely held religious beliefs, to establishing, maintaining, providing, offering, or arranging for: (i) coverage or payments for some or all contraceptive services; or (ii) a plan, issuer, or third-party administrator that provides or arranges for such coverage or payments.

Judgment is further entered in favor of Plaintiffs Richard W. DeOtte, Yvette DeOtte, John Kelley, and Alison Kelley, as well as the certified Individual Class Mr. DeOtte represents, consisting of:

All current and future individuals in the United States who: (1) object to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs; and (2) would be willing to purchase or obtain health insurance that excludes coverage or payments for some or all contraceptive services from a health insurance issuer, or from a plan sponsor of a group plan, who is willing to offer a separate benefit package option, or a separate policy, certificate, or contract of insurance that excludes coverage or payments for some or all contraceptive services.

Judgment is entered against defendants Alex M. Azar, in his official capacity as Secretary of Health and Human Services; Steven T. Mnuchin, in his official capacity as Secretary of the Treasury; R. Alexander Acosta, in his official capacity as Secretary of Labor; and the United States of America. The Court awards the following relief:

The Court **DECLARES** that the Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv), violates the Religious Freedom Restoration Act as applied to the Employer Class members. The Court further **DECLARES** that the Contraceptive Mandate violates the Religious Freedom Restoration Act to the extent it prevents the Individual Class members from purchasing health insurance that excludes coverage or payments for contraceptive methods that violate their sincerely held religious beliefs. The Court also concludes that the Employer Class members and the Individual Class members will suffer irreparable harm absent

an injunction, that the balance of equities favors injunctive relief, and that the public interest supports the enforcement of the Religious Freedom Restoration Act.

It is therefore **ORDERED** that:

1.      Defendants Alex M. Azar II, Steven T. Mnuchin, and R. Alexander Acosta, and their officers, agents, servants, employees, attorneys, designees, and subordinates, as well as any person acting in concert or participation with them, are **ENJOINED** from enforcing the Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv), against any group health plan, and any health insurance coverage provided in connection with a group health plan, that is sponsored by an Employer Class member. If an Employer Class member's sincere religious objections extend to the coverage of only some but not all contraceptives, then the defendants may continue to enforce the Contraceptive Mandate to the extent it requires coverage of contraceptive methods that the Employer Class member does not object to.

2.      Defendants Alex M. Azar II, Steven T. Mnuchin, and R. Alexander Acosta, and their officers, agents, servants, employees, attorneys, designees, and subordinates, as well as any person acting in concert or participation with them, are **ENJOINED** from enforcing the Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv), to the extent that the Mandate requires the Individual Class members to provide coverage or payments for contraceptive services that they object to based on their sincerely held religious beliefs, and to the extent that the Mandate prevents a willing health insurance issuer offering group or individual health insurance coverage, and as applicable a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance, or a separate group

health plan or benefit package option, to any group health plan sponsor (with respect to a member of the Individual Class) or to any member of the Individual Class, that omits coverage for contraceptive services that the Individual Class member objects to based on that individual's sincerely held religious beliefs.

If an Individual Class member objects to some but not all contraceptive services, but the issuer, and as applicable, plan sponsor, are willing to provide the plan sponsor or individual, as applicable, with a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option that omits all contraceptives, and the Individual Class member agrees, then the injunction applies as if the Individual Class member objects to all contraceptive services.

3.      Nothing in this injunction shall prevent the defendants, or their officers, agents, servants, employees, attorneys, designees, and subordinates, as well as any person acting in concert or participation with them, from:

(a)      Inquiring about whether any employer (including any member of the Employer Class) that fails to comply with the Contraceptive Mandate is a sincere religious objector;

(b)      Inquiring about whether an individual (including any member of the Individual Class) who obtains health insurance that excludes coverage for some or all contraceptive methods is a sincere religious objector;

(c)      Enforcing the Contraceptive Mandate against employers or individuals who admit that they are not sincere religious objectors; against any group health plan, and any health insurance coverage provided in connection with a group health plan, that is sponsored by an employer who admits that it is not a sincere religious objector; or

against issuers or plan sponsors to the extent they provide health insurance to individuals who admit that they are not sincere religious objectors;

(d)     Filing notice with this Court challenging any employer or individual who claims to hold sincere religious objections to some or all contraceptive methods, if the defendants reasonably and in good faith doubt the sincerity of that employer or individual's asserted religious objections, and asking the Court to declare that such employer or individual falls outside the scope of the Employer Class or the Individual Class;

(e)     Enforcing the Contraceptive Mandate against employers or individuals whom a court has declared to fall outside the scope of the Employer Class or the Individual Class; against any group health plan, and any health insurance coverage provided in connection with a group health plan, that is sponsored by an employer whom a court has declared to fall outside the scope of the Employer Class; or against issuers or plan sponsors to the extent they provide health insurance to individuals that a court has declared to fall outside the scope of the Individual Class.

**SO ORDERED** on this **5th day** of **June, 2019**.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**