UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **Richard W. DeOtte**, et al., | |
| Plaintiffs, | |
| v. | Case No. 4:18-cv-825-O |
| **Alex M. Azar II**, et al., | |
| Defendants. | |

## BRIEF IN OPPOSITION TO NEVADA'S MOTION TO INTERVENE

Charles W. Fillmore
H. Dustin Fillmore
The Fillmore Law Firm, LLP
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
chad@fillmorefirm.com
dusty@fillmorefirm.com

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and
the Certified Classes*

# TABLE OF CONTENTS

Table of contents ...............................................................................................i

Table of authorities ..........................................................................................ii

I. The motion to intervene should be denied because it fails to include a pleading, as required by Rule 24(c) ..................................................................1

II. The motion to intervene should be denied because Nevada has not identified a "claim or defense for which intervention is sought," as required by Rule 24(c)......................................................................................................2

III. The motion to intervene as of right should be denied because Nevada has failed to establish a "direct, substantial, and legally protectable interest" in the outcome of this litigation ..........................................................................3

    A. Nevada is asserting a mere economic interest, which is insufficient to warrant intervention under *NOPSI*.............................................................5

    B. Nevada has failed to establish a "direct" interest in outcome of these proceedings ................................................................................................6

    C. Nevada has failed to establish a "substantial" interest in the outcome of these proceedings ....................................................................................9

    D. Nevada's interest in avoiding state expenditures is not "legally protectable"...............................................................................................14

IV. The motion to intervene as of right should be denied because the State of Nevada cannot assert an "interest" that contradicts the policies embodied in its own laws .............................................................................................16

V. The motion for permissive intervention should be denied because Nevada has failed to show that it "has a claim or defense" in this litigation...................17

VI. The motion to intervene should be denied as untimely .....................................18

VII. If Nevada is permitted to intervene, its intervention should be limited to the claims asserted by the class of objecting employers......................................20

VIII. The text of the Religious Freedom Restoration Act prohibits intervenors or amici from attempting to prove that the contraceptive mandate is the "least restrictive means" of furthering a "compelling governmental interest," because the statute assigns the burden of proof on these questions to the federal government alone ........................................................20

Conclusion .........................................................................................................22

Certificate of service ..........................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine*, 527 U.S. 706 (1999) ............................................................................14

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................17

*Berman v. Parker*, 348 U.S. 26 (1954) ...........................................................................16

*Bush v. Viterna*, 740 F.2d 350 (5th Cir. 1984) .................................................................1

*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) .................15

*Donaldson v. United States*, 400 U.S. 517 (1971) ..........................................................3, 4

*New Orleans Public Service, Inc. v. United Gas Pipe Line Co.*,
    732 F.2d 452 (5th Cir. 1984) ...........................................................................passim

*Pin v. Texaco, Inc.*, 793 F.2d 1448 (5th Cir. 1986) .........................................................1, 2

*Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775 (1st Cir. 1988) ...................................2

*Shevlin v. Schewe*, 809 F.2d 447 (7th Cir. 1987) ..............................................................2

*Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) ..............................................19

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015) .........................................5, 6, 9, 18

*Yazdchi v. Am. Honda Fin. Corp.*, No. CIV.A. 3:05-cv-0737-L, 2005 WL
    1943611 (N.D. Tex. Aug. 12, 2005) ....................................................................1

**Statutes**

42 U.S.C. § 2000bb-1(b) ...........................................................................................20, 21

42 U.S.C. § 2000bb-2 ...............................................................................................20, 21

**Rules**

Fed. R. Civ. P. 24(a) .....................................................................................................3

Fed. R. Civ. P. 24(b)(1) ...............................................................................................17

Fed. R. Civ. P. 24(c) ...................................................................................................1, 2

Religious Exemptions and Accommodations for Coverage of Certain
    Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792
    (October 13, 2017) ..........................................................................................19

Religious Exemptions and Accommodations for Coverage of Certain
    Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536
    (November 15, 2018) ...................................................................................10, 19

**Other Authorities**

Robert H. Bork, *The Impossibility of Finding Welfare Rights in the
    Constitution*, 1979 Wash. U. L. Q. 695 ..............................................................15

Caleb Nelson, *Intervention*, 106 Va. L. Rev. ___ (forthcoming April 2020) ................3, 17

Nevada's motion to intervene should be denied for multiple independent reasons, most of which, standing alone, are fatal to Nevada's attempted intervention. Although the Court need only resolve one of these issues in our favor to deny intervention, we respectfully ask the Court to rule on each of the grounds set forth below. In the event that this Court's ruling is appealed, it will aid the Fifth Circuit if it has the benefit of this Court's analysis on each of the disputed issues, even if the Court disagrees with some or all of our arguments.

