**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

**July 09, 2019**

KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| **RICHARD W. DEOTTE et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 4:18-CV-00825-O** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALEX M. AZAR II, in his official** | ) | |
| **capacity as Secretary of Health and** | ) | |
| **Human Services et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**BRIEF OF MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT,
DELAWARE, THE DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, MAINE,
MARYLAND, MICHIGAN, MINNESOTA, NEW JERSEY, NEW MEXICO,
NEW YORK, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND,
VERMONT, VIRGINIA, AND WASHINGTON AS *AMICI CURIAE* OPPOSING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT
INJUNCTION AND SUPPORTING NEVADA'S MOTION TO INTERVENE**

MAURA HEALEY
  *Attorney General of Massachusetts*
JONATHAN B. MILLER
JON BURKE
JULIA E. KOBICK
  *Assistant Attorneys General*

Elizabeth N. Dewar (Mass. Bar. No. 680722,
*pro hac vice* motion pending)
  *State Solicitor*
One Ashburton Place
Boston, MA 02108
Phone: (617) 963-2204
Fax: (617) 727-5778
bessie.dewar@mass.gov

*(Complete counsel list appears on signature pages.)*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

INTERESTS OF *AMICI* ............................................................................................. 1

ARGUMENT ............................................................................................................... 2

      I.      The ACA's Contraceptive Mandate, as Implemented with the
             Accommodation, Does Not Violate RFRA. .......................................... 5

           A.      Plaintiffs have failed to establish a substantial burden. ............................. 5

           B.      The accommodation is, in any case, the least restrictive means of
                  accomplishing the government's compelling interests. ........................... 15

      II.     The Nationwide Injunction Sought by Plaintiffs Is Particularly
             Inappropriate in the Circumstances of This Case: a RFRA Claim Affecting
             Tens of Thousands of Third Parties, the Merits of Which the Government
             Has Declined to Defend. .................................................................. 21

CONCLUSION............................................................................................................ 24

CERTIFICATE OF SERVICE ..................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Bowen v. Roy*, 476 U.S. 693 (1986) ....................................................................................14, 15

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .................................................. *passim*

*California v. Health & Human Servs.*, 351 F. Supp. 3d 1267 (N.D. Cal. 2019) ..................................................................................................................10

*Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015) .......................................6, 10

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ...........................................................................14

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) .............................................................................19, 21

*East Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015) ........................................ *passim*

*Employment Division v. Smith*, 494 U.S. 872 (1990) ..................................................................14

*Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985).............................................................20

*Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016).......................................10, 11, 12, 18, 19

*Geneva Coll. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015).........................................................................................6, 8, 10, 13

*Hobby Lobby Stories, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) .....................................12

*Holt v. Hobbs*, 135 S. Ct. 853 (2015)...........................................................................................7

*Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151 (10th Cir. 2015) ......................................................................................10

*Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372 (6th Cir. 2014)............................................................................................10

*Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Pa. 2019) .....................................................10

*Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229 (D.C. Cir. 2014) .............................................................................................. *passim*

*Priests for Life v. U.S. Dep't of Health & Human Servs.*, 808 F.3d 1 (D.C. Cir. 2015).....................................................................................................8, 15

*Real Alternatives, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*,
    867 F.3d 338 (2017) ....................................................................................14, 15

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d
    927 (8th Cir. 2015) .............................................................................................10

*United States v. Lee*, 455 U.S. 252 (1982) ..................................................................20

*Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015) ............................10, 12

*Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014).................................5, 19, 20, 22

*Zubik v. Burwell*, 136 S. Ct. 1557 (2016) ............................................................ *passim*

**Statutes**

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*...................... *passim*
    § 2000bb-1(a)...........................................................................................5, 6, 11
    § 2000bb-1(b)...........................................................................................5, 6, 11

26 U.S.C. § 4980H(c)(2)...............................................................................................18

42 U.S.C. § 300gg-13(a)(4) .................................................................................. *passim*

**Rules and Regulations**

*Religious Exemptions and Accommodations for Coverage of Certain
    Preventive Services Under the Affordable Care Act*, 83 Fed. Reg.
    57536 (Nov. 15, 2018) ................................................................................13, 20

Health Resources and Services Administration, Women's Preventive
    Services Guidelines (2011) .................................................................................17

45 C.F.R. §§ 147.131(d)-(e)........................................................................................8, 9

**Miscellaneous**

155 Cong. Rec. S12025 (Dec. 1, 2009) .......................................................................17

155 Cong. Rec. S12027 (Dec. 1, 2009) ..................................................................17, 20

155 Cong. Rec. S12114 (Dec. 2, 2009) .......................................................................17

155 Cong. Rec. S12274 (Dec. 3, 2009) .......................................................................17

155 Cong. Rec. S12277 (Dec. 3, 2009) .......................................................................17

155 Cong. Rec. S12671 (Dec. 8, 2009) .......................................................................17

Guttmacher Institute, *Insurance Coverage of Contraceptives* (Mar. 1, 2019) .......................................................................................................................1

Kaiser Family Foundation, *2018 Employer Health Benefits Survey* (Oct. 3. 2018) ....................................................................................................................18

Respondents' Brief, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418) ......................................................................................................9, 16, 22

Respondents' Supplemental Reply Brief, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418) ...............................................................................8

U.S. Dep't of Health & Human Servs., Medical Expenditure Panel Survey, *Percent of Private-Sector Enrollees That Are Enrolled in Self-Insured Plans at Establishments That Offer Health Insurance by Firm Size and State: United States, 2016* (2019) ..............................................1

U.S. Dep't of Labor, Emp. Benefits Sec. Admin., FAQs About Affordable Care Act Implementation Part 36 (Jan. 9, 2017) ............................................11

## INTERESTS OF *AMICI*

Like proposed intervenor Nevada, the *Amici* States—Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington—have compelling interests in protecting the health, well-being, and economic security of our residents. To promote these interests, the *Amici* States are committed to ensuring that contraception is as widely available and affordable as possible. Access to contraception advances educational opportunity, workplace equality, and financial empowerment for women; improves the health of women and children; and reduces healthcare-related costs for individuals, families, and the States.

