**FILED**

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS**

**July 09, 2019**

KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

Richard W. DeOtte, et al.,

       Plaintiffs,

    v.

Alex M. Azar II, in his official capacity as
Secretary of Health and Human Services,
et al.,

       Defendants.

Case No. 4:18-cv-825-O

---

**BRIEF OF AMICI CURIAE THE NATIONAL WOMEN'S LAW CENTER, THE NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH, THE NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM, SISTERLOVE, INC. AND 25 OTHERS IN SUPPORT OF THE MOTION TO INTERVENE BY NEVADA AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Jeffrey Blumenfeld, Esq. (*pro hac vice* pending)
**LOWENSTEIN SANDLER LLP**
2200 Pennsylvania Avenue, NW
Washington, DC 20037

Naomi D. Barrowclough, Esq. (*pro hac vice* pending)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068

*s/ Kenneth D. Upton, Jr.*
Texas State Bar No. 00797972
**AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE**
Office: 1310 L Street NW, Suite 200
Washington, D.C. 20005
Telephone: (202) 466-3234
Fax: (202) 898-0958
Residence: 3009 Sundial Drive
Dallas, TX 75229
Telephone: (214) 673-0858
upton@au.org

*Attorneys for Amici Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

INTEREST AND IDENTITY OF AMICI CURIAE.................................................. xii

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................1

ARGUMENT ...............................................................................................4

I.      NEVADA HAS A LEGALLY PROTECTABLE INTEREST IN THIS ACTION BECAUSE MANY OF ITS RESIDENTS, INCLUDING THOSE FACING MULTIPLE AND INTERSECTING FORMS OF DISCRIMINATION, ARE LIKELY TO LOSE COVERAGE IF PLAINTIFFS PREVAIL. ..........................................................................4

II.     THE PROPOSED INJUNCTION WILL HARM THOSE WHO LOSE COVERAGE BY REINSTATING PRE-ACA COST AND OTHER BARRIERS TO CONTRACEPTION. .............................................11

     A.     The Proposed Injunction Will Make Contraception Cost-Prohibitive for Many People..............................................12

     B.     The Proposed Injunction Will Create Logistical, Administrative, and Informational Barriers to Contraception. ............................15

III.    THE PROPOSED INJUNCTION WILL HARM THE HEALTH, AUTONOMY, AND ECONOMIC SECURITY OF THOSE WHO LOSE CONTRACEPTIVE COVERAGE.................................................16

     A.     The Proposed Injunction Will Harm the Health of Individuals and Families..........................................................................16

          1.     The Proposed Injunction Places More People at Risk for Unintended Pregnancy and Associated Health Risks. ..................16

          2.     The Proposed Injunction Will Undermine Health Benefits from Contraception. ....................................................19

     B.     The Proposed Injunction Will Undermine Individuals' Autonomy and Control Over Their Reproductive and Personal Lives........................19

     C.     The Proposed Injunction Will Undermine Individuals' Economic Security. ...............................................................22

          1.     Access to Contraception Provides Life-Long Economic Benefits to Women, Families, and Society....................................22

2. The Proposed Injunction Will Exacerbate Economic and Social Disparities by Impeding Access to Contraception..............23

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982)...................................................................................................4

*Buck v. Bell,*
    274 U.S. 200 (1927).................................................................................................20

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ....................................................................................5

*Griswold v. Connecticut,*
    381 U.S. 479 (1965).................................................................................................20

*Massachusetts v. United States Dep't of Health & Human Servs.,*
    No. 18-1514, 2019 WL 1950427 (1st Cir. May 2, 2019) .....................................5, 6

*Newby v. Enron Corp.,*
    443 F.3d 416 (5th Cir. 2006) ....................................................................................5

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992).................................................................................................19

*Ruiz v. Estelle,*
    161 F.3d 814 (5th Cir. 1998) ....................................................................................5

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014).................................................................................................5, 6

*Tagore v. United States,*
    735 F.3d 324 (5th Cir. 2013) ....................................................................................7

*Texas v. United States,*
    805 F.3d 653 (5th Cir. 2015) ..................................................................................4, 6

*United States House of Representatives v. Price*, No. 16-5202, 2017 WL 3271445
    (D.C. Cir. Aug. 1, 2017) ...........................................................................................5

*Wal–Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n,*
    834 F.3d 562 (5th Cir. 2016) ..................................................................................4, 5

## STATUTES

8 U.S.C. § 1613(a) ........................................................................................................10

42 U.S.C. § 300a-4(c)(2) ..............................................................................................10

42 U.S.C. § 300gg-13(a)(4) .............................................................................................1

42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) ..........................................................................10

Nev. Rev. Stat. Ann. § 689B.0378 ..................................................................................6

## RULES

Fed. R. Civ. P.  24 ......................................................................................................4, 6

## REGULATIONS

42 C.F.R. §§ 59.2 .........................................................................................................10

77 Fed. Reg. 8,725 ...................................................................................................2, 23

82 Fed. Reg. 47,792 .......................................................................................................6

83 Fed. Reg. 57,536 .......................................................................................................7

83 Fed. Reg. 57,554 .....................................................................................................18

84 Fed. Reg. 7714 ........................................................................................................11

## OTHER AUTHORITIES

155 Cong. Rec. S12,021 (daily ed. Dec. 1, 2009) ..........................................................1

155 Cong. Rec. S12,033 (daily ed. Dec. 1, 2009) ..........................................................1

A. Law et al., *Are Women Benefiting from the Affordable Care Act? A Real-World Evaluation of the Impact of the Affordable Care Act on Out-of-Pocket Costs for Contraceptives*, 93 Contraception 392 (2016) ..................................................14

Adam Sonfield, *The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost-Sharing*, 14 Guttmacher Pol'y Rev. 7 (2011) .......................12

Adam Sonfield et al., Guttmacher Inst., *Moving Forward: Family Planning in the Era of Health Reform* (2014) ...................................................................................18

Adam Sonfield et al., Guttmacher Inst., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children* (2013), https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf....................................................................................................................22, 23

Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey (MEPS), Nevada Tables (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=87&year=2017 .........................6, 9

Alanna Williamson et al., Kaiser Family Found., *ACA Coverage Expansions and Low-Income Workers* (2016), http://files.kff.org/attachment/ACA-Coverage-Expansions-and-Low-Income-Workers (just under one-third of low-income workers had employer-sponsored coverage in 2014) ...............................................8

American Community Survey (ACS) 2013-2017 5-Year Estimates, using Steven Ruggles et al., Integrated Public Use Microdata Series, available at https://sda.usa.ipums.org. ........................................................................................9

Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 554, Reproductive and Sexual Coercion* (2013), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co554.pdf?dmc=1&ts=20180521T2206346190 ....................................................21, 22

Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 649:  Racial & Ethnic Disparities in Obstetrics & Gynecology*  (2015), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co649.pdf?dmc=1&ts=20180521T1849308146....................16

Amy O. Tsui et al., *Family Planning and the Burden of Unintended Pregnancies,* 32 Epidemiologic Rev. 152 (2010) .........................................................................17

Ana Nuevo Chiquero, *The Labor Force Effects of Unplanned Childbearing* (Boston Univ., Job Market Paper Nov. 2010), http://www.unavarra.es/digitalAssets/141/141311_100000Paper_Ana_Nuevo_Chiquero.pdf .......................................................................................................23

Ashley H. Snyder et al., *The Impact of the Affordable Care Act on Contraceptive Use and Costs among Privately Insured Women*, 28 Women's Health Issues 219 (2018).............................................................................................2, 11, 13, 14

Bearek et al., *Changes in Out-Of-Pocket Costs for Hormonal IUDs after Implementation of the Affordable Care Act: An Analysis of Insurance Benefit Inquiries*, 93 Contraception 139 (2016) ................................................................13

Black Mamas Matter Alliance, *Black Mamas Matter Toolkit Advancing the Right to Safe and Respectful Maternal Health Care* (2018), https://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/USPA_BMMA_Toolkit_Booklet-Final-Update_Web-Pages.pdf ...........................................17

Carole Joffe & Willie J. Parker, *Race, Reproductive Politics and Reproductive Health Care in the Contemporary United States*, 86 Contraception 1 (2012).........................20

Caroline Rosenzweig et al., Kaiser Family Found., *Women's Sexual and Reproductive Health Services: Key Findings from the 2017 Kaiser Women's Health Survey* (2018), http://files.kff.org/attachment/Issue-Brief-Womens-Sexual-and-Reproductive-Health-Services-Key-Findingsfrom- the-2017-Kaiser-Womens-Health-Survey/.............................................................................19

Cassandra Logan et al., Nat'l Campaign to Prevent Teen & Unplanned Pregnancy, Child Trends, Inc., *The Consequences of Unintended Childbearing: A White Paper* (2007), https://pdfs.semanticscholar.org/b353/b02ae6cad716a7f64ca48b3edae63544c03e.pdf. ....................................................................................................17

Catholic Benefits Ass'n, https://catholicbenefitsassociation.org/...................................7

Catholics for Choice, *The Facts Tell the Story 2014-2015* (2014), http://www.catholicsforchoice.org/wp-content/uploads/2014/12/FactsTelltheStory2014.pdf ...........................................8

Christine Dehlendorf et al., *Disparities in Family Planning*, 202 Am. J. Obstet. Gynecol. 214 (2010) ..............................................................................14, 15

Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. Pol. Econ. 730 (2002) ......................23

Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76 Contraception 360 (2007).........................................13

Deborah Gray White, *Ar'n't I a Woman?: Female Slaves in the Plantation South* (W.W. Norton & Co. ed., 1999) ..................................................................20

Economic Policy Institute, *Family Budget Calculator, Monthly Costs*, https://www.epi.org/resources/budget/ ....................................................................9

Elena R. Gutiérrez, *Fertile Matters: the Politics of Mexican-Origin Women's Reproduction* (2008) .................................................................................20

Elizabeth Miller et al., *Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy*, 81 Contraception 457 (2010).........................21

Erin Armstrong et al., *Intrauterine Devices and Implants: A Guide to Reimbursement* (Regents of U.C. et al. 2d ed. 2015), https://www.nationalfamilyplanning.org/file/documents----reports/LARC_Report_2014_R5_forWeb.pdf..................................................12

Express Scripts, *2015 Drug Trends Report* (2016), http://lab.express-
    scripts.com/lab/drug-trend-
    report/~/media/e2c9d19240e94fcf893b706e13068750.ashx ...................................................14

