**FILED**

**August 31, 2022**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 17, 2021

Lyle W. Cayce
Clerk

---

No. 19-10754

---

RICHARD W. DEOTTE, *on behalf of himself and others similarly situated*;
YVETTE DEOTTE; JOHN KELLEY; ALISON KELLEY; HOTZE
HEALTH & WELLNESS CENTER; BRAIDWOOD MANAGEMENT,
INCORPORATED, *on behalf of itself and others similarly situated*,

*Plaintiffs—Appellees*,

*versus*

STATE OF NEVADA,

*Movant—Appellant*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:18-CV-825 -O

---

Before HIGGINBOTHAM, SOUTHWICK, and ENGELHARDT, *Circuit
Judges*.

LESLIE H. SOUTHWICK, *Circuit Judge*:

This case involves a dispute about the effect of provisions in the
Religious Freedom and Restoration Act on the contraceptive mandate found
in the Affordable Care Act. The case became moot with issuance of the
Supreme Court's decision in *Little Sisters of the Poor Saints Peter and Paul
Home v. Pennsylvania*, 140 S. Ct. 2367 (2020). The principal remaining issue
is whether to leave in place the injunction that had been issued by the district

No. 19-10754

court. We VACATE the judgment below and REMAND with instructions to dismiss as moot.

## THE ACA AND THE CONTRACEPTIVE MANDATE

We begin with an abbreviated history of the Patient Protection and Affordable Care Act (the "ACA") and its contraceptive mandate, then explain the background of this case.

The ACA requires covered employers to provide women with "preventive care and screenings" without cost-sharing requirements "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" ("HRSA"), an agency of the Department of Health and Human Services ("HHS"). 42 U.S.C. § 300gg-13(a)(4). Shortly after passage, the HHS, the Department of the Treasury, and the Department of Labor (together, "the Departments") began promulgating rules under Section 300gg-13(a)(4). *Little Sisters*, 140 S. Ct. at 2374.

In 2011, the Departments adopted rules including the contraceptive mandate, which required health plans to include coverage for all contraceptive methods approved by the Food and Drug Administration. *See* 77 Fed. Reg. 8725 (Feb. 15, 2012). The rules created exemptions from the contraceptive mandate for religious employers. 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011) (to be codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147). This exemption was "narrow[ly] focus[ed] on churches . . . [and] is known as the church exemption." *Little Sisters*, 140 S. Ct. at 2374. In 2013, the Departments promulgated another final rule that created an accommodation process for religious nonprofits who did not qualify for the church exemption. 78 Fed. Reg. 39,870, 39,873–75 (July 2, 2013) (to be codified at 26 C.F.R. pt. 54; 45 C.F.R. pt. 147, 156; 29 C.F.R. pts. 2510, 2590; 45 C.F.R. pts. 147, 156). The accommodation was different from the

No. 19-10754

exemption: under the accommodation, qualifying nonprofits were required to provide a self-certification form to the health insurer, which would exclude contraceptive coverage from the plan and provide those services to the employees separately. *Id.* at 39,875, 39,878.

Those rules were challenged in courts. In 2014, the Supreme Court held that the contraceptive mandate violated the Religious Freedom and Restoration Act ("RFRA") as applied to closely held corporations with religious objections, and the religious accommodation must apply to them as well as religious nonprofits. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691–93 (2014). Assuming without deciding that free access to contraceptives was a compelling government interest, the Court held that extending the accommodation to closely held corporations was a less restrictive means of achieving it. *Id.* at 691–92. In response, the rules were changed to allow for-profit corporations to use the self-certifying accommodation previously reserved for religious non-profits ("2015 Rules"). 80 Fed. Reg. 41,318, 41,346 (July 14, 2015) (to be codified at 26 C.F.R. pt. 54; 29 C.F.R. pts. 2510, 2590, 45 C.F.R. pt. 147).