## I.    THE MOTION TO INTERVENE SHOULD BE DENIED BECAUSE IT FAILS TO INCLUDE A PLEADING, AS REQUIRED BY RULE 24(c)

A motion to intervene must be "accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). No such pleading was included with Nevada's motion to intervene. That alone requires denial of the motion. *See Bush v. Viterna*, 740 F.2d 350, 357 (5th Cir. 1984) ("Rule 24(c) requires that a motion for intervention 'be accompanied by a pleading setting forth the claim or defense for which intervention is sought.'"); *Pin v. Texaco, Inc.*, 793 F.2d 1448, 1450 (5th Cir. 1986) ("[I]ntervention under Rule 24 is conditioned by the Rule 24(c) requirement that the intervenor state a *well-pleaded* claim or defense to the action" (quoting *Rhode Island Federation of Teachers v. Norberg,* 630 F.2d 850, 854–55 (1st Cir. 1980) (emphasis added)); *Yazdchi v. Am. Honda Fin. Corp.*, No. CIV.A. 3:05-cv-0737-L, 2005 WL 1943611, at *2 n.4 (N.D. Tex. Aug. 12, 2005) ("Ali Yazdchi's Motion to Intervene should be denied because he has failed to satisfy the elements of Fed. R. Civ. P. 24, . . . [including] Rule 24(c), which requires that the motion to intervene be 'accompanied by a pleading setting forth a claim or defense for which intervention is sought.'"). Rules exist to be followed; they are not options for litigants to ignore whenever they think compliance unnecessary. Nevada's brief does not even acknowledge Rule 24(c), let alone explain why it should receive a dispensation.

The text of Rule 24(c) says that a motion to intervene "must" be accompanied by a pleading. Not "may," "should," or "ought to be." "Must." There is no allowance for any litigant to depart from this requirement. *See Public Citizen v. Liggett Group, Inc.*, 858 F.2d

775, 783–84 (1st Cir. 1988) ("'The motion *shall* state the grounds therefor and *shall* be accompanied by a pleading setting forth the claim or defense for which intervention is sought.' Fed. R. Civ. P. 24(c) (emphasis added). The language of the rule is mandatory, not permissive"); *Shevlin v. Schewe*, 809 F.2d 447, 450 (7th Cir. 1987) ("Federal Rule of Civil Procedure 24(c) is unambiguous in defining the procedure for an intervenor. It requires that the motion to intervene shall be 'accompanied by a pleading setting forth the claim or defense for which intervention is sought.'"). But even if there were the possibility of an exemption from Rule 24(c), the onus would be on Nevada to explain and justify its proposed exemption. Nevada makes no argument for an exception and makes no attempt to justify its non-compliance with Rule 24(c), apparently in the hope that its decision to ignore Rule 24(c) will somehow induce this Court to ignore the Rule's requirements as well.

## II.   THE MOTION TO INTERVENE SHOULD BE DENIED BECAUSE NEVADA HAS NOT IDENTIFIED A "CLAIM OR DEFENSE FOR WHICH INTERVENTION IS SOUGHT," AS REQUIRED BY RULE 24(c)

Nevada's failure to comply with Rule 24(c) extends beyond the omission of a pleading. Nevada has also failed to identify the "claim or defense" on which it is seeking to intervene. Rule 24(c) requires not only the submission of a pleading, it also requires a pleading that "sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). An intervenor who is unable to assert such a "claim or defense" is not a proper party to the lawsuit—even if it has an "interest" in the litigation sufficient to satisfy Rule 24(a). *See Pin v. Texaco, Inc.*, 793 F.2d 1448, 1450 (5th Cir. 1986) ("[I]ntervention under Rule 24 is conditioned by the Rule 24(c) requirement that the intervenor state a *well-pleaded claim or defense to the action*" (quoting *Rhode Island Federation of Teachers v. Norberg*, 630 F.2d 850, 854–55 (1st Cir. 1980) (emphasis added)).

There is no "claim" or "defense" asserted or described anywhere in Nevada's motion to intervene. Nevada obviously has no "claim" in this litigation, because it is not seeking judicial relief (such as damages or an injunction). But Nevada is not asserting a "defense" either,

because none of the requested relief would impose any legal obligations on Nevada. The plaintiffs have not brought a constitutional challenge to the Contraceptive Mandate, so there is no possibility that the Court's ruling could undermine the constitutionality of Nevada laws that regulate health insurance and contraception. *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 1. And there is no conceivable "defense" for Nevada to assert, because Nevada will not be required to do anything—nor will it be restrained from doing anything— by the relief that the plaintiffs are seeking against the federal government. *See* Caleb Nelson, *Intervention*, 106 Va. L. Rev. ___ (forthcoming April 2020) ("[A] 'defense' is a particular type of legal argument that the targets of a claim assert to explain why the court should not grant relief against them."), available at https://ssrn.com/abstract=3380589.

Nevada's refusal to identify its "claim or defense"—and its refusal to acknowledge its obligation to identify a claim or defense under Rule 24(c)—warrant denial of its motion to intervene.

## III. THE MOTION TO INTERVENE AS OF RIGHT SHOULD BE DENIED BECAUSE NEVADA HAS FAILED TO ESTABLISH A "DIRECT, SUBSTANTIAL, AND LEGALLY PROTECTABLE INTEREST" IN THE OUTCOME OF THIS LITIGATION

To qualify for intervention as of right, Nevada must show that it:

> (1) is given an unconditional right to intervene by a federal statute; or
>
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). Nevada seeks to intervene under Rule 24(a)(2), so it must describe an "interest" in the litigation sufficient to warrant intervention.