The Women's Health Amendment to the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 300gg-13(a)(4), plays a critical role in securing our residents' access to affordable contraception. Most women receive health care coverage through employer-based health plans. While 29 states have laws that require employer-based plans to cover contraception,[1] federal law preempts state regulation of self-insured plans, which cover the majority of employees and their dependents.[2] The ACA fills the resulting gap: as part of its mandate that insurers fully cover preventive care for women, it guarantees comprehensive, no-cost coverage for contraception, including to the tens of millions of residents whose plans federal law places beyond the reach of state legislative action. The *Amici* States thus have a strong

---

[1] Guttmacher Institute, *Insurance Coverage of Contraceptives* (Mar. 1, 2019), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[2] *See* U.S. Dep't of Health & Human Servs., Medical Expenditure Panel Survey, *Percent of Private-Sector Enrollees That Are Enrolled in Self-Insured Plans at Establishments That Offer Health Insurance by Firm Size and State: United States, 2016* (2019) https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiib2b1.pdf.

interest in ensuring that the ACA continues to advance women's health and equality as the law requires and as Congress intended.[3]

While the *Amici* States also share interests in ensuring that our residents enjoy free exercise of religion under both the U.S. Constitution and our respective state constitutions, the ACA's mandate to cover preventive care for women, as implemented with an accommodation for objecting non-profit and closely held corporations as well as an exemption for houses of worship, is fully consistent with those interests. And, as the Fifth Circuit has previously concluded, the law, as implemented, is also consistent with the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq. See East Tex. Baptist Univ. v. Burwell*, 793 F.3d 449, 463 (5th Cir. 2015), *vacated by Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (per curiam).

## ARGUMENT

The *Amici* States urge this Court to reject Plaintiffs' claim that the ACA's contraceptive mandate, as implemented with both an exemption for houses of worship and an accommodation for objecting non-profit and for-profit closely held corporations, violates RFRA with respect to all employers and all individuals who have sincere religious objections to contraceptives.

As a closely held corporation, plaintiff Braidwood Management Inc. is already entitled to opt out of providing contraceptive coverage altogether under the ACA's accommodation, identified by the Supreme Court in *Hobby Lobby* as a less restrictive alternative to the mandate.

---

[3] Reflecting the *Amici* States' strong interest in women's health and equality, a number of the *Amici* States are parties to other litigation concerning whether the ACA's contraceptive mandate is consistent with RFRA. *See Commonwealth of Massachusetts v. Dep't of Health & Human Servs. et al.*, No. 17-11930 (D. Mass.), *on remand from* ___ F.3d ___ , 2019 WL 1950427 (1st Cir. May 2, 2019); *Commonwealth of Pennsylvania et al. v. Trump et al.*, No. 17-4540 (E.D. Pa.), *appeals pending*, Nos. 17-3752, 18-1253, 19-1129, and 19-1189 (3d Cir.); *State of California et al. v. Dep't of Health & Human Servs. et al.*, No. 17-5783 (N.D. Cal.), *appeals pending*, Nos. 19-15072, 19-15118, and 19-15150 (9th Cir.).

*See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014); Amend. Compl., Dkt. 19,

¶ 7.[4] By claiming that even this accommodation violates RFRA, Plaintiffs insist that objecting

employers be excused not only from compliance with a generally applicable law (as the

accommodation does), but also from the mere act of raising their hands to claim that

accommodation. *See* Pl. Mem. in Supp. Prelim. Inj. ("Pl. Mem."), Dkt. 21-1 at 15-16 ("The

employer's submission of the form is the *but-for cause* of the issuer or third-party administrator's

provision of the disputed contraception coverage, and without this form there is no way for the

issuer or third-party administrator to know that it must ensure coverage for an employee's

contraception and pay for it with its own resources."). But the Supreme Court has never

recognized the mere act of opting out of a generally applicable law as a cognizable burden on the

free exercise of religion, let alone the substantial burden required to maintain a claim under

RFRA. To the contrary, *Hobby Lobby* recognized that an opt-out system like the accommodation

would satisfy the plaintiffs' RFRA objections there, *see* 573 U.S. at 728-32, and the Fifth Circuit

has already agreed that no substantial burden exists in these circumstances as a matter of law, *see*

*East Tex. Baptist Univ.*, 793 F.3d at 463. Moreover, Plaintiffs' argument proves too much: it

would disallow *any* accommodation to *any* generally applicable law under RFRA that requires

the sincerely objecting religious adherent to register the objection, based on the possible future

acts of third parties in response to the plaintiff's act of opting out.

The individual plaintiffs also have not established a substantial burden. First, as a factual

matter, Plaintiffs have presented no evidence or authority whatsoever for the proposition that by

---

[4] Under the accommodation, "the insurance issuer must exclude contraceptive coverage from the employer's plan and provide plan participants with separate payments for contraceptive services without imposing any cost-sharing requirements on the employer, its insurance plan, or its employee beneficiaries." *Hobby Lobby*, 573 U.S. at 682-83.

purchasing insurance for themselves they will be "subsidizing" others' use of objected-to contraceptives. *See* Pl. Mem. 18. Second, their claim of a substantial burden fails as a matter of law because it too rests solely on a sincere religious objection to the possible future acts of third parties: namely, how an insurance company may independently choose to use revenue generated from plaintiffs' insurance plans. RFRA does not grant plaintiffs such a veto over the internal accounting and business practices of third parties.

In any case, the ACA's contraceptive mandate, as implemented with both a church exemption and the accommodation, is the least restrictive means of carrying out the federal government's compelling interests in protecting the health and well-being of women and their families by providing them with full and equal access to contraception.

And an injunction preventing enforcement of the ACA's contraceptive mandate and accommodation against any employer across the country who objects on religious grounds to the very act of having to register its objection is particularly unwarranted under the circumstances of this case. As the Supreme Court has recognized, including in *Hobby Lobby* itself, potential harms to third parties caused by a plaintiff's requested RFRA relief must be taken into account in analyzing the claim. 573 U.S. at 729 n.37. In a typical case, the government actor defending against a RFRA challenge to its own statute or regulation can be expected to represent the interests of such third parties. But here—where Plaintiffs' employer-based RFRA claim would deprive employees across the country of the full and equal healthcare coverage guaranteed them by the ACA and would impose significant costs on the States in filling the gaps—the federal government has abdicated any defense of the merits of the claim. It is thus all the more imperative that this Court not issue the sweeping and unwarranted injunction requested by Plaintiffs, and that the Court grant Nevada's motion to intervene in order to defend the RFRA claim on its merits and represent the compelling interests of the State itself and its residents.