Express Scripts, *2016 Drug Trends Report* (2017), http://lab.express-
    scripts.com/lab/drug-trend-report/~/media/
    29f13dee4e7842d6881b7e034fc0916a.ashx ............................................................................14

Fatima Saleem & Syed W. Rizvi, *Transgender Associations and Possible
    Etiology: A Literature Review*, 9 Cureus 1 (2017) ...................................................21

Guttmacher Inst., *A Real-Time Look at the Impact of the Recession on Women's
    Family Planning and Pregnancy Decisions*  (2009),
    https://www.guttmacher.org/sites/default/files/report_pdf/recessionfp_1.pdf ........................13

Guttmacher Inst., *Insurance Coverage of Contraception* (Dec. 2016),
    https://www.guttmacher.org/evidence-you-can-use/insurance-coverage-
    contraception .........................................................................................................................13

Guttmacher Inst., *Publicly Funded Family Planning Services in the United States*
    (2016),
    https://www.guttmacher.org/sites/default/files/factsheet/fb_contraceptive_serv
    _0.pdf ....................................................................................................................................17

Health Res. & Servs. Admin., *Women's Preventive Services Guidelines*,
    https://www.hrsa.gov/womens-guidelines-2016/index.html ....................................................1

Heinrich H. Hock, *The Pill and the College Attainment of American Women and
    Men* (Fla. St. Univ., Working Paper 2007) ...............................................................22

Hobby Lobby Store Finder, https://www.hobbylobby.com/store-finder .........................................6

Hobby Lobby Stores, Inc. Medical and Dental Plan Document, Group No.: 14628,
    Meritain Health (originally effective May 1, 1988) .....................................................6

Inst. of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*
    (2011)..........................................................................................................................13, 17, 19

James Trussell et al., *Erratum to "Cost Effectiveness of Contraceptives in the
    United States" [Contraception 79 (2009) 5-14]*, 80 Contraception 229 (2009) ....................12

Jamila Taylor & Nikita Mhatre, *Contraceptive Coverage Under the Affordable
    Care Act, Ctr. for Am. Progress* (Oct. 6, 2017),
    https://www.americanprogress.org/issues/women/news/2017/10/06/440492/cont
    raceptive-coverage-affordable-care-act/ ...............................................................12

Jasmine Tucker & Kayla Patrick, Nat'l Women's Law Ctr., *Women in Low-Wage Jobs May Not Be Who You Expect* (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/08/ Women-in-Low-Wage-Jobs-May-Not-Be-Who-You-Expect.pdf .......................................................8, 24

Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291 (2012) ...........................................18

Jennifer J. Frost et al., Guttmacher Inst., *Contraceptive Needs and Services, 2014 Update 12* (2016), https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.........................................................................................................11

Jennifer J. Frost & Jacqueline E. Darroch, *Factors Associated with Contraceptive Choice and Inconsistent Method Use, United States, 2004*, 40 Perspectives on Sexual & Reprod. Health 94 (2008). ........................................................................................18

Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics*, 87 Contraception 465 (2013)......................................................................................20

Jo Jones et al., Ctrs. For Disease Control & Prevention, *Nat'l Health Statistics Reps.: Current Contraceptive Use in the United States 2006-2010, and Changes in Patterns of Use Since 1995* (2012) .......................................................................14

Juno Obedin-Maliver & Harvey J. Makadon, *Transgender Men and Pregnancy*, 9 Obstetric Med. 4 (2015).................................................................................................20, 21

Kaiser Family Found., 2018 Employer Health Benefits Survey, Section 10: Plan Funding, https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-10-plan-funding/ (Oct. 3, 2018) ........................................................................6

Kashif Syed, Advocates for Youth, *Ensuring Young People's Access to Preventive Services in the Affordable Care Act* (2014), http://www.advocatesforyouth.org/storage/advfy/documents/Preventive%20Services%20in%20the%20ACA-11-24-14.pdf .........................................................17

Kimberly Daniels et al., *Ctrs. For Disease Control & Prevention, 62 Nat'l Health Stats. Reps.: Contraceptive Methods Women Have Ever Used: United States, 1982–2010* (2013), https://www.cdc.gov/nchs/data/nhsr/nhsr062.pdf......................................8

Lawrence B. Finer & Mia R. Zolna, *Shifts in Intended and Unintended Pregnancies in the United States, 2001–2008*, 104 Am. J. Pub. Health S43 (2014).....................................................................................................................................17

Lisa L. Lindley & Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 Am. J. Pub. Health 1379 (2015) ..................................................................................................................17

Martha J. Bailey et al., *The Opt-in Revolution? Contraception and the Gender Gap in Wages*, 4 Am. Econ. J. Appl. Econ. 225 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3684076/ ....................................................22

NAPAWF calculations from U.S. Census Bureau, *2015 ACS 1-Year Estimates: Table S0201, Selected Population Profile in the United States,* https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_1YR/S0201//popgroup~031 ....................................................................................................................24

Nat'l Latina Inst. for Reproductive Health, *Latina/o Voters' Views and Experiences Around Reproductive Health* (2018), http://latinainstitute.org/sites/default/files/NLIRH%20Survey%20Report_F_0.pdf ............................................................................................................................8, 15

Nat'l Women's Law Ctr., *Collateral Damage: Scheduling Challenges for Workers in Low-Wage Jobs and Their Consequences* (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/Collateral-Damage.pdf..............................................................................................15, 24

Nat'l Women's Law Ctr., *Equal Pay for Asian and Pacific Islander Women* (2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2018/02/Asian-Women-Equal-Pay-Feb-2018.pdf........................................24

Nat'l Women's Law Ctr., *FAQs About the Wage Gap* (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf ................................................................................24

Nat'l Women's Law Ctr., *It Shouldn't Be a Heavy Lift: Fair Treatment for Pregnant Workers* (2016), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2015/08/pregnant_workers.pdf....................................................24

Nat'l Women's Law Ctr., *New Data Estimates 62.8 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs* (2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-4.pdf .....................................................................2

Nat'l Women's Law Ctr., *Sexual Harassment & Assault in Schools*, https://nwlc.org/issue/sexual-harassment-assault-in-schools/ .................................21

Nat'l Women's Law Ctr., *The Stealth Attack on Women's Health: Medicaid Work Requirements Would Reduce Access To Care For Women Without Increasing Employment* (2017), https://nwlc.org/wp-content/uploads/2017/04/Medicaid-Work-Requirements-1.pdf ......................................................................................11

Nat'l Women's Law Ctr., *NWLC Nevada*, https://nwlc.org/state/nevada/ ....................................24

Nevada Div. of Welfare and Supportive Servs., Medicaid Assistance Manual,
    MAGI Medical Categories at B-125, https://dwss.nv.gov/Medical-Manual/ ......................... 10

Nevada Div. of Welfare and Supportive Servs., Medicaid Assistance Manual,
    General Eligibility Requirements at C-420, https://dwss.nv.gov/Medical-
    Manual/ ..................................................................................................................... 10

Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket
    Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34
    Health Affairs 1204 (2015) ................................................................................. 12, 14

Office of Disease Prevention & Health Promotion, *HealthyPeople 2020: Family
    Planning*, HealthyPeople.gov, https://www.healthypeople.gov/2020/topics-
    objectives/topic/family-planning ........................................................................... 17

Planned Parenthood, *IUD*, https://www.plannedparenthood.org/learn/birth-
    control/iud ................................................................................................................ 12

Power to Decide, *Publicly Funded Sites Offering All Birth Control Methods By
    County*, https://powertodecide.org/what-we-do/access/access-birth-control ......................... 11

Proud Heritage: People, Issues, and Documents of the LGBT Experience, Vol. 2
    (Chuck Stewart, ed. 2015) ...................................................................................... 20

Rachel K. Jones & Joerg Dreweke, Guttmacher Inst., *Countering Conventional
    Wisdom: New Evidence on Religion and Contraceptive Use* (2011),
    https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-
    contraceptive-use.pdf; ............................................................................................... 8

Renee Montagne & Nina Martin, *Focus On Infants During Childbirth Leaves U.S.
    Moms In Danger*, Nat'l Pub. Radio (May 12, 2017, 5:00 AM),
    https://www.npr.org/2017/05/12/527806002/focus-on-infants-during-
    childbirth-leaves-u-s-moms-in-danger ...................................................................... 17

Sandy E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015
    U.S. Transgender Survey* (2015), https://www.transequality.org/sites/
    default/files/docs/USTS-Full-Report-FINAL.PDF .................................................. 16

SL Budge et al., *Anxiety and Depression in Transgender Individuals: The Roles of
    Transition Status, Loss, Social Support, and Coping*, 81 J. Consult Clin.
    Psych. 545 (2013) .................................................................................................... 21

Stacey McMorrow, Urban Inst., *Racial and Ethnic Disparities in Use of
    Prescription Contraception:  The Role of Insurance Coverage* (forthcoming),
    https://academyhealth.confex.com/academyhealth/2017arm/meetingapp.cgi/P
    aper/17939 ........................................................................................................... 14, 15

U.S. Census Bureau, *QuickFacts Nevada*, https://www.census.gov/quickfacts/nv ........................ 8

U.S. Dep't of Health and Human Servs., Asst. Sec'y for Planning and Education,
    Compilation of State Data on the Affordable Care Act,
    https://aspe.hhs.gov/compilation-state-data-affordable-care-act ..............................................10

W. Canestaro et al., *Implications of Employer Coverage of Contraception: Cost-
    Effectiveness Analysis of Contraception Coverage Under an Employer
    Mandate*, 95 Contraception 77 (2017)...................................................................................18

Zenen Jaimes et al., Generation Progress & Advocates for Youth, *Protecting Birth
    Control Coverage for Young People* (2015),
    http://www.advocatesforyouth.org/storage/advfy/documents/Factsheets/protec
    ting%20birth%20control%20coverage%20factsheet-2-18-15.pdf ..........................................13

## INTEREST AND IDENTITY OF AMICI CURIAE

Amici the National Women's Law Center, the National Latina Institute for Reproductive Health, SisterLove, Inc., the National Asian Pacific American Women's Forum, and the 25 additional organizations listed in the Appendix, are national and regional organizations committed to obtaining racial justice, economic security, gender equity, civil rights, and reproductive justice for all, which includes ensuring that individuals who may become pregnant have access to full and equal health coverage, including contraceptive coverage without cost-sharing, as guaranteed by the Affordable Care Act ("ACA").  We submit this brief to demonstrate the irreparable harm that will result, particularly to those who face multiple and intersecting forms of discrimination, if the State of Nevada is denied the right to intervene in this lawsuit to defend the ACA's contraceptive coverage requirement and if summary judgment is granted.[1]

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than Amici Curiae and their counsel made a monetary contribution to fund the preparation or submission of this brief.  Defendants have consented to the filing of this brief.  Plaintiffs have consented to the brief to the extent it opposes Plaintiffs' motion for summary judgment, but oppose the brief to the extent it support's Nevada's motion to intervene.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At stake in this litigation are the health and livelihoods of people in Nevada and across the United States who will suffer irreparable harm if Nevada is not permitted to intervene to defend the ACA's contraceptive coverage requirement—particularly Black, Latinx,[2] Asian American and Pacific Islander ("AAPI") women and other people of color, young people, people with limited resources, transgender men and gender non-conforming people, immigrants, people with limited English proficiency, survivors of sexual and interpersonal violence, and others who face multiple and intersecting forms of discrimination.