In 2015, the Supreme Court granted a writ of *certiorari* in a case that would have allowed it to determine whether the self-certifying accommodation itself violated RFRA, as many religious groups had argued, because completing the certification caused them to take an action that led to health insurers providing employees with the contraceptives to which they objected. *Zubik v. Burwell*, 577 U.S. 971, 971 (2015). Instead, though, the Supreme Court remanded without deciding the question in light of supplemental briefing by the parties. *Zubik v. Burwell*, 578 U.S. 403, 407–410 (2016). In that briefing, the petitioners and the government agreed that an alternative approach was possible where employees would receive contraceptive coverage from insurers without affirmative action by employers. *Id.* at 407–08. The Court ordered the parties on remand to reach

No. 19-10754

an approach that accommodated religious objections while meeting women's contraceptive needs. *Id.*

In the wake of *Zubik*, the Departments in 2016 published a request for information to reach an accommodation that satisfied the needs of both religious objectors and female employees of religious objectors. 81 Fed. Reg. 47741, 47741–45. Ultimately, the Departments could not arrive at a solution, and they did not modify the rules at that time. *Id.* In 2017, the Departments tried again to satisfy *Zubik* by modifying the rules related to the contraceptive mandate. In relevant part, the Departments promulgated interim final rules ("IFRs") that broadened the exemption to include for-profit and publicly traded entities who had religious objections to contraceptives, without having to use the self-certifying accommodation ("2017 Rules"). 82 Fed. Reg. 47,792, 47,835 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54; 29 C.F.R. pts. 2510, 2590; 45 C.F.R. pt. 147). The 2017 Rules also gave the individuals the option to obtain insurance that excluded contraception coverage so that individuals would not have to choose between policies that included contraceptive care or no policy at all. *Id.* The 2017 Rules included a lengthy explanation of why RFRA compelled the rule changes. *Id.* at 47, 800–06.

Litigants then challenged the 2017 Rules. Two district courts issued nationwide injunctions that enjoined enforcement of the 2017 Rules for procedural defects, thereby re-instating enforcement of the 2015 Rules with the church exemption and self-certifying accommodation. *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 585 (E.D. Pa. 2017), *rev'd sub nom. Pennsylvania v. President United States*, 816 F. App'x 632 (3d Cir. 2020); *California v. HHS*, 281 F. Supp. 3d 806, 831–32 (N.D. Cal. 2017). When the 2017 Rules became final, they were enjoined as the IFRs had been. *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 797–98 (E.D. Pa. 2019); Fed. Reg. 57, 536, 57, 537 (Nov. 15, 2018) (to be codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147).

No. 19-10754

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs sued the Secretaries of the three Departments in the United States District Court for the Northern District of Texas in 2018, seeking relief from the nationwide injunctions that blocked enforcement of the 2017 Rules and required enforcement of the 2015 Rules. They amended their complaint in February 2019.

The Plaintiffs sued either as individuals or as employers and sought class certification for those similarly situated. Both categories of plaintiffs are morally opposed to long-acting contraceptives, viewing them as equivalent to abortion. Neither opposes other forms of contraception by married couples to prevent pregnancy, but both object to the contraceptive mandate's requirement that insurers provide it to others because, as their complaint states, such contraception "encourages illicit sexual activity outside of marriage." The Individual Plaintiffs seek an option for an insurance policy that does not include contraceptive coverage, believing that the contraceptive mandate "forces religious believers to choose between purchasing health insurance that makes them complicit in abortifacient contraception and sexual activity outside of marriage [because their premiums subsidize contraceptives for others], or forgoing health insurance entirely." The Employer Plaintiffs argue that the contraceptive mandate's self-certifying accommodation violates RFRA because "[i]t forces the company to become complicit in the provision" of contraceptives to others.

The Plaintiffs sought to enjoin enforcement of the contraceptive mandate against individual and employer religious objectors — enforcement that was then occurring only because of the injunctions against enforcement of the 2017 Rules. The Defendants never filed a responsive pleading.