But it is not enough for an intervenor merely to show that it will be adversely affected by the outcome of a lawsuit. We know that from *Donaldson v. United States*, 400 U.S. 517 (1971), where the Supreme Court refused to allow a taxpayer to intervene in proceedings that the IRS had brought against the taxpayer's employer and accountant. The IRS had

sought to compel the employer and accountant to disclose records of payments that they had made to the taxpayer, and the taxpayer moved to intervene to protect those documents from disclosure. The taxpayer in *Donaldson* most assuredly had an "interest" in preventing the release of documents that could land him in trouble with the IRS. Yet the Supreme Court held that this "interest" was insufficient to warrant intervention:

> This asserted interest . . . is nothing more than a desire by Donaldson to counter and overcome Mercurio's and Acme's willingness, under summons, to comply and to produce records. . . . This interest cannot be the kind contemplated by Rule 24(a)(2) when it speaks in general terms of 'an interest relating to the property or transaction which is the subject of the action.' What is obviously meant there is a *significantly protectable interest.*

*Donaldson v. United States*, 400 U.S. 517, 530–31 (1971) (emphasis added). So a mere "interest" in the outcome of the litigation is not enough; the proposed intervenor must establish a "significantly protectable interest" to qualify for intervention under Rule 24(a)(2).

The Fifth Circuit has expounded on *Donaldson*'s "significantly protectable interest" requirement, and it has held that Rule 24(a)(2) requires an intervenor to establish a "direct, substantial, legally protectable interest in the proceedings." *New Orleans Public Service, Inc. (NOPSI) v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984) (en banc) (citation and internal quotation marks omitted). The Fifth Circuit has explained:

> The Supreme Court in *Donaldson v. United States,* 400 U.S. 517, 531 (1971), stated that the applicant's interest had to be "a significantly protectable interest." It is apparent that the Supreme Court in *Donaldson* used "protectable" in the sense of legally protectable, and it is difficult to conceive of any other sense in which the Court might have been employing "protectable" in that context.
>
> By requiring that the applicant's interest be not only 'direct' and 'substantial,' but also 'legally protectable,' it is plain that something more than an economic interest is necessary. What is required is that the interest be one which the *substantive* law recognizes as belonging to or being owned by the applicant. . . . We hold that an economic interest alone is insufficient, as a legally protectable interest is required for intervention under Rule 24(a)(2), and such intervention is improper where the intervenor does not itself possess the only substantive legal right it seeks to assert in the action.

*NOPSI*, 732 F.2d at 463–64, 466. Nevada does not cite or acknowledge *NOPSI*, but *NOPSI* makes abundantly clear that Nevada's purported "interest" in avoiding state expenditures is insufficient to warrant intervention under Rule 24(a)(2).

### A.   Nevada Is Asserting A Mere Economic Interest, Which Is Insufficient To Warrant Intervention Under *NOPSI*

The first and most obvious problem is that Nevada's desire to avoid additional state expenditures is a mere "economic interest"—and *NOPSI* specifically holds that "an economic interest alone is insufficient" to support intervention under Rule 24(a)(2). *See NOPSI*, 732 F.2d at 466. Nevada provides no argument in response because it does not acknowledge or address the holding of *NOPSI*.

The closest that Nevada comes to addressing this problem is the following statement that appears on page 5 of its brief:

> Property or pecuniary interests are the "most elementary type[s] of right[s]" protected by Rule 24(a) and "are almost always adequate."

Br. in Support of Mot. to Intervene (ECF No. 62-1) at 5 (quoting *Texas v. United States*, 805 F.3d 653, 658 (5th Cir. 2015)). Nevada asserts that *Texas v. United States*, 805 F.3d 653 (5th Cir. 2015), held that "pecuniary interests" are "almost always adequate" to establish intervention under Rule 24(a)(2)—a holding that would be in considerable tension (if not irreconcilable conflict) with *NOPSI*.

But Nevada misrepresents the holding of *Texas*. Here is what the Fifth Circuit in *Texas* actually said:

> Although property interests are almost always adequate, they are not the only types of interests that can support intervention under Rule 24(a)(2). Indeed, we have disclaimed the notion "that a person must possess a pecuniary or property interest to satisfy the requirement of Rule 24(a)(2)." *Mothersill D.I.S.C. Corp. v. Petroleos Mexicanos, S.A.*, 831 F.2d 59, 62 (5th Cir. 1987); *see also Moore's* § 24.03[2][b] ("Rule 24 does not require that the intervenor prove a property right. . . .").

*Texas*, 805 F.3d at 658. The Court said that "property interests"—not "pecuniary inter-ests"—are "almost always adequate." The notion of a "pecuniary interest" is discussed in the next sentence, where the Court says that "a pecuniary or property interest" is not *neces-sary* to establish intervention. Nowhere does the Court state or imply that a "pecuniary in-terest" is *sufficient* to warrant intervention, and nothing in the Court's opinion contradicts or undermines *NOPSI*'s holding that "an economic interest alone is insufficient" to support intervention. *NOPSI*, 732 F.2d at 466. Indeed, *Texas* explicitly acknowledges and reaffirms *NOPSI*'s holding on this point. *See Texas*, 805 F.3d at 658 ("Sitting *en banc*, we held that the officials' generalized, 'purely economic interest' was insufficient to justify intervention." (quoting *NOPSI*, 732 F.2d at 466)). So there is no conflict between *NOPSI* and *Texas*, and both opinions recognize that a mere economic interest of the sort that Nevada descibes can-not support intervention under Rule 24(a)(2).[1]

### B.  Nevada Has Failed To Establish A "Direct" Interest In Outcome Of These Proceedings

Nevada also fails to assert a "direct" interest in the proceedings. *See NOPSI*, 732 F.2d at 463 (requiring an intervenor to establish a "*direct*, substantial, [and] legally protectable in-terest in the proceedings." (emphasis added)). Nevada fears that a classwide injunction will create ripple effects, leading others to make choices that will eventually lead to additional burdens on the State's fisc. *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 5–7.