4

I.     **The ACA's Contraceptive Mandate, as Implemented with the Accommodation, Does Not Violate RFRA.**

RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the burden: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. §§ 2000bb-1(a)-(b). Here, Plaintiffs' challenge stumbles at the initial requirement that they demonstrate a substantial burden on their exercise of religion. As the Fifth Circuit has previously concluded, the mere act of opting out of providing contraceptive coverage does not substantially burden the exercise of religion. *East Tex. Baptist Univ.*, 793 F.3d at 456 ("We begin and end our analysis with the substantial-burden prong."). In any case, the existing accommodation is the least restrictive means of furthering the compelling governmental interests in ensuring that women have full and equal access to preventive care, including contraceptives. Plaintiffs' proposed class-wide injunction would, by contrast, require thousands of women to bear the cost of their employers' religious views about contraceptives—harms not present in *Hobby Lobby*, *Wheaton College*, or *Zubik*, where the Supreme Court emphasized that no woman would lose access to coverage for the full range of FDA-approved contraceptives.

A.     **Plaintiffs have failed to establish a substantial burden.**

"Whether a law substantially burdens religious exercise under RFRA is a question of law for courts to decide, not a question of fact." *East Tex. Baptist Univ.*, 793 F.3d at 456 n.33 (quoting *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 247 (D.C. Cir. 2014) (*"Priests for Life I"*), *vacated by Zubik*, 136 S. Ct. 1557). Here, no such burden exists as a matter of law for either the closely held employer-plaintiff or the individual plaintiffs. Their claims therefore should not be the basis for class-wide relief.

### 1.    No substantial burden exists for employers.

Contrary to Plaintiffs' suggestion, "[a]ccepting the sincerity of Plaintiffs' beliefs . . . does not relieve this Court of its responsibility to evaluate the substantiality of any burden on Plaintiffs' religious exercise, and to distinguish Plaintiffs' duties from obligations imposed, not on them, but on insurers and [third-party administrators]." *East Tex. Baptist Univ.*, 793 F.3d at 456 n.33 (quoting *Priests for Life I*, 772 F.3d at 247). And no substantial burden exists for employers under the accommodation because, "[a]lthough the plaintiffs have identified several acts that offend their religious beliefs, the acts *they* are required to perform do not include providing or facilitating access to contraceptives."  *Id.* at 459 (emphasis in original).

To begin with, Plaintiffs err in asserting that, as long as religious employers sincerely believe that participating in the accommodation makes them "complicit" in the provision of contraceptive coverage, that belief in complicity alone establishes—as a matter of law—that the accommodation substantially burdens their exercise of religion. *See* Pl. Mem. 12-13, 17. RFRA expressly requires a plaintiff to prove a "substantial[] burden" on their "exercise of religion." 42 U.S.C. §§ 2000bb-1(a)-(b). Yet Plaintiffs' argument would "read out of RFRA the condition that only *substantial* burdens on the exercise of religion trigger the compelling interest requirement." *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207, 217 (2d Cir. 2015) (emphasis added). In other words, "RFRA's reference to 'substantial' burdens expressly calls for a qualitative assessment of the burden that the accommodation imposes on the . . . exercise of religion." *Geneva Coll. v. Sec'y of U.S. Dep't Health & Human Servs.*, 778 F.3d 422, 442 (3d Cir. 2015), *vacated by Zubik*, 136 S. Ct. 1557. Plaintiffs' contention that a substantial burden is present any time a litigant sincerely believes such a burden exists would "collapse the distinction between beliefs and substantial burden, such that the latter could be established simply through the sincerity of the former." *Catholic Health Care Sys.*, 796 F.3d at 218.

*Hobby Lobby* supports the conclusion that it is for the courts to determine whether a government policy imposes a burden on religious belief that is substantial. There, the Court distinguished the question "whether the religious belief asserted in a RFRA case is reasonable"—a question "that the federal courts have no business addressing"—from the question under RFRA that *is* for the federal courts to decide: "whether the HHS mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with their religious beliefs." 573 U.S. at 724 (emphasis omitted). And the Court recognized that the accommodation would "not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion[.]" *Id.* at 731. Thus, sincerely held belief and substantial burden are not a single inquiry under RFRA, and *Hobby Lobby* itself relied on the distinction. Although the Court in *Zubik* later declined to decide a RFRA challenge to the accommodation and instead remanded the cases before the Court to give the parties "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage," the Court "express[ed] no view on the merits of the cases," including "whether petitioners' religious exercise has been substantially burdened," and thus did not disturb its analysis in *Hobby Lobby*. *Zubik*, 136 S. Ct. at 1559-60 (quotation omitted). *Accord Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) ("*In addition to* showing that the relevant exercise of religion is grounded in a sincerely held religious belief, petitioner bore the burden of proving that the Department's grooming policy substantially burdened that exercise of religion." (emphasis added)).

And the accommodation indeed imposes no substantial burden on employers, for reasons already recognized by the Fifth Circuit. In short, "[a]lthough the plaintiffs have identified several

7

acts that offend their religious beliefs, the acts *they* are required to perform do not include

providing or facilitating access to contraceptives"; rather, "the acts that violate their faith are

those of third parties." *East Tex. Baptist Univ.*, 793 F.3d at 459; *see also Priests for Life v. U.S.

Dep't Health & Human Servs.*, 808 F.3d 1, 26 (D.C. Cir. 2015) (Mem.) ("*Priests for Life II*")

(Kavanaugh, J., dissenting from the denial of rehearing en banc) ("The Government may of

course continue to require religious organizations' *insurers* to provide contraceptive coverage to

the religious organizations' employees, even if the religious organizations object."). The

accommodation allows religious objectors to opt out of providing, paying for, referring,

contracting, or arranging contraceptive coverage, *see* 45 C.F.R. §§ 147.131(d)-(e), and causes the

eligible organization to play "no role whatsoever" in the provision of federally mandated

contraception services, *Geneva Coll.*, 778 F.3d at 435–42. Self-certification "does not trigger or

facilitate the provision of contraceptive coverage because coverage is mandated to be otherwise

provided by federal law." *Id.* at 437. In other words, "[p]roviding the names and contact

information facilitates only the plaintiffs' exemption, not contraceptive coverage." *East Tex.