The ACA's contraceptive coverage requirement requires employers to provide insurance coverage without cost-sharing for all FDA-approved methods of contraception for women, and related education, counseling, and services.[3,4]   Congress intended the Women's Health Amendment of the ACA to reduce gender discrimination in health insurance by ensuring that it covers women's major health needs and that women no longer pay more for health care than men, including by decreasing the cost of contraception.[5]   The Departments of Health and Human

---

[2] "Latinx" is a term that represents a gender-neutral alternative to Latino and Latina and encompasses the identities of transgender and gender non-conforming individuals of Latin American descent.

[3] This brief uses the term "women" because the ACA was intended to end discrimination against women. As we discuss, the denial of reproductive health care and related insurance coverage also affects some gender non-conforming people and transgender men.

[4] 42 U.S.C. § 300gg-13(a)(4); Health Res. & Servs. Admin., *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines-2016/index.html (last visited May 22, 2019).

[5] 42 U.S.C. § 300gg-13(a)(4); *see also* 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski) (Women's Health Amendment intended to alleviate "punitive practices of insurance companies that charge women more and give [them] less in a benefit"); 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken) (Women's Health Amendment intended to incorporate "affordable family planning services" to "enable women and families to make informed decisions about when and how they become parents").

Services, Treasury, and Labor (the "Departments") previously acknowledged this intent, explaining that Congress added the ACA Women's Health Amendment because "women have unique health care needs and burdens . . . includ[ing] contraceptive services," and that the "Departments aim to reduce these disparities by providing women broad access to preventive services, including contraceptive services."[6]

The ACA contraceptive coverage requirement has furthered these aims by eliminating the out-of-pocket costs of contraception and ensuring coverage of the full range of FDA-approved contraceptives and related services for women.  Today, an estimated 62.8 million women are eligible for coverage of the contraceptive method that works best for them, irrespective of cost.[7] As a result, use of contraception—especially highly-effective long-acting reversible contraceptives ("LARCs") such as intrauterine devices ("IUDs") and contraceptive implants—has increased.[8]

The classwide relief sought by Plaintiffs would reverse these gains by establishing a sweeping exemption allowing virtually any employer nationwide to unilaterally opt out of the ACA contraceptive coverage requirement and deny insurance coverage for contraception and related services to employees and their dependents.  This will undermine gender equality by reintroducing the very inequities that Congress meant to remedy.  Nonetheless, the Departments, reversing course, now take the position in this litigation that they will not defend the ACA

---

[6] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,727, 8,728 (Feb. 15, 2012) [hereinafter "ACA Coverage"].

[7] Nat'l Women's Law Ctr., *New Data Estimates 62.8 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs* (2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-4.pdf.

[8] *See* Ashley H. Snyder et al., *The Impact of the Affordable Care Act on Contraceptive Use and Costs among Privately Insured Women*, 28 Women's Health Issues 219, 222 (2018).

contraceptive coverage requirement on the merits. *See* Brief of Federal Defendants in Response to Motion for Summary Judgment and Permanent Injunction ("Brief of Fed. Def."), Dkt. # 38, at 3. As a result, unless Nevada is granted intervention, no party in this litigation will defend the interest of the millions of women in Nevada and nationwide who rely on the ACA's contraceptive coverage requirement.

This brief first establishes that Nevada has a legally protectable interest in this matter supporting intervention (as well as Article III standing) because many individuals in Nevada are likely to lose contraceptive coverage, including many people who already face multiple and intersecting forms of discrimination. Second, the brief provides data showing that a classwide injunction would make contraception cost-prohibitive and will create other non-financial barriers to contraception for many who lose coverage. Third, the brief discusses the multiple ways the proposed classwide injunction would irreparably harm those who lose contraceptive coverage: (1) jeopardizing health by increasing unintended pregnancies and aggravating medical conditions managed by contraception; (2) undermining individuals' autonomy and control over their lives; and (3) threatening individuals' economic security. As highlighted throughout this brief, the classwide injunction will particularly harm people of color and others who already face systemic discrimination in Nevada and nationwide.

Amici therefore urge the Court to grant Nevada's motion to intervene to defend the ACA's contraceptive coverage requirement and to deny Plaintiffs' motion for summary judgment.

## ARGUMENT

**I.   NEVADA HAS A LEGALLY PROTECTABLE INTEREST IN THIS ACTION BECAUSE MANY OF ITS RESIDENTS, INCLUDING THOSE FACING MULTIPLE AND INTERSECTING FORMS OF DISCRIMINATION, ARE LIKELY TO LOSE COVERAGE IF PLAINTIFFS PREVAIL.**

To intervene as of right pursuant to Fed. R. Civ. P. 24(a)(2), a movant must demonstrate "an interest that is concrete, personalized, and legally protectable." *Texas v. United States*, 805 F.3d 653, 658 (5th Cir. 2015). An interest that is "legally protectable" is one "that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *Id.* at 659. "Rule 24 is to be liberally construed," and "[f]ederal courts should allow intervention when no one would be hurt and the greater justice could be attained." *Wal–Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (internal quotations and citations omitted).

Although property or pecuniary interests—such as a state's interest in its fisc—are the most "elementary type[s] of right[s] that Rule 24(a) is designed to protect" and are "almost always adequate," non-property interests may also support intervention. *Texas*, 805 F.3d at 658-59. The Fifth Circuit has repeatedly held that the intended beneficiaries of a regulatory scheme and their representatives have a "legally protectable interest" in litigation challenging the scheme that supports intervention. *Id.* at 660; *Wal-Mart*, 834 F.3d at 566 (association whose members were beneficiaries of regulatory system had legally protectable interest in defending system from legal challenge). As representative of the Nevada residents who are the beneficiaries of the ACA's contraceptive coverage requirement under attack in this suit, Nevada has a "legally protectable interest" supporting intervention. *Cf. Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) (a state has a "quasi-sovereign interest" in "the health and well-being—both physical and economic—of its residents in general").

Although Nevada need not establish Article III standing to intervene in this pending litigation, *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006); *Ruiz v. Estelle*, 161 F.3d 814, 830 (5th Cir. 1998), it easily has both standing and an interest in this litigation sufficient to support intervention as of right. *See Wal-Mart*, 834 F.3d at 566 n.3 (noting the Fifth Circuit has "previously suggested that a movant who shows standing is deemed to have a sufficiently substantial interest to intervene." (internal quotation marks and citations omitted)). An allegation of future injury is sufficient for standing purposes if there is a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Two federal courts of appeals have held that states have standing to challenge regulations promulgated by the Departments that would have virtually the same effect as the classwide injunctions sought in the instant case. *See Massachusetts v. United States Dep't of Health & Human Servs.*, No. 18-1514, 2019 WL 1950427, at *10, *12 (1st Cir. May 2, 2019) (holding Massachusetts had standing to challenge regulations where Massachusetts established "a substantial risk that *some* women in Massachusetts will lose [contraceptive] coverage" and that a "portion of the women who would lose contraceptive coverage would then obtain state-funded contraceptive care or state-funded prenatal care for unintended pregnancies, and thus cause the Commonwealth to incur costs"); *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018) (similar). Likewise, in *United States House of Representatives v. Price*, the court held that states had both standing and a legally protectable interest to intervene where the relief sought by plaintiff would "increase the number of uninsured individuals for whom the States will have to provide health care." No. 16-5202, 2017 WL 3271445, at **1-2 (D.C. Cir. Aug. 1, 2017).

Many Nevada residents are at risk of losing a vital health benefit. Although Nevada law requires coverage of contraception without cost-sharing in state-regulated insurance plans, this

does not apply to self-insured plans, which are governed solely by federal law.[9]  In 2017, over 30% of private-sector employers in Nevada that offered health insurance—over 9,000 employers—self-insured at least one plan.[10]  Employers that self-insure tend to be larger employers,[11] and in fact, just under 271,000 private-sector employees were enrolled in self-insured plans in Nevada in 2017—a number that does not include covered dependents.[12]  At least one self-insured employer with tens of thousands of employees nationwide, Hobby Lobby,[13] has employees in Nevada and will certainly take advantage of the classwide injunction, given that it has vehemently litigated against the contraceptive coverage requirement.  Thus, there is a "substantial risk" that least some Nevada residents will lose contraceptive coverage if the Court grants the nationwide classwide relief requested, amounting to both a legally protectable interest for purposes of Rule 24(a) and also a sufficiently imminent injury for purposes of Article III standing.  *Susan B. Anthony List*, 573 U.S. at 158; *Texas*, 805 F.3d at 659; *Massachusetts*, 2019 WL 1950427, at *10 (concluding

---

[9]  Nev. Rev. Stat. Ann. § 689B.0378.

[10]  NWLC calculations from Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey (MEPS), Nevada Tables II.A.1, II.A.2, and II.A.2.a (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=87&year=2017 (last visited May 19, 2019).

[11]  Kaiser Family Found., 2018 Employer Health Benefits Survey, Section 10: Plan Funding, https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-10-plan-funding/ (Oct. 3, 2018) ("Self-funding is common among larger firms because they can spread the risk of costly claims over a large number of workers and dependents.")

[12]  NWLC calculations from Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey, Nevada Tables II.B.1, II.B.2, II.B.2.b, and II.B.2.b(1) (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=87&year=2017 (last visited May 19, 2019).