The district court certified the two classes of plaintiffs described above — individual and employer — on March 30, 2019. The Plaintiffs filed

No. 19-10754

a motion for preliminary injunction, then on April 1, asked the court to convert that motion to a motion for summary judgment and for a permanent injunction. In response, the Defendants did not oppose summary judgment or a permanent injunction, conceding that the objected-to 2015 Rules were "insufficient" to satisfy RFRA. They did, however, oppose class-wide relief "*at this time.*"

The state of Nevada, acting through its attorney general, sought to intervene on May 24, 2019. The district court granted the Plaintiffs' motion for summary judgment and permanent injunction on June 5, 2019, without yet ruling on intervention. The permanent injunction granted relief to the Plaintiffs that in essence imposed the 2017 Rules. Nevada filed a notice of appeal from the June 5 merits order on July 3 to protect its right to appeal "in the event intervention [was] granted after the time to appeal" that order had run. On July 9, an additional 21 states and the District of Columbia filed a brief as *amicus curiae*, opposing the Plaintiffs' motion for summary judgment and permanent injunction and supporting Nevada's motion to intervene. The district court denied Nevada's motion to intervene on July 29 because Nevada did not satisfy the interest requirement of Federal Rule of Civil Procedure 24(a). The court also denied permissive intervention. It entered final judgment that same day.

Nevada appealed these rulings: (1) final judgment; (2) granting class certification (and later amending it); (3) granting summary judgment and permanent injunction; and (4) denying intervention.

Arguing lack of standing, the Plaintiffs filed a motion to dismiss all of Nevada's appeals except the appeal of the order denying intervention. We carried that motion with the case. In September 2019, the Defendants also filed a notice of appeal, then voluntarily dismissed it in December 2019. In January 2020, we stayed further proceedings pending the Supreme Court's

No. 19-10754

decision in *Little Sisters*.  In a July 2020 decision, the Court vacated the injunctions that prevented enforcement of the 2017 Rules, holding that the procedural challenges before it were unmeritorious.  *Little Sisters*, 140 S. Ct. at 2386.

Thereafter, the Plaintiffs renewed their motion in this court to dismiss Nevada's appeal of all orders other than the denial of intervention.  Our decision today resolves that motion and the other issues before us.

## DISCUSSION

The first question is whether the underlying dispute about the 2017 Rules is moot.  The Plaintiffs argue we need not address the effect of mootness because Nevada's appeal fails for a reason that predated mootness.  They contend there never was a case to become moot because Nevada has never had Article III standing to appeal the district court's merits orders.  They argue:  "The case between the plaintiffs and defendants is not moot; that case is *over* — and it ended when the defendants [the Department Secretaries] abandoned their appeal and allowed the district court's judgment to become final and conclusive between the parties."  The Plaintiffs urge us not to disturb the injunctions, while Nevada's aim is to have the injunctions vacated.

Despite the Plaintiffs' recommendation, we will start with the issue of mootness.  To some extent, we suppose, that forecasts our resolution of the issue of whether Nevada should have been allowed to intervene.

I.    *Mootness*

"[M]ootness is a threshold jurisdictional inquiry."  *Louisiana Env't Action Network v. U.S. EPA*, 382 F.3d 575, 580 (5th Cir. 2004).  A case is moot "only when it is impossible for a court to grant any effectual relief

No. 19-10754

whatever to the prevailing party." *Knox v. Service Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotation marks and citation omitted). "A controversy is mooted when there are no longer adverse parties with sufficient legal interests to maintain the litigation." *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999). The court is "obligated to address issues of jurisdiction, including mootness, prior to addressing the merits of an appeal." *Id.* at 714. "Generally, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006). Because *Little Sisters* granted the relief these Plaintiffs sought in the present litigation by vacating the injunctions that required the contraceptive mandate to be enforced against the Plaintiffs, mootness is an obvious issue.

The Plaintiffs filed this suit seeking relief from the Defendants' enforcement of the 2015 Rules against them, enforcement that resulted from the other district courts' nationwide injunctions against the 2017 Rules. *Little Sisters* vacated the district court injunctions against the 2017 Rules, thereby reinstating the rules. *See* 140 S. Ct. at 2386. Because the Plaintiffs through that decision received the relief they sought in this litigation, "it becomes impossible for the court to grant any effectual relief whatever to [the] prevailing party." *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quotation marks omitted) (alteration in original). The Supreme Court has done the work that Plaintiffs wanted the district court in this case to do, and no appeal to us can change that. Article III's case-or-controversy requirement is no longer met.