---

1.  If Nevada tries to get around *NOPSI* by asserting a "quasi-sovereign interest in the phys-ical and economic well-being of [its] residents," Br. in Support of Mot. to Intervene (ECF No. 62-1) at 7, then it will encounter an additional obstacle: A litigant cannot justify intervention by relying on harms to others. *See NOPSI*, 732 F.2d at 464 ("[I]nter-vention has been held subject to the prudential standing requirement that 'the presence of harm to a party does not permit him to assert the rights of third parties in order to obtain redress for himself.'" (citation omitted)); *id*. ("The real party in interest require-ment of Rule 17(a), Fed. R. Civ. P., 'applies to intervenors as well as plaintiffs,' as does also the rule that 'a party has no standing to assert a right if it is not his own.'" (citation omitted)).

These effects on the State's fisc—even if one assumes that they will actually occur—are far too attenuated to qualify as a "direct" interest in the outcome of this lawsuit.

The chain of causation that leads from a classwide injunction to additional state spending depends on a series of independent choices made by others. Nevada speculates that each of the following events will happen in response to a classwide injunction issued by this Court:

1.   Religious employers throughout Nevada will choose to terminate coverage of some or all contraceptive methods in their insurance or self-insured health plans.

2.   The female employees of child-bearing age who work for these objecting employers will choose not to obtain contraception from other sources such as Title X, Planned Parenthood, their family members' health insurance, purchasing contraception with their own money, or purchasing health insurance that covers contraceptive through the exchanges, and will instead seek contraception at the expense of Nevada taxpayers.

3.   The female employees of child-bearing age who work for objecting employers and choose not to obtain contraception from other sources will also choose to engage in unprotected sex that puts themselves at risk of an unintended pregnancy, rather than avoiding the risk of unintended pregnancy by refraining from sexual intercourse.

4.   The female employees of child-bearing age who work for objecting employers and (i) choose not to obtain contraception from other sources; and (ii) choose to engage in unprotected sex after failing to obtain contraception; will also (iii) become pregnant on account of those choices.

5.   The female employees of child-bearing age who work for objecting employers and (i) choose not to obtain contraception from other sources; (ii) choose to engage in unprotected sex after failing to obtain contraception; and (iii) become pregnant on account of

those choices; will also (iv) choose not to abort their pregnancy, even though abortion re-
mains available on demand before viability and even though elective abortion does not affect
Nevada's fisc because Nevada does not permit taxpayer funding of elective abortions.[2]

6.   The female employees of child-bearing age who work for objecting employers and
(i) choose not to obtain contraception from other sources; (ii) choose to engage in unpro-
tected sex after failing to obtain the necessary contraception; (iii) become pregnant on ac-
count of those choices; and (iv) choose not to abort their pregnancy; will also (v) drop their
employer-sponsored health insurance and switch to Medicaid or some other form of state-
provided health insurance shortly after becoming pregnant, causing the "increased hospital
costs for [these] unplanned pregnancies" to fall on the State of Nevada rather than a private
insurance company.

7.   Nevada will choose to increase public spending in response to these choices made by
others, rather than capping its spending—or cutting or eliminating its social-welfare pro-
grams—in response to this increased demand.

It would be an understatement to say that the "increase in spending" that Nevada pre-
dicts would not be a "direct" result of this Court's classwide injunction—even if one accepts
Nevada's dubious contention that this increased spending will occur. Instead, any increase in
state spending that results from the Court's relief will be the product of *many* independent
choices made by others along the way—including choices made by Nevada itself, which is
under no compulsion to establish or fund social-welfare programs that pay for its residents'
contraception or health care. If this can somehow qualify as a "direct" interest in the pro-
ceedings, then it is hard to imagine an asserted interest that would fail the directness require-
ment.

---

2.   Nevada prohibits taxpayer funding of abortion except in cases of rape, incest, or when
the mother's life is endangered. *See* https://www.guttmacher.org/state-policy/explore/
state-funding-abortion-under-medicaid (last visited on June 14, 2019).

To its credit, Nevada acknowledges that it must establish a "direct" interest in the proceedings. *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 4 ("[I]ntervenors must have a 'direct, substantial, legally protectable interest in the proceedings.'" (quoting *Texas*, 805 F.3d at 657)). Nevada, however, makes no effort to explain how this exceedingly attenuated chain of causation—which turns on a multitude of choices made by independent actors—can satisfy the directness requirement. Nevada's failure to allege a "direct" interest in the outcome of this litigation precludes its attempt to intervene as of right.

## C.   Nevada Has Failed To Establish A "Substantial" Interest In The Outcome Of These Proceedings

Nevada has also failed to establish a "substantial" interest in the proceedings, because it makes no effort to calculate or estimate the amount of additional spending that the State will incur. *See NOPSI*, 732 F.2d at 463 (requiring an intervenor to establish a "direct, *substantial*, [and] legally protectable interest in the proceedings." (emphasis added)). It is also abundantly clear that any harm that might befall the State's fisc on account of a classwide injunction will be negligible or non-existent.