Baptist Univ.*, 793 F.3d at 459.[5]

To wit, once the insurer is notified by the employer or the Secretary, it "must *expressly

exclude* contraceptive coverage from the group health insurance coverage provided in connection

with the group health plan and provide *separate* payments for any contraceptive services

required to be covered[.]" 45 C.F.R. § 147.131(d)(2)(i) (emphases added). Those separate

payments "occur entirely outside the employers' plans." Resp. Supp. Reply, *Zubik*, 2016 WL

---

[5] These circumstances thus differ from Plaintiffs' proposed analogy to law requiring a doctor to perform an abortion upon a patient's request unless the doctor issues a referral to the nearest abortion provider. *See* Pl. Mem. 6, 12. Here, under this analogy, all the doctor would be required to do would be to file a form stating that the doctor did not wish to perform abortions, and the rest would be taken care of by others, with no use of the doctor's resources.

1593410, at *2. Moreover, the insurer "must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services." 45 C.F.R. § 147.131(d)(2)(ii). And the insurer must provide separate, written notice to plan participants and beneficiaries that their employer "will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [the insurer] will provide separate payments for contraceptive services that you use" and the employer "will not administer or fund these payments." *Id*. § 147.131(e). The accommodation process thus completely separates the employer's health plan from any involvement in the provision of contraceptive coverage.

Further, contrary to Plaintiffs' contentions, Pl. Mem. 13-14, the same is true for ERISA-governed self-insured plans. As the federal government explained in *Zubik*, if a self-insured employer elects to exclude contraceptive coverage from its plan, ERISA authorizes the government to require a third-party administrator ("TPA") to provide employees with "separate contraceptive coverage." Resp. Br., *Zubik*, 2016 WL 537623, at *38. As with fully-insured plans, objecting self-insured employers are not required to "fund . . . or have any other involvement in that separate coverage—instead, the TPA alone does so." *Id*. It is true that, for purposes of ERISA, the coverage provided by the employer and the "separate contraceptive coverage" provided by the TPA constitute a package or "plan" of benefits available to employees. *Id*. But this means only that employees have an enforceable right *under ERISA* to receive both the coverage provided by the employer and the separate coverage *provided by the TPA*; the accommodation does not alter or affect the terms of the group health coverage offered and paid for by the employer—coverage that excludes contraceptives. *See id*.; *see also, e.g.*, *Priests for Life I*, 772 F.3d at 255 (the fact that "the government directs the TPA to cover contraceptive services" and "names the TPA as the plan administrator of [both] contraceptive services [and benefits available under the employers' plan]" for purposes of ERISA "does not . . . amend or

alter Plaintiffs' own plan instruments"). A self-insured employer therefore does not have "contraceptive coverage *provided through its plan* if it opts for the accommodation." Pl. Mem. 14 (emphasis added).

It is thus unsurprising that eight out of the nine courts of appeals to have considered this issue, including the Fifth Circuit, have concluded that the accommodation does not substantially burden the exercise of religion.[6] The Supreme Court itself has described the accommodation as "effectively exempt[ing] . . . 'eligible organizations' from the contraceptive mandate." *Hobby Lobby*, 573 U.S. at 698. And, in enjoining recent efforts on the part of the federal government to enact sweeping exemptions to the contraceptive mandate and accommodation for religious objectors, courts have continued to reject the theory, advanced by Plaintiffs here, that the accommodation imposes a substantial burden under RFRA. *See Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 823-25 (E.D. Pa. 2019); *California v. Health & Human Servs.*, 351 F. Supp. 3d 1267, 1287-91 (N.D. Cal. 2019). As the Eleventh Circuit concluded, "we simply cannot say that RFRA affords the plaintiffs the right to prevent women from obtaining contraceptive coverage to which federal law entitles them based on the de minimus burden that the plaintiffs face in

---

[6] *Catholic Health Care Sys.*, 796 F.3d at 220 (holding that the accommodation did not impose a substantial burden); *accord Geneva Coll.*, 778 F.3d at 442; *East Tex. Baptist Univ.*, 793 F.3d at 463; *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 390 (6th Cir. 2014); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 618 (7th Cir. 2015); *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151, 1173 (10th Cir. 2015); *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122, 1151 (11th Cir. 2016); *Priests For Life I*, 772 F.3d at 249. *But see Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 943 (8th Cir. 2015) (holding that the accommodation substantially burdens religious beliefs). Although *Zubik* vacated all of the court of appeals decisions before the Court, nothing in *Zubik* undercut these courts' reasoning. *See Zubik*, 136 S. Ct. at 1560 ("express[ing] no view on the merits of the cases").

notifying the government that they have a religious objection." *Eternal Word Television Network v. Sec'y of U.S. Dep't Health & Human Servs.*, 818 F.3d 1122, 1150 (11th Cir. 2016).[7]

Indeed, under Plaintiffs' view of RFRA, *any* religious accommodation requiring objectors to notify the government of their objection could be considered a substantial burden on religious exercise, requiring imposition of strict scrutiny, solely because of action the government might take in response. *See* Pl. Mem. 15-16 (emphasizing that "[t]he employer's submission of the form is the *but-for cause* of the issuer or third-party administrator's provision of the disputed contraception coverage, and without this form there is no way for [it] to know that it must ensure coverage for an employee's contraception and pay for it with its own resources").[8] For example, as the Fifth Circuit has pointed out, under Plaintiffs' theory a religious conscientious objector to the military draft could object even to notifying the government of his religious opposition, because "that information would enable the Selective Service to locate eligible draftees more quickly." *East Tex. Baptist Univ.*, 793 F.3d at 461; *see also, e.g.*, *Eternal Word*, 818 F.3d at 1150 (positing similar objection that pacifist's "act of opting out triggers the drafting of another person in his place"). Yet it is untenable to assert "that the government's subsequent act of drafting another person in his place . . . transforms the act of

---

[7] The fact that, following *Zubik*, the prior administration was unable to identify a "feasible approach . . . that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage," Pl. Mem. 16 (quoting U.S. Dep't of Labor, Emp. Benefits Sec. Admin., FAQs About Affordable Care Act Implementation Part 36 (Jan. 9, 2017)), does not undermine this conclusion. As discussed, the mere fact of a religious objection does not amount to establishing the requisite "substantial[] burden" on the "exercise of religion" under RFRA. 42 U.S.C. §§ 2000bb-1(a)-(b).