[13]  Hobby Lobby self-insures and has five Nevada locations.  *See* Hobby Lobby Store Finder, https://www.hobbylobby.com/store-finder (last visited May 17, 2019); Hobby Lobby Stores, Inc. Medical and Dental Plan Document, Group No.: 14628, Meritain Health (originally effective May 1, 1988); *see also* Religious Interim Final Rule, 82 Fed. Reg. 47,792–01, 47,817 n.67 (citing 13,240 Hobby Lobby employees nationwide).

Massachusetts' identification of employers likely to drop coverage, including Hobby Lobby, supported standing).

Of course, given the broad reach of the certified "Employer Class," it would be error to assume that only those entities that filed litigation or requested an accommodation, and a trivial number of similar entities, will take advantage of the requested injunctions.  By extending the previously narrow religious exemption to "every current and future employer in the United States," Order Granting Motion to Certify Class, Dkt. # 33, at 7, including publicly traded companies, the classwide injunction will greatly expand the number of entities that can unilaterally opt out of the contraceptive coverage requirement, with no requirement that an objecting employer establish that it actually has a "sincere religious objection"—which, as the Departments correctly point out, "is an essential requirement of both class membership and of proving a claim on the merits," Brief of Fed. Def., Dkt. # 38, at 4 (citing *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013)).  Nor is there any other mechanism for oversight to prevent abuse.  Moreover, some of the original litigating entities represent multiple, unidentified employers: for example, the Catholic Benefits Association alone represents more than 1,000 employers.[14]

It is also error to assume—as the Departments do—that employees of objecting entities share their employers' religious objections to contraception.[15]  Many women of faith and their dependents who rely on objecting entities for health insurance use contraception and will be impacted by loss of contraceptive coverage.  More than 99% of sexually experienced women aged 15-44 have used at least one method of contraception at some point regardless of religious

---

[14] Catholic Benefits Ass'n, https://catholicbenefitsassociation.org/ (last visited May 22, 2019).

[15] *See, e.g.*, Religious Final Rule, 83 Fed. Reg. 57,536–01, 57,563–64, 57,581.

affiliation.[16]   Among sexually experienced Catholic women, 98% have used a method of contraception other than natural family planning; that number is 95% for married Catholic Latinas.[17]   Over 70% of Protestant women use a "highly effective contraceptive method" (including sterilization, IUDs, the pill, and other hormonal methods).[18]   28.5% of Nevada's population is Latinx.[19]   Of Latina and Latino voters, 86% consider contraception to be preventive health care and 82% do not view contraception through a religious lens.[20]

Additionally, a substantial number of the individuals in Nevada and nationwide who are at risk of losing coverage are those who can least afford it.   Many low-wage workers—who are disproportionately women of color[21]—and their dependents rely on employer-sponsored health insurance and stand to lose coverage if the Court grants the proposed classwide injunction.[22]

---

[16] Kimberly Daniels et al., Ctrs. For Disease Control & Prevention, *62 Nat'l Health Stats. Reps.: Contraceptive Methods Women Have Ever Used: United States, 1982–2010* 8 (2013), https://www.cdc.gov/nchs/data/nhsr/nhsr062.pdf.

[17] Rachel K. Jones & Joerg Dreweke, Guttmacher Inst., *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use* 4 (2011), https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf; Catholics for Choice, *The Facts Tell the Story 2014-2015* 5 (2014), http://www.catholicsforchoice.org/wp-content/uploads/2014/12/FactsTelltheStory2014.pdf.

[18] Catholics for Choice, *supra* note 17, at 5.

[19] U.S. Census Bureau, *QuickFacts Nevada*, https://www.census.gov/quickfacts/nv (last visited May 20, 2019).

[20] Nat'l Latina Inst. for Reproductive Health, *Latina/o Voters' Views and Experiences Around Reproductive Health* 2 (2018), http://latinainstitute.org/sites/default/files/NLIRH%20Survey%20Report_F_0.pdf

[21] Jasmine Tucker & Kayla Patrick, Nat'l Women's Law Ctr., *Women in Low-Wage Jobs May Not Be Who You Expect* 1 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/08/Women-in-Low-Wage-Jobs-May-Not-Be-Who-You-Expect.pdf.

[22] Alanna Williamson et al., Kaiser Family Found., *ACA Coverage Expansions and Low-Income Workers* 4 (2016), http://files.kff.org/attachment/ACA-Coverage-Expansions-and-Low-Income-Workers (just under one-third of low-income workers had employer-sponsored coverage in 2014).

Among the over 9,000 private-sector employers in Nevada that offer self-insured health benefits, over 30%—nearly 2,800 employers—have a predominantly low-wage workforce, and 55%—nearly 5,000 employers—are in the retail and non-professional services industries.[23]   Retail workers tend to earn lower wages:  they earn a median annual income in in Nevada of $33,671 compared to $41,036 for all workers in all industries in the state.[24]

Female retail salespersons in Nevada make a median hourly wage of $14.16.[25]   Black female retail salespersons make significantly less, $11.93.[26]   These earnings equate to a median monthly income of $2,455 for all female retail salespersons and $2,068 for Black female retail salespersons..[27]   This is less than the approximately $2,800-$3,000 needed for a single person with no children to cover basic monthly expenses such as housing, food, transportation, health care, taxes, and other necessities in Nevada.[28]   Faced with out-of-pocket expenses for contraception, many female retail workers, particularly women of color, will be forced to forgo contraception or other necessities due to cost.

---

[23] *See* NWLC caclculations from MEPS Nevada Tables V.A.1., V.A.2, VII.A.1, VII.A.2 (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=24&year=20172017 (last visited May 22, 2019).

[24] NWLC calculations based on American Community Survey (ACS) 2013-2017 5-Year Estimates, using Steven Ruggles et al., Integrated Public Use Microdata Series, available at https://sda.usa.ipums.org. Figures are for full-time, year round workers in the retail industry and in all industries in the state.

[25] *Id.* Median hourly wages calculated by dividing the median annual income for female retail salespersons by 2,080.

[26] *Id.* Median hourly wages calculated by dividing the median annual income for Black female retail salespersons by 2,080.

[27] *Id*. Median monthly income calculated by dividing median annual income by 12.

[28] Economic Policy Institute, *Family Budget Calculator, Monthly Costs*, https://www.epi.org/resources/budget/ (last visited May 19, 2019) (range based on Pershing and Douglas County, respectively).

The same holds true for young people, who often have limited resources, large educational debt, and little ability to absorb extra costs. Many young people are dependents in employer-sponsored plans, either from their own employment or because the ACA allows young adults to remain on their parent's or guardian's health plan until age 26. From 2010-2013, 2.3 million dependent young adults—including 19,000 in Nevada—gained or maintained coverage under this provision and stand to lose contraceptive coverage under the proposed classwide injunction if their parents' employers object to it.[29]

Not all those who lose contraceptive coverage as a result of this lawsuit will be able to access contraception through other existing government-sponsored programs, such as Title X, Medicaid, and state-run programs. While the injunction will certainly force thousands more women to seek contraceptive care from these already-strained programs, causing Nevada fiscal harm, many who lose ACA coverage will not be able to access such care due to eligibility restrictions and capacity constraints. In addition to income- and category-based eligibility criteria for these programs,[30] anti-immigrant provisions in Medicaid restrict eligibility for most *lawful* permanent residents—many of whom are Latinx and AAPI—for five years.[31] For eligible women, Medicaid and Title X do not have the capacity to meet current needs, much less the demand from

---

[29] U.S. Dep't of Health and Human Servs., Asst. Sec'y for Planning and Education, Compilation of State Data on the Affordable Care Act, https://aspe.hhs.gov/compilation-state-data-affordable-care-act (last visited May 19, 2019).

[30] *See, e.g.*, 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. §§ 59.2, 59.5(7), (8) (free care at Title X clinics limited to families at 100% federal poverty level [FPL]; subsidized care restricted to 250% FPL); *see also* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) (limiting Medicaid eligibility for childless, non-pregnant adults to 133% FPL); Nevada Div. of Welfare and Supportive Servs., Medicaid Assistance Manual, MAGI Medical Categories at B-125, https://dwss.nv.gov/Medical-Manual/ (last visited May 19, 2019).

[31] 8 U.S.C. § 1613(a); Nevada Div. of Welfare and Supportive Servs., Medicaid Assistance Manual, General Eligibility Requirements at C-420, https://dwss.nv.gov/Medical-Manual/ (last visited May 19, 2019).

thousands who will lose coverage due to this litigation.[32]   Moreover, there are regions in Nevada without reasonable access (one clinic per 1,000 women in need) to a publicly-funded clinic offering the full range of FDA-approved contraceptive methods.[33]   The Administration's ongoing attempts to restructure Title X and Medicaid will further burden already-scarce resources.[34]

## II.   THE PROPOSED INJUNCTION WILL HARM THOSE WHO LOSE COVERAGE BY REINSTATING PRE-ACA COST AND OTHER BARRIERS TO CONTRACEPTION.

The ACA dramatically reduced out-of-pocket expenditures on contraception, resulting in increased use.[35]   The injunction Plaintiffs seek threatens to reverse these gains.   Without coverage, women will again face financial, logistical, informational, and administrative barriers that make it more difficult to use the most appropriate contraceptive method.   These changes will particularly affect women of color, young people, transgender and gender non-conforming people, and others who face stark health disparities due to systemic barriers to contraceptive and other reproductive health care.

---

[32] Jennifer J. Frost et al., Guttmacher Inst., *Contraceptive Needs and Services, 2014 Update* 12, 30 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf (publicly-funded providers met only 39% of need for publicly-supported contraceptive services in 2014).

[33] Power to Decide, *Publicly Funded Sites Offering All Birth Control Methods By County*, https://powertodecide.org/what-we-do/access/access-birth-control (last visited May 19, 2019).

[34] *See, e.g.*, Nat'l Women's Law Ctr., *The Stealth Attack on Women's Health: Medicaid Work Requirements Would Reduce Access To Care For Women Without Increasing Employment* (2017), https://nwlc.org/wp-content/uploads/2017/04/Medicaid-Work-Requirements-1.pdf; *see also* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714 (Mar. 4, 2019) (codified at 42 C.F.R. Part 59) (revising Title X regulations). The Title X final rule would redefine "low-income family" for Title X eligibility to include women who lose contraceptive coverage because of an employer's objection.   This redefinition illegally defies the plain meaning and purpose of Title X, and in any event the final rule does nothing to ensure Title X providers actually have the capacity to meet the needs of these additional women.