Nevada argues that the case is not moot because states could succeed in challenging the 2017 Rules as arbitrary and capricious or the new Presidential Administration could change the rules. If either occurred, the district court's injunction would remain, requiring that the Defendants

No. 19-10754

exempt the two classes of plaintiffs from the contraceptive mandate. Nevada's argument that the case is still ripe because the current rules *might* be changed by the executive branch does not support that an injury is "actual or imminent"; rather, it is "conjectural or hypothetical." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation and quotation marks omitted). The Plaintiffs no longer have a cognizable injury. This underlying dispute is moot.

II. *Remedy in light of mootness*

Nevada is a denied intervenor, not a party, yet seeks vacatur. The Plaintiffs acknowledged in oral argument, as they must, that had vacatur been requested by a party, we would have jurisdiction. The Plaintiffs argue that because Nevada has not yet been allowed to intervene and should not be, we lack jurisdiction to vacate because this appeal needs to be dismissed for absence of a proper appellant.

Vacatur of a lower court judgment generally follows when a case becomes moot during an appeal. The Supreme Court stated it was the

> established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss.

*United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). The reason is that vacatur

> clears the path for future religitation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved; none is prejudiced by a decision which in the statutory scheme was only preliminary.

No. 19-10754

*Id.* at 40.

Close to fifty years later, the Supreme Court emphasized that vacatur is not automatic; it is "equitable relief" and must "take account of the public interest." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994). Precedents "are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur." *Id.* (quoting *Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 40 (1993) (Stevens, J., dissenting)). A court must assess "the equities of the individual case" to determine whether vacatur is proper. *Staley v. Harris Cnty.*, 485 F.3d 305, 312 (5th Cir. 2007) (en banc). This consideration centers on (1) "whether the party seeking relief from the judgment below caused the mootness by voluntary action"; and (2) whether public interests support vacatur. *Id.* at 310 (quoting *U.S. Bancorp*, 513 U.S. at 24, 26–27). We will give some background, then give our explanation of what the Supreme Court is telling courts facing such issues.

Our authority to vacate comes from a statute that provides that an appellate court "may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court *lawfully brought before it for review*." 28 U.S.C. § 2106 (emphasis added). The Plaintiffs argue that an appeal by a nonparty is not "lawfully brought," thus precluding authority to vacate.

The Plaintiffs elaborate on the central point with two separate arguments. First, "[t]he district court's judgment and classwide injunction have not been 'lawfully brought before' this [c]ourt, because Nevada lack[ed] Article III standing to appeal those district-court rulings." They present the question about standing as one primarily about Nevada's *injury in fact* from the district court's order. In their view, "Nevada *never* had standing to appeal the district court's judgment — either before or after the Supreme Court's ruling in *Little Sisters*."

No. 19-10754

Second, the Plaintiffs draw a distinction between parties and nonparties seeking vacatur.  In briefing before this court, the Plaintiffs argue that had the Defendants appealed and sought vacatur, this court would have jurisdiction to vacate: "the losing party that appeals an adverse district-court judgment retains standing to seek vacatur on appeal — even after the case has become moot — because he will suffer injury from the preclusive effect below."  Because Nevada was never a party, the Plaintiffs claim we lack jurisdiction to vacate.

We take the two arguments — standing and nonparty status — in reverse order to decide if Nevada has lawfully brought the case here.

A.     *Nevada's nonparty status*

Certainly, had the federal defendants continued with their appeal, we would have authority to vacate.  The difficult issue is whether Nevada "lawfully brought" this appeal to us.  Nevada was not a party to this lawsuit because the district court denied intervention, but Nevada argues that denial was error.[1]  We need to decide, then, whether intervention should have been allowed.  If so, we then must decide whether Nevada has any injury that allows it to appeal to seek vacatur.

i.     *Jurisdiction to decide whether Nevada should have been allowed as an intervenor*

We may examine the merits of the denial of intervention to determine our jurisdiction to vacate the district court injunction.  The D.C. Circuit has described a similar situation where the sole named plaintiff in a putative class action petitioned the court for interlocutory review of the district court's denial of class certification.  *In re Brewer*, 863 F.3d 861, 867 (D.C. Cir. 2017).

---

[1] Nevada has standing to appeal the denial of intervention, as the Plaintiffs concede.