Nevada asserts that a classwide injunction will lead to increased state spending on: (1) contraception access; and (2) hospital costs for unplanned pregnancies. *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 5. But Nevada makes no effort to estimate the number of women who will demand that the State pay for their contraception or hospital costs in response to a classwide injunction. Nevada's suggestion that "more than 379,000 women . . . could be affected by Plaintiffs' proposed class action relief" is preposterous, as the vast majority of these women work for secular employers and cannot be affected by this Court's ruling in any way. *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 5. Nevada later asserts that "between 600 and 1,200 Nevadan women would be harmed from implementation of Plaintiffs' proposed class relief." *Id*. at 6. But Nevada does not explain how it came up with this number. It cites paragraph 5 of Beth Handler's declaration, but that contains nothing more than a bald assertion that "between 600 to 1,200 Nevada women would be

harmed"; it is unsupported by any citation or explanation. *See* Decl. of Beth Handler (ECF No. 62-2) ¶ 5. And while Nevada claims that this number was "based on the calculations in the Federal Government's proposed Final Rules," we cannot find anything in the Final Rule that purports to calculate the number of women in Nevada who work for objecting employers. The Final Rule does state that the proposed religious and moral exemptions will affect "*no more than* 126,400 women of childbearing age who use contraceptives," but there is no Nevada-specific calculation. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536, 57,550 (November 15, 2018) (emphasis added). And this nationwide number was not an estimate but an estimated *ceiling* on the number of women who *could* be affected; it is not a number from which anyone can extrapolate state-specific data on the number of women who actually *will* be affected by exempting objecting employers from the Contraceptive Mandate.

Nevada is obligated to explain how it came up with this "600 to 1,200" number. It cannot blurt out a number without any citations or any explanation for how this number was derived. There is no way for the Court or opposing counsel to determine whether this estimate is based on reliable data or methodologies, nor is there any way to know whether these numbers were simply fabricated. An unexplained and unsupported "estimate" cannot establish the factual premise of a motion to intervene.

But even if we were to assume, simply for the sake of argument, that there really are "600 to 1,200" women of childbearing years who work for objecting employers and will no longer have full contraceptive coverage provided in their employer's health plan,[3] it *still* does not follow that *any* of these women will make demands on the state's treasury in response to their employer's decisions.

---

3.   We assume this is what Nevada means when it says that 600 to 1,200 women in Nevada will be "harmed" by classwide relief, although Nevada never bothers to explain what it means by the word "harmed." *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 6 ("[B]etween 600 to 1,200 Nevadan women would be harmed from implementation of Plaintiffs' proposed class relief.").

The notion that the State will be picking up the tab for *any* pregnant woman's hospitalization costs is fantastical. Even if one were to assume that some of these 600 to 1,200 women will actually become pregnant on account of this Court's classwide injunction, those women all have employer-sponsored health insurance, and those private insurance plans—rather than the State—will pay for the hospital costs associated with the pregnancy and delivery. For any of these costs to fall on the State, one would have believe that a woman who is employed by an objecting employer would suddenly terminate her employer-sponsored insurance after becoming pregnant and switch to Medicaid, a course of action that would be entirely irrational for a pregnant woman who knows that she is facing a litany of upcoming health-care expenses. Not to mention that Medicaid in Nevada is limited to individuals whose annual household incomes fall below 138% of the federal poverty level—who are not found among the ranks of those who hold jobs with employer-sponsored health insurance. For Nevada to claim that it will be paying for hospitalization costs on account of this Court's relief is beyond speculation—it is utterly fatuous.

More importantly, Nevada has not even shown that a classwide injunction will cause any of these 600 to 1,200 women to become pregnant in the first place. Nevada makes no effort to account for:

- The women who will be able access full contraceptive coverage through their husbands' health plans.

- The women under the age of 26 who will be able access full contraceptive coverage through their parents' health plans.

- The women whose employers object only to abortifacient contraception, and who will continue to provide non-abortifacient contraception at zero marginal cost.

- The women who share the religious beliefs of their employer, and who would never use contraceptive methods (or abortifacients) regardless of whether their employer provides coverage for them.

- The women who will obtain free contraception through Title X if they can no longer get free contraception through their employer's health plan.

- The women who will purchase health insurance on the exchanges in response to their employer's decision to limit contraceptive coverage.

- The women who will buy their own contraception if they can no longer obtain it through their employer's health plan. (The pill costs between $15 and $50 per month, which many though not all women can easily afford.)

- The women who will refrain from sexual intercourse if they are unable or unwilling to obtain contraception through other means, rather than risking an unintended pregnancy by choosing to engage in unprotected sex.

- The women whose sexual partners will undergo vasectomies or use condoms if contraception is no longer provided free of charge in their employer's health plan.

- The women who work for objecting employers in Nevada who are already protected from the Contraceptive Mandate by an injunction entered in a different lawsuit.

By the time that one accounts for the women in these categories, the "600 to 1,200" number that Nevada touts could very well drop to zero—and even if it does not drop that far Nevada still has not shown that any of the remaining women will *actually become pregnant* on account of the relief issued by this Court. Nevada's claim that classwide relief will increase unintended pregnancies is nothing more than rank speculation, and it insults the women of Nevada by assuming that they are incapable of avoiding unwanted pregnancy through other means.

The State also fears that it will have to increase its spending on contraception access, but this will happen only if a woman who works for an objecting employer is unable or unwilling to obtain contraception from other sources. And there are *many* other ways for women to obtain contraception (or use other birth-control strategies) that do not impose any costs whatsoever on the taxpayers of Nevada. Those include:

- For married women, obtaining contraception through their husbands' health plans.

- For women under the age of 26, obtaining contraception through their parents' health plans.

- For women whose employers object only to abortifacients, obtaining and using the non-abortifacient contraception that remains available through their employer's plan.

- Obtaining contraception through Title X, which is federally funded and does not use state money.

- Purchasing health insurance on the exhanges that covers contraception.

- Paying for their own contraception.