[8] Notably, Plaintiffs do not contend that any aspect of the form itself is burdensome. Nor could they. It is a very simple two-page form, applicable to both insured and self-insured employers: https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/laws/affordable-care-act/for-employers-and-advisers/ebsa-form-700-revised.pdf.

lodging a conscientious objection into a substantial burden." *Eternal Word*, 818 F.3d at 1150;

*accord Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 623 (7th Cir. 2015).

Finding a substantial burden here is all the more inappropriate given the inclusion of

publicly traded companies in the employer class. The Supreme Court in *Hobby Lobby* recognized

that significant differences between closely held and publicly traded corporations bear on the

substantial burden analysis, and the Court explicitly declined to extend its holding to publicly

traded corporations, suggesting that publicly traded corporations would be unlikely to hold a

singular sincere religious belief. *See* 573 U.S. at 717. And, in holding that RFRA's protections

extend to closely held corporations, the Court emphasized the degree to which the personal

views of natural persons were intertwined with the plaintiff-corporations' actions; the businesses

were "each owned and controlled by members of a single family." *Id.*; *see also, e.g.*, *id.* at 706

("[I]t is important to keep in mind that the purpose of this fiction [of including corporations

within RFRA's definition of 'persons'] is to provide protection for human beings."); *Hobby*

*Lobby Stories, Inc. v. Sebelius*, 723 F.3d 1114, 1152 (10th Cir. 2013) (Gorsuch, J., concurring)

("Hobby Lobby and Mardel cannot comply with the mandate unless and until the Greens direct

them to do so"; "they are the human actors who must compel the corporations to comply with the

mandate. And it is *this* fact, the Greens contend, that poses their problem." (emphasis in

original)). The named Plaintiffs here—who, notably, do not include a publicly traded

corporation—have made no effort to explain how such a burden exists in the context of a

publicly traded corporation; indeed, their memorandum of law does not even acknowledge that

the employer class includes publicly traded corporations. *See* Pl. Mem. 11-17.[9] They thus ask

---

[9] The defendant federal agencies have elsewhere conceded that they "are not aware of any publicly traded entities that have publicly objected to providing contraceptive coverage on the basis of religious belief," and, "while scores of closely held for-profit businesses filed suit

(footnote continued)

this Court to extend *Hobby Lobby* beyond the Supreme Court's holding without so much as a reasoned explanation.

In sum, the accommodation does not substantially burden the exercise of religion. There is no need to proceed any further under RFRA.

### 2. The individual plaintiffs also have not established a substantial burden on their exercise of religion.

Plaintiffs argue that the individual plaintiffs face a distinct substantial burden as a result of the accommodation: that, if they purchase insurance from a plan that covers contraceptive methods to which they have a sincere religious objection, the insurance company may use the money the plaintiffs pay in premiums to "subsidize" others' use of the objected-to contraception. Pl. Mem. 18. But Plaintiffs fail to cite any record evidence—or authority of any kind—to support their speculative assertion that individual plaintiffs' insurance premiums will indeed be used by insurance companies to "subsidize" the objected-to forms of contraception. *See id*. While the Court cannot question plaintiffs' sincere religious beliefs, it also cannot accept factually unsupported claims regarding "how the…[health insurance system] actually works." *Geneva Coll.*, 778 F.3d at 436. Plaintiffs thus have failed to meet their burden at summary judgment. *See East Tex. Baptist Univ.*, 793 F.3d at 456 & n.28 (plaintiff must establish substantial burden).

Moreover, this asserted substantial burden on the individuals fails as a matter of law for the same fundamental reason the Fifth Circuit rejected the employers' theory: RFRA requires a substantial burden on a plaintiff's *own* exercise of religion and does not give would-be plaintiffs a veto right over the subsequent actions of third parties. *See East Tex. Baptist Univ.*, 793 F.3d at

---

against the Mandate, no publicly traded entities did so, even though they were not authorized to seek the accommodation." 83 Fed. Reg. 57562 (Nov. 15, 2018). There is thus no pressing "need" to provide these corporations with injunctive relief. *Cf.* Pl. Mem. 2.

459; *see also Real Alternatives, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 867 F.3d

338, 359-64 & n.25 (2017) (holding that individuals challenging contraceptive mandate had

failed to show that any burden on their exercise of religion was substantial, in part because

"employees' actions under the ACA are mediated by the insurance company, and any link

between the decision to sign up for insurance on the one hand and the provision of contraceptives

to a particular individual on the other is far too attenuated to rank as substantial"). Plaintiffs

themselves remain free to choose not to use their insurance coverage for contraception; the

ACA's contraceptive mandate is not, of course, a mandate forcing individuals to use

contraception, or else lose insurance coverage. Rather, the individual plaintiffs object to how

insurance companies could use the revenue generated from the sale of their plans. But whatever

an insurance company itself ultimately chooses to do as an accounting matter with individuals'

insurance premiums, "RFRA confers no right to challenge the independent conduct of third

parties[.]" *East Tex. Baptist Univ.*, 793 F.3d at 459; *accord Real Alternatives*, 867 F.3d at 364.