[35] *See* Snyder, *supra* note 8, at 222.

## A.    The Proposed Injunction Will Make Contraception Cost-Prohibitive for Many People.

Without insurance coverage, contraception is expensive.  Prior to the ACA, women spent between 30% and 44% of their total out-of-pocket health costs just on contraception.[36]  A 2009 study found oral contraception (the pill) costs, on average, $2,630 over five years, and other very effective methods such as injectables, transdermal patches, and the vaginal ring, cost women between $2,300 and $2,800 over a five-year period.[37]  Today, women without insurance can be expected to spend $850 annually—or $4,250 over five years assuming static costs—on oral contraception and attendant care.[38]  LARCs—among the most effective contraceptives—carry the highest up-front costs: IUDs can cost up to $1,300 up front,[39] in addition to costs of ongoing care.[40]

Cost is a major determinant of whether people obtain needed health care, particularly for individuals with lower incomes.[41]  Studies confirm that "[e]ven small increments in cost sharing

---

[36] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 1204, 1208 (2015), available at https://www.healthaffairs.org/doi/10.1377/hlthaff.2015.0127.

[37] James Trussell et al., *Erratum to "Cost Effectiveness of Contraceptives in the United States" [Contraception 79 (2009) 5-14]*, 80 Contraception 229 (2009).

[38] Jamila Taylor & Nikita Mhatre, *Contraceptive Coverage Under the Affordable Care Act*, Ctr. for Am. Progress (Oct. 6, 2017, 5:09 PM), https://www.americanprogress.org/issues/women/news/2017/10/06/440492/ contraceptive-coverage-affordable-care-act/.

[39] Erin Armstrong et al., *Intrauterine Devices and Implants: A Guide to Reimbursement* 5 (Regents of U.C. et al. 2d ed. 2015), https://www.nationalfamilyplanning.org/file/documents---- reports/LARC_Report_2014_R5_forWeb.pdf; Planned Parenthood, IUD, https://www.plannedparenthood.org/learn/birth-control/iud (last visited May 22, 2019).

[40] Such care may include removal or replacement of the IUD or help with complications should any occur.

[41] Adam Sonfield, *The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost-Sharing*, 14 Guttmacher Pol'y Rev. 7, 10 (2011).

have been shown to reduce the use of preventive services."[42]  When finances are strained, women

cease using contraception, skip pills, delay filling prescriptions, or purchase fewer packs at once.[43]

Cost is also a major determinant of contraceptive use by young people: before the ACA, 55% of

young women reported experiencing a time when they could not afford contraception

consistently.[44]

     Cost also impacts the choice of contraceptive method.  People often use methods that are

medically inappropriate or less effective because they cannot afford more appropriate or effective

methods with higher out-of-pocket costs.[45]

     The ACA contraceptive coverage requirement has yielded enormous cost-savings for

women, as was its purpose.[46]  The mean total out-of-pocket expenses for FDA-approved

---

[42] *See* Inst. of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 109 (2011) [hereinafter "IOM Rep."].

[43] Guttmacher Inst., *A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions* 5 (2009), https://www.guttmacher.org/sites/default/files/report_pdf/recessionfp_1.pdf.

[44] Zenen Jaimes et al., Generation Progress & Advocates for Youth, *Protecting Birth Control Coverage for Young People* 1 (2015), http://www.advocatesforyouth.org/storage/advfy/documents/Factsheets/protecting%20birth%20control%20coverage%20factsheet-2-18-15.pdf.

[45] Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76 Contraception 360, 360, 363 (2007) (finding decrease in out-of-pocket costs of contraception increased use of more effective methods); Guttmacher Inst., *Insurance Coverage of Contraception*, (Dec. 2016), https://www.guttmacher.org/evidence-you-can-use/insurance-coverage-contraception.

[46] Snyder, *supra* note 8, at 222; *see also* Bearek et al., *Changes in Out-Of-Pocket Costs for Hormonal IUDs after Implementation of the Affordable Care Act: An Analysis of Insurance Benefit Inquiries*, 93 Contraception 139, 141 (2016) (cost of hormonal IUDs fell to $0 for most insured women following ACA).

contraceptives decreased approximately 70% following the ACA,[47] and women saved $1.4 billion

in 2013 on oral contraception alone.[48]  This has corresponded with an increase in use,[49] particularly

of the most effective forms of contraception.  For example, at least one study found that "the

removal of the cost barrier to IUDs and implants has increased their rate of adoption after the

ACA."[50]  The proposed injunction will reverse these critical gains.

Notwithstanding the significant overall decrease in out-of-pocket expenditures on

contraception under the ACA, racial and ethnic disparities in access to contraception persist,

including access to the most effective methods.  Black, Latina, and AAPI women are less likely to

use prescription contraception than their white peers due to structural barriers, such as

geographically inaccessible providers and inflexible work schedules.[51]  In the past two years, four

in ten Latina and Latino voters under age 45 (41%) have gone without the contraceptive method

---

[47] A. Law et al., *Are Women Benefiting from the Affordable Care Act? A Real-World Evaluation of the Impact of the Affordable Care Act on Out-of-Pocket Costs for Contraceptives*, 93 Contraception 392, 397 (2016).

[48] Becker & Polsky, *supra* note 36, at 1208.

[49] Express Scripts, *2015 Drug Trends Report* 118 (2016), http://lab.express-scripts.com/lab/drug-trend-report/~/media/e2c9d19240e94fcf893b706e13068750.ashx (reporting that contraceptive use increased 17.2% from 2014-15); Express Scripts, *2016 Drug Trends Report* 24 (2017), http://lab.express-scripts.com/lab/drug-trend-report/~/media/29f13dee4e7842d6881b7e034fc0916a.ashx (reporting 3.0% overall increase in contraceptive use from 2015-16, and 137.6% increase in specialty contraceptives, including LARCs).

[50] Snyder, *supra* note 8, at 222.

[51] Stacey McMorrow, Urban Inst., *Racial and Ethnic Disparities in Use of Prescription Contraception: The Role of Insurance Coverage* (forthcoming), https://academyhealth.confex.com/academyhealth/2017arm/meetingapp.cgi/Paper/17939; Jo Jones et al., Ctrs. For Disease Control & Prevention, *Nat'l Health Statistics Reps.: Current Contraceptive Use in the United States 2006-2010, and Changes in Patterns of Use Since 1995* 5, 8 (2012), https://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf; Christine Dehlendorf et al., *Disparities in Family Planning*, 202 Am. J. Obstet. Gynecol. 214, 216 (2010).

of their choice because of access issues.[52]   Insurance coverage for contraception is an important

factor in reducing these disparities in contraceptive use.[53]   The proposed injunction will exacerbate

existing disparities by inhibiting access to such coverage.

**B.      The Proposed Injunction Will Create Logistical, Administrative, and Informational Barriers to Contraception.**

The proposed classwide injunction will also impose other barriers to contraception,

including logistical, informational, and administrative burdens in navigating the health care system

without employer- or university-sponsored contraceptive coverage.

Navigating the health care system is complicated, requiring many resources, such as free

time, regular and unlimited phone and internet access, privacy, transportation, language

comprehension, and ability to read and respond to complex paperwork.   It is, therefore, particularly

difficult for individuals with limited English proficiency and for people in low-wage jobs—

disproportionately women of color—who often work long, unpredictable hours with no scheduling

flexibility and who lack reliable access to transportation.[54]

Many who lose coverage will be forced by cost constraints to navigate switching away

from providers they trust and who know their medical histories.   This interruption in continuity of

care poses particular challenges for people of color, people with limited English proficiency, and

LGBTQ people, who already face multiple barriers to obtaining reproductive health services,

including language barriers, a lack of cultural competency among providers, providers' limited

---

[52] Nat'l Latina Inst. for Reproductive Health, *supra* note 20, at 2.

[53] McMorrow, *supra* note 51; Dehlendorf, *supra* note 51, at 216.

[54] Nat'l Women's Law Ctr., *Collateral Damage: Scheduling Challenges for Workers in Low-Wage Jobs and Their Consequences* 1-3 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/Collateral-Damage.pdf.

geographic availability, and implicit bias and discrimination.[55]  Having to switch from a trusted

provider is particularly consequential for transgender and gender non-conforming people, who

report pervasive provider discrimination and refusals to provide care, cultural insensitivity, and

ignorance of gender-affirming care.[56]

### III.   THE PROPOSED INJUNCTION WILL HARM THE HEALTH, AUTONOMY, AND ECONOMIC SECURITY OF THOSE WHO LOSE CONTRACEPTIVE COVERAGE.

### A.   The Proposed Injunction Will Harm the Health of Individuals and Families.

By reinstating cost and other barriers to contraception, the proposed classwide injunction

will harm the health of individuals and families, particularly those already suffering negative

health outcomes for which access to contraception is critical.  Contraception is a vital component

of preventive health care: it combats unintended pregnancy and its attendant health consequences,

avoids exacerbating medical conditions for which pregnancy is contraindicated, and offers

standalone health benefits unrelated to pregnancy.

#### 1.   *The Proposed Injunction Places More People at Risk for Unintended Pregnancy and Associated Health Risks.*

By inhibiting access to contraception, the classwide injunction will increase the risk of

unintended pregnancy, which, due to systemic barriers, is already higher for women of color and

---

[55] *See* Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 649:  Racial & Ethnic Disparities in Obstetrics & Gynecology* 3 (2015), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co649.pdf?dmc=1&ts=20180521T1849308146; Sandy E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 96-99 (2015), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

[56] James, *supra* note 55, at 96-99.

young people (including LGBTQ youth).[57]   Unintended pregnancy can have serious health consequences for individuals and their families.   People with unplanned pregnancies are more likely to experience delayed access to prenatal care, leaving potential health complications unaddressed and increasing the risk of infant mortality, birth defects, low birth weight, and preterm birth.[58]   Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and physical violence during pregnancy.[59]   The U.S. has a higher maternal mortality rate than any other high-income country, especially for Black women. [60]   By creating additional barriers to contraception and preconception care, the proposed injunction threatens to increase rates of unintended pregnancy and related health risks.