No. 19-10754

While that petition was pending, the plaintiff settled his individual claims and stipulated in district court to the dismissal of the claims. *Id.*

At almost the same time, four individuals sought to intervene both in the interlocutory appeal to the D.C. Circuit and in district court. *Id.* Those same individuals later sought to appeal the dismissal of the named plaintiff and the denial of class certification. *Id.* The D.C. Circuit stated that the dismissal deprived the court of "any live claims or adverse parties unless one of the two motions for intervention is granted." *Id.* at 868. Intervention could not be granted, the court held, unless "this court or the district court [has] jurisdiction over the case, notwithstanding the apparent absence of either live claims or adverse parties at the moment." *Id.*

First, the court noted the circularity problem created by the situation: "Intervention can overcome the apparent jurisdictional problem created by the stipulated dismissal, but a court may grant intervention only if it has jurisdiction to do so." *Id.* In answering the jurisdiction question, that court said: "[W]e have jurisdiction to determine our own jurisdiction, *United States v. Ruiz*, 536 U.S. 622, 628 (2002), and we conclude we have jurisdiction to hear the motion for intervention." *Id.*

The court next considered the effect of a stipulated dismissal on a federal court's jurisdiction to hear a post-dismissal motion for intervention. *Id.* at 868. The court held "that mootness, albeit accelerated by the immediacy of a stipulated dismissal, is what gives a dismissal pursuant to Rule 41(a)(1)(A)(ii) its jurisdictional effect. And *if a motion to intervene can survive a case becoming otherwise moot*, then so too can a motion to intervene survive a stipulated dismissal." *Id.* at 870 (emphasis added). It therefore held that it had jurisdiction to hear the motion to intervene, notwithstanding the dismissal of the named plaintiff's claims. *Id.*

No. 19-10754

Although the general rule is that intervention in a case that does not exist "is a legal impossibility," several circuits have held that dismissal of the underlying action does not moot an appeal of the denial of a motion to intervene. *See CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 474 (4th Cir. 2015) (quotation marks omitted) (explaining that the Third, Tenth, and Eleventh Circuits allow the appeal of a motion denying intervention to continue after dismissal, the Second Circuit does not, and the Ninth and D.C. Circuits have divergent precedents).

We have held that intervention can be permitted even after dismissal of the case. *Ford v. City of Huntsville*, 242 F.3d 235, 239–41 (5th Cir. 2001). A court can allow "intervention as of right in a jurisdictionally and procedurally proper suit that has been dismissed voluntarily," even when nothing is left before the district court. *Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 513 n.5 (5th Cir. 2016); *see also Odle v. Flores*, 899 F.3d 342 (5th Cir. 2017) (per curiam).

The rationale for allowing an appeal is that although final judgment was entered, "the intervention controversy is still alive because, if it were concluded on appeal that the district court had erred in denying the intervention motion, and that the applicant was indeed entitled to intervene in the litigation, then the applicant would have standing to appeal the district court's judgment." *DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1037 (9th Cir. 2006) (quoting *Canatella v. California*, 404 F.3d 1106, 1109 n.1 (9th Cir. 2005)). That is the situation here: a would-be intervenor seeks party status to appeal and request vacatur.

The Supreme Court has compared a motion to intervene after final judgment for the purpose of appealing an earlier denial of class certification to other post-judgment motions to intervene for the purpose of appeals. *United Airlines v. McDonald*, 432 U.S. 385, 395 n.16 (1977) (citing other cases

No. 19-10754

allowing post-judgment intervention for appeal). That also is analogous to what Nevada seeks here.

We recognize that various opinions allowing post-judgment intervention differ from our case in that, as one court put it, "[i]ntervention can overcome the apparent [mootness] problem." *In re Brewer*, 863 F.3d at 868. This case will remain moot even if we allow intervention. We conclude, though, that even though mootness would remain, there is some life to the case because of the relief the parties are contesting, namely, vacatur. Thus the "intervention controversy is still alive because, if it were concluded on appeal that the district court had erred in denying the intervention motion . . . then the applicant would have standing to" seek vacatur of the district court order. *See DBSI/TRI IV Ltd. P'ship*, 465 F.3d at 1037.