- Insisting that their sexual partners undergo vasectomies or use condoms.

- Refraining from sexual intercourse.

There is no basis for Nevada to assume that *any* woman who works for an objecting employer will go on the dole and demand that state taxpayers pay for her contraception, when there are countless other ways for women to obtain contraception and practice birth control that do not involve the State in any way.

More importantly, Nevada has failed to show that *any* of the affected women would even qualify for state-funded contraception under Medicaid or other means-tested programs. In Nevada, a woman cannot receive Medicaid benefits if her annual household income exceeds 138% of the federal poverty level. In 2018, that amounted to $16,753 per year for an individual, and $34,638 per year for a family of four.[4] A woman who holds a job with employer-provided health insurance is exceedingly unlikely to have an annual household income below these amounts. And Nevada's brief fails to identify any state-funded program apart from Medicaid that could wind up providing contraception at taxpayer expense, nor does it describe the eligibility requirements for such a program. According the Guttmacher Institute,

---

4.   *See* https://www.nevadahealthlink.com/start-here/about-the-aca/medicaid (last visited on June 14, 2019).

the amount that Nevada spends on family-planning services outside its Medicaid program is practically non-existent.[5]

Nevada refuses to acknowledge or account for *any* of these possibilities in its brief, so it has failed to show that any of the 600 to 1,200 women will seek and obtain taxpayer-funded contraception in response to a classwide injunction. At worst, the amount of money that the State would spend in response to this situation will be nothing more than a rounding error in the state's budget, which hardly accounts for a "substantial" interest in these proceedings.

### D.    Nevada's Interest In Avoiding State Expenditures Is Not "Legally Protectable"

Finally, Nevada has failed to show that its interest in avoiding additional state expenditures is "legally protectable." *See NOPSI*, 732 F.2d at 463 (requiring an intervenor to establish a "direct, substantial, [and] *legally protectable* interest in the proceedings." (emphasis added)); *id.* at 464 ("What is required is that the interest be one which the *substantive* law recognizes as belonging to or being owned by the applicant." (emphasis in original)).

There is no "law" of any sort that "protects" Nevada from increased expenditures on social-welfare programs. Indeed, no such law could ever exist. Whether and how much a State should spend is sovereign prerogative that rests entirely with the people of Nevada, and no decision of this Court can ever compel a State to increase its spending on social-welfare programs without its consent. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 750–51 (1999). It is Nevada's *choice* whether to increase or decrease its spending on contraceptive access or health care in response to a classwide injunction from this Court, and nothing in the classwide injunction threatens Nevada's right to decide the amount of money that it will spend on these matters.

Nevada acts as though it will be *compelled* to increase public spending if a classwide injunction increases the number of women who want state taxpayers to pay for their birth

---

5.   *See* https://www.guttmacher.org/sites/default/files/factsheet/nv_13.pdf (last visited on June 14, 2019).

control. But Nevada is not obligated to accommodate to these demands. Nevada is not re-quired to establish a welfare state, and Nevada is under no compulsion to tax its citizens and redistribute that money toward those want others to pay for their contraception and health care. *See DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989) ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."); Robert H. Bork, *The Impossibility of Finding Welfare Rights in the Constitution*, 1979 Wash. U. L. Q. 695. Nevada chooses to establish these programs, and Nevada chooses the amount of taxpayer money that it will direct toward family planning and health-related services. Nevada will retain its prerogative to make these choices no matter what relief the Court awards in this case.

So Nevada is flatly wrong to claim that a classwide injunction will "necessitate" additional public spending in Nevada—even if the Court's relief has the dire effects that Nevada pre-dicts. *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 5. Nothing prevents Nevada from establishing spending caps on its contraceptive-access programs, and nothing prevents Nevada from cutting spending on these programs or canceling them entirely. To be sure, Nevada may face political pressure to increase its spending on contraceptive-access programs if objecting employers drop contraceptive coverage, but a State has no "legally protected interest" in preventing *that* from happening; otherwise Nevada could assert a "legally pro-tected" interest in preventing women of child-bearing age from moving into the State.

Nevada has yet to explain how its supposed "interest" in avoiding state expenditures is "legally protected" when Nevada has total control over the amount of money that it chooses to spend on health care and contraceptive access. Nevada's failure to establish or assert a "legally protected" interest provides yet another reason for rejecting its motion to intervene as of right.

## IV.   The Motion To Intervene As Of Right Should Be Denied Because The State Of Nevada Cannot Assert An "Interest" That Contradicts The Policies Embodied In Its Own Laws

Nevada admits at the outset of its brief that its very own state-law contraceptive mandate *has a religious exemption* for insurers who are "affiliated with a religious organization." Br. in Support of Mot. to Intervene (ECF No. 62-1) at 1. Nevada's statutes do not define "religious organization" or the meaning of "affiliated," and we have not uncovered any court decision or regulation that purports to define these terms. But Nevada's own law acknowledges that the right of religious freedom should prevail over laws that compel employer-provided health insurance to cover contraception in at least *some* situations. So it is hard to understand how the Attorney General of Nevada can insist that his State has an "interest" in subordinating the right of religious freedom to the goal of universal access to contraception, when the State's very laws recognize situations in which access to contraception takes a back seat to the protection of religious liberty. *See Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive.").