Indeed, prior to *Employment Division v. Smith*, 494 U.S. 872 (1990),[10] the Supreme

Court similarly recognized that "[t]he Free Exercise Clause simply cannot be understood to

require the Government to conduct its own internal affairs in ways that comport with the

religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699 (1986) (rejecting a Free

Exercise claim brought by parents who believed that the government's assignment and use of a

Social Security number for their child would harm the child's spirit). There, the Court noted that

the plaintiffs' own "religious views may not accept this distinction between individual and

government conduct," but it was nevertheless "clear . . . that the Free Exercise Clause, and the

---

[10] As its name implies, RFRA was adopted to restore by statute the Free Exercise Clause
jurisprudence that existed before *Smith* was decided. *See Hobby Lobby*, 573 U.S. at 693-96; *City
of Boerne v. Flores*, 521 U.S. 507, 512-16 (1997).

Constitution generally, recognize such a distinction; for the adjudication of a constitutional claim, the Constitution, rather than an individual's religion, must supply the frame of reference." *Id.* at 700 n.6. Here too, as discussed above, under RFRA, the question whether a substantial burden exists is a question of law distinct from the factual question whether a plaintiff holds a sincere religious belief. *See East Tex. Baptist Univ.*, 793 F.3d at 456-57 (discussing *Bowen* and other precedent to the same effect); *accord Real Alternatives*, 867 F.3d at 355-57.

Plaintiffs' speculative assertion regarding how an insurance company *may* use revenue generated from their insurance premiums to pay for contraception for a third party thus does not establish a substantial burden as a matter of fact or law.

**B.    The accommodation is, in any case, the least restrictive means of accomplishing the government's compelling interests.**

If the Court reaches the second part of the RFRA inquiry, it should conclude that the ACA's contraceptive mandate, as implemented with the accommodation (as well as the church exemption), is the least restrictive alternative available to achieve the government's compelling interests in providing full and equal healthcare coverage.

The contraceptive mandate serves the government's compelling interests in improving public health and ensuring women's equal access to preventive care for their distinctive health needs. The Supreme Court in *Hobby Lobby* assumed without deciding that the contraceptive coverage requirement served compelling interests, 573 U.S. at 728, and Justice Kennedy, as the fifth vote for the majority, joined the four dissenting justices in recognizing in particular the "compelling" interests of employees affected by their employer's refusal to provide contraceptive coverage, 573 U.S. at 738 (Kennedy, J., concurring). *See also Priests for Life II*, 808 F.3d at 15, 22-23 (Kavanaugh, J., dissenting from the denial of rehearing en banc) (noting that "[i]t is not difficult to comprehend" why facilitating access to contraceptive coverage is a

"compelling interest," and that "*Hobby Lobby* strongly suggests that the Government has a compelling interest in facilitating access to contraception for the employees of these religious organizations").

While no one contends that general "interests in 'public health' and 'gender equality' necessarily render compelling every subsidiary governmental action that advances them," here, these compelling interests support the government's decision "to provide cost-free contraceptive coverage and to remove administrative and logistical obstacles to accessing contraceptive care," including "requiring eligible organizations to ask for an accommodation if they want to take advantage of one, so that the government can protect its interests by ensuring that the resulting coverage gaps are filled." *Priests for Life I*, 772 F.3d at 259. Indeed, until 2017, the federal government recognized the many important benefits of cost-free contraceptive coverage, including enabling women to avoid the health problems that may occur from unintended pregnancies; avoiding the increased risk of adverse pregnancy outcomes when pregnancies are closely spaced together; preventing pregnancy when women have medical conditions which would make pregnancy dangerous or life threatening; and securing health benefits from contraceptives that are unrelated to pregnancy, including preventing certain cancers, menstrual disorders, and pelvic pain. Resp. Br., *Zubik*, 2016 WL 537623, at *55-57; *see also Priests for Life I*, 772 F.3d at 261-62. Contraceptive coverage without cost sharing is especially important, because cost barriers discourage the use of contraceptives, particularly IUDs, that have high up-front costs but are especially reliable and effective. *Priests for Life I*, 772 F.3d at 261. And the contraceptive mandate also advances a compelling interest in ensuring that our healthcare system serves women's health needs as fully as those of men; prior to the ACA, women paid more for coverage than men and incurred more in out-of-pocket costs, in part because services specific to

women were not adequately covered by health insurance.  *Id.* at 262-63 (discussing ACA's legislative history and empirical evidence).

Plaintiffs do not seriously dispute the extensive legislative history underlying the Women's Health Amendment, or the medical, scientific, and public health consensus regarding the importance of contraceptives in women's lives. Plaintiffs only contend briefly that the fact that the Women's Health Amendment did not expressly require covering contraception in particular—and instead required an expert body to promulgate "comprehensive guidelines," 42 U.S.C. § 300gg-13(a)(4)—suggests that Congress did not view ensuring access to contraception as serving compelling interests. Pl. Mem. 20. But the statute's legislative history manifestly confirms that Congress did indeed intend that the guidelines would include contraception among the no-cost preventive care services covered under the Women's Health Amendment—as turned out to be the case once the expert body issued its evidence-based guidelines. *See* Health Resources & Servs. Admin. ("HRSA"), Women's Preventive Services Guidelines (2011). The Amendment's proponents repeatedly emphasized that a vote for the Amendment was a vote for comprehensive contraceptive coverage, and that it would guarantee access to "affordable birth control and contraceptives" and lead to "more counseling, more contraceptives, and fewer unintended pregnancies." 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin).[11] Thus, although

---

[11] *See also, e.g.*, 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventive care "include[s] . . . family planning services"); *id.* at S12027 (Sen. Shaheen) ("Women must have access to vitally important preventive services such as . . . preconception counseling that promotes healthier pregnancies and optimal birth outcomes."); *id.* (Sen. Gillibrand) (under the Amendment, "even more preventive screenings will be covered, including . . . family planning"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services and screenings for women," including "family planning."); 155 Cong. Rec. S12274 (Dec. 3, 2009) (Sen. Murray) (the "amendment will make sure this bill provides coverage for important preventive services for women at no cost," including "family planning services"); *id.* at S12277 (Sen. Nelson) ("I

(footnote continued)

Congress delegated the drafting of the guidelines to HRSA as an expert agency, Congress plainly did intend that the "comprehensive" coverage for women's preventive-care services required under the Women's Health Amendment would include coverage for contraceptives.