[57] IOM Rep., *supra* note 41, at 103-04; Lawrence B. Finer & Mia R. Zolna, *Shifts in Intended and Unintended Pregnancies in the United States, 2001–2008*, 104 Am. J. Pub. Health S43, S47 (2014); Kashif Syed, Advocates for Youth, *Ensuring Young People's Access to Preventive Services in the Affordable Care Act* 2 (2014), http://www.advocatesforyouth.org/storage/advfy/documents/Preventive%20Services%20in%20t he%20ACA-11-24-14.pdf; Lisa L. Lindley & Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 Am. J. Pub. Health 1379, 1383 (2015).

[58] IOM Rep., *supra* note 42, at 103; *see also* Cassandra Logan et al., Nat'l Campaign to Prevent Teen & Unplanned Pregnancy, Child Trends, Inc., *The Consequences of Unintended Childbearing: A White Paper* 3-5 (2007), https://pdfs.semanticscholar.org/b353/b02ae6cad716a7f64ca48b3edae63544c03e.pdf.

[59] IOM Rep., *supra* note 42, at 103; Amy O. Tsui et al., *Family Planning and the Burden of Unintended Pregnancies*, 32 Epidemiologic Rev. 152, 165 (2010); Office of Disease Prevention & Health Promotion, *HealthyPeople 2020: Family Planning*, HealthyPeople.gov, https://www.healthypeople.gov/2020/topics-objectives/topic/family-planning (last visited Dec. 28, 2018).

[60] Black Mamas Matter Alliance, *Black Mamas Matter Toolkit Advancing the Right to Safe and Respectful Maternal Health Care* 21 (2018), https://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/USPA_BMMA_To olkit_Booklet-Final-Update_Web-Pages.pdf; Renee Montagne & Nina Martin, *Focus On Infants During Childbirth Leaves U.S. Moms In Danger*, Nat'l Pub. Radio (May 12, 2017, 5:00 AM), https://www.npr.org/2017/05/12/527806002/focus-on-infants-during-childbirth-leaves-u-s-moms-in-danger; Guttmacher Inst., *Publicly Funded Family Planning Services in the United States* 1 (2016), https://www.guttmacher.org/sites/default/files/factsheet/fb_contraceptive_serv_0.pdf.

The Departments have questioned whether the availability of contraceptive coverage without cost-sharing decreases the incidence of unintended pregnancy.[61]  But as the post-ACA research corroborates, lowering the cost of contraception leads to increased use.[62]  And increased access to contraception without cost-sharing has been found to result in fewer unintended pregnancies.[63]  Denying contraceptive coverage was found to have resulted in 33 more pregnancies per 1000 women.[64]

Allowing employers to pick and choose covered methods—rather than allowing the users themselves to choose—undermines people's ability to consistently use the contraceptive that is most appropriate for them, increasing the risk of unintended pregnancy.  Inconsistent or incorrect contraceptive use accounts for 41% of unintended pregnancies in the U.S.; non-use accounts for 54%.[65]  Women are more likely to use contraception consistently and correctly when they can choose the method that suits their needs.[66]

---

[61] *See, e.g.*, Final Rule, 83 Fed. Reg. 57,554–55.

[62]  *See supra* notes 56-60 and accompanying text.

[63]  Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291, 1291 (2012).

[64] W. Canestaro et al., *Implications of Employer Coverage of Contraception: Cost-Effectiveness Analysis of Contraception Coverage Under an Employer Mandate*, 95 Contraception 77, 83, 85 (2017).

[65] Adam Sonfield et al., Guttmacher Inst., *Moving Forward:  Family Planning in the Era of Health Reform* 8 (2014).

[66] Jennifer J. Frost & Jacqueline E. Darroch, *Factors Associated with Contraceptive Choice and Inconsistent Method Use, United States, 2004*, 40 Perspectives on Sexual & Reprod. Health 94, 99, 101-03 (2008).

## 2. *The Proposed Injunction Will Undermine Health Benefits from Contraception.*

Contraception allows women to delay pregnancy when it is contraindicated and offers several standalone benefits unrelated to pregnancy.  Although most women aged 18-44 who use contraception do so to prevent pregnancy (59%), 13% use it solely to manage a medical condition, and 22% use it for both purposes.[67]

Contraception is necessary to control medical conditions that are complicated by pregnancy, including diabetes, obesity, pulmonary hypertension, and cyanotic heart disease.[68]  In addition, contraception treats menstrual disorders, reduces menstrual pain, reduces the risks of certain cancers, such as endometrial and ovarian cancer, and helps protect against pelvic inflammatory disease.[69]

By reinstating cost barriers to some or all contraceptive methods, the proposed injunction will aggravate medical conditions and undermine necessary health benefits.

## B. The Proposed Injunction Will Undermine Individuals' Autonomy and Control Over Their Reproductive and Personal Lives.

The Supreme Court has recognized that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives."  *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992); *see also*

---

[67] Caroline Rosenzweig et al., Kaiser Family Found., *Women's Sexual and Reproductive Health Services: Key Findings from the 2017 Kaiser Women's Health Survey* (2018) at 3, http://files.kff.org/attachment/Issue-Brief-Womens-Sexual-and-Reproductive-Health-Services-Key-Findingsfrom- the-2017-Kaiser-Womens-Health-Survey/.

[68] IOM Rep., *supra* note 41, at 103-04.

[69] *Id.* at 107.

*Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965).  Women also report that the ability to plan their lives is a main reason for their use of contraception.[70]

Contraception and the freedom it affords are particularly important for communities with histories of subjection to the control of others in their sexual and reproductive lives.  During slavery, when Black women were the legal chattel of their masters, they had no ability to resist unwanted sex or childbearing.[71]  Slavery gave way to twentieth century policies and practices that encouraged and coerced women of color, individuals with disabilities, and so-called "sexual deviants," to refrain from reproduction; these policies culminated in forced sterilizations without informed consent.[72]  Affordable access to the full range of contraceptive options empowers individuals to exercise control over their reproductive futures.

Contraception is also critical to the autonomy of transgender men and gender non-conforming individuals.  Contraception permits individuals to align their gender identity with their physiology by enabling them to prevent pregnancy and control menstruation.[73]  Social exclusion and bias in healthcare already contribute to transgender men experiencing higher incidence of

---

[70] Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics*, 87 Contraception 465, 467, 470 (2013).

[71] Deborah Gray White, *Ar'n't I a Woman?: Female Slaves in the Plantation South* 68 (W.W. Norton & Co. ed., 1999).

[72] Carole Joffe & Willie J. Parker, *Race, Reproductive Politics and Reproductive Health Care in the Contemporary United States*, 86 Contraception 1, 1 (2012); *see also* Proud Heritage: People, Issues, and Documents of the LGBT Experience, Vol. 2 205 (Chuck Stewart, ed. 2015); Elena R. Gutiérrez, *Fertile Matters: the Politics of Mexican-Origin Women's Reproduction* 35-54 (2008); *Buck v. Bell*, 274 U.S. 200, 205 (1927) (upholding law permitting coerced sterilization of "mentally defective" people).

[73] Juno Obedin-Maliver & Harvey J. Makadon, *Transgender Men and Pregnancy*, 9 Obstetric Med. 4, 6 (2015).

depression, anxiety, and suicide,[74] and for some, pregnancy and menstruation can increase experiences of gender dysphoria—the distress resulting from one's physical body not aligning with one's sense of self.[75]

Finally, contraception is vital for survivors of rape and interpersonal violence.[76]   Access to emergency contraception without cost-sharing empowers sexual assault survivors to prevent unwanted pregnancy, and is particularly critical for students given the high rate of sexual assault on college campuses.[77]   The shot and LARCs enable women to prevent pregnancy with reduced risk of detection by or interference from partners.[78]   Without these options, pregnancy can entrench a woman in an abusive relationship, endangering the woman, her pregnancy, and her children. Abusive partners often engage in "reproductive coercion" behaviors to promote unwanted pregnancy, including interfering with contraception or abortion.[79]   By impeding their access to

---

[74] SL Budge et al., *Anxiety and Depression in Transgender Individuals: The Roles of Transition Status, Loss, Social Support, and Coping*, 81 J. Consult Clin. Psych. 545 (2013); Fatima Saleem & Syed W. Rizvi, *Transgender Associations and Possible Etiology: A Literature Review*, 9 Cureus 1, 2 (2017) ("Forty-one % of [transgender individuals in the U.S.] reported attempting suicide as compared to 1.6% of the general population.").

[75] Obedin-Maliver & Makadon, *supra* note 73, at 6; Saleem & Rizvi, *supra* note 74, at 1.

[76] Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 554*, *Reproductive and Sexual Coercion* 2-3 (2013), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co554.pdf?dmc=1&ts=20180521T2206346190 [hereinafter "ACOG No. 554"].

[77] Nat'l Women's Law Ctr., *Sexual Harassment & Assault in Schools*, https://nwlc.org/issue/sexual-harassment-assault-in-schools/ (last visited Dec. 28, 2018).

[78] ACOG No. 554, *supra* note 76, at 2-3.

[79] *Id.* at 1-2; Elizabeth Miller et al., *Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy*, 81 Contraception 457, 457–58 (2010).

contraceptive methods less susceptible to interference, the proposed injunction will harm women's ability to resist such coercion.[80]

### C.   The Proposed Injunction Will Undermine Individuals' Economic Security.

The proposed classwide injunction will thwart people's ability to plan, delay, space, and limit pregnancies as is best for them, thereby undermining their ability to participate equally in society and further their educational and career goals.

#### 1.   *Access to Contraception Provides Life-Long Economic Benefits to Women, Families, and Society.*

Access to contraception has life-long economic benefits: it enables women to complete high school and attain higher levels of education, improves their earnings and labor force participation, and secures their economic independence.[81]   The availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[82]   Access to oral contraceptives has improved women's educational attainment,[83] which in turn has caused large increases in women's participation in law,

---

[80] ACOG No. 554, *supra* note 76, at 2-3.

[81] Adam Sonfield et al., Guttmacher Inst., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children* 7-8 (2013), https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf.

[82] Martha J. Bailey et al., *The Opt-in Revolution? Contraception and the Gender Gap in* Wages, 4 Am. Econ. J. Appl. Econ. 225, 241 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3684076/.

[83] Heinrich H. Hock, *The Pill and the College Attainment of American Women and Men* 19 (Fla. St. Univ., Working Paper 2007).

medicine, and other professions.[84]   While wage disparities persist, contraception has helped advance gender equality by reducing the gap.[85]

The Departments are well aware of these significant benefits.  In previously-issued rules, they explained that before the ACA, disparities in health coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," that "[r]esearchers have shown that access to contraception improves the social and economic status of women," and that the contraceptive coverage requirement "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[86]

By inhibiting access to contraception, the proposed injunction will threaten the economic security and advancement of individuals, families, and society.