ii.    *Sufficiency of interest to allow Nevada's intervention*

We next analyze whether the denial of intervention by the district court was error, which, if corrected, allows Nevada to become a party and seek vacatur of the district court's injunction.[2] The four requirements for intervention as of right are these:

> (1) the application . . . must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the

---

[2] Rule 24(c) provides: "A motion to intervene . . . must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Plaintiffs contend Nevada's failure to include such pleading was fatal to its motion to intervene. The district court declined to preclude Nevada's intervention on such grounds, noting the circuit split around the approach to enforcement of Rule 24(c), with a majority favoring a permissive interpretation of the rule. *See International Marine Towing Inc. v. S. Leasing Partners, Ltd.*, 722 F.2d 126, 129 (5th Cir. 1983) ("In view of our lenience in the past and the fact that the district court's act might be considered equivalent to authorizing intervention, we will not dismiss for failure to comply with Rule 24(c)."). We follow a permissive approach here.

No. 19-10754

applicant's interest must be inadequately represented by the
existing parties to the suit.

*Wal–Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 565
(5th Cir. 2016) (alteration in original) (quoting *Texas v. United States*, 805
F.3d 653, 657 (5th Cir. 2015.

The district court concluded that Nevada established all of Rule
24(a)'s requirements except that it failed to show it had "an interest relating
to the property or transaction which is the subject of the action." *Id.* That is
the only requirement we need to consider now.

To meet this requirement, the "applicant must have a 'direct,
substantial, legally protectable interest in the proceedings.'" *Edwards v. City
of Houston*, 78 F.3d 983, 1004 (5th Cir. 1996) (quoting *NOPSI v. United Gas
Pipe Line Co.*, 732 F.2d 452, 463 (5th. Cir. 1984)). We have observed that the
preceding quotation is a "'gloss on the rule' [that] may not 'provide any
more guidance than does the bare term "interest" used in Rule 24 itself.'"
*Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) (quoting 7C
CHARLES ALAN WRIGHT ET. AL., FEDERAL PRACTICE AND
PROCEDURE § 1908.1 (3d ed. 2007)). What is important is "whether the
intervenor has a stake in the matter that goes beyond a generalized preference
that the case come out a certain way," as when the party "seeks to intervene
solely for ideological, economic, or precedential reasons." *Id.* This focus on
the party's interest is "primarily a practical guide to disposing of lawsuits by
involving as many apparently concerned persons as is compatible with
efficiency and due process." *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir.
1994) (quotation marks and citation omitted).

An interest is insufficiently direct when it requires vindication in a
separate legal action or the intervenor is too removed from the dispute. *Wal–
Mart*, 834 F.3d at 568. A "legally protectable" right is not identical to a

No. 19-10754

"legally enforceable" right, such that "an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor . . . would not have standing to pursue her own claim." *Texas*, 805 F.3d at 659. The intervenor must itself possess the right it seeks to assert in the action. *NOPSI*, 732 F.2d at 466.

The First, Third, and Ninth Circuits held that states had standing to challenge the 2017 Rules. *Massachusetts v. U.S. Dep't of HHS*, 923 F.3d 209, 212, 227–28 (1st Cir. 2019); *Pennsylvania v. President United States*, 930 F.3d 543, 561–65 (3d Cir. 2019); *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018). In these cases, the states established standing because they demonstrated with reasonable probability that the 2017 Rules would cause the state financial injury through strain on its healthcare programs. *Massachusetts*, 923 F.3d at 226–27; *Pennsylvania*, 930 F.3d at 564; *Azar*, 911 F.3d at 573. For example, in *Azar*, the states submitted declarations and analyses projecting anticipated costs of women losing coverage, and while the states did not identify a specific woman who would turn to state programs after losing coverage, the predicted costs were enough to show it was reasonably probable the 2017 Rules would cause economic harm to the states. *Azar*, 911 F.3d at 572–73. The states' interests in challenging the 2017 Rules were established similarly in *Massachusetts* and *Pennsylvania*. *See Massachusetts*, 923 F.3d at 219, 223–25 (establishing financial injury through regulatory analysis and declarations demonstrating anticipated lost coverage); *Pennsylvania*, 930 F.3d at 561–63 (establishing financial injury through regulatory analysis demonstrating anticipated lost coverage).