It is obvious that the State of Nevada does *not* believe that insurers affiliated with a religious organization should be compelled to provide contraception. The Attorney General of Nevada is of course free to disagree with that assessment, but when he acts as a representative of the State he is obligated to assert the State's interests and not his own. We do not see how the Attorney General can argue that his *State* has an "interest" in an outcome that forecloses religious exemptions to the federal Contraceptive Mandate, when the law of Nevada acknowledges that at least *some* religious exemptions to contraceptive mandates should exist. How can the State possibly have an "interest" in having the federal Contraceptive Mandate override exemptions that Nevada sought to preserve for insurers and religious organizations under state law?

## V.  The Motion For Permissive Intervention Should Be Denied Because Nevada Has Failed To Show That It "Has A Claim Or Defense" In This Litigation

Nevada also seeks permissive intervention under Rule 24(b). *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 10–11. But Nevada makes no effort to explain how it "has a claim or defense" in this litigation, as required by Rule 24(b)(1)(B).

Rule 24(b)(1) sets forth the requirements for permissive intervention:

> On timely motion, the court may permit anyone to intervene who:
> (A) is given a conditional right to intervene by a federal statute; or
> (B) *has a claim or defense* that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24(b)(1) (emphasis added). Nevada, however, carefully re-states this rule to omit any mention of the "claim or defense" requirement:

> Rule 24(b) . . . permits the Court to use its discretion to grant intervention where the application is timely, *there is a common question of law or fact*, and there will be no undue delay or prejudice to the original parties.

*See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 10 (emphasis added). Nevada tells this Court that it can grant intervention under Rule 24(b) so long as there "is" a common question of law and fact. *See id.* The rule, however, says that the intervenor must *have a claim or defense* that shares a common question of law or fact with the main action. And Nevada fails to identify the "claim or defense" that it "has."

Nevada has no "claim" because it is not suing any of the litigants. And Nevada has no "defense" because it will not be required to do anything—nor will it be restrained from doing anything—by the relief that the plaintiffs are seeking against the federal government. *See* Caleb Nelson, *Intervention*, 106 Va. L. Rev. ___ (forthcoming April 2020) ("[A] 'defense' is a particular type of legal argument that the targets of a claim assert to explain why the court should not grant relief against them."), available at https://ssrn.com/abstract=3380589; *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 n.18 (1997) ("The words 'claims or defenses' . . . in the context of Rule 24(b)(2) governing permissive intervention—manifestly refer to the kinds of claims or defenses that can be raised in courts of

law as part of an actual or impending law suit." (citation and internal quotation marks omit-
ted)). Nevada does not "have" a claim or defense against any of the litigants, so it has no
grounds for permissive intervention.

Instead, Nevada falls back on its oft-repeated statement that intervention should be al-
lowed "where no one would be hurt and the greater justice could be obtained"—a statement
that appears to invite disregard of established rules in favor of a freewheeling inquiry into
amorphous concepts such as "greater justice." Br. in Support of Mot. to Intervene (ECF No.
62-1) at 10 (quoting *Texas*, 805 F.3d at 657). But it does not serve the cause of "justice" to
disregard the language of the Rules of Civil Procedure, which unambiguously requires a per-
missive intervenor to *have* a "claim or defense." And it does not serve the cause of "justice"
to disregard the rulings of the en banc Fifth Circuit, which require intervenors as of right to
establish a "direct, substantial, legally protectable interest in the proceedings," and which
specifically hold that a mere "economic interest" is insufficient to support intervention. *New
Orleans Public Service, Inc. (NOPSI) v. United Gas Pipe Line Co.*, 732 F.2d 452, 463, 466
(5th Cir. 1984) (en banc) (citation and internal quotation marks omitted).

## VI.   The Motion To Intervene Should Be Denied As Untimely

Rule 24 permits intervention only in response to a "timely" motion. Nevada moved to
intervene on May 24, 2019—more than seven months after the plaintiffs filed their lawsuit
on October 6, 2018; nearly four months after the plaintiffs moved for class certification and
preliminary injunction on February 5, 2019; nearly two months after the Court certified the
classes on March 30, 2019; more than one month after the close of briefing on the plaintiffs'
motion for summary judgment and permanent injunction; four days after the original date
that the Court set for oral argument on the motion for summary judgment and permanent
injunction; and only two business days before the Court's rescheduled hearing date of May
29, 2019. The Court has already granted summary judgment to the plaintiffs and entered a

permanent classwide injunction. Nevada now seeks to relitigate these matters and present arguments that it should have offered to the Court months ago.

It goes without saying that the plaintiffs will be prejudiced by allowing this attempted intervention at the thirteenth hour. The briefing on the merits has long been concluded, and the Court has already ruled. Nevada cites no authority that allows a litigant to spring an intervention motion after the close of briefing and demand an additional round of briefing and argument after the Court has issued its final ruling.

Worse, Nevada does not even attempt to explain why it waited until May 24, 2019, to move for intervention. And Nevada does not tell the Court when it became aware of this litigation, even though timeliness turns on "[t]he length of time the applicants knew or should have known of their interest in the case." *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264 (5th Cir. 1977). The Court cannot assess this factor if Nevada refuses to say when it "knew" or "should have known" about this lawsuit. Nevada's suggestion that it first learned of its "interest" in the litigation when the defendants filed their brief conceding the RFRA arguments is not credible;[6] it was common knowledge that the Trump Administration was not defending the Contraceptive Mandate in *any* of the RFRA challenges brought by objecting employers, and the defendants' interim and final rules explicitly state that the Contraceptive Mandate violates RFRA for the precise reasons that the plaintiffs have alleged.[7] And in all events, there is no excuse for Nevada to have waited nearly six weeks after that brief to get its motion to intervene on file.