Instead of grappling with the extensive evidence supporting the importance of the interests advanced by the mandate, Plaintiffs claim that the contraceptive coverage requirement cannot serve compelling governmental interests simply because the ACA and its implementing regulations do not require some small businesses, grandfathered health plans, and churches to offer such coverage. Not so. The exemption for grandfathered plans is a short-lived transitional measure.[12] Small employers were not exempted from the contraceptive mandate, *per se*, but rather from the requirement to provide health insurance at all, *see* 26 U.S.C. § 4980H(c)(2), and their employees who do not get insurance through their small employer would be eligible to purchase it through the exchanges, where all plans must comply with the mandate, *see Priests for Life, I*, 772 F.3d at 266-67. And the regulatory exemption for houses of worship acknowledges "our nation's longstanding history of deferring to a house of worship's decisions about its internal affairs." *Eternal Word*, 818 F.3d at 1155-1157.

The accommodation is, moreover, the least restrictive method of achieving these compelling interests while also accommodating any burden on religious exercise created where individuals sincerely believe they must not provide access to contraception. As discussed, the accommodation ensures that employers do not have to fund or otherwise be involved in

---

strongly support the underlying goal of furthering preventive care for women, including . . . family planning.").

[12] *See* Kaiser Family Found., *2018 Employer Health Benefits Survey* (Oct. 3. 2018), https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-13-grandfathered-health-plans/ (showing decline in percentage of workers enrolled in a grandfathered plan from 36% in 2013 to 26% in 2014 and to 17% in 2017).

providing coverage for contraceptive methods to which they object. *See supra* at 7-11.

Meanwhile, affected third-party employees receive contraceptive coverage independent of

objecting employers' plans and yet seamlessly with other health services, and without cost

sharing or additional logistical or administrative hurdles to receiving that coverage. It is thus the

most effective means of ensuring that women have full and complete access to contraceptives.

*See, e.g.*, *Eternal Word*, 818 F.3d at 1158 ("Because there are no less restrictive means available

that serve the government's interest equally well, we hold that the mandate and accommodation

survive strict scrutiny under RFRA."); *accord Priests for Life I*, 772 F.3d at 264-67.

    While Plaintiffs assert a lack of a compelling interest in applying the contraceptive

mandate to the objecting entities in particular, they provide no reason why the government is less

interested in guaranteeing access to contraception to the women who have coverage through such

objecting employers. Pl. Mem. 19. And, as discussed further below, in determining whether the

accommodation is the least restrictive means of furthering a compelling interest, a primary

consideration is whether other alternatives would harm third parties. In *Hobby Lobby*, the Court

instructed that "'courts must take adequate account of the burdens a requested accommodation

may impose on nonbeneficiaries[,]'" which "will often inform the analysis of the Government's

compelling interest and the availability of a less restrictive means of advancing that interest."

573 U.S. at 729 n.37 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)); *see also id.* at 739

(Kennedy, J., concurring) (accommodating religious exercise should not "unduly restrict other

persons, such as employees, in protecting their own interests, interests the law deems

compelling"). Accordingly, in *Hobby Lobby* and *Wheaton College*, the Supreme Court

emphasized that extending the accommodation to apply in those cases would result in no woman

losing access to the full range of FDA-approved contraceptives—contrary to Plaintiffs' position

here. *See Hobby Lobby*, 573 U.S. at 693 ("under that accommodation, these women would still

be entitled to all FDA-approved contraceptives without cost sharing"); *Wheaton College v. Burwell*, 134 S. Ct. 2806, 2807 (2014) ("Nothing in this interim order affects the ability of the applicant's employees and students to obtain, without cost, the full range of FDA approved contraceptives"). And in *Zubik*, the Court specifically instructed that "[n]othing in this opinion . . . is to affect the ability of the Government to ensure that women covered by petitioners' health plans 'obtain, without cost, the full range of FDA approved contraceptives." 136 S. Ct. at 1560-61 (internal citation omitted).

Here, in contrast, granting the injunctive relief sought by Plaintiffs would force tens of thousands of women to bear the cost of their employers' religious views about contraceptives, *see* 83 Fed. Reg. 57578, 57580 (Nov. 15, 2018)—a cost in considerable tension with the Free Exercise precedents from which RFRA sprang. *See, e.g.*, *United States v. Lee*, 455 U.S. 252, 261 (1982) (refusing to exempt Amish employer and his employees from social security taxes, which would "impose the employer's religious faith on the employees"). Indeed, courts have invoked the Establishment Clause to invalidate accommodations which "would require the imposition of significant burdens on other employees[.]" *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (invalidating Connecticut statute which gave Sabbath observers an absolute and unqualified right not to work on the Sabbath).

Plaintiffs assert that the federal government could directly provide contraceptives for affected women. Pl. Mem. 22. But that would not serve the government's interest in ensuring women seamless access to contraceptive care and services: eligible women would be required to take additional steps outside of their normal coverage to access care, thereby undermining the "fundamental inequity" that the Women's Health Amendment sought to remedy. 155 Cong. Rec. S12027 (Dec. 1, 2009) (statement of Sen. Gillibrand). Moreover, women would not receive contraception within their normal health care framework, nor necessarily from their current

doctors. Both of these disruptions would reduce the likelihood that women would obtain the care they need.[13] And it is altogether unclear how Plaintiffs' proposed alternative could even exist as a practical matter, given the very nature of their RFRA claim here: that employers cannot even be required to register their objection to providing coverage on a simple form.

In sum, this Court should deny Plaintiffs' motion for summary judgment because they have failed to establish a substantial burden on their exercise of religion, as required by RFRA. Furthermore, the ACA contraceptive mandate, as implemented with the accommodation and the exemption for houses of worship, is the least restrictive means available to serve the government's compelling interests in facilitating women's seamless access to contraceptive care and services.

## II.     The Nationwide Injunction Sought by Plaintiffs Is Particularly Inappropriate in the Circumstances of This Case: a RFRA Claim Affecting Tens of Thousands of Third Parties, the Merits of Which the Government Has Declined to Defend.

The *Amici* States respectfully submit that, in the circumstances of this case, the nationwide injunction sought by Plaintiffs is particularly misguided because of the harms it would impose on third parties whose interests have heretofore been unrepresented in this litigation. And the *Amici* States further respectfully submit that this Court should grant Nevada's motion to intervene, so that these interests may have some representation before the Court.