### 2. The Proposed Injunction Will Exacerbate Economic and Social Disparities by Impeding Access to Contraception.

The proposed injunction will most jeopardize the economic security of those facing systemic barriers to economic advancement, forcing women with limited means into an impossible situation: they will have less ability to absorb the cost of an unintended pregnancy, but will be more at risk for it due to greater difficulty affording contraception.

Unplanned pregnancy can entrench economic hardship.  Unplanned births reduce labor force participation by as much as 25%.[87]  The ability to avoid unplanned pregnancy is especially

---

[84] Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. Pol. Econ. 730, 749 (2002).

[85] Sonfield, *supra* note 81, at 14.

[86] ACA Coverage, 77 Fed. Reg. 8,725, 8,728.

[87] Ana Nuevo Chiquero, *The Labor Force Effects of Unplanned Childbearing*, (Boston Univ., Job Market Paper Nov. 2010), http://www.unavarra.es/digitalAssets/141/141311_100000Paper_Ana_Nuevo_Chiquero.pdf

important for women in low-wage jobs, who are less likely to have parental leave or predictable and flexible work schedules.[88]   Many women in low-wage jobs who become pregnant are denied pregnancy accommodations and face workplace discrimination; some are forced to quit, are fired, or are pushed into unpaid leave.[89]   Nearly 70% of those holding jobs that pay less than $10 per hour are women, and a disproportionate number of women in low-wage jobs are women of color.[90] In Nevada, women make only 83¢ for every dollar paid to men.[91]   Women of color experience even greater wage disparities than white women: among full-time workers (nationwide), Latina women make only 54¢ for every dollar paid to white men; that number is 57¢ for Native American women, 63¢ for Black women, and as low as 51¢ and 56¢ for AAPI women in some ethnic subgroups.[92]   In Nevada, Black and Latina women make only 55¢ and 64¢ for every dollar paid to white men.[93]

---

[88] Nat'l Women's Law Ctr., *supra* note 54, at 1, 4.

[89] Nat'l Women's Law Ctr., *It Shouldn't Be a Heavy Lift: Fair Treatment for Pregnant Workers* 1 (2016), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2015/08/pregnant_workers.pdf; Nat'l Women's Law Ctr., *Equal Pay for Asian and Pacific Islander Women* (2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2018/02/Asian-Women-Equal-Pay-Feb-2018.pdf.

[90] Tucker & Patrick, *supra* note 21, at 1.

[91] Nat'l Women's Law Ctr., *NWLC Nevada*, https://nwlc.org/state/nevada/.

[92] Nat'l Women's Law Ctr., *FAQs About the Wage Gap* (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf; NAPAWF calculations from U.S. Census Bureau, *2015 ACS 1-Year Estimates: Table S0201, Selected Population Profile in the United States,* https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_1YR/S0201//popgroup~031 (last visited Dec. 28, 2018).

[93] Nat'l Women's Law Ctr., *supra* note 91.

## CONCLUSION

The proposed classwide injunction will cause substantial and irreparable harm to individuals in Nevada and nationwide, and particularly to those facing multiple and intersecting forms of discrimination. The Departments have indicated that they agree with Plaintiffs on the merits of their claim; thus, if Nevada is not permitted to intervene, no party to this litigation will defend the ACA contraceptive coverage requirement in order to prevent these harms from coming to pass.  Accordingly, the Court should grant Nevada's motion to intervene and deny Plaintiffs' motion for summary judgment.

Respectfully Submitted,

Date: May 24, 2019

_s/ Kenneth D. Upton, Jr._
Kenneth D. Upton, Jr. [94]
Texas State Bar No. 00797972
**AMERICANS UNITED FOR
SEPARATION OF CHURCH AND
STATE**
Office: 1310 L Street NW, Suite 200
   Washington, D.C. 20005
   Telephone: (202) 466-3234
   Fax: (202) 898-0958
Residence: 3009 Sundial Drive
   Dallas, TX 75229
   Telephone: (214) 673-0858
   upton@au.org

---

[94] Licensed in Oklahoma and Texas only. Supervised by Richard B. Katskee, a member of the D.C. Bar.

Fatima Goss Graves
Gretchen Borchelt
Sunu Chandy
Michelle Banker
**NATIONAL WOMEN'S
LAW CENTER**
11 Dupont Circle NW, Suite 800
Washington, DC 20036


Sequoia Ayala
Jill Heaviside
**SISTERLOVE, INC.**
P.O. Box 10558
Atlanta, GA 30310-1731


Jane Liu
**NATIONAL ASIAN PACIFIC
AMERICAN WOMEN'S FORUM**
1730 Rhode Island Ave, NW
Suite 210
Washington, DC 20036


*Of Counsel for Amici Curiae*

Jeffrey Blumenfeld, Esq. (*pro hac* pending)
**LOWENSTEIN SANDLER LLP**
2200 Pennsylvania Avenue, NW
Washington, DC 20037


Naomi D. Barrowclough (*pro hac* pending)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068

*Attorneys for Amici Curiae*

(*Amici appreciate the assistance of Nina Serrianne at the National Latina Institute for Reproductive Health for her role in the preparation of this brief*)

**APPENDIX A:**

**STATEMENTS OF INTEREST OF AMICI CURIAE**

Since 1914, the **American Sexual Health Association** has worked to prevent the adverse outcomes of poor sexual health in the United States. We believe strongly that women should have access to health care coverage that includes contraceptive care. This guarantee, under the ACA is essential to ensure that people have control over their reproductive health. Sexual and reproductive health are part of overall health and well-being, and inextricably linked to a broad range of other economic and social factors. We seek to ensure that women have access to essential reproductive services.

**Americans United for Separation of Church and State** is a national, nonsectarian public-interest organization that is committed to ensuring religious freedom and protecting fundamental rights, including reproductive rights, for all Americans by safeguarding the constitutional principle of church–state separation. Americans United has long supported legal exemptions that reasonably accommodate religious practice, but we oppose religious exemptions that unduly harm third parties or favor a religious practice not actually burdened by the government. Accordingly, Americans United regularly represents parties or acts as an *amicus curiae* in cases addressing the Affordable Care Act's contraceptive-coverage requirement.

The **Center on Reproductive Rights and Justice (CRRJ)** propels law and policy solutions by connecting people and ideas across the academic-advocate divide. We seek to realize reproductive rights and advance reproductive justice by influencing legal and social science discourse, furthering research and scholarship, and bolstering law and policy advocacy efforts. CRRJ knows that reproductive justice can only be realized when people have full autonomy to make informed reproductive choices; including receiving the full benefits of seamless access to

no-cost contraceptive coverage as intended by the Affordable Care Act. CRRJ has participated as amicus in numerous cases that affect this right.

**The Desiree Alliance** positions ourselves in the belief that no entity should censor a woman's right to choose regardless of religious and moral beliefs. It should not be left up to a corporate decision to block forms of birth control or access to contraception based on religion or moral rhetoric.

Founded in 1974, **Equal Rights Advocates (ERA)** is a national non-profit legal advocacy organization dedicated to protecting and expanding economic and educational access and opportunities for women and girls. In concert with our commitment to securing gender equity in the workplace and in schools, ERA seeks to preserve women's right to reproductive choice and protect women's access to health care, including safe, legal contraception and abortion. In addition to litigating cases on behalf of workers and students and providing free legal advice and counseling to hundreds of women each year, ERA has participated in numerous amicus briefs in cases affecting the rights of women and girls, such as this right, and the long-term economic impacts of limited and inequitable access to opportunity and care for intersectional populations.

**Gender Justice** is a nonprofit legal and policy advocacy organization based in the Midwest that is committed to the eradication of gender barriers through impact litigation, policy advocacy, and education. As part of its litigation program, Gender Justice represents individuals and provides legal advocacy as amicus curiae in cases involving issues of gender discrimination. Gender Justice has an interest in ensuring that all individuals capable of getting pregnant have access to birth control through their employers' insurance plans. This is central to eliminating gender discrimination and ensuring the full participation of all individuals in society.

**In Our Own Voice: National Black Women's Reproductive Justice Agenda** is a national-state partnership with eight Black women's Reproductive Justice organizations: The Afiya Center, Black Women for Wellness, Black Women's Health Imperative, New Voices for Reproductive Justice, SisterLove, Inc., SisterReach, SPARK Reproductive Justice NOW, and Women with a Vision. In Our Own Voice is a national Reproductive Justice organization focused on lifting up the voices of Black women leaders on national, regional, and state policies that impact the lives of Black women and girls.     Reproductive Justice is a framework rooted in the human right to control our bodies, our sexuality, our gender, and our reproduction.  Reproductive Justice will be achieved when all people, of all immigration statuses, have the economic, social, and political power and resources to define and make decisions about our bodies, health, sexuality, families, and communities in all areas of our lives with dignity and self-determination. Access to birth control is essential to ensuring this right.

**Jobs With Justice Education Fund** is a 501(c)(3) non-profit organization that believes that all workers should have collective bargaining rights, employment security and a decent standard of living within an economy that works for everyone. We bring together labor, community, student, and faith voices at the national and local levels to win improvements in people's lives and shape the public discourse on workers' rights and the economy. Jobs With Justice Education Fund believes that working people and not their employers have the right to control their bodies and their reproductive decisions. This is important both as a matter of human rights in and of itself and in order for working people to exercise their human right to organize collectively and bargain with their employers. If employers have control over their employees bodies and reproductive systems, working people will have substantially less power to come together to exercise their collective rights.

**NARAL Pro-Choice America** is a national advocacy organization, dedicated since 1969 to supporting and protecting, as a fundamental right and value, a woman's freedom to make personal decisions regarding the full range of reproductive choices through education, organizing, and influencing public policy. NARAL Pro-Choice America works to guarantee every woman the right to make personal decisions regarding the full range of reproductive choices. Ensuring that people can get affordable birth control and have the ability to decide whether, when, and with whom to start or expand their family is crucial to that mission.