Nevada argues that its interest in this suit meets the Rule 24(a)(2) requirements. It says it has a legally protectable interest based on the financial strain caused by an increase in women relying on its family planning programs, but it distinguishes this interest from "a mere economic interest not directly related [to] this litigation." Instead, it explains it also has an

No. 19-10754

interest "in the provision of contraception care to preserve resulting public health gains and to conserve financial resources that were previously expended attempting to address unplanned pregnancies."

For support of that interest, Nevada attached two declarations to its motion for intervention. In one, Beth Handler, Deputy Administrator of Community Health Division of Public and Behavioral Health for the Nevada DHHS, stated that 379,000 Nevada women of child-bearing age "receive private insurance coverage and could be affected by Plaintiffs' proposed class action relief." Based on the national numbers and estimates of which employers would choose the exemption, she estimated that "between 600 and 1200 Nevada women would be harmed" by the injunction. *See* 83 Fed. Reg. 57,578, 57580. She also believed that in 2014, before the contraceptive mandate, 194,000 women in Nevada were in need of publicly funded family planning, but Nevada was able to meet only 10% of the need. Those numbers, she believed, would increase without the 2015 Rules. Also, in 2010 before the contraceptive mandate, Nevada saw 29,000 unintended pregnancies. She identified a 35% decrease in abortions for women ages 15–19 and a 10% decrease for women ages 20–24 from 2012–2017.

Kathryn Host, Acting Vice President for Domestic Research of the Guttmacher Institute, provided a similar declaration in which she explained the impact of the contraceptive mandate more generally, and the benefits that she believed flowed from it.

Lastly, Nevada relies on its "quasi-sovereign" interests at issue, which "consist of a set of interests that the State has in the well-being of its populace." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 602 (1982). "[I]f the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them." *Id.* at 603–04 (quoting *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)).

No. 19-10754

The Plaintiffs describe Nevada's interests as (1) preservation of gained public-health benefits and (2) conserving its financial resources that it previously spent on addressing unplanned pregnancies. The Plaintiffs find these interests inadequate for several reasons.

First, the Plaintiffs argue Nevada's interest in the outcome of the proceedings is not "direct" because it depends on speculation about independent choices made by other parties and even Nevada itself. The Plaintiffs argue that any injury to Nevada is too attenuated from the outcome of the litigation here.

Second, the Plaintiffs dispute the substantiality of the interest that Nevada claims to have demonstrated. Not only do the Plaintiffs take issue with Nevada's "600 to 1200" figure of women who will be harmed, but they contend that Nevada has not sufficiently described the harm. Further, the Plaintiffs argue that the number of women who work for objecting employers is not the relevant number for calculating Nevada's financial interest because it fails to account for alternatives such as who will obtain contraceptives from other sources, or who will actually become unintentionally pregnant, or who will choose not to abort. Moreover, because the 2017 Rules, which track the district court's injunction here, are currently in effect, they argue that Nevada has no interest in the outcome of the litigation. Finally, the Plaintiffs reject that Nevada's interest is "legally protectable" because no law protects a state from an increase in expenditures in social-welfare programs. How much Nevada expends on public health and welfare programs will be completely within Nevada's control.

We evaluate the arguments. The "property or transaction that is the subject of the action" is the contraceptive mandate. FED. R. CIV. P. 24(a)(2). The question is whether Nevada has any interest relating to that mandate. *See Texas*, 805 F.3d at 657. We conclude that Nevada's interest

No. 19-10754

"goes beyond a generalized preference that the case come out a certain way." *Id.* Through the affidavits of Handler and Host, Nevada has established a financial interest in federally mandated contraceptive provision so its state fisc does not have to fill the void if exceptions are carved out of the mandate. This holding accords with the holdings of our sister circuits in *Azar*, *Pennsylvania*, and *Massachusetts*, which found standing on similar facts. Nevada also argues it has a quasi-sovereign interest, but as in *Azar, Pennsylvania*, and *Massachusetts*, the panel need not reach this argument because its fiscal injury alone is sufficiently direct to allow it to intervene. *See Azar*, 911 F.3d at 570; *Pennsylvania*, 930 F.3d at 561–62; *Massachusetts*, 923 F.3d at 227–28. Further, Nevada's interest is heightened here because the Defendants have abandoned any defense of the contraceptive mandate. In light of the liberal construction in favor of intervention, *Wal–Mart*, 834 F.3d at 565, the district court erred by holding Nevada's interest was insufficient to establish intervention as of right as an intervenor–defendant.