---

6.   *See* Br. in Support of Mot. to Intervene (ECF No. 62-1) at 3.

7.   *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,800–07 (October 13, 2017) (interim final rule); Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536, 57,544–51 (November 15, 2018) (final rule).

## VII. IF NEVADA IS PERMITTED TO INTERVENE, ITS INTERVENTION SHOULD BE LIMITED TO THE CLAIMS ASSERTED BY THE CLASS OF OBJECTING EMPLOYERS

If the Court disagrees with our arguments and allows Nevada to intervene, then it should limit Nevada's intervention to the claims asserted by the Braidwood class of objecting employers. Nevada does not even attempt to argue that it will be affected by the relief awarded to the DeOtte class of objecting individuals, so it should not be permitted to defend against those claims, and it should not have standing to appeal that aspect of the Court's permanent injunction.

## VIII. THE TEXT OF THE RELIGIOUS FREEDOM RESTORATION ACT PROHIBITS INTERVENORS OR AMICI FROM ATTEMPTING TO PROVE THAT THE CONTRACEPTIVE MANDATE IS THE "LEAST RESTRICTIVE MEANS" OF FURTHERING A "COMPELLING GOVERNMENTAL INTEREST," BECAUSE THE STATUTE ASSIGNS THE BURDEN OF PROOF ON THESE QUESTIONS TO THE FEDERAL GOVERNMENT ALONE

Finally, even if Nevada could somehow find a way to intervene in this case, the Court would be forbidden to consider its arguments that the Contraceptive Mandate advances a "compelling government interest"—or that the Mandate represents the "least restrictive means" of furthering such an interest.

The Religious Freedom Restoration Act assigns the burden of proof on these questions to the federal government alone. The statute provides:

> Government may substantially burden a person's exercise of religion *only if it demonstrates* that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(b) (emphasis added). The "it" that must "demonstrate" a compelling governmental interest—and the least restrictive means of furthering that interest—is the federal government. *See* 42 U.S.C. § 2000bb-2 ("The term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law)

of the United States, or of a covered entity").[8] The government that imposes the substantial burden is the *only* entity that may "demonstrate" that its burden is justified under the strict-scrutiny standard described in 42 U.S.C. § 2000bb-1(b).

If the federal government fails to carry its burden of proof on these questions, then it does not matter whether an intervenor or an amicus can "demonstrate" the existence of a "compelling governmental interest." *Only* the federal government can make this "demonstration" under the text of the statute. So when the government concedes that the Contraceptive Mandate fails to advance a "compelling governmental interest," that concession is final and conclusive under the language of 42 U.S.C. § 2000bb-1(b). The same goes for a concession or a failure or proof from the government on the "least restrictive means" prong.

This is a crucial textual feature of the Religious Freedom Restoration Act that is all too often overlooked. An intervenor's arguments or evidence on the "compelling governmental interest" issue *cannot even be considered* by a court, and neither can any of its arguments or evidence about the "least restrictive means." The federal government—and *only* the federal government—must "demonstrate" that the Contraceptive Mandate is the "least restrictive means" of furthering a "compelling governmental interest," and no other litigant or amicus can step into the government's shoes and offer the arguments or proof that it failed or chose not to provide.

The Court should make this point explicit in its ruling, regardless of how it rules on the ultimate question of intervention. RFRA does not permit entities other than the federal government to "demonstrate" that the Contraceptive Mandate furthers a compelling governmental interest that trumps a person's religious freedom, and RFRA does not allow such

---

8. The term "covered entity" includes "the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States." 42 U.S.C. § 2000bb-2. But only the "government" that has substantially burdened a person's exercise of religion may make the "demonstration" required by 42 U.S.C. § 2000bb-1(b). So the District of Columbia's participation in Massachusetts's amicus brief does not allow this Court to consider Massachusetts's arguments on the "compelling interest" or "least restrictive means" issues. *See* Br. of Massachusetts, et al. (ECF No. 63-1) at 15–21.

entities to "demonstrate" that the least-restrictive-means test has been satisfied. Intervenors and amici cannot carry a burden that RFRA places on the "Government" alone.

## CONCLUSION

The motion for intervention should be denied.

Respectfully submitted.

 /s/ Jonathan F. Mitchell
CHARLES W. FILLMORE                  JONATHAN F. MITCHELL
H. DUSTIN FILLMORE                   Texas Bar No. 24075463
The Fillmore Law Firm, LLP           Mitchell Law PLLC
1200 Summit Avenue, Suite 860        111 Congress Avenue, Suite 400
Fort Worth, Texas 76102              Austin, Texas 78701
(817) 332-2351 (phone)               (512) 686-3940 (phone)
(817) 870-1859 (fax)                 (512) 686-3941 (fax)
chad@fillmorefirm.com                jonathan@mitchell.law
dusty@fillmorefirm.com

                                     *Counsel for Plaintiffs and*
Dated: June 14, 2019                 *the Certified Classes*

## CERTIFICATE OF SERVICE

I certify that on June 14, 2019, I served this document through CM/ECF upon all counsel of record in this case, including:

Daniel Riess
U.S. Department of Justice
Civil Division, Room 6122
20 Massachusetts Avenue NW
Washington, D.C. 20530
(202) 353-3098
daniel.riess@usdoj.gov

*Counsel for Defendants*

　/s/ Jonathan F. Mitchell　
Jonathan F. Mitchell
*Counsel for Plaintiffs and
the Certified Classes*