As discussed above, the Supreme Court has recognized that, in analyzing a RFRA claim, a court must take cognizance of harms to and burdens on third parties created by a RFRA plaintiff's requested accommodation. *Hobby Lobby*, 573 U.S. at 729 n.37 (quoting *Cutter*, 544

---

[13] The medical research underpinning the contraceptive mandate shows that even "minor obstacles"—like having to find, access, or pay for alternative sources of care, distinct from a woman's regular doctor—significantly deter use of contraception, and that, in turn, reduced access to contraception leads to an increase in the rate of unintended pregnancies. *Priests for Life I*, 772 F.3d at 235.

U.S. at 720). And in a typical RFRA case, the defending government agency can, at least to some

extent, stand in the shoes of such third parties and argue why supposed less restrictive

alternatives are not actually tenable, because of the harms to others they may cause. *See, e.g.*,

Resp. Br., *Zubik*, 2016 WL 537623, at *78 (arguing that the plaintiffs' proposals "cannot be valid

less-restrictive alternatives because they would inflict tangible harms on tens of thousands of

women based on their employers' religious beliefs, even though the employer has been exempted

from any legal obligations").

     Here, however, the federal government has entirely declined to defend against Plaintiffs'

RFRA claims on the merits. *See* Defts. Resp., Dkt. 38 at 3 ("Defendants are not raising a

substantive defense of the Mandate or the accommodation process with respect to Plaintiffs'

[RFRA] challenge."). In other words, these Defendants have wholly abandoned any merits-based

defense of the interests of the tens of thousands of women who stand to lose statutorily-

guaranteed contraceptive coverage if this Court enters Plaintiffs' requested injunction.

     And there can be no question that tens of thousands of women would be harmed by such

an injunction: losing the seamless access to cost-free coverage for contraception that the

Women's Health Amendment was enacted to provide, and which the Supreme Court has

repeatedly assured that the accommodation preserves for employees of employers with religious

objections to providing contraception. *See Hobby Lobby*, 573 U.S. at 693; *Zubik*, 136 S. Ct. at

1560-61 ("Nothing in this opinion . . . is to affect the ability of the Government to ensure that

women covered by petitioners' health plans 'obtain, without cost, the full range of FDA

approved contraceptives.'" (quoting *Wheaton Coll.*, 134 S. Ct. at 2807)).  While Plaintiffs muse

in their reply that "it is hard to understand how anyone benefits from a ruling that denies class-

wide relief and leaves the objecting employers and individuals to litigate their RFRA claims on a

case-by-case basis," Dkt. 39 at 8, the answer is clear: the non-objecting employees of objecting

employers will benefit. They will not abruptly lose their cost-free contraceptive coverage; they will not be forced to seek out alternative insurance coverage; they will not be forced to seek out state-subsidized programs and other means of obtaining reduced-cost or free contraception; they will not be forced to turn to cheaper, more readily available, and less reliable methods of contraception; they will not become pregnant unintentionally as a result of losing access to their reliable long-acting method of contraception; and they will not suffer the adverse health and economic consequences that can come with unintended pregnancies.

If RFRA claims continue to be litigated on a case-by-case basis, these third-party employees gain a greater possibility of notice and an opportunity to be heard, an opportunity all the more important where the federal government is declining to defend against the claim. The employer class extends to "every current and *future* employer in the United States."  There is no reason to believe that employees of employer-class-members across the country know about this lawsuit and its potential impact on their healthcare coverage; there has been no attempt to issue notice to either class members or affected third parties. Moreover, even if some employees have heard of the lawsuit, it is not readily determinable from publicly available documents whether any particular employer is part of the plaintiff-class. Class membership depends on the state of the employer's sincere religious beliefs, now or in the future—a fact potentially unavailable to many employees today, and, vis-à-vis the future, wholly unascertainable. These employees therefore do not have even a theoretical ability to intervene and defend their interests here.

To remedy at least in part this complete absence of representation, the Court should grant Nevada's motion to intervene, so that Nevada can represent its proprietary and sovereign interests, and its interests in protecting the health and welfare of the people of Nevada.

## CONCLUSION

For the foregoing reasons, the *Amici* States urge this Court to deny Plaintiffs' motion for

summary judgment and a permanent injunction and to grant Nevada's motion to intervene.

Respectfully submitted,

MAURA HEALEY
   *Attorney General of Massachusetts*
JONATHAN B. MILLER
JON BURKE
JULIA E. KOBICK
   *Assistant Attorneys General*

/s/ Elizabeth N. Dewar
Elizabeth N. Dewar (Mass. Bar. No.
680722, *pro hac vice* motion pending)
   *State Solicitor*
One Ashburton Place
Boston, MA 02108
Phone: (617) 963-2204
Fax: (617) 727-5778
bessie.dewar@mass.gov

Date: May 24, 2019

XAVIER BECERRA
   *Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
   *Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
   *Attorney General of Connecticut*
55 Elm Street
Hartford, Ct 06106

KATHLEEN JENNINGS
   *Attorney General of Delaware*
Department of Justice
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
   *Attorney General for the*
   *District of Columbia*
One Judiciary Square
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001

CLARE E. CONNORS
   *Attorney General of Hawaii*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
   *Attorney General of Maine*
6 State House Station
Augusta, ME 04333

24

BRIAN E. FROSH
  *Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
  *Attorney General of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
  *Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Boulevard
St. Paul, MN 55155

GURBIR S. GREWAL
  *Attorney General of New Jersey*
25 Market Street, Box 080
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

JOSHUA H. STEIN
  *Attorney General of North Carolina*
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General of Pennsylvania*
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
  *Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
  *Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
  *Attorney General of Virginia*
202 North 9th Street
Richmond, VA 23219

ROBERT W. FERGUSON
  *Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2019, the foregoing proposed *amicus* brief was filed on the Court's electronic filing system with a motion for leave of Court to file. Notice of this filing therefore will be sent to all parties for whom counsel has entered an appearance through the Court's electronic filing system, and Parties may access this filing through the Court's system.

/s/ Elizabeth N. Dewar

Dated: May 24, 2019                              Elizabeth N. Dewar