The **National Asian Pacific American Women's Forum (NAPAWF)** is the only national, multi-issue Asian American and Pacific Islander ("AAPI") women's organization in the country. NAPAWF's mission is to build a movement to advance social justice and human rights for AAPI women, girls, and transgender and gender non-conforming people. NAPAWF approaches all of its work through a reproductive justice framework that seeks for all members of the AAPI community to have the economic, social, and political power to make their own decisions regarding their bodies, families, and communities. Its work includes advocating for the reproductive health care needs of AAPI women and ensuring AAPI women's access to reproductive health care services. Legal and institutional barriers to reproductive health care disproportionately impact women of color, low-income women, and other marginalized groups. Without legal protection to ensure meaningful, affordable access to basic reproductive health care, including contraception, many AAPI women are left without the crucial health and family planning services that they need to be able to make their own decisions regarding their bodies, families, and communities. Consequently, NAPAWF has a significant interest in ensuring that all people, regardless of their economic circumstances, immigration status, race, gender, sexual orientation, or other social factors, have affordable access to safe and effective contraception.

The **National Center for Law and Economic Justice** advances the cause of economic justice for low-income families, individuals, and communities. We have worked with low-income communities fighting the systemic causes of poverty for more than 50 years. In our work, we often combat injustice and fundamental unfairness in government programs, including those that provide access to health care.

The **National Center for Transgender Equality** is a national social justice organization working for life-saving change for the over 1.5 million transgender Americans and their families. NCTE has seen the harmful impact that discrimination in health care settings has on transgender people and their loved ones, including discrimination based on religious or moral disapproval of who transgender people are, how they live their lives, and their reproductive choices. Discrimination against transgender people in health care—whether it is being turned away from a doctor's office, being denied access to or coverage of basic care, or being mistreated and degraded simply because of one's transgender status—is widespread and creates significant barriers to care, including contraceptive care. NCTE works to ensure that transgender people and other vulnerable communities are protected from discrimination in health care and other settings and have autonomy over their bodies and health care needs.

The **National Institute for Reproductive Health (NIRH)** is a non-profit advocacy organization working to build a society in which everyone has the freedom and ability to control their reproductive and sexual lives. NIRH promotes its mission by galvanizing public support for access to reproductive health care, including abortion and contraception, and supporting public policy that ensures that women have timely, affordable access to the full range of reproductive health care in their communities.

The **National Latina Institute for Reproductive Health (NLIRH)** is the only national reproductive justice organization dedicated to advance health, dignity, and justice for 28 million Latinas, their families, and communities in the United States.  Through leadership development, community mobilization, policy advocacy, and strategic communications, NLIRH works to ensure that all Latinas are informed about the full range of options for safe and effective forms of contraception and family planning.   NLIRH believes that affordable access to quality contraception and family planning is essential to ensuring that all people, regardless of age or gender identity, can shape their lives and futures.

Since 1973, the **National LGBTQ Task Force** has worked to build power, take action, and create change to achieve freedom and justice for lesbian, gay, bisexual, transgender, and queer (LGBTQ) people and our families. As a progressive social justice organization, the Task Force works toward a society that values and respects the diversity of human expression and identity and achieves equity for all.

The **National Network to End Domestic Violence (NNEDV)** is a not-for profit organization incorporated in the District of Columbia in 1994 to end domestic violence. As a network of the 56 state and territorial domestic violence and dual domestic violence and sexual assault coalitions and their over 2,000 member programs, NNEDV serves as the national voice of millions of women, children and men victimized by domestic violence, and their advocates. NNEDV was instrumental in promoting Congressional enactment and implementation of the Violence Against Women Acts. NNEDV works with federal, state and local policy makers and domestic violence advocates throughout the nation to identify and promote policies and best practices to advance victim safety. NNEDV is deeply concerned about the connection between domestic violence and reproductive coercion, understanding that abusers will try to maintain

power and control over their victim's reproductive health. Access to reproductive healthcare can provide a victim autonomy and safety.

The **National Organization for Women (NOW) Foundation** is a 501 (c)(3) entity affiliated with the National Organization for Women, the largest grassroots feminist activist organization in the United States with chapters in every state and the District of Columbia. Since its inception, NOW Foundation's goals have included advocating for improved access to the full range of reproductive health services for all women, no matter where they work or what their income level may be. NOW Foundation is opposed to any policy or regulatory provision that reduce women's access to reproductive health care services.

The **National Partnership for Women & Families (National Partnership)**, formerly the Women's Legal Defense Fund, is a national advocacy organization that develops and promotes policies to help women achieve equal opportunity, quality health care, and economic security for themselves and their families. Since its founding in 1971, the National Partnership has worked to advance women's health, reproductive rights, and equal employment opportunities through several means, including by challenging discriminatory policies in the courts.

The **National Women's Health Network ("NWHN")** improves the health of all women by influencing public policy and providing health information to support decision-making by individual consumers. Founded in 1975 to give women a greater voice within the health care system, NWHN aspires to create systems guided by social justice that reflect the needs of women in all their diversities. NWHN is committed to ensuring that women have self-determination in all aspects of their reproductive and sexual health and establishing universal access to health care. NWHN is a membership-based organization supported by thousands of individuals and organizations nationwide.

The **National Women's Law Center (the Center)** is a non-profit legal advocacy organization dedicated to the advancement and protection of women's legal rights and opportunities since its founding in 1972.   The Center focuses on issues of key importance to women and their families, including economic security, employment, education, health, and reproductive rights, with special attention to the needs of low-income women and those who face multiple and intersecting forms of discrimination.   Because access to contraception is of tremendous significance to women's health, equality, and economic security, the Center seeks to ensure that women receive the full benefits of seamless access to contraceptive coverage without cost-sharing as intended by the Affordable Care Act and has participated as amicus in numerous cases that affect this right.

The **Oklahoma Call for Reproductive Justice** founded as a 501(c)4 organization in 2010, is a statewide grassroots coalition of organizations and individuals focusing on the advancement of reproductive health, rights, and justice in Oklahoma. OCRJ accomplishes this through legislative advocacy, community outreach and education, and litigation. We believe that every individual has the right to have or not have a child, access to sexual education, contraception, abortion, and pregnancy care for people to plan their families on their own terms. Everyone should have access to the full range of reproductive health care available without restriction. When access is impeded, individuals, families, and collective communities are harmed in the process. To this end, we stand in opposition to any attempts that stifle access to the full range of reproductive health care services.

**Raising Women's Voices for the Health Care We Need ("RWV")** is a national initiative working to ensure that the health care needs of women and families are addressed as the Affordable Care Act is implemented. It has a diverse network of thirty grassroots health advocacy

organizations in twenty-nine states. RWV has a special mission of engaging women who are not often invited into health policy discussions: women of color, low-income women, immigrant women, young women, and members of the lesbian, gay, bisexual, transgender, and queer community.

The **Reproductive Health Access Project** is a national nonprofit organization dedicated to training and supporting clinicians to make reproductive health care accessible to everyone, everywhere in the United States. We focus on three key areas: abortion, contraception, and management of early pregnancy loss. Our work focuses on integrating full-spectrum reproductive health care in primary care settings and we are guided by the belief that everyone should be able to access basic health care, including contraceptive care, from their primary care clinician.

The **Sexuality Information and Education Council of the United States (SIECUS)**, founded in 1964, is a non-profit policy and advocacy organization that envisions an equitable nation where all people receive comprehensive sexuality education and quality sexual and reproductive health services affirming their identities, thereby ensuring their lifelong health and well-being. SIECUS advocates for the rights of all people to the full spectrum of sexual and reproductive health services as well as accurate information and comprehensive sexuality education.  SIECUS maintains that as a fundamental component of reproductive health services, affordable access  to contraception—as intended by  the Affordable Care Act and regardless of age, race, size, gender,  gender identity and expression, class, sexual orientation, and ability—is central to maintaining sexual and reproductive freedom for all people.

Founded in July 1989, **SisterLove, Inc.** is an HIV/AIDS and reproductive justice nonprofit service organization focusing on women, particularly women of African descent.  SisterLove's mission is to eradicate the adverse impact of HIV/AIDS and other sexual and reproductive

oppressions upon all women, their families, and their communities in the United States and worldwide through education, prevention, support, and human rights advocacy.  To realize this mission, SisterLove engages in advocacy, reproductive health education, and prevention. SisterLove seeks to educate and empower youth and women of color to influence the laws and policies that disparately impact them.

**SisterReach,** founded October 2011, is a Memphis, TN based grassroots 501c3 non-profit supporting the reproductive autonomy of women and teens of color, poor and rural women, LGBTQ+ folx, gender non-conforming people and their families through the framework of Reproductive Justice.  Our mission is to empower our base to lead healthy lives, raise healthy families and live in healthy communities. We do our work from a 3-pronged strategy of education, policy & advocacy, and culture change work while advocating on the local, state and national levels for public policies which support the reproductive health and rights of the most vulnerable women, individuals and youth.

**URGE: Unite for Reproductive & Gender Equity (URGE)** is a non-profit grassroots advocacy organization that works to mobilize young people through a reproductive justice framework. URGE builds infrastructure through campus chapters and city activist networks, where we invite individuals to discover their own power and transform it into action. URGE members educate their communities and advocate for local, state, and national policies around issues of reproductive justice and sexual health.

The **Women's Institute for Freedom of the Press** is a non-profit media democracy organization dedicated to the advancement and protection of women's rights and voices since its founding in 1972. WIFP focuses on issues of importance to women and all those who do not have full rights. Without control over their health and well-being, women cannot fully participate in

democracy. Women need access to no-cost contraceptive coverage as intended by the Affordable Care Act and therefore WIFP supports this amicus brief.

The **Women's Rights and Empowerment Network (WREN)** is a nonpartisan nonprofit organization whose mission is to build a movement to advance the health, economic well-being, and rights of South Carolina's women, girls and their families. WREN recognizes that the health and education of women and children is crucial in order to ensure statewide prosperity. We advocate for policies that address the barriers that families, predominantly women and mothers, face when accessing the rights and resources needed to make healthy and well informed decisions. Access to contraception is of tremendous significance to women's health, equality, and economic security. WREN seeks to ensure that women receive the full benefits of seamless access to no-cost contraceptive coverage as intended by the Affordable Care Act, and has advocated for this at the state and national level.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2019, I electronically filed the within Brief of Amici Curiae the National Women's Law Center, the National Latina Institute for Reproductive Health, Sisterlove, Inc., the National Asian Pacific American Women's Forum, and 25 other Amici in support of Nevada's Motion to Intervene and in Opposition to Plaintiffs' Motion for Summary Judgment with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system.

I certify that all participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Date:  May 24, 2019                    By:     _s/ Kenneth D. Upton, Jr_____