Nevada should have been granted intervention as of right.

### B. *Nevada's standing to appeal the district court's injunction*

Even if Nevada satisfies the requirements to intervene in the district court, Nevada still must show it has standing to appeal. The Plaintiffs argue Nevada lacks standing to appeal because "it failed to introduce evidence that it will suffer injury from this classwide relief."

Standing to appeal requires injury from the judgment of the lower court. *Texas v. United States*, 945 F.3d 355, 374 (5th Cir. 2019), *as revised* (Jan. 9, 2020), *rev'd on other grounds, California v. Texas*, 141 S. Ct. 2104 (2021). Though related, the intervention question is not dispositive of the standing-to-appeal question; rather, an intervenor must still demonstrate an injury from the district court's judgment to establish appellate standing. *Id.* at 376. Standing includes injury in fact, a causal connection, and

No. 19-10754

redressability. *Lujan*, 504 U.S. at 560. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (quotation marks and citations omitted).

Appellate standing is measured at the time of filing the notice of appeal, and mootness refers to standing that does not persist throughout a case. *Center for Individual Freedom*, 449 U.S. at 661. Moreover, in all *Munsingwear* situations, the underlying case is moot, so the court cannot redress the injury that initially led to the suit or the appeal. It can redress only the *preclusive-effect injury*, but that is sufficient for standing to vacate or there would never be *Munsingwear* vacatur.[3] Similarly, we refused in an earlier case to dismiss for lack of standing after a case became moot because dismissing the appeal on that basis "would lead to the problem at the heart of the *Munsingwear* doctrine — that an order may become unappealable due to no fault of the losing party, thus denying review of a possibly erroneous decision." *Goldin*, 166 F.3d at 720.

Nevada suffers the preclusive effect of the district-court order with equal force as a party to the lawsuit because of the nationwide scope of the injunction and the resulting inability to relitigate the issue of whether the 2017 Rules violate RFRA. This is sufficient to establish appellate standing: "a party may be aggrieved by a district court decision that adversely affects its legal rights or position vis-à-vis other parties in the case or other potential litigants." *Texas*, 945 F.3d at 377 (quotation marks omitted). The district

---

[3] Though a preclusion injury is sufficient, it may not be necessary. *See Alfa Int'l Seafood, Inc. v. Ross*, 320 F. Supp. 3d 184, 188 (D.D.C. 2018) ("Plaintiffs, however, cite no authority for the proposition that, to establish standing, a party or putative intervenor seeking vacatur must show that allowing the adverse decision to remain will have an 'adverse precedential effect. . . . [Such requirement] would make little sense.").

No. 19-10754

court held that Nevada suffered such injury, and that the nationwide injunction re-implementing the 2017 Rules is otherwise unappealable.

Moreover, Nevada's preclusive-effect injury would be redressed by a favorable court ruling that vacated the injunctions. The *Munsingwear* doctrine is a remedy for the preclusive effect of an unappealable district-court judgment, making the preclusive injury sufficient for jurisdiction to vacate. *U.S. Bancorp*, 513 U.S. at 22. Vacatur is also proper under *U.S. Bancorp*'s equitable considerations. *U.S. Bancorp* requires parties to demonstrate both that they did not cause the suit to become moot and that public interests favor vacatur. *Staley*, 485 F.3d at 310 (citing *U.S. Bancorp*, 513 U.S. at 26). Here, both considerations are met — Nevada did not cause the case to become moot; it was moot after the ruling in *Little Sisters*, and vacatur serves public interests in that it vacates a permanent injunction that Nevada never had proper opportunity to litigate the merits of before the district court. Regardless, the Plaintiffs conceded Nevada was entitled to vacatur at oral argument. Vacatur is therefore appropriate in this case.

\*    \*    \*

The judgment below is VACATED. We REMAND to the district court with instructions to dismiss as moot.